**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK**

JAMES DONALDSON, PEGGY
DONALDSON, INDIVIDUALLY AND AS
THE PERSONAL REPRESENTATIVE OF
THE ESTATE OF ADRIAN J. BUTLER,
ELDRIDGE BUTLER, WALTER
TOLLEFSON, INDIVIDUALLY AND AS
THE PERSONAL REPRESENTATIVE OF
THE ESTATE OF JOHN O. TOLLEFSON,
MARY STEINMAN, JESSICA
MECKLENBURG, KATHRYN MILLER,
RANDALL WENDLING,
INDIVIDUALLY AND AS THE
PERSONAL REPRESENTATIVE OF THE
ESTATE OF MICHAEL J. WENDLING,
CARRIE WENDLING, DIANE
PENNINGTON, INDIVIDUALLY AND
AS THE PERSONAL REPRESENTATIVE
OF THE ESTATE OF HOWARD ALLEN,
D.A., A MINOR, BRYAN ANDERSON,
JANET WASWO, JAMES WASWO,
ROBERT ANDERSON, BRIANA
WASWO, MELISSA KAY CUKA,
INDIVIDUALLY AND AS THE
PERSONAL REPRESENTATIVE OF THE
ESTATE OF DANIEL CUKA, ABIGAIL
ROSE CUKA, A.M.C., A MINOR, KAY
SCHILD, INDIVIDUALLY AND AS THE
PERSONAL REPRESENTATIVE OF THE
ESTATE OF RICHARD SCHILD, KE. S.,
A MINOR, KO. S., A MINOR, COLLEEN
SCHILD, BRUCE SCHILD, BROOKS
SCHILD, MIRTHA PONCE,
INDIVIDUALLY AND AS THE
PERSONAL REPRESENTATIVE OF THE
ESTATE OF ROLAND CALDERON,
A.R.C., A MINOR, A.J.C., A MINOR,
ROSA MILAGRO, SAUL RAUDA, YENY
RAUDA, JASMYN RAUDA, EVELYN
RAUDA, WENDY GREEN,
INDIVIDUALLY AND AS THE
PERSONAL REPRESENTATIVE OF THE
ESTATE OF IAN WEIKEL, J.T.W., A

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

CASE NO.: _____

**ORIGINAL COMPLAINT**
**JURY TRIAL DEMANDED**

1

MINOR, CHAD WEIKEL, TAMMY )
RICHARD, INDIVIDUALLY AND AS )
THE PERSONAL REPRESENTATIVE OF )
THE ESTATE OF BRANDON TEETERS, )
GLENN RICHARD, HEATHER )
RICHARD, LANITA HERLEM, )
INDIVIDUALLY AND AS THE )
PERSONAL REPRESENTATIVE OF THE )
ESTATE OF BRYANT HERLEM, )
YARISSA TORRES, INDIVIDUALLY )
AND AS THE PERSONAL )
REPRESENTATIVE OF THE ESTATE OF )
TEODORO TORRES, VELIA F. MESA, )
INDIVIDUALLY AND AS THE )
PERSONAL REPRESENTATIVE OF THE )
ESTATE OF RUDY MESA, VELIA A. )
MESA, LUCY RIGBY, LUIS AGUILAR, )
MANUEL AGUILAR, NICHOLAS )
PAUPORE, MARIA PAUPORE, M.P., A )
MINOR, CODY PAUPORE, SHARON )
OSBORNE, THOMAS PAUPORE, )
LESLIE PAUPORE BUENO, JOE )
PAUPORE, BRIAN SAARISTO, CHERYL )
SAARISTO, L.M.S., A MINOR, B.D.S., )
JR., A MINOR, SHIRLEY ANN )
SAARISTO, BRENDA ANGELL, )
BARBARA LIIMATAINEN, LONNIE )
FORD, INDIVIDUALLY AND AS THE )
PERSONAL REPRESENTATIVE OF THE )
ESTATE OF JOSHUA FORD, LINDA )
MATTISON-FORD, JESSICA MATSON, )
SHAWN FORD, COREY SCHLENKER, )
INDIVIDUALLY AND AS THE )
PERSONAL REPRESENTATIVE OF THE )
ESTATE OF WILLIAM THORNE, )
KAREN THORNE, DOYLE THORNE, )
JOEY ROBINSON, TIMOTHY MERRILL, )
INDIVIDUALLY AND AS THE )
PERSONAL REPRESENTATIVE OF THE )
ESTATE OF JASON MERRILL, WANDA )
SUE MERRILL, ALYSSA MERRILL, )
AMBER PIRANEO, ASHLEA LEWIS, )
JOHN BOTTS, JENNIFER BOTTS, DARA )
BOTTS, JOHN STEPHEN "STEVE" )
BOTTS, ELIZABETH CUNNINGHAM, )
DANIEL PEREZ, INDIVIDUALLY AND )

AS THE PERSONAL REPRESENTATIVE )
OF THE ESTATE OF EMILY J.T. PEREZ, )
VICKI PEREZ, KEVYN PEREZ, BRIAN )
BEEM, ELIZABETH BEEM, DIANE )
BEEM, JOSEPH BEEM, CASSANDRA )
BEEM, KAITLYN BEEM, K.B., A )
MINOR, CYNTHIA COLÓN AND )
JOSEPH BEEM, JR., DIANE TRAYNOR )
SOWINSKI, INDIVIDUALLY AND AS )
THE PERSONAL REPRESENTATIVE OF )
THE ESTATE OF NICHOLAS )
SOWINSKI, JARED SOWINSKI, AUSTIN )
SOWINSKI, BRANDON BYERS, MEGAN )
BYERS, C.B., A MINOR, SAMANTHA )
GAGE, INDIVIDUALLY AND AS THE )
PERSONAL REPRESENTATIVE OF THE )
ESTATE OF JOSEPH GAGE, M.G., A )
MINOR, RANDY GAGE, TAMARA )
GAGE, JULIA ROSA, JENNIFER WHITE, )
INDIVIDUALLY AND AS THE )
PERSONAL REPRESENTATIVE OF THE )
ESTATE OF LUCAS T. WHITE, JULIA )
BROOKS, LYLE BROOKS, MARCUS )
RAMOS, JOSHUA COPE, ERICA COPE, )
L.K.C., A MINOR, LINDA COPE, PHILIP )
COPE, JACOB COPE, JONATHAN COPE, )
GLENN MORRIS, AMY MORRIS , )
INDIVIDUALLY AND AS THE )
PERSONAL REPRESENTATIVE OF THE )
ESTATE OF DANIEL MORRIS, ADAM )
MORRIS, CASSIDY MORRIS, KRISTIE )
PEARSON, INDIVIDUALLY AND AS )
THE PERSONAL REPRESENTATIVE OF )
THE ESTATE OF ANDREW NELSON, )
MARIAH COWARD, DEREK GAGNE, )
FAYE MROCZKOWSKI, AUDREY )
BARBER, INDIVIDUALLY AND AS THE )
PERSONAL REPRESENTATIVE OF THE )
ESTATE OF BRANDON STOUT, )
WILLIAM STOUT, TAMARA STOUT, )
CALLIE MCGEE, STEPHANIE )
BENEFIELD, MICHELLE WAGER, )
MELINDA IGO, ALICIA IGO, ASHLEY )
LEWIS, DEVIN IGO, TRAVIS VENDELA, )
MARIANNE VENDELA, NADIA )
CADAVERO, INDIVIDUALLY AND AS )

THE PERSONAL REPRESENTATIVE OF )
THE ESTATE OF JONATHAN )
CADAVERO, MICHELLE DEARING, )
DAVID CADAVERO, KRISTIA )
MARKARIAN, GINA WRIGHT, JOANNA )
HARRIS, INDIVIDUALLY AND AS THE )
PERSONAL REPRESENTATIVE OF THE )
ESTATE OF BLAKE HARRIS, J.H., A )
MINOR, DEBORAH HARRIS, JOHN )
MAYO, INDIVIDUALLY AND AS THE )
PERSONAL REPRESENTATIVE OF THE )
ESTATE OF BARRY MAYO, KIMBERLY )
YARBROUGH, ANDY MAYO, KATHY )
MOORE, INDIVIDUALLY AND AS THE )
PERSONAL REPRESENTATIVE OF THE )
ESTATE OF RYAN RUSSELL, THOMAS )
MOORE, JR., SAUL MARTINEZ, SARAH )
MARTINEZ, ERIN DRUCTOR, )
INDIVIDUALLY AND AS THE )
PERSONAL REPRESENTATIVE OF THE )
ESTATE OF BLAKE STEPHENS, JAKE )
ALTMAN, NADJA ALTMAN, J.A., A )
MINOR, GLORIA PROSSER, CHARLES )
ALTMAN, MICHAEL ALTMAN, )
TAYLOR BROWN, INDIVIDUALLY )
AND AS THE PERSONAL )
REPRESENTATIVE OF THE ESTATE OF )
SCOTT BROWN, LOUIS DAHLMAN, )
KAY STOCKDALE, LUCAS DAHLMAN, )
AMBER AHRENS, JAMES SCHUMANN, )
INDIVIDUALLY AND AS THE )
PERSONAL REPRESENTATIVE OF THE )
ESTATE OF JASON SCHUMANN, BEN )
SCHUMANN, BRENT ANDERSON, )
KRISTIE NELSON, KAYLA NELSON, )
JERRAL HANCOCK, RACHEL )
LAMBRIGHT, J.H., A MINOR, A.H., A )
MINOR, STACIE TSCHERNY, DIRRICK )
BENJAMIN, SAVANNAH TSCHERNY, )
SAMANTHA HANCOCK, BRENDA )
RICHARDS, INDIVIDUALLY AND AS )
THE PERSONAL REPRESENTATIVE OF )
THE ESTATE OF SHAWN GAJDOS, )
JULIE PAYNE, INDIVIDUALLY AND AS )
THE PERSONAL REPRESENTATIVE OF )
THE ESTATE OF CAMERON PAYNE, )

AL.E.P., A MINOR, K.P., A MINOR,　　）
JULIE MONTANO, INDIVIDUALLY　　）
AND AS THE PERSONAL　　）
REPRESENTATIVE OF THE ESTATE OF　　）
JOSHUA MODGLING, KEITH　　）
MODGLING, CHRISTOPHER　　）
MODGLING, KELLILYNN STUART,　　）
MICHELLE MODGLING, KENNETH　　）
SCHAFFER, CONIETHA ZAPFE, C.Z., A　　）
MINOR, S.Z., A MINOR, A.Z., A MINOR,　　）
JOSEPH ZAPFE, EDWARD ZAPFE,　　）
CHELSEA ADAIR, INDIVIDUALLY　　）
AND AS THE PERSONAL　　）
REPRESENTATIVE OF THE ESTATE OF　　）
JAMES ADAIR, JOHN TAKAI, MAE　　）
TAKAI, JONAMAE TAKAI, NIANA　　）
TAKAI, I.T., A MINOR, K.T., A MINOR,　　）
PATRICIA CRUZ, JUAN TAKAI,　　）
JOLENE TAKAI, JERMAINE TAKAI,　　）
CONSTANCE AHEARN, JAMES　　）
AHEARN, SR., KEVIN AHEARN, BETTY　　）
JEAN KLINE, JOHN KLINE, JR.,　　）
PAMELA MCKEAN, AS THE　　）
PERSONAL REPRESENTATIVE OF THE　　）
ESTATE OF KEITH KLINE, ANTHONY　　）
LILL, INDIVIDUALLY AND AS THE　　）
PERSONAL REPRESENTATIVE OF THE　　）
ESTATE OF ERIC LILL, SKYE OTERO,　　）
CHARMAINE LILL, KORTNE LILL　　）
JONES, M.L., A MINOR, C.L., A MINOR,　　）
SIMONA FRANCIS , INDIVIDUALLY　　）
AND AS THE PERSONAL　　）
REPRESENTATIVE OF THE ESTATE OF　　）
LE RON A. WILSON, DEBBIE OTTE,　　）
CHRISTOPHER KUBE, DAVID KUBE,　　）
JONATHAN KUBE, JESSICA KUBE,　　）
JASON KUBE, JENNIFER KUBE, ADAM　　）
EGLI, DANIELLE EGLI, K.E., A MINOR,　　）
B.E., A MINOR, LAURA GONZALEZ,　　）
INDIVIDUALLY AND AS THE　　）
PERSONAL REPRESENTATIVE OF THE　　）
ESTATE OF ZACHARIAH GONZALEZ,　　）
BENEDICT GONZALEZ, MARGARET　　）
WAKEMAN, INDIVIDUALLY AND AS　　）
THE PERSONAL REPRESENTATIVE OF　　）
THE ESTATE OF DUSTIN WAKEMAN,　　）

DAVID WAKEMAN, WILLIAM "ZACK"  )
WAKEMAN, SHERRI COTTRELL, E.C.,  )
A MINOR, JAMES COTTRELL,  )
BRANDY COTTRELL, MEGAN  )
COTTRELL, DOESHIE WATERS,  )
NORRIS WATERS, SR., LAURA  )
RUSSELL KENNEDY, INDIVIDUALLY  )
AND AS THE PERSONAL  )
REPRESENTATIVE OF THE ESTATE OF  )
JONATHAN EDDS, BARRY EDDS,  )
JULIA EDDS, JOEL EDDS, ANDREW  )
TONG, LEESHA CROOKSTON,  )
INDIVIDUALLY AND AS THE  )
PERSONAL REPRESENTATIVE OF THE  )
ESTATE OF DUNCAN CROOKSTON,  )
STEPHANIE MARCIANTE, LUIGI  )
MARCIANTE, JR., L.M., A MINOR,  )
MARIA MARCIANTE, LUIGI  )
MARCIANTE, ENZA MARCIANTE  )
BALESTRIERI, STEPHANIE  )
MARCIANTE, LYDIA LANTRIP, BILLIE  )
WELLS, JR., DAVID "BLAKE"  )
LANTRIP, J.W., A MINOR, BRYAN  )
WAGNER, JEANETTE KNAPP,  )
INDIVIDUALLY AND AS THE  )
PERSONAL REPRESENTATIVE OF THE  )
ESTATE OF DAVID A. KNAPP,  )
NORMAN FORBES, IV, JENNIFER  )
RUBIO, N.H., A MINOR, DORIS  )
BENNETT, DEMPSEY BENNETT,  )
INDIVIDUALLY AND AS THE  )
PERSONAL REPRESENTATIVE OF THE  )
ESTATE OF DURRELL BENNETT,  )
DARNELL BENNETT, JULIE  )
ROSENBERG, INDIVIDUALLY AND AS  )
THE PERSONAL REPRESENTATIVE OF  )
THE ESTATE OF MARK ROSENBERG,  )
J.R., A MINOR, M.R., A MINOR,  )
MONIQUE SHANTEL GREEN  )
RICHARD, INDIVIDUALLY AND AS  )
THE PERSONAL REPRESENTATIVE OF  )
THE ESTATE OF JOSEPH RICHARD, III,  )
ELAINE (LOIS) RICHARD, JOSEPH  )
RICHARD, JR., CARMEN RICHARD  )
BILLEDEAUX, JON MARIE PEARSON,  )
INDIVIDUALLY AND AS THE  )

PERSONAL REPRESENTATIVE OF THE )
ESTATE OF ANDREW R. PEARSON, )
TIA MIXON, T.R.M., A MINOR, )
MELINDA MIXON, WALTER MIXON, )
INDIVIDUALLY AND AS THE )
PERSONAL REPRESENTATIVE OF THE )
ESTATE OF JUSTIN MIXON, KENNETH )
MIXON, KIMBERLY SPILLYARDS, )
LISA THOMPSON, INDIVIDUALLY )
AND AS THE PERSONAL )
REPRESENTATIVE OF THE ESTATE OF )
JOSHUA PLOCICA, LOWELL "KEITH" )
THOMPSON, BRENNA CORBIN, JOHN )
BLICKENSTAFF, MISTY )
BLICKENSTAFF, M.B., A MINOR, C.B., )
A MINOR, PAM JONES, JARED )
BLICKENSTAFF, ADRIANNE )
BLICKENSTAFF, TRISTA CARTER, )
GARY L. HENRY, MELANIE )
ATZMANN, S.U., A MINOR, )
FRANCISCA MARMOL, JOSE ULLOA, )
RUBERTERNA ULLOA, STEPHANIE )
MARMOL, INDIVIDUALLY AND AS )
THE PERSONAL REPRESENTATIVE OF )
THE ESTATE OF JOSE E. ULLOA, )
LORAMAY "LORA" DIAMOND, )
INDIVIDUALLY AND AS THE )
PERSONAL REPRESENTATIVE OF THE )
ESTATE OF SEAN DIAMOND, TAYLOR )
M. DIAMOND, MADISON J. DIAMOND, )
S.R.D., A MINOR, A.N.D., A MINOR, )
SALLY DIAMOND WILEY, JAMES )
"MICHAEL" WILEY, JASON DIAMOND, )
MICHAEL DIAMOND, CHERYL )
ANAYA, INDIVIDUALLY AND AS THE )
PERSONAL REPRESENTATIVE OF THE )
ESTATE OF MICHAEL ANAYA, TRISTA )
MOFFETT, CARMELO ANAYA, JR., )
CHARLENE WILCOX, INDIVIDUALLY )
AND AS THE PERSONAL )
REPRESENTATIVE OF THE ESTATE OF )
CARLOS WILCOX, BIANCA WILCOX, )
ONA WILCOX, CHARLES WILCOX III, )
)
      Plaintiffs, )
    v. )

HSBC HOLDINGS PLC, HSBC BANK )
PLC, HSBC BANK MIDDLE EAST )
LIMITED, HSBC BANK USA, N.A., )
BARCLAYS BANK PLC, STANDARD )
CHARTERED BANK, ROYAL BANK OF )
SCOTLAND, N.V., CREDIT SUISSE AG, )
BANK SADERAT PLC, )
COMMERZBANK AG, DEUTSCHE )
BANK AG, AND JOHN DOES 1-50 )
)
       Defendants. )
)
------------------------------------------------------ )

## TABLE OF CONTENTS

I.      NATURE OF THE ACTION ................................................................................ 18

II.     JURISDICTION AND VENUE ......................................................................... 36

III.    THE DEFENDANTS ......................................................................................... 39

        A.   THE HSBC DEFENDANTS ..................................................................... 39

        B.   DEFENDANT BARCLAYS BANK PLC ................................................. 40

        C.   DEFENDANT SCB .................................................................................... 41

        D.   DEFENDANT ROYAL BANK OF SCOTLAND N.V. ........................... 42

        E.   DEFENDANT CREDIT SUISSE AG ....................................................... 42

        F.   DEFENDANT BANK SADERAT PLC ..................................................... 43

        G.   DEFENDANT COMMERZBANK AG ...................................................... 44

        H.   DEFENDANT DEUTSCHE BANK AG .................................................... 44

IV.     FACTUAL ALLEGATIONS ............................................................................ 45

        A.   IRAN'S LONG HISTORY OF SUPPORTING AND FINANCING
             TERRORISM ............................................................................................. 45

        B.   U.S. SANCTIONS AND IRAN'S RELIANCE ON U.S. DOLLARS .............. 49

        C.   IRAN CONTINUALLY EVADED U.S., EUROPEAN UNION AND
             UNITED NATIONS SANCTIONS .......................................................... 51

        D.   THE EURODOLLAR MARKET – IRAN'S MONEY LAUNDERING
             AND ILLICIT EXPORT NEXUS WITH DEFENDANT BANKS .................. 54

             1. The Conspiracy's Shared Goals ........................................................ 54

             2. Eurodollar Market Operations .......................................................... 55

        E.   THE IRANIAN U-TURN EXEMPTION AND ITS REVOCATION ............... 56

        F.   LETTERS OF CREDIT – AN ALTERNATIVE METHOD OF
             UNDERMINING THE IRANIAN SANCTIONS  PROGRAM ...................... 62

             1. Terminology ...................................................................................... 62

             2. The U.S. Trade Embargo – United States Munitions List (USML)
                and Commerce Control List (CCL) .................................................. 64

        G.   IRAN'S ILLEGAL ARMS  SHIPMENTS THROUGH ISLAMIC
             REPUBLIC OF IRAN SHIPPING LINES (IRISL) ............................... 65

        H.   IRAN'S AGENTS, HEZBOLLAH AND THE IRGC, FOMENT
             TERRORISM IN IRAQ ............................................................................ 69

I.     IRAN FUNDED THE DESIGN AND PRODUCTION OF EXPLOSIVELY FORMED PENETRATORS ("EFPS") USED BY SPECIAL GROUPS TO KILL OR MAIM COALITION FORCES, INCLUDING THE PLAINTIFFS ...................................................... 75

J.     IRAN SUPPORTED HEZBOLLAH-CONTROLLED SPECIAL GROUPS IN IRAQ THAT COORDINATED WITH THE IRGC ................... 81

    1.   JAYSH AL MAHDI .................................................................... 82

    2.   KATA'IB HEZBOLLAH ........................................................... 89

    3.   ASA'IB AHL AL-HAQ.............................................................. 92

K.    ALL OF THE ATTACKS AT ISSUE IN THIS COMPLAINT WERE ACTS OF INTERNATIONAL TERRORISM ..................................... 93

V.    GENERAL ALLEGATIONS AGAINST DEFENDANTS ......................................... 94

VI.   OVERVIEW OF THE CONSPIRACY ...................................................... 102

A.    AGREEMENT AND KNOWLEDGE................................................. 102

B.    ACTS AND EFFECTS ...................................................................... 106

C.    BANK SADERAT PLC's AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY ...................................................... 110

D.    THE CENTRAL BANK OF IRAN'S AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY .................................... 114

E.    BANK MELLI IRAN AND MELLI BANK PLC'S AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY ......................................... 118

F.    BANK MELLAT'S AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY ..................................................................... 124

G.    BANK SEPAH'S AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY ..................................................................... 126

H.    JOHN DOE DEFENDANTS' 1-50 AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY .................................... 128

I.     THE HSBC DEFENDANTS' AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY .................................... 129

    1.   HSBC-EUROPE'S 2001 "BANK MELLI PROPOSAL" ....................... 146

    2.   DEFENDANT HSBC-US'S AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY IN VIOLATION OF 18 U.S.C. § 2332d.................................................................. 152

J.    DEFENDANT BARCLAYS' AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY .................................... 161

K.    DEFENDANT SCB'S AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY ..................................................................... 169

1. SCB Conspired to Conceal Iran's Financial Activities and Transactions From Detection, Scrutiny, and Monitoring By U.S. Regulators, Law Enforcement, and/or Depository Institutions. .............. 169

**2.** SCB Facilitated Transactions On Behalf of MODAFL, Mahan Air and Other Instrumentalities of Iranian State-Sponsored Terror (Including a Hezbollah Affiliated Entity) in Furtherance of Numerous Violations of the U.S.  Trade Embargo, Thereby Substantially Contributing to the Plaintiffs' Injuries. ............................. 179

    a. SCB Knowingly Provided Illegal Financing to Mahan Air............... 180

    b. SCB Knowingly Provided Illegal Financing to MODAFL Companies: AIO, IACI, IHRSC and HESA. ...................................... 185

        i. SCB Trade-Finance Transactions with MODAFL's Aerospace Industries Organization (AIO) .................................... 186

        ii. SCB Trade-Finance Transactions with MODAFL's [Iran] Aviation Industries Organization (IAIO) .................................... 187

            (A) SCB's Trade-Finance Transactions with MODAFL-IAIO Front Company Downtown Trading Ltd. .................. 187

            (B) SCB's Trade-Finance Transactions with MODAFL-IAIO Front Company Mac Aviation .................................... 189

            (C) SCB's Trade-Finance Transactions with MODAFL-IAIO Front Company Monarch Aviation (Singapore) ......... 193

            (D) SCB's Trade Finance Transactions with MODAFL-IAIO Front Company Jetpower Industrial Ltd (Hong Kong) .................................................................................... 197

    c. SCB's Trade-Finance Transactions Iran Power Development Company ("IPDC"), MAPNA and Zener Electronics Services (an agent of Hezbollah) ...................................................................... 200

    d. SCB's Trade-Finance Transactions with National Iranian Oil Company (NIOC) Subsidiaries .......................................... 202

    e. SCB's Trade-Finance Transactions with Iranian Front Company Khoram Sanat Producing Co. – Iran ................................. 204

3. Regulatory Actions and Criminal Investigations Against SCB, 2012 – Present ......................................................................... 206

L. DEFENDANT ROYAL BANK OF SCOTLAND N.V.'S AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY ......... 215

M. DEFENDANT CREDIT SUISSE'S AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY .................................... 225

N. DEFENDANT COMMERZBANK AG'S  AGREEMENT TO,  AND PARTICIPATION IN, THE CONSPIRACY .................................... 236

O.    DEFENDANT DEUTSCHE BANK AG'S AGREEMENT TO,  AND PARTICIPATION IN, THE CONSPIRACY ...................................................245

P.    DEFENDANTS' AIDING AND ABETTING OF HEZBOLLAH THROUGH DIRECT FUNDING OF HEZBOLLAH'S AGENTS .................250

VII.    PLAINTIFFS ........................................................................................252

ATTACK 1: JULY 14, 2005 - KIRKUK, IRAQ ......................................253

    A.    James Donaldson ......................................................253

ATTACK 2: JULY 27, 2005 – CAMP ASHRAF, IRAQ ........................254

    B.    The Butler Family ......................................................254

    C.    The Tollefson Family ..................................................255

ATTACK 3: SEPTEMBER 26, 2005 - SHU'AIBA, IRAQ ......................256

    D.    The Wendling Family ..................................................256

ATTACK 4: SEPTEMBER 26, 2005 - AL RAHMANIYAH DISTRICT, BAGHDAD, IRAQ ...........................................................................258

    E.    The Allen Family ........................................................258

ATTACK 5: OCTOBER 23, 2005 - RUSAFA DISTRICT, BAGHDAD, IRAQ ...........................................................................................259

    F.    The Anderson Family ..................................................259

ATTACK 6:  DECEMBER 4, 2005 - BAGHDAD, IRAQ ......................261

    G.    The Cuka Family ........................................................261

    H.    The Schild Family ......................................................262

ATTACK 7: APRIL 12, 2006 - MISIAB, IRAQ ......................................264

    I.    The Calderon Family ..................................................264

ATTACK 8: APRIL 18, 2006 - BAGHDAD, IRAQ..................................266

    J.    The Weikel Family ....................................................266

ATTACK 9: APRIL 20, 2006 – SHUHADA AL SYDIA, BAGHDAD, IRAQ........267

    K.    The Teeters Family ....................................................267

ATTACK 10: APRIL 28, 2006 - BAGHDAD, IRAQ...............................269

    L.    The Herlem Family ....................................................269

ATTACK 11: MAY 5, 2006 - BAGHDAD, IRAQ...................................270

    M.    The Torres Family......................................................270

ATTACK 12: MAY 8, 2006 – RUSTAMIYAH BAGHDAD, IRAQ ......271

    N.    The Mesa Family ......................................................271

ATTACK 13: JULY 2, 2006 – KIRKUK, IRAQ ...................................................... 272

    O.    The Paupore Family ................................................................... 272

    P.    The Saaristo Family .................................................................. 275

ATTACK 14: JULY 31, 2006 – AL NUMANIYAH, IRAQ ................................... 277

    Q.    The Ford Family ....................................................................... 277

ATTACK 15: AUGUST 24, 2006 - BAGHDAD, IRAQ ........................................ 278

ATTACK 16: SEPTEMBER 3, 2006 - RUSTAMIYAH BAGHDAD, IRAQ ......... 279

    S.    The Merrill Family .................................................................... 279

ATTACK 17: SEPTEMBER 7, 2006 - SADR CITY, IRAQ ................................... 281

    T.    The Botts Family ...................................................................... 281

ATTACK 18: SEPTEMBER 12, 2006 - AL KIFL, IRAQ ....................................... 283

    U.    The Perez Family ...................................................................... 283

ATTACK 19: OCTOBER 11, 2006 – SADR CITY BAGHDAD, IRAQ ................. 284

    V.    The Beem Family ...................................................................... 284

    W.    The Sowinski Family ................................................................ 286

ATTACK 20: OCTOBER 16, 2006 - SAFWAN, IRAQ .......................................... 287

    X.    The Byers Family ..................................................................... 287

ATTACK 21: NOVEMBER 2, 2006 - BAGHDAD, IRAQ ...................................... 289

    Y.    The Gage Family ...................................................................... 289

ATTACK 22: NOVEMBER 6, 2006 – BAGHDAD, IRAQ ..................................... 290

    Z.    The White Family ..................................................................... 290

ATTACK 23: NOVEMBER 13, 2006 - AL-WAHDA, IRAQ .................................. 292

    AA.    The Cope Family ...................................................................... 292

ATTACK 24: NOVEMBER 25, 2006 - AL JUDIAH, IRAQ ................................... 294

    BB.    The Morris Family .................................................................... 294

ATTACK 25: DECEMBER 25, 2006 – TOBJI, BAGHDAD, IRAQ ........................ 295

    CC.    The Nelson Family .................................................................... 295

    DD.    The Preston Family ................................................................... 296

ATTACK 26: JANUARY 22, 2007 - BAGHDAD, IRAQ ....................................... 297

    EE.    Derek Gagne ............................................................................ 297

    FF.    The Stout Family ...................................................................... 298

    GG.    The Wager Family .................................................................... 300

ATTACK 27: FEBRUARY 7, 2007 - AL DULOIYA, IRAQ ................................... 301

    HH.    The Vendela Family ....................................................................... 301

    II.    The Cadavero Family ...................................................................... 303

ATTACK 29: MARCH 2, 2007 – SAFWAN, IRAQ .................................................. 304

    JJ.    The Young Family ........................................................................... 304

ATTACK 30: MARCH 5, 2007 - BAQUBAH, IRAQ ............................................... 305

    KK.    The Harris Family ........................................................................... 305

    LL.    The Mayo Family ............................................................................ 306

    MM. The Russell Family ........................................................................ 307

ATTACK 31: MAY 8, 2007 - PASMAYA, IRAQ ................................................... 308

    NN.    The Martinez Family ...................................................................... 308

    OO.    The Blake Stephens Estate ............................................................. 309

ATTACK 32: MAY 14, 2007 – AMIL DISTRICT, BAGHDAD, IRAQ ................. 310

    PP.    The Altman Family ......................................................................... 310

ATTACK 33: MAY 18, 2007 - BAGHDAD, IRAQ ................................................ 312

    QQ.    The Brown Family ......................................................................... 312

ATTACK 34: MAY 18, 2007 – NASIRIYAH, IRAQ ............................................. 313

    RR.    The Dahlman Family ...................................................................... 313

    SS.    The Schumann Family .................................................................... 315

ATTACK 35: MAY 29, 2007 – SADR CITY, IRAQ .............................................. 316

    TT.    The Hancock Family ...................................................................... 316

ATTACK 36: JUNE 6, 2007 – BAGHDAD, IRAQ ................................................. 318

    UU.    The Gajdos Family ......................................................................... 318

    VV.    The Payne Family .......................................................................... 319

ATTACK 38: JUNE 19, 2007 – MUHAMMAD SALIH, IRAQ .............................. 320

    WW.    The Modgling Family ..................................................................... 320

    XX.    The Zapfe Family ........................................................................... 322

ATTACK 39: JUNE 29, 2007 - BAGHDAD, IRAQ ............................................... 323

    YY.    The Adair Family ........................................................................... 323

    ZZ.    The Takai Family ........................................................................... 324

ATTACK 40: JULY 5, 2007 - BAGHDAD, IRAQ ................................................. 326

AAA.   The Ahearn Family ................................................... 326

BBB.   The Kline Family .................................................... 327

ATTACK 41: JULY 6, 2007 - BAGHDAD, IRAQ .................................... 328

CCC.   The Lill Family ..................................................... 328

ATTACK 42: JULY 6, 2007 – BAGHDAD, IRAQ .................................... 329

DDD.   The Wilson Family ................................................. 329

ATTACK 43: JULY 14, 2007 - BAGHDAD, IRAQ .................................. 330

EEE.   The Kube Family .................................................... 330

ATTACK 44: JULY 31, 2007 - SADR CITY, BAGHDAD, IRAQ ......................... 332

FFF.   The Egli Family ..................................................... 332

GGG.   The Gonzalez Family .............................................. 333

ATTACK 45: AUGUST 4, 2007   HAWR RAJAB, IRAQ ..................................... 334

HHH.   The Wakeman Family ............................................. 334

ATTACK 46: AUGUST 13, 2007—QAYYARAH, NINEVEH PROVINCE, IRAQ ........................................................................ 335

III.    The Cottrell Family ................................................. 335

ATTACK 47: AUGUST  17, 2007 - BAGHDAD AL JADEEDA, IRAQ ............... 336

JJJ.    The Edds Family .................................................... 336

ATTACK 48: AUGUST 18, 2007—RAHMANIYA, BAGHDAD, IRAQ .............. 337

KKK.   Andrew Tong ...................................................... 337

ATTACK 49: SEPTEMBER 4, 2007 - BAGHDAD AL JADEEDA, IRAQ........... 338

LLL.    The Crookston Family ............................................. 338

ATTACK 50: SEPTEMBER 20, 2007—MUQDADIYAH, IRAQ ......................... 339

MMM. The Marciante Family.............................................. 339

ATTACK 51: NOVEMBER 2, 2007 – HURRIYA, BAGHDAD, IRAQ ................ 341

NNN.   The Wells Family .................................................. 341

ATTACK 52: DECEMBER 17, 2007 – BAGHDAD AL JADEEDA, IRAQ .......... 342

OOO.   The Wagner Family ................................................ 342

ATTACK 53: MARCH 14, 2008 – EAST OF MUSAYIB, IRAQ ......................... 343

PPP.    The Knapp Family .................................................. 343

ATTACK 54: MARCH 17, 2008 - SADR CITY, BAGHDAD, IRAQ .................... 345

QQQ.   Norman Forbes, IV ................................................ 345

ATTACK 55: MARCH 23, 2008 - MALEF, BAGHDAD, IRAQ ............................ 345

    RRR.   The Rubio-Hernandez Family ................................................... 346

ATTACK 56: MARCH 29, 2008 - SADR CITY, BAGHDAD, IRAQ ................... 346

    SSS.    The Bennett Family ............................................................... 346

ATTACK 57: APRIL 8, 2008 – BAGHDAD, IRAQ ......................................... 347

    TTT.   The Rosenberg Family ............................................................ 347

ATTACK 58: APRIL 14, 2008 – BAGHDAD, IRAQ ....................................... 349

    UUU.  The Joseph Richard, III Family ................................................ 349

ATTACK 59: APRIL 30, 2008 – BAGHDAD, IRAQ ....................................... 350

    VVV.  The Pearson Family ................................................................ 350

ATTACK 60: JUNE 1, 2008 – BAGHDAD, IRAQ .......................................... 351

    WWW. The Mixon Family .................................................................. 351

ATTACK 61: JUNE 25, 2008 - BAGHDAD, IRAQ ........................................ 352

    XXX.  The Plocica Family ................................................................. 352

ATTACK 62: AUGUST 4, 2008 - BAGHDAD, IRAQ ..................................... 354

    YYY.  The Blickenstaff Family .......................................................... 354

    ZZZ.  The Henry Family ................................................................... 356

ATTACK 63: AUGUST 9, 2008 – SADR CITY, IRAQ .................................... 357

    AAAA. The Ulloa Family ................................................................... 357

ATTACK 64: FEBRUARY 15, 2009 - AS SALAM, IRAQ ................................. 358

    BBBB. The Diamond Family ............................................................... 358

ATTACK 65: APRIL 12, 2009 - BAYLA, IRAQ ............................................. 360

    CCCC. The Anaya Family .................................................................. 360

ATTACK 66: JULY 16, 2009 – BASRA, IRAQ ............................................. 362

    DDDD. The Wilcox Family ................................................................. 362

VIII.  CLAIMS FOR RELIEF ................................................................. 363

FIRST CLAIM FOR RELIEF  CIVIL LIABILITY UNDER 18 U.S.C. §
2333(a) AGAINST ALL DEFENDANTS FOR VIOLATIONS OF 18 U.S.C.
§ 2339A CONSTITUTING ACTS OF INTERNATIONAL TERRORISM ............. 363

SECOND CLAIM FOR RELIEF  CIVIL LIABILITY UNDER 18 U.S.C. §
2333(a) AGAINST ALL DEFENDANTS FOR VIOLATIONS OF 18 U.S.C.
§ 2339B CONSTITUTING ACTS OF INTERNATIONAL TERRORISM ............. 369

THIRD CLAIM FOR RELIEF  CIVIL LIABILITY AGAINST HSBC BANK USA, N.A. UNDER 18 U.S.C. § 2333(a) FOR VIOLATIONS OF 18 U.S.C. § 2332d CONSTITUTING ACTS OF INTERNATIONAL TERRORISM.................374

FOURTH CLAIM FOR RELIEF  CIVIL LIABILITY UNDER 18 U.S.C. § 2333(a) AGAINST STANDARD CHARTERED BANK, ROYAL BANK OF SCOTLAND N.V. AND COMMERZBANK FOR VIOLATIONS OF 18 USC § 2332d CONSTITUTING ACTS OF INTERNATIONAL TERRORISM.................................................................................378

FIFTH CLAIM FOR RELIEF  CIVIL LIABILITY AGAINST COMMERZBANK AG UNDER 18 U.S.C. § 2333(a) FOR VIOLATIONS OF 18 U.S.C. § 2339A CONSTITUTING ACTS OF INTERNATIONAL TERRORISM.................................................................................381

SIXTH CLAIM FOR RELIEF  CIVIL LIABILITY AGAINST COMMERZBANK AG UNDER 18 U.S.C. § 2333(a) FOR VIOLATIONS OF 18 U.S.C. § 2339B CONSTITUTING ACTS OF INTERNATIONAL TERRORISM.................................................................................383

SEVENTH CLAIM FOR RELIEF  CIVIL LIABILITY AGAINST STANDARD CHARTERED BANK UNDER 18 U.S.C. § 2333(a) FOR VIOLATIONS OF 18 U.S.C. § 2339A CONSTITUTING ACTS OF INTERNATIONAL TERRORISM .............................................................385

EIGHTH CLAIM FOR RELIEF  PRIMARY LIABILITY UNDER 18. U.S.C. §2333(a) AGAINST ALL DEFENDANTS.................................................389

NINTH CLAIM FOR RELIEF SECONDARY LIABILITY UNDER 18. U.S.C. §2333(d)(2) FOR AIDING AND ABETTING A FOREIGN TERRORIST ORGANIZATION  .............................................................390

TENTH CLAIM FOR RELIEF CIVIL LIABILITY FOR CONSPIRACY IN VIOLATION OF 18 U.S.C. § 2333(d)(2) (JASTA)....................................393

ELEVENTH CLAIM FOR RELIEF COLLECTING AND PROVIDING FUNDS FOR THE FINANCING OF TERRORISM IN VIOLATION OF 18 U.S.C. §2339C AND 18 U.S.C. §2333(a) .................................397

PRAYER FOR RELIEF ........................................................................397

PLAINTIFFS DEMAND A JURY TRIAL ON ALL ISSUES ................................398

Plaintiffs, by and through their attorneys, allege the following:

## I.   <u>NATURE OF THE ACTION</u>

1.      This is a wrongful death and personal injury lawsuit authorized pursuant to 18 U.S.C. §§ 2333(a) and (d) of the so-called Anti-Terrorism Act (18 U.S.C. § 2331 *et seq.*) ("ATA") and the Justice Against Sponsors of Terrorism Act (Pub. L. 114-222, Sept. 28, 2016, 130 Stat. 852) ("JASTA").  The lawsuit is brought by American service members and their families against a group of international banks ("Banking Defendants") that engaged in illegal money laundering and other illegal financial transactions on behalf of Lebanese Hezbollah ("Hezbollah"), the Islamic Republic of Iran ("Iran"), and their agents.

2.      The Banking Defendants were criminal partners with Hezbollah and Iran during the time frame of at least 2000 through 2011.  The Banking Defendants criminally funded Hezbollah's fervent pro-Iranian and anti-American terror campaign in post-Saddam Hussein Iraq, both directly through Hezbollah's agents and indirectly through Iran and its intermediaries.  This funding played a crucial role in Hezbollah's planning for and authorizing its various Iraqi-based agents to commit the series of Explosively-Formed Penetrator ("EFP") device[1] and other attacks against Plaintiffs or their family members as they performed peacekeeping activities in Iraq on behalf of the United States Army, the Multi-National Force-Iraq Coalition ("Coalition"), and the United Nations between 2005 and 2011 ("Relevant Time Period").

3.      Hezbollah worked with its historic "mentor" and principal, Iran, including through Iran's elite Iranian Revolutionary Guard Corps ("IRGC") and the IRGC Qods Force ("QF"), to

---

[1] EFPs usually consist of a steel tube, sealed closed on one end, with plastic explosives and a detonator.  A precision-manufactured inverted copper (or steel) liner is then placed on the other end of the tube.  When an explosion is triggered, the copper liner partially melts into liquefied molten metal and is expelled at great force.

conspire, plan, design, prepare for, train for, direct, fund and commit EFP and other attacks against an estimated 1,100 Americans during the Relevant Time Period. The EFPs used in these attacks, including the EFP attacks against the Plaintiffs herein, were designed and manufactured by Iran and Hezbollah using United States Dollars ("USD").

4.      For decades now, Hezbollah, Iran and their terror proxies operating in Iraq have relied on the financial services of the Banking Defendants to sustain their operations and launch terrorist attacks against Americans. Not surprisingly, engaging in a terror campaign that reaches back decades is extremely expensive, requiring access to billions of U.S. dollars ("USD"), including dollar-denominated assets in the Eurodollar market.[2] This access is only made possible as a result of the calculated decision of the Banking Defendants to disregard their anti-terrorism and anti-money laundering obligations—obligations intended to prevent the flow of money and resources to terrorists like Hezbollah.

5.      Since September 11, 2001, and as a result of Western governments' increased pressure against terrorism financing, Hezbollah and its enablers intensified their efforts to access the U.S. financial system and to evade U.S. sanctions and anti-money laundering regulations intended to prevent the funding of terrorism. This access was gained largely through two separate avenues: (1) by working through Iran, which for years has collaborated with Hezbollah in supporting terrorist attacks in Iraq and elsewhere; and (2) by working through various agents,

---

[2] Eurodollar refers to a time deposit denominated in U.S. dollars that is maintained by a bank outside the United States. Payment transactions in the Eurodollar market are not typically settled by the physical transfer of USD-denominated banknotes from one counterparty to another. Instead, Eurodollar transactions are settled electronically in New York through a bank-owned clearinghouse, and then maintained by book entries of credits and debits in the respective counterparties' accounting systems (based on the Society for Worldwide Interbank Financial Telecommunication network ("SWIFT-NET") messages sent between the counterparties and their correspondent banks).

proxies, and/or alter egos of Hezbollah, which Hezbollah developed and controlled for the express purpose of funding its terrorist agenda.

6.     Iran and Hezbollah determined that they could rely upon certain Western financial institutions to work around and otherwise evade the coordinated and sustained efforts of the United States, the European Union and the United Nations to isolate and restrict their capacity to fund terrorism.

7.     As a consequence of enabling Iran, Hezbollah, and their agents to evade anti-terror sanctions, the Banking Defendants became willing members or partners in a conspiracy to commit terrorist attacks that resulted in the deaths and injuries to Plaintiffs.  The Banking Defendants knowingly conspired with Hezbollah, Iran and other banks (including Bank Saderat Plc, Bank Melli Iran, the Central Bank of Iran ("CBI"),[3] Bank Mellat, Bank Tejaarat, Bank Refah and Bank Sepah) to evade U.S. economic sanctions and anti-money laundering obligations, conduct illicit trade-finance transactions, and disguise financial payments to and from U.S. dollar-denominated accounts (the "Conspiracy").

8.     The Banking Defendants aided and abetted Hezbollah and its terror proxies by knowingly providing substantial assistance, including the facilitation of illegal, atypical and/or non-routine financial transactions, which enabled Hezbollah (including its Iraqi-based agents) to commit the terrorist attacks that resulted in the deaths and injuries to Plaintiffs.

9.     Since financial support is the lifeblood of terrorist organizations, Hezbollah, Iran and their agents could not have conducted their decades-long terror campaign to the same extent and magnitude, and would have certainly been severely hampered in their terror financing activities, without the vital assistance of the Banking Defendants.

---

[3] CBI is occasionally referred to as Bank Markazi (spelled phonetically in a variety of ways).

10.     The Banking Defendants' actions foreseeably enabled Iran to provide direct material support and resources to, and engage in illegal money laundering and other illegal financial transactions on behalf of, Hezbollah and its agents with the knowledge that such funds were to be used, in full or in part, to carry out acts of international terrorism during the Relevant Time Period, with the goal of killing, maiming and injuring the Plaintiffs and/or their family members in Iraq.

11.     The United States designated Hezbollah a Foreign Terrorist Organization ("FTO") (as that term is defined in 8 U.S.C. § 1189 of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA")) in 1997.  The designation has remained in effect since that time.

12.     The United States designated Iran a State Sponsor of Terrorism on January 19,1984, pursuant to § 6(j) of the Export Administration Act, § 40 of the Arms Export Control Act, and § 620A of the Foreign assistance Act.

13.     The Plaintiffs are living and deceased American service members (and their family members) who were maimed or killed by EFP detonation attacks and other attacks while serving in post-Saddam Hussein Iraq pursuant to United Nations Resolutions from 2004 through 2011.

14.     The named Defendants herein are HSBC Holdings Plc, HSBC Bank Plc ("HSBC-London"), HSBC Bank Middle East Ltd., HSBC Bank USA, N.A. (referred to herein collectively as the "HSBC Defendants"), Barclays Bank Plc ("Barclays"), Standard Chartered Bank ("SCB"), Royal Bank of Scotland N.V. (referred to herein as "ABN Amro" or "RBS N.V."), Credit Suisse AG ("Credit Suisse"), Bank Saderat Plc, Commerzbank AG ("Commerzbank"), Deutsche Bank AG ("DB") and Does 1-50.

15.     Each Defendant is primarily liable for committing acts of international terrorism and violating 18 U.S.C. § 2339A and § 2339B when it deliberately evaded U.S. economic

sanctions, arms embargos and anti-money laundering requirements regarding Iran and suspected terrorists knowing, or deliberately indifferent to the fact, that Iran and Hezbollah would use some of the funds[4] they laundered through the United States to finance their agents for the purpose of killing and maiming, *inter alia,* American citizens serving as part of the Coalition Forces in Iraq during the Relevant Time Period, including Plaintiffs or their family members.

16.     Each Defendant is secondarily liable for aiding and abetting by knowingly providing substantial assistance to Hezbollah and its agents in the commission of acts of international terrorism that resulted in the injuries and deaths of Plaintiffs or their family members.

17.     Each Defendant is secondarily liable for conspiring with Hezbollah and its agents in the commission of acts of international terrorism that resulted in the injuries and deaths of Plaintiffs.

18.     In October 2007, the United States designated Iran's Ministry of Defense and Armed Forces Logistics ("MODAFL").

19.     The U.S. government explained the basis for the designation as follows:

The Ministry of Defense and Armed Forces Logistics (MODAFL) controls the Defense Industries Organization, an Iranian entity identified in the Annex to UN Security Council Resolution 1737 and designated by the United States under E.O. 13382 on March 30, 2007. MODAFL also was sanctioned, pursuant to the Arms Export Control Act and the Export Administration Act, in November 2000 for its involvement in missile technology proliferation activities.

MODAFL has ultimate authority over Iran's Aerospace Industries Organization (AIO), which was designated under E.O. 13382 on June 28, 2005.  The AIO is the Iranian organization responsible for ballistic missile research, development and production activities and organizations, including the Shahid Hemmat Industries Group (SHIG) and the Shahid Bakeri Industries Group (SBIG), which were both listed under UN Security Council Resolution 1737 and designated under E.O. 13382. The head of MODAFL has publicly indicated Iran's willingness to continue to work on ballistic missiles.  Defense Minister Brigadier General Mostafa Mohammad Najjar

---

[4] USD funds include the following U.S. dollar-denominated financial instruments: deposit balances in domestic or Eurodollar bank accounts, repurchase agreements, letters of credit, bills of exchange, payment orders, checks, banknotes and coins.

said that one of MODAFL's major projects is the manufacturing of Shahab-3 missiles and that it will not be halted. MODAFL representatives have acted as facilitators for Iranian assistance to an E.O. 13382- designated entity and, over the past two years, have brokered a number of transactions involving materials and technologies with ballistic missile applications.

20.     Formally, the IRGC is a subordinate directorate of MODAFL, but in practice, it has substantial autonomy from MODAFL.

21.     The IRGC, however, uses MODAFL to both procure and develop weapons and equipment for its use.

22.     In October 2007, the United States designated the IRGC-QF a Specially Designated Global Terrorist ("SDGT") pursuant to Executive Order ("E.O.") 13324, explaining that:

> The Qods Force has had a long history of supporting Hizballah's military, paramilitary, and terrorist activities,  providing  it with guidance, funding, weapons, intelligence, and logistical support.  The Qods Force operates training camps for Hizballah in Lebanon's Bekaa Valley and has reportedly trained more than 3,000 Hizballah fighters at IRGC training facilities in Iran.  The Qods Force provides roughly $100 to $200 million in funding a year to Hizballah and has assisted Hizballah in rearming in violation of UN Security Council Resolution 1701.
>
> *In addition, the Qods Force provides lethal support in the form of weapons, training, funding, and guidance to select groups of Iraqi Shi'a militants who target and kill Coalition and Iraqi forces and innocent Iraqi civilians.* [Emphasis added.]

23.     In October 2007, Defendant Bank Saderat Plc, together with its parent company Bank Saderat Iran, was designated an SDGT by the United States pursuant to E.O. 13224.

24.     The U.S. Treasury Department's 2007 press release regarding Bank Saderat's designation stated:

> Bank Saderat, its branches, and subsidiaries: Bank Saderat, which has approximately 3200 branch offices, has been used by the Government of Iran to channel funds to terrorist organizations, including Hezbollah and EU-designated terrorist groups Hamas, PFLP-GC, and Palestinian Islamic Jihad. For example, from 2001 to 2006, Bank Saderat transferred $50 million from the Central Bank of Iran through its subsidiary in London to its branch in Beirut for the benefit of Hezbollah fronts in Lebanon that support acts of violence.

25.     On October 12, 2011, the United States designated the Iranian commercial airline Mahan Air as an SDGT for "providing financial, material and technological support to the Islamic Revolutionary Guard Corps-Qods Force (IRGC-QF).  Based in Tehran, Mahan Air provides transportation, funds transfers and personnel travel services to the IRGC-QF."

26.     The Treasury Department explained Mahan Air's direct involvement with terrorist operations, personnel movements and logistics on behalf of the IRGC-QF:

> Mahan Air also facilitated the covert travel of suspected IRGC-QF officers into and out of Iraq by bypassing normal security procedures and not including information on flight manifests to eliminate records of the IRGC-QF travel.

> Mahan Air crews have facilitated IRGC-QF arms shipments. Funds were also transferred via Mahan Air for the procurement of controlled goods by the IRGC- QF.

> In addition to the reasons for which Mahan Air is being designated today, Mahan Air also provides transportation services to Hezbollah [sic], a Lebanon-based designated Foreign Terrorist Organization. Mahan Air has transported personnel, weapons  and goods on behalf of Hezbollah [sic] and omitted from Mahan Air cargo manifests secret weapons shipments bound for Hezbollah [sic].

27.     Mahan Air was also later identified as the conduit to Iran of *thousands* of radio frequency modules recovered by Coalition Forces in Iraq from Improvised Explosive Devices ("IEDs") that were used to target U.S. and Coalition Forces.

28.     As used in this Complaint, "the Conspiracy" refers to an illegal criminal agreement, beginning in 1997 and, on information and belief, continuing to the present, between Iran, its banking agents and various international financial institutions by and through which Defendants knowingly participated in a criminal scheme in which they agreed to alter, falsify, or omit information from bank-to-bank payment orders sent on the SWIFT private financial messaging network ("SWIFT-NET") operated by the Society for Worldwide Interbank Telecommunication ("SWIFT-Brussels")[5] that involved Iran or Iranian parties including several Iranian banks

---

[5] SWIFT-Brussels is a cooperative society under Belgian law owned by its member financial

(referred to herein collectively as the "Iranian Bank Co-conspirators") such as Bank Melli Iran, Bank Saderat Iran, the CBI, Bank Mellat, Bank Tejarat, Bank Refah and Bank Sepah, as well as the Islamic Republic of Iran Shipping Lines ("IRISL"),[6] the National Iranian Oil Company ("NIOC") and Mahan Air that serve as financial and logistical conduits for the IRGC and its terrorist activities.

29.    The aims and objectives of the Conspiracy, all of which were foreseeable to the Defendants, and which each Defendant knew or was deliberately indifferent to, included, among others:

    a.   Concealing Iran's dollar-denominated financial activities and transactions from detection, scrutiny, or monitoring by U.S. regulators, law enforcement, and/or depository institutions;

    b.   Facilitating illicit transactions totaling at least $50 million USD for the benefit of Hezbollah;

    c.   Facilitating illicit transactions totaling at least $100 million in USD funds for the direct benefit of the IRGC and billions in USD funds for the benefit of the NIOC, then controlled by the IRGC;

    d.   Facilitating at least hundreds of illicit transactions totaling more than $60 million on behalf of IRISL, including over 150 "stripped" transactions after IRISL was designated an SDN;

    e.   Facilitating tens of millions of dollars in illicit transactions on behalf of MODAFL, the IRGC, Mahan Air and other instrumentalities of Iranian state-sponsored terror to further numerous violations of the U.S. trade embargo against Iran, conceal Iran's efforts to evade U.S. sanctions and enable Iran's acquisition from the United States of goods and technologies prohibited by U.S. law to be sold or transferred to Iran, including components of IEDs deployed against Coalition Forces in Iraq; and

    f.   Enabling Iran, the Iranian Bank Co-conspirators (including Defendant Bank

---

institutions. SWIFT-Brussels's global private network, SWIFT-NET, enables financial institutions to send and receive information about financial transactions in the Eurodollar market, among other financial markets, in a standardized message format.

[6] IRISL is Iran's national maritime carrier: a global operator of merchant vessels with a worldwide network of subsidiaries, branch offices and agent relationships.  It provides a variety of maritime transport services, including bulk, break-bulk, cargo and containerized shipping.

Saderat Plc), the IRGC, Hezbollah, and a litany of Hezbollah-controlled Iraqi Shi'a terror groups (referred to as the "Special Groups") to plan for, conspire to, and perpetrate acts of international terrorism under 18 U.S.C. § 2331(1); homicides, attempted homicides, or conspiracies to commit homicide under 18 U.S.C. § 2332(a)-(c); bombings using destructive devices under 18 U.S.C. § 2332a; bombings and attempted bombings under 18 U.S.C. § 2332f; engaging in terrorist activity under 8 U.S.C. § 1182(a)(3)(B)(iii)-(iv); and/or engaging in terrorism under 22 U.S.C. § 2656f.

30.     As noted by the U.S. Treasury Department's Financial Crimes Enforcement Network ("FinCEN") in a March 20, 2008 advisory: "Through state-owned banks, the Government of Iran disguises its involvement in proliferation and terrorism activities through an array of deceptive practices specifically designed to evade detection."[7]

31.     Although the Conspiracy was effectuated in a variety of ways, four primary techniques were used by Iran acting in concert with both the Iranian Bank co-conspirators, MODAFL, the IRGC, IRISL and the Defendants herein:

    a.     The Defendants removed or altered the names, Bank Identifier Codes ("BICs"), and other identifying information of the Iranian Bank Co- conspirators or Iranian counter-parties in the payment orders sent through U.S. correspondent banks via SWIFT-NET– a practice commonly known and referred to as "stripping" SWIFT-NET messages;

    b.     The Defendants converted ordinary transactions involving SWIFT-NET message type 103 ("MT 103") payment orders (that would disclose the details of the counter-parties to the transactions) into bank-to-bank transfers known as SWIFT-NET message type 202 ("MT 202") payment orders (that did not require the transmitting bank to include information disclosing the originator, beneficiary, and counter-parties), for the specific purpose of concealing the origin and destination of Iranian funds transfers;

    c.     The Defendants deliberately chose not to conduct the required screening of Iran-linked SWIFT-NET messages  and letters of credit documents worth at least tens of millions in USD funds on an annual basis, for compliance with the U.S. Office of Foreign Assets Control ("OFAC") list of SDNs; the U.S. State Department's United States Munitions List ("USML") of defense-related export controlled items; and/or the U.S. Bureau of Industry and Security's ("BIS") Commerce

---

[7] *See*, https://www.fincen.gov/statutes_regs/guidance/pdf/fin-2008-a002.pdf.

Control List ("CCL") of dual-use export controlled items, and Denied Persons List ("DPL") of export denied entities; and

d.      The Defendants knowingly and willfully facilitated the illicit export and import of Iranian petroleum products for the NIOC and other sanctioned Iranian entities. These petrodollar transactions, including trade-finance and foreign exchange, provided Iran with illegal access to billions of dollars, including the direct funding through the Defendants of the IRGC and its network of front companies.

32.     Absent the criminal collusion and conspiratorial conduct of the Defendants named herein, Iran and its agents-including the IRGC, IRISL, and NIOC, and Banks Melli, Sepah, Refah, Mellat and Saderat-could not have successfully hidden the volume of U.S. dollar clearing and trade-finance transactions that they succeeded in illegally clearing through the United States in U.S. dollars.[8]

33.     The connection between the IRGC, IRGC-QF and Bank Melli Iran, their deceptive banking practices and the attacks by the Special Groups that injured the Plaintiffs is further illustrated by a 2009 U.S. diplomatic cable which stated:

> *Iran's Islamic Revolutionary Guards Corps (IRGC) and IRGC-Qods Force, who channel funds to militant groups that target and kill Coalition and Iraqi forces and innocent Iraqi civilians, have used Bank Melli and other Iranian banks to move funds internationally.*  Bank Melli used deceptive banking practices to obscure its involvement from the international banking system by requesting that its name be removed from financial transactions when handling financial transactions on behalf of the IRGC. [Emphasis added.]

34.     Iran's objectives were not secret. Its pursuit and development of Weapons of

---

[8] The Defendants willfully circumvented the sanctions screening, anti-money laundering ("AML"), and combatting the financing of terrorism ("CFT") requirements of OFAC, SWIFT-Brussels, Clearing House Interbank Payment System ("CHIPS-NY"), CLS Bank International ("CLS-NY"), Federal Reserve Bank of New York ("FRB- NY") and the Fedwire Funds Service ("Fedwire"). CHIPS is a Systemically Important Financial Market Utility ("SIFMU") for the U.S. financial system and the primary provider of clearing and settlement services in USD funds for Eurodollar transactions. CLS Bank is a SIFMU for the U.S. financial system and the primary provider of clearing and settlement services for foreign exchange transactions in the Eurodollar market, and FRB-NY is one of the twelve U.S. Federal Reserve Banks and the central bank lender-of- last-resort for the Eurodollar market (via Fedwire).

Mass Destruction—including mines and similar explosive munitions—was the subject of hundreds of news reports, U.S. government reports, and Congressional testimony, as well as U.N. Security Council resolutions and European Union regulations.

35.     Iran's "deceptive banking practices" were not entirely secret either.

36.     Beginning in September 2006, the U.S. Treasury and State Departments launched a quiet campaign to warn 40 major international banks and financial institutions about the risks of conducting business with the Iranian government, particularly targeting financial transactions involving the IRGC.

37.     Defendants SCB, Commerzbank and the HSBC Defendants were among those briefed by U.S. government officials about the dangers posed (in terms of both proliferation and terror financing) in conducting business with Iran.

38.     On April 19, 2007, the Wolfsberg Group, an association of twelve global banks whose stated aim is to develop financial services industry standards, issued a statement "endorsing measures to enhance the transparency of international wire transfers to promote the effectiveness of global anti-money laundering and anti-terrorist financing programs.  The measures include both the development of an enhanced payment message format, which would include more detailed information about those conducting wire transfers in certain instances, as well as calling for the global adoption of basic messaging principles aimed at promoting good practice with respect to the payment system." This statement was directed to the increasingly apparent risks inherent in MT 202 "cover payments" – one of the methods Defendants used to conceal their illegal USD funds transfers on behalf of Iran through the Eurodollar market.

39.     Defendants ABN Amro (RBS N.V.), Barclays, Credit Suisse, and HSBC were all members of the Wolfsberg Group, and were listed on the 2007 press statement.

40.     Iran's efforts to kill and maim U.S. and British citizens in Iraq, and to thwart U.S. policy objectives in Iraq, were also readily apparent and widely reported.

41.     In fact, Iran's role in funding "militant groups that target and kill Coalition and Iraqi forces and innocent Iraqi civilians" were a matter of public record.

42.     For example, on October 10, 2005, the British Broadcasting Company (BBC) reported that:

> An armour-piercing version of the bomb - blamed for the deaths of eight British soldiers this year - marks the latest advance in the insurgents' arsenal. *The UK has accused Iran of supplying the new weapon to militants in southern Iraq, via the Lebanese Hezbollah militia group,* although Tehran has denied this. [Emphasis added.]

43.     The BBC followed up with multiple reports in 2006 describing the details from military briefings about Iran's material support to the Special Groups that were targeting and killing British and U.S. forces in Iraq.

44.     For example, on June 23, 2006, the BBC reported:

> BBC world affairs correspondent, Paul Reynolds, says both the American and British military in Iraq have claimed for some time that Iran, or factions within the Iranian government, have been supporting Shias politically and militarily.

> For example, the British ambassador to Baghdad William Patey accused the Iranian Revolutionary Guard of helping to supply the technology which has been used in bomb attacks against British troops in the south.

> "Since January we have seen an upsurge in their support, particularly to the Shia extremist groups," Gen Casey said.

> "They are using surrogates to conduct terrorist operations both against us and against the Iraqi people.

> "We are quite confident that the Iranians, through the special operations forces, are providing weapons, IED [improvised explosive device] technology and training to Shia extremist groups in Iraq," he said.

45.     In another example, on September 26, 2008, CNN reported that U.S. officials

claimed Iran had provided the Special Groups in Iraq with "millions of dollars" in funding and that:

> The official said that high-grade military explosives and specialized timers are among the "boutique military equipment" moving from Iran into Iraq. Some of the equipment is of the same type that Hezbollah, an Iranian-backed Shiite militia, used against Israeli forces in Lebanon during the summer, the official said. The origin of the weapons was easy to discern because of Iranian markings on it, he said. Because Iran maintains tight control over armaments, he said, shipment of the weapons into Iraq had to involve "elements associated with the Iranian government."

46.    Each of the Defendants knew about the existence of the Conspiracy; directly conspired with Iran, through Defendant Bank Saderat Plc, Bank Melli Iran, the CBI and others, to facilitate the Conspiracy; took affirmative, extensive and unlawful actions to further the Conspiracy over long periods of time; and was aware of the existence and participation of other Co-conspirators, including other Defendants named herein.

47.    In fact, on numerous occasions, three or more of the Defendants acted jointly to facilitate the same illegal trade-finance transaction (*e.g.* providing material assistance to Mahan Air because the Iranian airline wanted to purchase U.S. manufactured aircraft and needed help circumventing U.S. export restrictions against Iran).

48.    Each of the Defendants, at the time it agreed to join and actively take part in the Conspiracy, knew that Iran was a U.S.-designated State Sponsor of Terrorism and knew that Iran was clandestinely routing billions of dollars through the United States to hide its unlawful conduct; and each Defendant took affirmative steps to help Iran in its unlawful conduct.

49.    Each of the Defendants also knew, or was deliberately indifferent to, the fact that Iran, as a U.S.-designated State Sponsor of Terrorism, would (and, in fact, did) channel hundreds of millions of the dollars that Defendants helped launder and conceal from U.S. regulators and law enforcement agencies to the IRGC and Hezbollah as part of the Conspiracy.

50.     Each of the Defendants also knew, or was deliberately indifferent to, the well-publicized fact that Iran and its terror proxies were killing and maiming American civilians and servicemen in Iraq, and that U.S. nationals would foreseeably be injured or killed as a result of the substantial assistance those dollars provided to the IRGC and Hezbollah.

51.     Each of the Defendants also knew, or was deliberately indifferent to, the foreseeable (and inevitable) consequences of providing Iran, a State Sponsor of Terrorism, with access to hundreds of *billions* of dollars of concealed payments and the resulting funding of the Special Groups that targeted American civilians and servicemen through acts of international terrorism in Iraq from 2004-2011.

52.     Without the active participation of the Defendants in the Conspiracy, Iran could not have transferred the same volume of USD to the IRGC and Hezbollah, nor could it have done so with the same ease and efficiency.

53.     Without the active participation of the Defendants in the Conspiracy, Iran could not have successfully violated U.S. export controls, financed its illicit arms shipments or manufactured the same volume and sophistication of factory-grade Explosively Formed Penetrators ("EFPs") to kill and maim Americans in Iraq as discussed below.[9]

---

[9] EFPs are a particularly effective form of manufactured IED sometimes known as a shaped charge, usually made with a manufactured concave copper disk and a high explosive packed behind the liner. In Iraq, EFPs were often triggered by various technologies, including passive infra-red sensors (tripped by the engine heat of passing vehicles) and radio frequency modules (triggering the weapon when high-powered radio waves were generated by Coalition Forces' jamming devices). Metallurgic analysis by U.S. technicians helped confirm that the high-purity copper EFP liners were not produced in Iraq. Differences in the liners indicated the kind of press that was required to fabricate them—a heavy (hydraulic) press not commonly seen in Iraq. To produce these weapons, copper sheets were often loaded onto a punch press to yield copper discs. These discs were annealed in a furnace to soften the copper. The discs were then loaded into a large hydraulic press and formed into the disk-like final shape. This manufacturing process is critical to the design and concomitant lethality of the weapon. When the explosives inside an EFP detonate, the blast energy inverts the copper plate into a ragged slug traveling over a mile per

54.     The transfer of hundreds of millions of dollars by Iran to the IRGC and Hezbollah was within the scope, and in furtherance of, the Conspiracy; and the provision of material support to the IRGC and Hezbollah was the natural and reasonably foreseeable consequence of the Defendants' unlawful agreement to help Iran launder money through the United States financial system.

55.     As set forth below, the HSBC Defendants, Commerzbank, SCB, Barclays, and Credit Suisse altered, falsified, or omitted information from payment order messages that they facilitated on behalf of Bank Saderat knowing, or deliberately indifferent to the fact, that Bank Saderat was engaged in money laundering on behalf of a State Sponsor of Terrorism, and after October 2007, that Bank Saderat was an SDGT that provided material support to Iran's terrorist activities, and, in the case of the HSBC Defendants, knew there was direct evidence of Bank Saderat "funding of Hezbollah."

56.     As set forth below, the HSBC Defendants, and Defendants SCB, ABN Amro (RBS N.V.), and Commerzbank facilitated numerous payments totaling more than $60 million on behalf of IRISL knowing, or deliberately indifferent to the fact, that IRISL was designated a Specially Designated National ("SDN") by the United States for, as stated in the U.S. Treasury Department's September 10, 2008 press release announcing IRISL's designation, "facilitating shipments of military cargo destined for the (Iranian) Ministry of Defense and Armed Forces Logistics (MODAFL)," which could be used for terrorist attacks on Coalition Forces, including American nationals.

57.     IRISL *did*, in fact, facilitate shipments of military cargo to Hezbollah, the organization responsible for planning, authorizing and committing (through its agents) acts of

---

second, capable of punching through armor even 300 feet away.

international terrorism that killed and injured American citizens in Iraq, including the Plaintiffs.

58.     As alleged below, Defendants SCB, Credit Suisse, Bank Saderat Plc and Commerzbank all altered, falsified, or omitted information from payment messages (worth billions of U.S. dollars) that they facilitated on behalf of the National Iranian Oil Company, then an agent of the IRGC, knowing, or deliberately indifferent to the risk involved in rendering those payments without any transparency to U.S. regulators and law enforcement, and thereby directly providing the IRGC with access to billions of USD that it could move – undetected – through the global financial system.

59.     As alleged below, Defendant SCB also knowingly and actively financed and facilitated illegal trade-finance transactions worth hundreds of millions of dollars on behalf of MODAFL, the IRGC and various instrumentalities of Iranian state-sponsored terror, including companies working directly for Hezbollah and the IRGC-Qods Force.

60.     Furthermore, as alleged below, Defendants HSBC Bank USA, N.A., Barclays, SCB, ABN Amro (RBS N.V.), and Commerzbank committed acts of international terrorism in violation of 18 U.S.C. § 2332d.

61.     Defendant HSBC Bank USA, N.A. is a U.S. person that knowingly conducted financial transactions with Iran in the United States in violation of 18 U.S.C. § 2332d, and it was reasonably foreseeable that Iran would provide material support to acts of international terrorism that killed and injured American citizens in Iraq.

62.     Plaintiffs further allege that the U.S. branches of Defendants Barclays, SCB, ABN Amro (RBS N.V.), and Commerzbank are U.S. persons that knowingly conducted financial transactions with Iran in the United States in violation of 18 U.S.C. § 2332d, and it was reasonably foreseeable that Iran would provide material support to acts of international terrorism that killed

and injured American citizens in Iraq.

63.     Defendants and their American branches were no less than criminal partners with Iran and Hezbollah during the Relevant Time Period. Defendants criminally funded Iran's and Hezbollah's fervent anti-American terror campaign in post-Saddam Hussein Iraq, which funding played a direct and causal role in Hezbollah's planning, training, and directing various Special Groups to implement the series of EFP attacks against Plaintiffs or their family members as they performed peacekeeping activities in Iraq on behalf of the United States Army, the Coalition, and the United Nations during the Relevant Time Period.

64.     Congress enacted JASTA with the following specific findings and stated purposes:

(1)     International terrorism is a serious and deadly problem that threatens the vital interests of the United States.

(2)     International terrorism affects the interstate and foreign commerce of the United States by harming international trade and market stability, and limiting international travel by United States citizens as well as foreign visitors to the United States.

(3)     Some foreign terrorist organizations, acting through affiliated groups or individuals, raise significant funds outside of the United States for conduct directed and targeted at the United States…

(6)     Persons, entities, or countries that knowingly or recklessly contribute material support or resources, directly or indirectly, to persons or organizations that pose a significant risk of committing acts of terrorism that threaten the security of nationals of the United States or the national security, foreign policy, or economy of the United States, necessarily direct their conduct at the United States, and should reasonably anticipate being brought to court in the United States to answer for such activities…

(7)     The United States has a vital interest in providing persons and entities injured as a result of terrorist attacks committed within the United States with full access to the court system in order to pursue civil claims against persons, entities, or countries that have knowingly or recklessly provided material support or resources, directly or indirectly, to the persons or organizations responsible for their injuries.

(b)     Purpose.--The purpose of this Act is to provide civil litigants with the broadest possible basis, consistent with the Constitution of the United States, to seek relief against persons, entities, and foreign countries, wherever acting and wherever they may be found, that have provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against the United States.

65.     Pursuant to §219 of the Immigration and Naturalization Act, 8 U.S.C. §1189, the Secretary of State designated Hezbollah as a "Foreign Terrorist Organization" ("FTO") on October 8, 1997.  By definition of being so designated, the Secretary necessarily found that Hezbollah was a foreign organization which engages in terrorist activity which threatens the security of the United States and its nationals.  8 U.S.C. §1189(a)(1).  This FTO designation has remained in place through the present.

66.     In making such designations, Congress found:

[T]he Antiterrorism and Effective Death Penalty Act of 1996 prohibits the provision of material support or resources to foreign terrorist groups that have been formally designated, pursuant to statute, as "foreign terrorist organizations" by the Secretary of State. In prohibiting comprehensively the provision of such support and resources, the law does not differentiate between the criminal, terrorist activities of these organizations, and the civil, non-violent activities, if any, in which they might engage. In legislating this particular dimension of the "material support" ban, the Congress found that "foreign organizations that engage in terrorist activity are so tainted by their criminal conduct that any contribution to such an organization facilitates that conduct."

67.     Hezbollah, working with its historic "mentor" and principal, Iran, along with Iranian Banks, Iran's elite Iranian Revolutionary Guard Corps ("IRGC"), the IRGC Qods Force ("QF"), and the Special Groups, conspired, planned, designed, prepared for, trained for, directed, funded and carried out EFP attacks against an estimated 1,100 U.S. Soldiers from 2005 through 2011, with EFPs designed and manufactured by Iran and Hezbollah using United States Dollars

("USD"), including the EFP attacks against the Plaintiffs herein.

68.     Each of the Plaintiffs was injured as a result of an act of international terrorism for which Iran and its state-controlled organizations and terrorism proxies, including Hezbollah, were responsible.

## II.     JURISDICTION AND VENUE

69.     This Court has subject matter jurisdiction over this lawsuit pursuant to 18 U.S.C. §§2333 (the "ATA") and 2334, as a civil action brought by citizens of the United States, their estates, survivors, and heirs who have been killed or injured by reason of acts of international terrorism.  This Court also has subject matter jurisdiction over this action based on diversity of citizenship pursuant to 28 U.S.C. § 1332(a)(2).  The matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

70.     This Court also has subject matter jurisdiction over this lawsuit pursuant to 28 U.S.C. §1331 and 18 U.S.C. §2338 since all claims are being brought pursuant to the ATA, 18 U.S.C. §2333.

71.     Venue is proper in this district pursuant to 18 U.S.C. § 2334(a) and 28 U.S.C. § 1391(d).

72.     Defendants are subject to personal jurisdiction in the United States pursuant to Fed.R.Civ.P. 4(k) and 18 U.S.C §2334(a) because, among other things, they reside within this District and continuously and systematically do business within this District. Defendants are also subject to personal jurisdiction in the United States pursuant to 18 U.S.C. §2339B(d)(1)(D), (E), and (F) because they have committed tortious acts within the United States by transferring funds ("material support or resources") through the United States banking system in New York City, New York, for the benefit of designated FTO, Hezbollah, and have purposefully availed

themselves of United States jurisdiction in the course of committing the wrongful acts alleged herein.

73.     Each of the Defendants is also subject to personal jurisdiction in a court of general jurisdiction in New York State pursuant to N.Y. C.P.L.R §302(1) and (2) and personal jurisdiction comports with the United States Constitution, as each continuously and systematically does business within this District and committed egregious tortious acts within this District.

74.     JASTA's language and clearly articulated statutory purposes, as set forth above, comport with notions of fairness in that these Defendants each knowingly and/or recklessly provided material support and resources through the financial transactions described herein to a longtime designated Foreign Terrorist Organization ("FTO"), Hezbollah, an organization committed to harming the national security interests of these United States, as well as its agents, and thus should reasonably anticipate being brought to this Court to answer for their nefarious conduct and activities.

75.     In this lawsuit, the claims of all Plaintiffs arose, at least in part, from the financial transactions facilitated through Defendants in the United States.  Because the USD transfers facilitated and completed through the Bank Defendants on behalf of and at the request of Hezbollah's agents to further support the Special Groups' terrorist activities were a substantial part of the unlawful conduct perpetrated by Defendants, the Court may exercise jurisdiction with respect to all of Plaintiffs' claims.

76.     The repeated use of correspondent accounts in New York to effectuate these illegal fund transfers constituted a course of dealing by the Defendants in the U.S.  Each fund transfer referenced herein was effectuated by Defendants in the United States at the request of or on behalf of Hezbollah's agents to further support the Special Groups' terrorist activities, with each

Defendant having actual knowledge that an FTO was being provided with material support and resources that allowed it to foment and participate in acts of international terrorism against the Plaintiffs as identified herein.

77.     Just as importantly and significantly, the intentional and criminal acts and omissions of Defendants in allowing literally trillions and trillions of USD financial transactions to go through the United States banking system without scrutiny surely allowed additional billions and billions of USD to fall into the coffers of these Special Groups.

78.     Thus, Defendants have purposefully availed themselves of the laws of New York's transparent banking system and the predictable jurisdictional and commercial laws of New York and the United States.

79.     Defendants deliberately and repeatedly used United States accounts to support designated FTOs, including through their agents, the Special Groups, and to further fund their terrorist activities by and through illegal financial transactions with the Iranian Banks, known OFAC-designated organizations with known ties to the Special Groups.

80.     A sufficient and articulable nexus exists which demonstrates a substantial relationship between Plaintiffs' claims and Defendants' transactions in the State of New York.  To be certain, as it relates to Plaintiffs' claims, Defendants utilized correspondent accounts in the State of New York to facilitate the clearing of USD transfers on behalf of Hezbollah's agents, which ultimately provided significant material support and resources for the Special Groups which were responsible for the subject EFP attacks against the Plaintiffs herein, and such financial transactions violated---by Defendants' own admissions---the IEEPA (18 U.S.C. § 371) and the BSA (31 U.S.C. § 5318, 31 U.S.C. § 5322, failing to report suspicious activity, and failing to establish due diligence for foreign correspondent accounts in violation of 31 U.S.C. §§ 5318 and 5322).

81.     In executing these fund transfers, Defendants used New York's banking system to effectuate the very financial support that is the basis of Plaintiffs' claims herein.

82.     Due just in part to the conduct complained of herein–each Defendant had other, very public and nefarious AML, KYC, and material support allegations concerning other OFAC-sanctioned entities then ongoing–each Defendant either pled guilty to felony charges under U.S. and New York state laws and/or entered into Deferred Prosecution Agreements ("DPAs") or Consent Orders with the U.S. and/or New York State government regulators.

## III.     THE DEFENDANTS

### A.     THE HSBC DEFENDANTS

83.     Defendant HSBC Holdings Plc ("HSBC Holdings") is a public limited company organized under the laws of the United Kingdom. HSBC Holdings directly or indirectly owns, *inter alia*, Defendant HSBC Bank Plc, Defendant HSBC Bank Middle East Limited, and Defendant HSBC Bank USA, N.A. (as noted above, referred to herein collectively as the "HSBC Defendants"). HSBC Holdings is occasionally referred to internally (and in this Complaint) as "HSBC Group," or "The Group," and members and affiliates of HSBC Holdings (including the named HSBC Defendants herein) are occasionally referred to herein as "HSBC Group members."

84.     Defendant HSBC Holdings constitutes the ultimate parent company of one of the world's largest banking and financial services groups with approximately 6,300 offices in over 75 countries and territories.

85.     HSBC Holdings is listed on the New York Stock Exchange ("NYSE"), London Stock Exchange ("LSE") and Hong Kong Stock Exchange ("SEHK").

86.     HSBC Group members comprise financial institutions throughout the world that are owned by various intermediate holding companies, and ultimately, but indirectly, by Defendant HSBC Holdings, which, as alleged above, is incorporated and headquartered in England.

87.     Defendant HSBC Bank Plc ("HSBC-London," often referred to internally by members of HSBC Group as "HBEU") is a financial institution registered under the laws of England and Wales.

88.     Defendant HSBC Bank Middle East Limited ("HSBC-Middle East," often referred to internally by members of HSBC Group as "HBME"), is a financial institution registered under the laws of the Jersey Channel Islands.

89.     Defendant HSBC Bank USA, N.A. ("HSBC-US," often referred to internally by members of HSBC Group as "HBUS"), is a national bank chartered under the National Bank Act (12 U.S.C. § 2 *et seq.*) that constitutes a "U.S. person" under the definitions set forth in 31 C.F.R. Part 560.314 of the Iranian Transactions Regulations (the "ITR") and 18 U.S.C. § 2332d(b)(2) of the Anti-Terrorism Act.

90.     According to the fact sheets published on HSBC-US's official website, HSBC-US's headquarters are in McLean, VA, and it has its principal office in New York City.

91.     HSBC-US operates more than 240 bank branches throughout the United States, with offices and branches in New York, California, Connecticut, Delaware, Washington, D.C., Florida, Maryland, New Jersey, Oregon, Pennsylvania, Virginia, and Washington State.

92.     HSBC-US is the principal subsidiary of HSBC USA Inc., which is, in turn, an indirect, wholly-owned subsidiary of HSBC North America Holdings, Inc. ("HNAH"). HNAH's businesses serve customers in retail banking and wealth management, commercial banking, private banking, and global banking and markets.

B.     **DEFENDANT BARCLAYS BANK PLC**

93.     Defendant Barclays Bank Plc ("Barclays") is a global financial services provider headquartered in London, United Kingdom.

94.     Defendant Barclays is a wholly-owned subsidiary of Barclays Plc, a public limited

liability company organized under the laws of England and Wales.

95.     As used in this Complaint, "Barclays" refers to Barclays Bank Plc, the wholly-owned subsidiary of Barclays Plc, not Barclays Plc, Defendant Barclays Bank Plc's parent company.

96.     Barclays is one of the largest banks in the world.  Barclays' home country regulator is the United Kingdom's Financial Services Authority ("FSA").

97.     At all relevant times, Barclays maintained a New York branch ("Barclays-NY") that functioned as the primary U.S. dollar funds clearer for all of Barclays, its affiliates, and its customers.  The branch thus constitutes a "U.S. person" under the definitions set forth in § 560.314 of the ITR and 18 U.S.C. § 2332d(b)(2).

C.    **DEFENDANT SCB**

98.     Defendant SCB is one of the world's largest international banks, with over 1,700 branches, offices, and outlets in more than 70 countries. Headquartered in London, SCB operates principally in Asia, Africa, and the Middle East, and has operations in consumer, corporate and institutional banking, and treasury services.

99.     SCB-London is listed on the London Stock Exchange ("LSE") and Hong Kong Stock Exchange ("SEHK").

100.     Since 1976, SCB has had a license issued by the state of New York to operate as a foreign bank branch in New York, New York ("SCB-NY").  The branch provides wholesale banking services, primarily U.S.-dollar clearing for international wire payments.

101.     SCB's New York branch is the seventh largest U.S. dollar correspondent bank in the world, clearing and settling approximately 195 billion in USD funds per day.

102.     SCB's New York branch also constitutes a "U.S. person" under the definitions set forth in § 560.314 of the ITR and 18 U.S.C. § 2332d(b)(2).

D.  **DEFENDANT ROYAL BANK OF SCOTLAND N.V.**

103.    In October 2007, a consortium consisting of Fortis, the Royal Bank of Scotland Group ("RBS"), and Banco Santander acquired ABN Amro Holding N.V., the parent company of ABN Amro Bank N.V., using the acquisition vehicle RFS Holdings.

104.    The former ABN Amro Bank N.V.  subsequently underwent a restructuring process to transfer its Dutch State-acquired businesses and activities out of the existing ABN Amro Group. To do so, the relevant Dutch State-acquired businesses were first transferred to a new legal entity owned by ABN Amro Holding N.V.

105.    On February 5, 2010, through a statutory demerger process, the former ABN Amro Bank N.V. was renamed RBS N.V.

106.    Ultimately, RBS acquired ABN Amro Holding N.V.  As such, RBS acquired the New York and Chicago branches of ABN Amro Bank N.V. and began integrating certain business lines handled by these branches into its other U.S. operations.  These former branches constitute a "U.S. person" under the definitions set forth in § 560.314 of the ITR and 18 U.S.C. § 2332d(b)(2).

107.    In this Complaint, "ABN Amro (RBS N.V.)" refers to the named Defendant herein.

E.  **DEFENDANT CREDIT SUISSE AG**

108.    Defendant Credit Suisse AG ("Credit Suisse") is a financial services company headquartered in Zurich, Switzerland. Its U.S. headquarters are located at 11 Madison Avenue, New York, New York.

109.    Credit Suisse serves clients worldwide through its Private Banking unit, which includes a Wealth Management and Corporate & Institutional Clients unit; Investment Banking unit; and Asset Management unit.

110.    According to the CHIPS-NY website, Credit Suisse used the following U.S. financial institutions in New York to clear and settle its Eurodollar transactions:

a.     Defendant HSBC Bank USA, N.A. (identified by CHIPS-NY participant number 0108 and Fedwire routing number 021001088);

b.     The Bank of New York Mellon (identified by CHIPS-NY participant number 0001 and Fedwire routing number 011001234);

c.     Deutsche Bank Trust Co Americas (identified by CHIPS-NY participant number 0103 and Fedwire routing number 021001033); and

d.     Wells Fargo Bank NY International (identified by CHIPS-NY participant number 0509 and Fedwire routing number 026005092).

111.   Credit Suisse's New York branch is subject to oversight and regulation by the Board of Governors of the U.S. Federal Reserve System and the New York State Banking Department.   The branch thus constitutes a "U.S. person" under the Iranian Transaction Regulations and § 2332d(b)(2).

F.     **DEFENDANT BANK SADERAT PLC**

112.   Bank Saderat Iran is one of the largest banks in Iran. It has approximately 3,400 offices worldwide, including, as discussed below, a United Kingdom subsidiary (Defendant Bank Saderat Plc), and branches in Frankfurt, Paris, Athens, Dubai and Beirut.

113.   Bank Saderat Iran was nationalized after the Iranian Revolution, but allegedly privatized in 2009.  According to Bank Saderat Iran, 49% of its shares are owned by the Iranian government, but it is technically a non-governmental entity.

114.   In 2002, Bank Saderat Iran's London bank branch became a wholly-owned bank subsidiary, incorporated under United Kingdom law (*i.e.* Defendant Bank Saderat Plc).

115.   Bank Saderat Plc is the legal successor in interest to the Iran Overseas Investment Bank ("IOIB"), London.

116.   IOIB changed its name to Bank Saderat Plc in March 2002.

117.   Defendant Bank Saderat Plc maintains its principal office in London, United

43

Kingdom.

### G.     DEFENDANT COMMERZBANK AG

118.    Defendant Commerzbank AG ("Commerzbank") is a financial services company headquartered in Frankfurt, Germany, and has over 1,200 branches in Germany alone.

119.    According to the CHIPS-NY website, Commerzbank AG used, *inter alia*, the following U.S. financial institutions in New York to clear and settle its Eurodollar transactions:

      a.    Defendant Commerzbank's New York branch (identified by CHIPS-NY participant number 0804 and Fedwire routing number 026008044);

      b.    Defendant HSBC Bank USA, N.A. (identified by CHIPS-NY participant number 0108 and Fedwire routing number 021001088);

      c.    Defendant SCB-NY (identified by CHIPS-NY participant number 0256 and Fedwire routing number 026002561); and

      d.    Deutsche Bank Trust Co Americas (identified by CHIPS-NY participant number 0103 and Fedwire routing number 021001033).

120.    Commerzbank maintains 23 foreign branches, including a New York branch licensed by the State of New York since 1967.

121.    The New York branch of Commerzbank constitutes a "U.S. person" under the Iranian Transaction Regulations and § 2332d(b)(2).

122.    Commerzbank is listed on stock exchanges in Germany, London, and Switzerland.

### H.     DEFENDANT DEUTSCHE BANK AG

123.    Defendant Deutsche Bank AG ("DB"), a global investment bank, has a presence in more than 70 countries, with more than 2,700 branches worldwide.  DB has over 98,000 employees and over $1.6 trillion dollars in total assets.

124.    DB is organized under the laws of, and headquartered in, Germany, and its principal office is in Frankfurt.

125.    Defendant operates a branch in New York State that is licensed, supervised, and regulated by the New York State Department of Financial Services (the "DFS"). Defendant also has a U.S. subsidiary, Deutsche Bank Trust Company Americas ("DBTCA"), which constitutes a "U.S. person" under the definitions set forth in 31 C.F.R. Part 560.314 of the Iranian Transactions Regulations (the "ITR") and 18 U.S.C. § 2332d(b)(2) of the Anti-Terrorism Act.

126.    DB's New York branch conducts correspondent banking services and USD clearing activities for its international branches and customers.

127.    In addition to the New York office, DB operates over thirty banking locations throughout the United States in 18 different states.

## IV.    FACTUAL ALLEGATIONS

### A.    IRAN'S LONG HISTORY OF SUPPORTING AND FINANCING TERRORISM

128.    Soon after the Iranian Revolution in 1979, and a Shia Islamic theocratic government was established, Ayatollah Khomeini created the Iranian Revolutionary Guard Corps ("IRGC") as defenders of the Revolution against internal and external threats.  Since then, Iran has been a principal source of extremism and terrorism throughout the Middle East and the rest of the world, responsible for bombings, kidnappings and assassinations across the globe.

129.    An integral division and special branch of the IRGC is the Quds Force ("QF"), which historically specialized in projecting Iranian foreign policy outside of Iranian borders.  Since the Iranian Revolution in 1979, Iran has been a major Shia Muslim source and sponsor of extremism and terrorism throughout the Middle East and the rest of the world, responsible for bombings, kidnappings and assassinations across the globe.  Beginning with the Iranian-sponsored "birth" of Hezbollah in 1982, and through the present, Hezbollah has been Iran's "go to" entity to project its foreign policy goals and initiatives abroad, especially in the Middle East.

130.    Countries determined by the United States Secretary of State to have repeatedly provided support for acts of international terrorism are designated pursuant to three laws:  Section 6(j) of the Export Administration Act; Section 40 of the Arms Export Control Act; and Section 620A of the Foreign Assistance Act.  The United States designated Iran a "State Sponsor of Terrorism" ("SSOT") on January 19, 1984.  That designation has remained continuously in place through the present.

131.    The Islamic Republic of Iran, in turn, has throughout its relatively short existence as a Nation State, used State- and Government-controlled entities to carry out the functions and activities of Iran itself, including but not limited to: MODALF; IRGC; the QF; Ministry of Information and Security ("MOIS"); Defense Industries Organization ("DIO"); National Iranian Oil Company ("NIOC"); Bank Melli; Bank Saderat (hereinafter referred to either individually as itself or collectively as "the Iranian Banks"); and Mahan Air.  References to these agencies and entities of the Islamic Republic of Iran shall be deemed to refer to the Islamic Republic of Iran itself.

132.    In every United States Department of State "Country Reports on Terrorism" during the Relevant Time Period of 2005 through 2011, Iran was noted to be the "most active state sponsor of terrorism."  During the Relevant Time Period, the Country Reports called out Iran and its IRGC for working with Hezbollah to provide guidance and training to Special Groups that targeted U.S. and Coalition Forces in EFP attacks in Iraq.  U.S. Department of State, State Sponsors of Terrorism Overview, 2005-2011, www.state.gov.

133.    The Country Reports noted that the QF continued to provide Special Groups with EFPs, among other weapons listed therein, which were the major weapon used in the detonation attacks on Plaintiffs' armored vehicles.  The 2007 Report indicated that:

"The QF, working in concert with Lebanese Hezbollah, provided training outside Iraq for Iraqi militants in the construction and use of sophisticated IED technology and other advanced weaponry. These individuals then passed on this training to additional militants inside Iraq, a "train-the-trainer" program. In addition, the QF and Hezbollah have also provided training inside Iraq. In fact, Coalition Forces captured a Lebanese Hezbollah operative in Iraq in 2007."

U.S. Department of State, State Sponsors of Terrorism Overview, April 30, 2007, www.state.gov.

134. In short, the Islamic Republic of Iran, in its relatively short-lived history, has adopted a state policy and modus operandi of fomenting, coordinating, planning, equipping, manning, directing and perpetrating acts of international terrorism. This state policy and modus operandi has been orchestrated historically in concert with Iran's created agent and proxy, Hezbollah.

135. The following is just a partial timeline of major global terrorism events which have been perpetrated by Iran and its agent and proxy, Hezbollah, evidencing what has become a symbiotic relationship:

**1982**: Between 1982 and 1992, Iran-founded, funded, and backed **Hezbollah** systematically abducted a total of 96 foreign nationals, including 25 U.S. citizens, during the Lebanon Hostage Crisis. CIA Station Chief William Buckley was among the Americans killed.

**1983**: On April 18, 1983, a **Hezbollah** suicide bomber rammed a truck into the U.S. embassy in Beirut, Lebanon, killing 63 people, including 17 Americans.

**1983**: On October 23, 1983, **Hezbollah** killed 241 Americans in a terrorist attack on the U.S. Embassy's Marine barracks in Beirut, Lebanon. Over 100 were wounded. The explosion <u>caused</u> what was described as the "largest non-nuclear explosion that had ever been detonated on the face of the Earth." A separate, and simultaneous, suicide truck bombed and destroyed a building housing French soldiers, leaving 58 French paratroopers dead.

**1983**: On December 12, 1983, **Hezbollah** and Iran-backed terrorist group Da'wa bombed the U.S. embassy in Kuwait, leaving six dead and 90 injured.

**1984**: On September 20, 1984, **Hezbollah** detonated a van carrying explosives outside the U.S. Embassy annex in East Beirut, Lebanon, leaving 24 people dead.

**1985**: On Friday, June 14, **Hezbollah** hijacked TWA flight 847, flying from Cairo, Egypt, to San Diego, California, and dumped U.S. Navy Diver Robert Stethem's lifeless body onto the runway at the Beirut Airport. The hijackers sought the release of 700 Shi'ite Muslims being held as prisoners in Israel, Kuwait, and Spain.

**1992**: On March 17, 1992, **Hezbollah** carried out a suicide bombing on the Israeli embassy in Buenos Aires, Argentina, leaving 29 people killed and injuring 242 others.

**1994**: On July 18, 1994, **Hezbollah** bombed the AMIA Jewish community center in Buenos Aires, Argentina, leaving 85 people dead and injuring 300 others. This attack was the deadliest in the history of the Western Hemisphere prior to September 11, 2001.

**1996**: On June 25, 1996, 14 members of the Iran-backed Saudi branch of **Hezbollah** bombed the Khobar Towers in Saudi Arabia, leaving 19 U.S. airmen dead and 372 injured.

**2000**: On October 7, 2000, **Hezbollah** forces abducted three Israeli Defense Forces (IDF) soldiers from the Israeli side of the border with Lebanon. Benny Avraham, Adi Avitan, and Omar Souad's bodies were returned to Israel in 2004 in exchange for the release of 400 Palestinian prisoners.

**2005**: On February 14, 2005, **Hezbollah** carried out a suicide bomb attack on, among other persons nearby, Lebanese Prime Minister Rafiq Hariri, near the St. George's Hotel in Beirut.

136. Prior to the 9/11 attacks, Hezbollah had killed more Americans than any other terrorist organization.

137.    As noted above, the United States designated Iran a State Sponsor of Terrorism on January 19, 1984.  That designation has remained in force throughout the relevant time period to this Action.

138.    Since its 1984 designation, the United States has attempted to constrain and deter Iran's sponsorship and conduct of terrorist activities, as well as its development of Weapons of Mass Destruction, by imposing a wide variety of trade and economic sanctions intended to reduce the flow of financial resources, especially U.S. dollar-denominated assets, for Iran's support of such activities.

### B.    U.S. SANCTIONS AND IRAN'S RELIANCE ON U.S. DOLLARS

139.    On June 25, 1996, a truck bomb decimated a building at the Khobar Towers complex in Saudi Arabia that was used to house American military personnel, killing 19 Americans and wounding another 372 people.

140.    It was soon established that the Hezbollah agents responsible for the bombing were trained and equipped by the IRGC.

141.    Soon thereafter, Congress responded by passing the 1996 Iran-Libya Sanctions Act finding that:

> (1) The efforts of the Government of Iran to acquire weapons of mass destruction and the means to deliver them *and its support of acts of international terrorism* endanger the national security and foreign policy interests of the United States and those countries with which the United States shares common strategic and foreign policy objectives.
>
> (2) The objective of preventing the proliferation of weapons of mass destruction and *acts of international terrorism* through existing multilateral and bilateral initiatives *requires additional efforts to deny Iran the financial means* to sustain its nuclear, chemical, biological, and missile weapons programs. [Emphasis added.]

142.    To ensure that U.S. financial institutions that process international wire transfers in

the Eurodollar market do not assist Iran in its support of international terrorism and weapons proliferation or facilitate other prohibited transactions, U.S. financial institutions have been (and are) required to use sophisticated computer systems and software algorithms to monitor and screen all wire transfer activities.

143.     Banks in New York that process most of the world's Eurodollar payments and foreign exchange transactions depend on these automated systems to prevent Iran and other sanctioned entities (as well as terrorists, money launderers, and other criminals) from gaining access to the United States banking system. In this way, U.S. financial institutions are supposed to be the first line of defense to prevent Iran from accessing the U.S. financial system to fund or otherwise engage in terrorism and other prohibited conduct.

144.     At the same time, because, on average, 60 percent of Iranian government revenues and 90 percent of Iran's export revenues originate from the sale of its oil and gas resources, a market largely denominated in USD (known as "petrodollars"[10]), and because Iran's currency, the Rial, was (in part due to U.S. sanctions) one of the world's least valued currencies, the Iranian regime was desperately dependent on access to the USD funds it maintained in the Eurodollar market, and the interest income these petrodollar deposits generated.[11]

145.     Thus, reliably consistent access to, and the ability to facilitate trade in, the Eurodollar market has been critical to the capacity of the Iranian regime to fund its terror proxies such as Hezbollah in Lebanon, and to fuel its other terrorism and weapons proliferation activities through the IRGC.

---

[10] The petrodollar market developed because, *inter alia*, the United States was the largest producer and consumer of oil in the world, the world oil market has been priced in USD since the end of World War II.

[11] The Eurodollar interest rate is also known as the London Interbank Offered Rate ("LIBOR").

146.     The importance to Iran of funding Hezbollah, the IRGC and subsequently, the Special Groups in Iraq, became even more acute after the 2003 U.S. invasion of Iraq.  After that event, Iran directed Hezbollah to create "Unit 3800" (discussed below) and began devoting greater financial resources to gain influence in Iraq, inflict casualties on American citizens in Iraq, and intensify its quest for Weapons of Mass Destruction.

147.     None of these goals could be accomplished by Iran without USD funds, access to the Eurodollar market, and the agreement of Western financial institutions, such as the Western Bank Defendants, to shield Iran's unlawful Eurodollar and trade-finance activities from detection.

## C.     IRAN CONTINUALLY EVADED U.S., EUROPEAN UNION AND UNITED NATIONS SANCTIONS

148.     Congress and successive Administrations have enacted several laws and executive orders that imposed sanctions on countries and firms that sell Weapons of Mass Destruction technology and military equipment to Iran.

149.     On March 16, 1995, as a result of Iranian sponsorship of international terrorism and Iran's active pursuit of Weapons of Mass Destruction, President Clinton issued Executive Order 12957 prohibiting U.S. involvement with petroleum development in Iran.

150.     On May 6, 1995, President Clinton signed Executive Order 12959, pursuant to the International Emergency Economic Powers Act ("IEEPA"),[12] as well as the 1985 International Security and Development Cooperation Act ("ISDCA"), substantially tightening sanctions against Iran.

151.     On August 19, 1997, President Clinton signed Executive Order 13059 clarifying

---

[12] On October 16, 2007, President Bush signed into law the International Emergency Economic Powers (IEEPA) Enhancement Act, Public Law No. 110-96, amending IEEPA section 206.  The Act enhanced criminal and administrative penalties that could be imposed under IEEPA.

Executive Orders 12957 and 12959, and confirming that virtually all trade and investment activities with Iran by U.S. persons, wherever located, were prohibited.

152.    In order to thwart U.S. sanctions efforts, Iran cultivated close relationships with foreign arms suppliers, including Russia, China, and North Korea.

153.    In addition, Iran sought to clandestinely acquire dual-use technologies from European manufacturers, and certain export-controlled defense products, aircraft parts, dual-use technologies and materials from the United States.

154.    For years, U.S. law enforcement officials, customs agents and intelligence services have worked to thwart Iranian efforts to circumvent U.S. economic sanctions and arms embargos.

155.    A few brief examples illustrate the larger U.S. government effort:

- •    On March 12, 2001, criminal and civil sanctions were imposed on Refinery Industries, Inc., of Budd Lake, New Jersey, for attempted exports of gas detection equipment to Iran.

- •    On June 11, 2001, Saeed Homayouni and Yew Leng Fung, officials of Multicore, Inc., pled guilty in the U.S. in connection with the firm's purchase of commercial and military aircraft parts and missile components for export to Iran.

- •    In March 2007, the U.S. led efforts to pass U.N. Security Council Resolution 1747 that declared: "Iran shall not supply, sell or transfer directly or indirectly from its territory or by its nationals or using its flag vessels or aircraft any arms or related materiel."

- •    In March 2008, the U.S. led efforts to pass U.N. Security Council Resolution 1803 that called upon all member states "to exercise vigilance over the activities of financial institutions in their territories with all banks domiciled in Iran, in particular with Bank Melli and Bank Saderat, and their branches and subsidiaries abroad" and "to inspect the cargoes to and from Iran, of aircraft and vessels, at their airports and seaports, owned or operated by Iran Air Cargo and Islamic Republic of Iran Shipping Line, provided there are reasonable grounds to believe that the aircraft or vessel is transporting [prohibited] goods…"

- •    On September 17, 2008, the U.S. Department of Justice unsealed a

criminal indictment against 16 foreign-based defendants related to Mayrow General Trading Company, for their involvement in providing Weapons of Mass Destruction-related, military, and dual-use items to Iran, specifically components found in IEDs in Iraq that caused deaths and injuries to U.S. military personnel.

- On December 11, 2009, at the request of the U.S. government, the Thai government detained a Russian aircraft containing a cargo of weapons from North Korea destined for Iran.

- On June 23, 2010, the U.S. Department of Justice charged an Iranian company and citizen, as well as Opto Electronics PTE, Ltd., a Singapore company and others with, *inter alia*, violations of the Arms Export Control Act (22 U.S.C. §2778) for facilitating the unlawful transfer of long range radio frequency modules used in IEDs targeting Coalition Forces in Iraq.  The modules were flown to Iran by Mahan Air.

- On May 11, 2010, Balli Aviation Ltd., a subsidiary of the U.K.-based Balli Group Plc., was sentenced in the District of Columbia to pay a $2 million fine, and to serve a five-year corporate period of probation after pleading guilty to a two-count criminal information in connection with its illegal export of a commercial Boeing 747 aircraft from the United States to Iran.

- In December 2012, the U.S. Department of Justice charged Business Machinery World Wide, an Iranian corporation based in Tehran, Iran; three of its subsidiary companies located in Dubai, United Arab Emirates; and nine officers and individuals for conspiring to violate the IEEPA by facilitating the shipment of computers to the United Arab Emirates for delivery to Iran.

- In April 2014, John Alexander Talley was sentenced to 30 months in prison for conspiracy to violate the IEEPA and Iranian Transaction and Sanctions Regulations.  Talley's company, Tallyho Peripherals, Inc., was also sentenced to one year of probation.  According to court documents, from 2009 to September 2012, Talley and his company conspired with others to unlawfully export sophisticated computer equipment from the United States to Iran.  The shipments of the computers and the payments transited through the United Arab Emirates.

156.    In addition, both the U.S. Treasury Department and Commerce Department have

blacklisted a long list of Iranian front companies, shell companies and middlemen that the U.S.

has determined to be complicit in Iran's sanctions evasion efforts.

D.   **THE EURODOLLAR MARKET – IRAN'S MONEY LAUNDERING AND ILLICIT EXPORT NEXUS WITH DEFENDANT BANKS**

1.   **The Conspiracy's Shared Goals**

157.   As noted *supra*, Iran needed access to the Eurodollar market in order to sustain the Islamic Revolutionary government that has ruled Iran since 1979.

158.   Specifically, the Government of Iran used the Eurodollar market for the following economic activities:

a.   Investing petrodollar (in USD funds) revenue from Iran's oil and gas export sales;

b.   Exporting the Iranian Islamic Revolution through acts of international terrorism; and

c.   Illicitly acquiring U.S.-manufactured equipment, parts and technology to further its nuclear and conventional weapons programs.

159.   Iran did not have a legitimate need to access the Eurodollar market for the benefit of any Iranian civilian agency, operation or program; it could have operated with funds denominated in any number of other Eurocurrencies[13] (deciding, instead, to continually conduct its international trade primarily in Eurodollars).

160.   Specifically, Iran did in fact have access to viable alternative options both for foreign exchange and time deposits in Eurocurrencies (other than Eurodollars) to meet the needs of its civilian programs, including, but not limited to, its credit at the European Central Bank denominated in Euros, its credit at the International Monetary Fund ("IMF") denominated in Special Drawing Rights ("SDRs"), its credit at the Asian Clearing Union ("ACU") denominated in Asian Monetary Units ("AMUs"), or its domestic credit denominated in Iranian Rial.

---

[13] The term Eurocurrency refers to deposits of funds transferred to, and maintained by, banks outside of the home country for the respective currency. Thus, had Iran chosen to convert its petrodollars into Japanese Yen, it would have held "Euroyen" deposits at banks outside of Japan.

161.    However, Iran would not have been able to move its funds undetected through the Eurodollar market without the covert operational and technical assistance it received from the Defendants.

162.    Likewise, Iran would not have been able to substantially fund the Special Groups—and acquire U.S.-manufactured products (including dual-use technologies and export-controlled manufacturing equipment)—without access to USD funds through the Eurodollar market.

163.    In mid-2012, Iran's access to the Eurodollar market through the Defendant Banks was cut-off by SWIFT-Brussels.

164.    Soon thereafter, Iran's domestic currency collapsed.

165.    The CBI was forced to intensify the use of its gold reserves in order to prop-up the Rial's value.

166.    Absent the Defendant Banks providing Iran and its proxies with decades of clandestine access to the Eurodollar market, Iran's foreign policy goal of furthering its Islamic Revolution through the financing of terrorism—including Iran's sponsorship of terrorist attacks against Coalition Forces in Iraq between 2004 and 2011—would have been severely constrained.

## 2.    **Eurodollar Market Operations**

167.    As mentioned above, the global Eurodollar market is a wholesale, bank-to-bank market where a correspondent network of banks, bank branches and other bank affiliates outside the United States make loans and accept deposits denominated in U.S. dollars.

168.    According to the FRB-NY, the Eurodollar market emerged after World War II due to a large increase in U.S. dollars funds circulating outside of the United States from, *inter alia*, the Marshall Plan expenditures to rebuild Europe after the war.

169.    Prior to the launch of SWIFT-NET in 1977, most transactions in the Eurodollar market were conducted electronically by telegraphic transfer ("TELEX").

170.     By the time of the 1979 Iranian Revolution, the Bank of International Settlements ("BIS-Basel") estimated that the size of the Eurodollar market was over $600 billion.

171.     A mid-2015 report by the Bank of International Settlements ("BIS-Basel") estimated that the size of the Eurodollar market by the end of 2014 was over twenty-one trillion in USD funds.

172.     As mentioned *supra*, nearly all U.S. dollar transfers initiated through banks outside the United States are processed electronically by correspondent banks in the United States, almost exclusively in New York.

173.     The Clearing House Interbank Payment System ("CHIPS-NY") represents that it processes 95 percent of those Eurodollar funds transfers.

E.      **THE IRANIAN U-TURN EXEMPTION AND ITS REVOCATION**

174.     Alongside its economic sanctions against Iran, the United States government designed an exception process to permit Iran's circumscribed access to U.S. dollars through a narrowly-tailored exemption to the Iranian Trade Regulations, known as the "U-Turn exemption" (Section 560.516 of the Iranian Trade Regulations).  At the same time, the U.S. government insisted that U.S. financial institutions operating in the Eurodollar market conduct careful monitoring of all Iranian transactions to both deter and detect the financing of sanctioned entities involved in, *inter alia*, Iran's terrorism and weapons proliferation activities.

175.     The purpose of the U-Turn exemption was to permit Iranian parties indirect access to USD funds, *provided* that these transactions were fully disclosed to U.S. correspondent banks; were strictly for Iran's legitimate agencies, operations and programs; and were not earmarked for terrorist, WMD proliferation or other proscribed purposes.

176.     Until November 2008, U.S. financial institutions were authorized to process certain funds transfers (under the U-Turn exemption) for the direct or indirect benefit of Iranian banks,

56

other persons in Iran or the Government of Iran, *provided* such payments were initiated offshore by a *non-Iranian*, non-U.S. financial institution and only passed through the U.S. financial system *en route* to another offshore, *non-Iranian*, non-U.S. financial institution; *and* provided that none of the parties to the transactions had been designated an SDN, or that the transaction was for an SDN's benefit.

177.    The U-Turn exemption was therefore conditioned on transparency to permit the careful monitoring of all Iranian transactions, both to deter and detect terror financing and weapons proliferation activities.

178.    Because so much of Iran's international trade has historically flowed through the United States for the clearing and settlement and because Iran's primary terrorist proxy, Hezbollah, operates in Lebanon (itself a dollarized economy and largely dependent on U.S. currency) maintaining transparency in the processing of Iranian USD transactions has been a vital part of the architecture of U.S. national security for decades and was reflected as such in the Iranian Trade Regulations.

179.    Iran's access through the U-Turn exemption was to be closely monitored filtering all U-Turn exemption transactions through sophisticated computer systems used by U.S. financial institutions to monitor and screen all USD-denominated wire transfers.

180.    Defendants, however, knowingly and intentionally agreed to, and did, manipulate tens of thousands of payment order messages (SWIFT-NET MT 103 and MT 202) and the records of such transactions to defeat such monitoring and screening, and prevent transparency, in order to provide USD funds to Iran for unlawful uses, which foreseeably included the support of Iranian terrorism and terrorist organizations, including the Special Groups.

181.    The U.S. Treasury Department informed Defendants that critical to the U-Turn

exemption's functioning was the transparent identification of the various counterparties to the transactions. This transparency allowed U.S. banks, regulators and law enforcement to ensure that no transactions would benefit any sanctioned entities, thereby preventing Iran from using any of its assets to promote its terrorism goals. Thus, by intentionally masking the identity of the counterparties, Defendants processed fund transfers with full knowledge and intent that the transactions would benefit sanctioned entities.

182.    Over time, however, U.S. authorities began to understand the contours of the Conspiracy involving Iran and the Defendants that is set forth in this Complaint.

183.    Initially, the realization that Iran was engaging in "deceptive banking practices" led the U.S. to target key Iranian financial institutions, entities, and individuals under proliferation, counter-terrorism, and Iran-related sanctions *(i.e.,* E.O. 13382, E.O. 13224, and E.O. 13438, respectively).

184.    The apparent assumption made initially by U.S. authorities was that Iran and its banking agents (Iranian Bank Co-conspirators Bank Sepah, Bank Melli, Bank Saderat and others) were engaged in deception that was exploiting unwitting Western financial institutions that were engaged in high risk but legal, foreign exchange, precious metals, and trade-finance business with Iran. The truth was otherwise.

185.    *First,* despite Iran's feeble domestic economy during the entire relevant period of time, its oil and natural gas exports still provided the Iranian regime with substantial revenues denominated in U.S. dollars.

186.    *Second,* Iran's petrodollar revenues were managed by, and through, among others, the Central Bank of Iran ("CBI") and the Iranian Ministry of Petroleum (including the National Iranian Oil Company; later designated an SDN pursuant to E.O. 13382 and identified as an agent

or affiliate of the IRGC).[14]

187.    *Third*, the challenge Iran faced was that it was almost entirely dependent on USD funds but U.S. economic sanctions—and the attendant monitoring of Iran's financial activities—were incompatible with its terror financing and Weapons of Mass Destruction proliferation goals.

188.    *Fourth*, between 2004 and 2011, both Lebanon (where Iran's agent, Hezbollah, is based) and Iraq (where the Special Groups were launching terror attacks killing and maiming the Plaintiffs) were U.S.-dollarized economies, a fiscal reality that made Iran's funding of its terror proxies a highly "dollar-sensitive" endeavor.

189.    *Fifth*, in order to free itself from U.S. economic sanctions, and circumvent the U.S., European Union ("EU") and United Nations ("U.N.") monitoring of its financial activities, Iran needed more than a single willing partner among Western financial institutions to assist its illegal goals.

190.    *Finally*, Iran needed the active assistance of at least several of the world's largest (non-U.S.) multinational banks that were already accustomed to handling large volumes of dollar clearing and settlement transactions, and thus would be less likely to raise suspicions with U.S. authorities.

191.    For example, in early 2001, the Central Bank of Iran asked Defendant SCB to act as its correspondent bank with respect to Iranian petrodollar payments, trade-finance and foreign exchange transactions on behalf of NIOC.

192.    As set forth *infra*, Defendant SCB agreed to participate in the Conspiracy and deliberately removed identifying data on NIOC's payment orders (SWIFT-NET MT 103 and MT 202 payment order messages) for these and other wire transfers.

---

[14] That designation was removed in January 2016.

193.    The sheer size and volume of these NIOC transactions would have raised numerous red flags if not undertaken by a bank of SCB's size and existing USD clearing and settlement volume.

194.    However, even the large international banks worried about attracting attention from U.S. authorities when their illegal dollar clearing activities for Iran markedly increased.

195.    For example, as detailed below, in 2003, Defendant Commerzbank's employees expressed concern that Commerzbank's increased volume of illegal Eurodollar clearing activities on behalf of Bank Melli and Bank Saderat would draw unwanted attention.

196.    In the spring of 2006, the Manhattan District Attorney's Office first discovered evidence of the Conspiracy engaged in by certain European banks (including the Western Bank Defendants herein) on behalf of Iran and Iranian banks.

197.    As the New York State Department of Financial Services ("DFS") later observed:

> By 2008 it was clear that this system of wire transfer checks had been abused, and that U.S. foreign policy and national security could be compromised by permitting U-Turns to continue. In November 2008, the U.S. Treasury Department revoked authorization for "U-Turn" transactions because it suspected Iran of using its banks – including the CBI/Markazi, Bank Saderat and Bank Melli – to finance its nuclear weapons and missile programs. *The U.S. also suspected that Iran was using its banks to finance terrorist groups, including Hezbollah, Hamas and the Palestinian Islamic Jihad, and engaging in deceptive conduct to hide its involvement in various other prohibited transactions, such as assisting OFAC-sanctioned weapons dealers.* [Emphasis added].

198.    These findings led to a wide-ranging investigation that ultimately resulted in the entry of a series of Deferred Prosecution Agreements ("DPAs") with the Defendants (as well as other European and Japanese banks), and it exposed catastrophic vulnerabilities in America's counter-financing of terrorism ("CFT") security architecture inherent in the U-Turn exemption because foreign banks, including the Defendants herein, were actively conspiring with Iran to help

it evade U.S. economic sanctions and secret hundreds of billions of dollars through the U.S. financial system undetected.

199.     On October 11, 2007, the Financial Action Task Force ("FATF") released a statement of concern that "Iran's lack of a comprehensive anti-money laundering/counter-terrorist finance regime represents a significant vulnerability within the international financial system."

200.     FATF's October 11, 2007 statement further noted that "FATF members are advising their financial institutions to take the risk arising from the deficiencies in Iran's AML/CFT regime into account for enhanced due diligence."

201.     The U.S. criminal investigations would ultimately find that "the risk arising from the deficiencies in Iran's AML/CFT regime" ultimately included willful money laundering and terror financing by Iran with the *active, **critical*** assistance of the Defendants herein.

202.     Based on figures from both the International Monetary Fund and the Central Bank of Iran, from 2004 through 2011 Iran's total revenues from oil and natural gas export sales totaled approximately $972.9 billion USD.

203.     Without the Conspiracy between the Defendants herein, and other foreign financial institutions, Iran could not have (a) transferred the overall volume of USD funds through the international financial system that it did; (b) surreptitiously transferred large amounts of these USD funds for the benefit of Hezbollah and the IRGC; and (c) exploited the Iranian U- Turn exemption to blind U.S. regulators and law enforcement to the degree, and for the duration, that it did.

204.     As former Manhattan District Attorney Robert M. Morgenthau pointedly told Congress in 2009, "the U-Turn exemption constituted a glaring hole that undermined both the enforcement of, and the rationale behind, the Iranian sanctions program."

205.     Effective November 10, 2008, OFAC revoked the U-Turn exemption in its entirety,

and, as of that date, U.S. depository institutions were no longer authorized to process any Iranian U-Turn payments.

206. In revoking the U-Turn exemption, the U.S. government explained:

> Iran's access to the international financial system enables the Iranian regime to facilitate its support for terrorism and proliferation. The Iranian regime disguises its involvement in these illicit activities through the use of a wide array of deceptive techniques, specifically designed to avoid suspicion and evade detection by responsible financial institutions and companies.

## F.  LETTERS OF CREDIT – AN ALTERNATIVE METHOD OF UNDERMINING THE IRANIAN SANCTIONS PROGRAM

### 1.  Terminology

207. Letters of Credit ("LCs") are often used in international transactions to ensure that payment will be received. Due to the nature of international transactions, including factors such as the distance goods must travel, differing laws in each country, and the difficulty of trading parties knowing each party personally, the use of LCs has become a very important aspect of international trade.

208. The LC transaction process begins when an "Applicant" opens the Letter of Credit with a bank.

209. Normally, the Applicant is the purchaser of goods and the LC is opened with his/her bank according to the terms and conditions of the purchase order and business contract between buyer and seller.

210. The "Beneficiary" of the LC is the party to the transaction who receives the payment amount agreed upon in the LC.

211. In order to receive payment for the goods, the Beneficiary company submits all required documents under the terms and conditions of the LC.

212. When an LC is required to be secured, an "Issuing Bank" agrees to guarantee

payment for its customer upon the completion of the terms and conditions of the LC.

213.    The Issuing Bank's role is to provide a guarantee to the seller that if the required documentation is presented, the bank will examine the documents and pay the contract sum if these documents comply with the terms and conditions set out in the LC.

214.    Typically, the documents requested will include a commercial invoice, a transport document such as a bill of lading or airway bill and an insurance document; there are many other documents such as certificates of origin, packing lists and inspection certificates that can be included. LC transactions deal in documents, not in the underlying goods themselves.

215.    An "Advising Bank" is usually a foreign correspondent bank of the Issuing Bank that will advise the beneficiary of the transaction. Generally, a Beneficiary of an LC wants to use a local bank to insure that the LC is valid.

216.    In addition, the Advising Bank is usually responsible for sending the documentation to the Issuing Bank. Generally, the Advising Bank has no other obligation under the LC. If the Issuing Bank does not pay the beneficiary, the Advising Bank is not obligated to pay the obligation under the LC.

217.    The "Confirming Bank" is usually a correspondent bank that confirms the LC for the Beneficiary.  At the request of the Issuing Bank, the Confirming Bank obligates itself to ensure payment under the LC.

218.    Because the Confirming Bank does not confirm the credit until it evaluates the country and bank where the LC originates, the Confirming Bank usually acts as the Advising Bank.

219.    In the middle of this serpentine process is the "Negotiating Bank," which negotiates documents delivered by the Beneficiary of the LC.

220.    The Negotiating Bank examines the drafts and/or documents, and verifies and

confirms the terms and conditions under the LC on behalf of the Beneficiary to avoid discrepancies.

221.    A Negotiating Bank gives value to, and relies upon (or may rely upon), such drafts and/or documents, and may purchase or agree to purchase the drafts and/or documents presented.

222.    A Reimbursing Bank usually pays part or all of the amount due to the Beneficiary of the LC on behalf of the Issuing Bank once it receives a statement from the Negotiating Bank that the documents required comply with the LC's terms; however, in certain cases a Reimbursing Bank serves only as a guarantor for the payment by the Issuing Bank.

**2.    The U.S. Trade Embargo – United States Munitions List (USML) and Commerce Control List (CCL)**

223.    For decades, U.S. trade with Iran has been carefully circumscribed by the International Traffic in Arms Regulations ("ITARs"), Export Administration Regulations ("EARs"), and Iran Trade Regulations ("ITRs").

224.    Certain types of U.S. defense articles and defense services, such as nuclear or conventional weapon systems, are identified based on the ITARs promulgated by the U.S. Department of State and its Directorate of Defense Trade Controls through a publically available United States Munitions List ("USML").[15]

225.    In addition to USML items, certain types of U.S. dual-use products, such as nuclear materials, aerospace and other potentially sensitive materials, are identified based on the EARs and ITRs by the U.S. Department of Commerce and its Bureau of Industry and Security ("BIS") on a publicly available Commerce Control List ("CCL").

226.    Dual-use items that are not published on the CCL by BIS are commonly referred to

---

[15] The updated USML is available at:
https://www.pmddtc.state.gov/regulations_laws/documents/official_itar/ITAR_Part_121.pdf.

by U.S. manufacturers and shipping companies as "EAR99."

227.    These EAR99 items generally consist of low-technology consumer goods and do not always require a license; however, shipment from the United States of an EAR99 item to Iran, or any other embargoed country, often requires disclosure to BIS in addition to a license from the Commerce Department.

228.    As set forth below, one of the aims of the Conspiracy was to evade the U.S. ITARs, ITRs, and EARs—and also various EU decisions and U.N. Security Council Resolutions—prohibiting Iran from conducting both conventional weapons-trafficking and WMD proliferation.

229.    To facilitate this aim, Iran and its Co-Conspirators, including the Defendants herein, used LCs drawn on the CBI and other Iranian banks (and "stripped" the underlying payment orders), to clandestinely obtain and transport goods, technologies and weapons that were listed on the USML and/or CCL.

230.    Because the IRGC and Hezbollah needed to transport their terrorist operatives and weapons into Iraq, U.S. export-controlled item acquisitions financed by Letters of Credit were instrumental in facilitating the activities of these terrorist organizations, including, but not limited to, helping Iran acquire component parts and technologies used to make the IEDs, EFPs, and Improvised Rocket-Assisted Munitions ("IRAMs") that were deployed by the Iraqi Special Groups against Coalition Forces.

### G.    IRAN'S ILLEGAL ARMS  SHIPMENTS THROUGH ISLAMIC REPUBLIC OF IRAN SHIPPING LINES (IRISL)

231.    As Iran's national maritime carrier, IRISL has a long history of facilitating arms shipments on behalf of the IRGC and the Iranian military, including copper discs that are a key component in EFPs (discussed below) used to kill and maim many of the Plaintiffs herein.[16]

---

[16] Improvised Explosive Device ("IED") is a term commonly used by the U.S. military as

232.    The cargo included Iranian Defense Industries Organization ("DIO")[17] manufactured ammunition cartridges (7.62 x 39 rounds for AK-47 assault rifles).

233.    DIO is an Iranian government-owned weapons manufacturer controlled by MODAFL.

234.    An April 2008 State Department cable warned of an IRISL shipment of chemical weapons precursors from China aboard the IRISL-leased, Iranian flagged merchant vessel ("M/V") *Iran Teyfouri*.

235.    In September 2008, the U.S. Treasury Department designated IRISL an SDN, stating: "Not only does IRISL facilitate the transport of cargo for U.N. designated proliferators, it also falsifies documents and uses deceptive schemes to shroud its involvement in illicit commerce."

236.    The Treasury Department further noted that:

> [i]n order to ensure the successful delivery of military-related goods, IRISL has deliberately misled maritime authorities through the use of deception techniques.  These techniques were adopted to conceal the true nature of shipments ultimately destined for MODAFL [Iran's Ministry of Defense and Armed Forces Logistics].

237.    In January 2009, a former Russian merchant ship chartered by IRISL—named the M/V *Monchegorsk* and flying a Cypriot flag—was spotted leaving the Iranian port of Bandar Abbas and heading for the Suez Canal.

---

shorthand for a roadside bomb. However, unlike IEDs, the EFPs deployed by the IRGC, Hezbollah and the Special Groups in Iraq were not "improvised," but, instead, these advanced weapons were professionally manufactured and specifically designed to defeat the armor plating that protected the vehicles used by U.S. and Coalition Forces.

[17] DIO was designated an SDN by the U.S. on March 30, 2007. IRGC Brigadier-General Seyyed Mahdi Farahi was the Managing Director of DIO and has been sanctioned by the EU since 2008 (*see*, http://eur- lex.europa.eu/legal-content/EN/TXT/?uri=CELEX%3A32008D0475).  He was later sanctioned by the U.S. on January 17, 2016.

238.    Egyptian authorities were alerted by the U.S. Navy, and the M/V *Monchegorsk* was forced into an Egyptian port to be searched. Iran's DIO was later determined to be the shipper of the military-related cargo.

239.    Munitions, believed headed for Gaza, were found hidden in the cargo, including components for mortars and thousands of cases of powder, propellant, and shell casings for 125mm and 130mm guns.

240.    In October 2009, U.S. troops boarded a German-owned freighter, the M/V *Hansa India*, in the Gulf of Suez and found eight containers full of ammunition that were headed to Syria from Iran.

241.    The vessel carried seven containers of small arms ammunition (including 12 million bullet casings), as well as one container containing copper discs of the type used in EFPs to kill and maim many of the Plaintiffs herein.

242.    The acronym "IRISL" was painted in large block letters on the exterior side walls of each shipping container, and the barrels of munition parts discovered inside the containers were marked with the inscription "SAEZMANE SANAYE DEFA," a common transliteration from Farsi to English of the name for Iran's Defense Industries Organization (DIO).

243.    The M/V *Hansa India* was registered to the Hamburg-based shipping company Leonhardt & Blumberg, but had been under charter to IRISL for several years.

244.    In November 2009, the Government of Israel intercepted an IRISL-flagged ship, the M/V *Francop*, headed for Beirut, Lebanon and then Latakia, Syria.  The vessel was loaded with munitions crates that were either stamped "IRISL" or included documentation marked with the IRGC-QF logo.

245.    The munitions found onboard included over two thousand 107mm "Katyusha"

rockets, more than six hundred 122mm "Grad 20" rockets, and also various rocket fuses, mortar shells, rifle cartridges, fragment grenades and 7.62mm bullets.

246.    The M/V *Francop*, owned by the Cypriot shipping company UFS, was carrying shipping containers clearly marked IRISL.

247.    United Nations Security Council Resolution 1929, adopted on June 9, 2010, froze certain assets of IRISL and called on the international community to cease providing financial and insurance services to both the IRGC and IRISL.

248.    In addition, a July 2010 European Union ("EU") sanctions implementing regulation confirmed that IRISL conducted deceptive business practices in order to access USD funds.

249.    Specifically, EU Council Implementation Regulation Number 668/2010 stated that "IRISL subsidiaries have used US dollar-denominated bank accounts registered under cover-names in Europe and the Middle East to facilitate routine fund transfers."

250.    218.    Similarly, the June 2011 indictment of IRISL in New York stated:

> In many aspects of global commerce, including the international maritime industry, contracts and payments are denominated in U.S. dollars. Such U.S. dollar transactions are primarily executed, or "cleared," through correspondent banks in the United States. The U.S. dollar clearing operations for many large U.S. financial institutions are processed through correspondent bank accounts domiciled in New York County.

> In order to deceive and bypass these OFAC filters, SDNs designated under OFAC's non-proliferation of weapons of mass destruction program must falsify, or cause to be falsified, the originator and/or beneficiary information in wire transfers. In other words, by omitting or falsifying data regarding their roles as the true originators or beneficiaries, SDNs are able to send and receive wire transfers that would otherwise be blocked by U.S. financial institutions. Through the fraudulent use of a web of subsidiary entities and front companies, IRISL and the other defendants were able to deceive U.S. financial institutions and maintain their access to the U.S. financial system.

251.    Because the DIO, as discussed *infra*, was one of MODAFL's three main weapons systems manufacturers, it was required to use IRISL for most of its illicit shipments of military-

related raw-materials, parts and finished products for, and from, foreign suppliers, Iranian arms dealers and terrorist organizations.

252.   Iran's DIO was listed as an entity of concern for military procurement activities in an early warning document distributed by the German government to industry in July 2005.

253.   The DIO was also designated by the United Nations in 2006 for its involvement in Iran's WMD program.

254.   During 2006 and 2007, weapons caches seized by Coalition Forces from the Special Groups in Iraq contained large quantities of weapons produced by Iran; including many 107 millimeter artillery rockets with closely clustered DIO lot numbers and production dates between 2005 and 2007, as well as rounds and fuses for 60 millimeter and 81 millimeter mortars with DIO lot markings and 2006 production dates.

255.   In sum, at no point in time was the DIO a legitimate agency of the Iranian government.

256.   According to the U.S. State Department, the DIO was the owner of a Eurodollar account that was maintained by Bank Melli Iran's branch in Hamburg; and this bank account was used to send and receive USD funds transfer transactions for the benefit of the DIO.

257.   Bank Melli Iran's branch in Hamburg was a customer of Defendant Commerzbank during the relevant period, and both Bank Melli Iran and Commerzbank were active participants in the Conspiracy set forth herein.

**H.   IRAN'S AGENTS, HEZBOLLAH AND THE IRGC, FOMENT TERRORISM IN IRAQ**

258.   As previously noted, Iran has had a long, deep, strategic partnership with the Lebanese-based Foreign Terrorist Organization Hezbollah, which historically has served as Iran's

proxy and agent, enabling Iran to project extremist violence and terror throughout the Middle East and around the globe.

259. Through its proxy, agent, and strategic partner Hezbollah, Iran orchestrated a series of kidnappings of Westerners in Lebanon, including several Americans, in the 1980s; killed more than two hundred U.S. Marines at their barracks in Beirut, Lebanon, in 1983; hijacked TWA flight 847 in 1985; and launched two major attacks in the 1990s on Jewish targets in Buenos Aires, Argentina, namely the 1992 bombing of the Israeli Embassy (killing twenty- nine people) and the 1994 bombing of a Jewish community center (killing eighty five people).

260. As a result of its mission, conduct, and terrorist activities, on January 25, 1995, Hezbollah was designated a Specially Designated Terrorist ("SDT") by the United States.

261. On October 8, 1997, Hezbollah was designated an FTO by the United States. It has retained that designation since that time.

262. On October 31, 2001, pursuant to E.O. 13224, Hezbollah was designated an SDGT by the United States.

263. For more than 30 years, Iran, through the IRGC, has funded, trained and equipped Hezbollah.

264. The IRGC-QF's "Department 2000" manages Iran's relationship with Hezbollah, which includes the flow of some of Iran's most sophisticated weapons systems, including military grade EFPs, anti-tank guided missiles ("ATGMs"), and various rockets, such as the Fajr-5.

265. Beginning with the 2003 U.S. overthrow of Saddam Hussein's regime in Iraq, Iran has assiduously worked to expand its influence in Iraq and throughout the region in a variety of ways, including by fomenting violence and terrorism when such activities have served its ambitions.

266.    In doing so, Iran has relied on both Hezbollah and the IRGC.

267.    According to a December 20, 2004 *Washington Post* article, "Western diplomats and political analysts in Beirut estimated that Hezbollah received $200 million a year from Iran."

268.    As the U.S. government noted when it designated Defendant Bank Saderat Plc, Iran has provided tens of millions of U.S. dollars in funding to Hezbollah through the international financial system, including $50 million that Defendant Bank Saderat Plc provided to Hezbollah.

269.    Sometime after the 2003 U.S. invasion of Iraq, Hezbollah created "Unit 3800," an entity dedicated to supporting Iraqi Shi'a terrorist groups targeting Multi National Forces in Iraq ("MNF-I").

270.    Unit 3800 was established by Hezbollah leader Hassan Nasrallah at Iran's request.

271.    Unit 3800 has trained and advised the Special Groups, which as previously noted are Hezbollah-controlled Shi'a terrorist groups operating in Iraq.

272.    Hezbollah training camps in southern Lebanon and Iran, and Hezbollah's expertise in the use of EFPs, kidnapping, communications and small-unit operations, were critical to the IRGC's operations in Iraq between 2004 and 2011.

273.    Iran's support of terrorist groups in Iraq was described in the U.S. State Department's 2005 *Country Reports on Terrorism*, which observed:

> Iran has provided political and ideological support for several terrorist and militant groups active in Iraq. Attractive to terrorists in part because of the limited presence of the United States and other Western governments there, Iran is also a safe haven in that known terrorists, extremists, and sympathizers are able to transit its territory and cross the long and porous border into Iraq. Iran also equips terrorists with technology and provides training in extremist ideology and militant techniques.

274.    The IRGC's subversion of Iraq has not been limited to terrorism.

275.    The IRGC has also infiltrated Iraqi society, providing "political and ideological

support" via charitable associations such as the Khomeini Social Help Committee – in Karbala, Najaf, Kut, and Sadr City – and the Imam Mohammad Bagher Institute in Najaf.

276.     The IRGC also purchased or developed seven television stations in Iraq, and at least three radio stations.

277.     All of these "investments" required substantial funding in USD funds (as Iraqi local currency was not widely accepted in Iraq during this time period).

278.     According to the same U.S. State Department's 2005 Country Reports on Terrorism: "[t]he IRGC was increasingly involved in supplying lethal assistance to Iraqi militant groups, which destabilizes Iraq …Senior Iraqi officials have publicly expressed concern over Iranian interference in Iraq, and there were reports that Iran provided funding, safe passage, and arms to insurgent elements."

279.     By early 2005, the presence of Hezbollah operatives in Iraq became an open secret when Iraqi Interior Minister Falah al-Naquib announced the arrest of eighteen Lebanese Hezbollah members on terrorism charges.

280.     Two years later, according to U.S. intelligence estimates—and following the 2007 arrest and interrogation of Hezbollah's senior operative in Iraq—the IRGC-QF provided Hezbollah and one of its local trainers, Ali Musa Daqduq (discussed in greater detail below), up to $3 million in U.S. currency every month.

281.     In October 2007, the IRGC-QF was designated as an SDGT pursuant to E.O. 13324 for its terrorism-related activities.

282.     The U.S. Treasury Department's press release announcing the designation noted that:

> The Qods Force has had a long history of supporting Hizballah's military, paramilitary, and terrorist activities, providing it with guidance, funding,

weapons, intelligence, and logistical support. The Qods Force operates training camps for Hizballah in Lebanon's Bekaa Valley and has reportedly trained more than 3,000 Hizballah fighters at IRGC training facilities in Iran. The Qods Force provides roughly $100 to $200 million in funding a year to Hizballah and has assisted Hizballah in rearming in violation of UN Security Council Resolution 1701.

*In addition, the Qods Force provides lethal support in the form of weapons, training, funding, and guidance to select groups of Iraqi Shi'a militants who target and kill Coalition and Iraqi forces and innocent Iraqi civilians.* [Emphasis added.]

283. In 2008, Pentagon Press Secretary Geoff Morrell reported on the "smuggling system -- in which the Iranians are providing their allies within Iraq, these special groups, with the munitions that are then used to take on us, whether it be EFPs or rockets or conventional arms. These are being used by these special groups and being provided by the Iranians."

284. According to a 2010 report by the Combatting Terrorism Center at West Point, Iran paid Iraqi "insurgent" groups "between $4,000 and $13,000 per rocket or roadside bomb, depending on the circumstances."

285. Because of the perceived unreliability and value of the post-Hussein regime Iraqi currency, the Special Groups in Iraq (like most people in Iraq) used U.S. currency almost exclusively.

286. According to Brigadier Gen. Kevin J. Bergner, a U.S. military spokesman who previously served as the Deputy Commanding General for Multi-National Forces in Mosul, Iraq, "the Qods Force has provided armor-piercing weapons to extremist groups in Iraq, funneling them up to $3 million a month and training Iraqi militiamen at three camps near Tehran."

287. General Bergner added, "[t]he Iranian Qods Force is using Lebanese Hezbollah essentially as a proxy, as a surrogate in Iraq ... Our intelligence reveals that senior leadership in Iran is aware of this activity."

288.    On January 9, 2008, the U.S. Treasury Department designated four individuals and one entity under E.O. 13438 for threatening the peace and stability of Iraq and the government of Iraq.  Three of the individuals, Ahmed Foruzandeh (a Brigadier General in the IRGC-QF), Abu Mustafa Al-Sheibani, and Isma'il Hafiz Al Lami (a/k/a "Abu Dura") were all based in Iran and/or received funding from Iran.

289.    Regarding the designation of Abu Mustafa Al-Sheibani, the Treasury Department press release stated:

> Iran-based Abu Mustafa Al-Sheibani leads a network of Shia extremists that commit and provide logistical and material support for acts of violence that threaten the peace and stability of Iraq and the Government of Iraq.  Al-Sheibani's Iran-sponsored network was created to affect the Iraqi political process in Iran's favor.  The network's first objective is to fight U.S. forces, attacking convoys and killing soldiers. Its second objective is to eliminate Iraqi politicians opposed to Iran's influence.  *Elements of the IRGC were also sending funds and weapons to Al- Sheibani's network.*
>
> Al-Sheibani's network – consisting of several hundred members – conducted IED attacks against Americans in the Baghdad region.  As of March 2007, Al-Sheibani, known to transport Katyusha rockets to be used for attacks against Coalition Forces, launched rockets against Americans and made videos of the attacks to get money from Iran. *As of April 2007, a member of Al-Sheibani's network supervised the transport of money and explosives from Iran for eventual arrival in Baghdad.* In early - May 2007, Al-Sheibani's network assisted members of a Shia militia group by transporting them to Iran for training and providing them with weapons for their activities in Iraq.
>
> Additionally, Al-Sheibani commands several pro-Iranian insurgent groups in southern Iraq that work to destabilize Iraq and sabotage Coalition efforts. These groups use a variety of weapons, to include mortars, Katyusha rockets, and anti-tank landmines. *Ordered by IRGC headquarters to create disorder, the task of these groups is to attack bases of Coalition Forces in southern Iraq, particularly British forces.* [Emphasis added.]

290.    To that end, Iran and Hezbollah have armed, trained, and funded a variety of terrorist groups and infiltrated and co-opted Iraqi security forces in an effort to kill or maim Coalition Forces to coerce the United States into withdrawing those forces and to terrorize Iraq's

civilian population in order to increase Iran's own influence.

### I. IRAN FUNDED THE DESIGN AND PRODUCTION OF EXPLOSIVELY FORMED PENETRATORS ("EFPS") USED BY SPECIAL GROUPS TO KILL OR MAIM COALITION FORCES, INCLUDING THE PLAINTIFFS

291. As noted above, the EFPs deployed by the Special Groups in Iraq were not truly "improvised" explosive devices but professionally manufactured and specifically designed to target U.S. and Coalition Forces' armor.

292. EFPs constitute "weapons of mass destruction" as that term is defined in 18 U.S.C. § 2332a(2)(A).

293. EFPs had first been used against the Israeli Defense Forces ("IDF") in the 1990s, and were modified and heavily employed against U.S. forces by the FTO. Iran passed EFP technology to Hezbollah, which in turn passed EFP kits to its agents (the Special Groups) fighting in Iraq, and which effectively and lethally utilized these weapons to blow up, maim and kill the Plaintiffs herein.

294. EFPs are categorized by the U.S. military as a type of shaped-charge weapon. They are usually made by placing a precision-manufactured concave copper disk in front of high-explosives that have been packed into a steel tube with a cap welded to one end.

295. In Iraq, EFPs were often triggered by a passive infra-red device that ultimately set off an explosion within the steel casing of the EFP, forcing the copper disk forward, and turning it into a high-velocity molten slug that could pierce the military-grade armor of most U.S. vehicles deployed in Iraq.

296. To produce these weapons, copper sheets are often loaded onto a punch press to yield copper discs. These discs are annealed in a furnace to soften the copper. The discs are then loaded into a large hydraulic press and formed into the disk-like final shape.

297.    This munitions manufacturing process is critical to the design and concomitant lethality of the EFP weapon.

298.    Unlike homemade explosive devices such as traditional IEDs, EFPs are far more sophisticated and are specifically designed to target vehicles such as armored patrols and supply convoys, though the Special Groups have deployed them against U.S. and Iraqi civilians as well.

299.    Almost immediately following the U.S. invasion of Iraq in 2003, U.S. intelligence reports emerged indicating Hezbollah operatives were reaching out to establish ties to other members of terrorist groups.

300.    Iran sent in thousands of Hezbollah personnel into Iraq after the 2003 fall of Saddam Hussein.

301.    By August of 2007, Iranian- and Hezbollah-backed violence by the Special Groups accounted for roughly half of the attacks on U.S. and Coalition Forces in Iraq.  By this time, the U.S. military had catalogued large quantities of enemy weapons in Iraq which had the "imprint" of Iranian design and manufacture, particularly the highly-lethal EFPs which were made from copper discs manufactured with highly-calibrated machine tools.  Many of the confiscated EFPs had indications they had been manufactured in Iran as recently as October of 2006.

302.    In the spring of 2007, and in moves taken to attempt to reduce the ability of the Special Groups to destabilize the Iraqi government and the security of Iraq, Special Forces Operations were undertaken to flush out Iranian and Hezbollah involvement in fomenting that resistance.

303.    Those operations and other intelligence reports indicated that the highest echelons of the Iranian government and Hezbollah had worked together to organize a violent resistance movement in Iraq.

304.    Because Iran propagated its specialized weapons knowledge up and down its network of terror proxies in Iraq, the U.S. State Department's 2006 *Country Reports on Terrorism* further documented Iran's specific efforts to provide terrorists with lethal EFPs to ambush and murder U.S. and other Coalition Forces:

> Iran provided guidance and training to select Iraqi Shia political groups, and weapons and training to Shia militant groups to enable anti-Coalition attacks. Iranian government forces have been responsible for at least some of the increasing lethality of anti-Coalition attacks by providing Shia militants with the capability to build IEDs with explosively formed projectiles similar to those developed by Iran and Lebanese Hezbollah. The Iranian Revolutionary Guard was linked to armor-piercing explosives that resulted in the deaths of Coalition Forces. The Revolutionary Guard, along with Lebanese Hezbollah, implemented training programs for Iraqi militants in the construction and use of sophisticated IED technology. These individuals then passed on this training to additional militants in Iraq.

305.    Also in 2006, Brigadier Gen. Michael Barbero, Deputy Chief of Staff for Strategic Operations of the Multi-National Force – Iraq stated: "Iran is definitely a destabilizing force in Iraq. I think it's irrefutable that Iran is responsible for training, funding and equipping some of these Shi'a extremist groups and also providing advanced IED technology to them, and there's clear evidence of that."

306.    That same year, the Deputy Chief of Staff for Intelligence with the MNF-I, U.S. Army Major General Richard Zahner, declared that:

> Labels on weapons stocks seized inside and outside Iraq point to Iranian government complicity in arming Shiite militias in Iraq […] Iran is funneling millions of dollars for military goods into Iraq […] You'll find a red label on the C-4 [explosive] printed in English and will tell you the lot number and name of the manufacturer.

307.    Major General Zahner further added:

> [T]he control of military-grade explosives in Iran is controlled through the state apparatus and is not committed through rogue elements right there. It is a deliberate decision on the part of elements associated with the Iranian government to affect this type of activities.

308.    General Bergner commented on Iran funding Hezbollah operatives in Iraq:

Actions against these Iraqi groups have allowed coalition intelligence officials to piece together the Iranian connection to terrorism in Iraq […] Iran's Quds Force, a special branch of Iran's Revolutionary Guards, is training, funding and arming the Iraqi groups. […] It shows how Iranian operatives are using Lebanese surrogates to create Hezbollah-like capabilities.  And it paints a picture of the level of effort in funding and arming extremist groups in Iraq.

309.    Bergner further noted that:

The groups operate throughout Iraq.  They planned and executed a string of bombings, kidnappings, sectarian murders and more against Iraqi citizens, Iraqi forces and coalition personnel.  They receive arms—including explosively formed penetrators, the most deadly form of improvised explosive device—and funding from Iran.  They also have received planning help and orders from Iran.

310.    In May 2007, the Commander of the Multinational Division-Center, U.S. Army

Major General Richard Lynch, stated that:

Most of our casualties have come from improvised explosive devices.  That's still the primary threat to our soldiers—IEDs.  And we have an aggressive campaign to counter those IEDs, but they still are taking a toll on our soldiers: 13 killed, 39 soldiers wounded. *What we're finding is that the technology and the financing and the training of the explosively formed penetrators are coming from Iran.  The EFPs are killing our soldiers, and we can trace that back to Iran*." [Emphasis added.]

311.    According to the U.S. State Department's 2007 *Country Reports on Terrorism*:

Despite its pledge to support the stabilization of Iraq, Iranian authorities continued to provide lethal support, including weapons, training, funding, and guidance, to some Iraqi militant groups that target Coalition and Iraqi security forces and Iraqi civilians. In this way, Iranian government forces have been responsible for attacks on Coalition forces.  The Islamic Revolutionary Guard Corps (IRGC)-Qods Force, continued to provide Iraqi militants with Iranian-produced advanced rockets, sniper rifles, automatic weapons, mortars that have killed thousands of Coalition and Iraqi Forces, and explosively formed projectiles (EFPs) that have a higher lethality rate than other types of improvised explosive devices (IEDs), and are specially designed to defeat armored vehicles used by Coalition Forces.  The Qods Force, in concert with Lebanese Hezbollah, provided training outside Iraq

for Iraqi militants in the construction and use of sophisticated IED technology and other advanced weaponry. These individuals then passed on this training to additional militants inside Iraq, a "train-the-trainer" program. In addition, the Qods Force and Hezbollah have also provided training inside Iraq. In fact, Coalition Forces captured a Lebanese Hezbollah operative in Iraq in 2007.

312.   Other U.S. Government reports, such as the Department of Defense's 2007

*Measuring Stability and Security in Iraq* quarterly report to Congress, similarly concluded that:

The Iranian regime's primary tool for exercising clandestine influence in Iraq is the Islamic Revolutionary Guard Corps' (IRGC) Qods Force (QF), which provides arms, intelligence, funds, training, and propaganda support to Iraqi Shi'a militants targeting and killing Coalition and Iraqi forces, as well as Iraqi civilians. The QF seeks to increase long-term Iranian strategic influence in Iraq and the withdrawal of U.S. forces. Among the weapons it provides to Iraqi militants are improvised explosive devices (IEDs), advanced IED technologies (including explosively formed projectiles (EFPs)), and rockets and mortars used for indirect fire attacks.

313.   These observations continued in 2008.

314.   According to the U.S. State Department's *2008 Country Reports on Terrorism*:

The Qods Force, an elite branch of the Islamic Revolutionary Guard Corps (IRGC), is the regime's primary mechanism for cultivating and supporting terrorists abroad. The Qods Force provided aid in the form of weapons, training, and funding to HAMAS and other Palestinian terrorist groups, Lebanese Hezbollah, Iraq-based militants, and Taliban fighters in Afghanistan.…

Despite its pledge to support the stabilization of Iraq, Iranian authorities continued to provide lethal support, including weapons, training, funding, and guidance, to Iraqi militant groups that targeted Coalition and Iraqi forces and killed innocent Iraqi civilians. Iran's Qods Force continued to provide Iraqi militants with Iranian-produced advanced rockets, sniper rifles, automatic weapons, and mortars that have killed Iraqi and Coalition Forces as well as civilians. Tehran was responsible for some of the lethality of anti-Coalition attacks by providing militants with the capability to assemble improvised explosive devices (IEDs) with explosively formed projectiles (EFPs) that were specially designed to defeat armored vehicles. The Qods Force, in concert with Lebanese Hezbollah, provided training both inside and outside of Iraq for Iraqi militants in the construction and use of sophisticated IED technology and other advanced weaponry.

315.    One of the ways in which the IRGC provided "militants with the capability to assemble improvised explosive devices (IEDs) with explosively formed projectiles (EFPs) that were specially designed to defeat armored vehicles" included providing them with manufacturing supplies such as copper and steel, as well as machinery—including hydraulic presses used to form copper into the shape of disks used in EFPs.

316.    Likewise, the State Department's 2011 *Country Reports on Terrorism* reported:

> Despite its pledge to support the stabilization of Iraq, Iran continued to provide lethal support, including weapons, training, funding, and guidance, to Iraqi Shia militant groups targeting U.S. and Iraqi forces, as well as civilians. Iran was responsible for the increase of lethal attacks on U.S. forces and provided militants with the capability to assemble explosives designed to defeat armored vehicles. The IRGC-QF [Islamic Revolutionary Guard Corps-Quds Force], in concert with Lebanese Hezbollah, provided training outside of Iraq as well as advisors inside Iraq for Shia militants in the construction and use of sophisticated improvised explosive device technology and other advanced weaponry.

317.    Similarly, in 2011, the U.S. Ambassador to Iraq, James F. Jeffrey, was quoted as saying:

> [F]resh forensic testing on weapons used in the latest deadly attacks in the country bolsters assertions by U.S. officials that Iran is supporting Iraqi insurgents with new weapons and training. […] We're not talking about a smoking pistol. There is no doubt this is Iranian.

318.    All of the foregoing support from Iran and its agents for attacks on Coalition Forces and Iraqi civilians was financed and facilitated, in substantial part, by funds transfers initiated by Iran through Iranian banks (including, inter alia, the Central Bank of Iran, Bank Melli Iran and Defendant Bank Saderat Plc) on behalf of, and for the benefit of, the Special Groups as part of the Conspiracy set forth in detail herein.

319.    Because of the size and scope of Iran's efforts to murder Americans in Iraq—and subvert the U.S.-sponsored and freely elected Iraqi government, Iran required access to hundreds

of millions of dollars that it could only reliably and effectively transfer through the global financial system with the illicit assistance of the Western Bank Defendants.

### J.    IRAN SUPPORTED HEZBOLLAH-CONTROLLED SPECIAL GROUPS IN IRAQ THAT COORDINATED WITH THE IRGC

320. Hezbollah has committed terrorist attacks around the world primarily by acting through terrorist proxies. Hezbollah is extremely adept at recruiting members from local populations in areas where they have networks on the ground. Hezbollah has trained and equipped these local terrorist proxies to carry out terrorist attacks on Hezbollah's behalf. Hezbollah has successfully employed this strategy to facilitate attacks by its proxies in (among other places) Paris, France (1985-86); Buenos Aires, Argentina (1992); and Khobar, Saudi Arabia (1996). The attacks on Plaintiffs or their family members in Iraq are yet another example of Hezbollah's established practice of committing terrorist attacks through its agents.

321. Hezbollah used a number of different methods to control its agents, the Iraqi-based Special Groups. These include installing Hezbollah loyalists to key leadership positions, demanding allegiance from members, conditioning ongoing support on the commission of terrorist attacks, and appeals to religious and spiritual authority.

322. For example, Hezbollah took advantage of the reverence that Iraqi Shi'a felt towards Hezbollah's senior leadership – and in particular Secretary-General Hassan Nasrallah and Grand Ayatollah Fadlallah – by having those leaders issue repeated calls to Iraqi Shi'a to join the Special Groups and attack Americans in Iraq. Hezbollah's message of authorization was effective because many Special Group members looked to Hezbollah as a moral and religious authority.

323. Hezbollah's religious and moral authority was especially powerful because the Special Groups looked to religious authorities for validation. The Special Groups who committed the attacks against Plaintiffs do not believe in the legitimate authority of secular governments, but

instead view religion as a legitimizing force – conveyed by sacred text or imparted via clerical authorities claiming to speak for the divine.  Thus, for religious terrorist organizations such as the Special Groups, violence is first and foremost a sacramental act or divine duty executed in direct response to some theological demand or imperative. As prominent voices in Shi'a Islam, Grand Ayatollah Fadlallah and Secretary-General Nasrallah were especially influential among members of the Special Groups.

324.    Hezbollah's leaders leveraged their moral and religious authority over the Special Groups by publicly calling for "jihad" and issuing *fatwas* against Americans in Iraq.  The violence that followed is further evidence of the control that Hezbollah asserted over the Special Groups.

325.    Hezbollah's Iraqi agents include Jaysh al Mahdi, Promised Day Brigades, Kata'ib Hezbollah, and Asa'ib Ahl Al-Haq, among others.

### 1. JAYSH AL MAHDI

326.    Jaysh al Mahdi (also known as "Mahdi Army") is a Special Group that was co-founded by Imad Mughniyah, one of Hezbollah's most senior commanders, and radical Shi'a cleric Muqtada al-Sadr in June 2003.  Jaysh al Mahdi was co-founded by for the specific purpose of creating a Hezbollah clone that would operate in Iraq and carry out Hezbollah's terrorist agenda. A U.S. Special Operations task force report explained that "the Lebanese Hizballah leadership believes that the struggle in Iraq is the new battleground in the fight against the U.S."  Israeli intelligence reported that, by October 2003, Hezbollah was already planning to set up a resistance movement that would cause mass casualties among American forces in Iraq.  Jaysh al Mahdi was therefore created to be the Iraqi branch of Hezbollah.

327.    Immediately after Saddam's government fell in April 2003, Hezbollah dispatched Mugniyeh, its chief terrorist mastermind, to Iraq.  Mugniyeh's assignment was to work with Sadr

to build a terrorist organization modeled after Hezbollah and capable of carrying out sophisticated attacks on Americans in Iraq.

328.　Mugniyeh and Sadr created the terrorist organization that would become known as Jaysh al-Mahdi.  Sadr was an obvious choice by Hezbollah to lead its terror campaign in Iraq.  Sadr had a close relationship with Hezbollah.  Hassan Nasrallah, Hezbollah's Secretary-General, had studied under Muqtada al-Sadr's uncle, Baqir al-Sadr. Muqtada's cousin, Musa al-Sadr, founded Hezbollah's predecessor in Lebanon. A 2004 U.S. military-intelligence report concluded that Sadr had a direct relationship with Hassan Nasrallah, the head of Hezbollah, and that a top adviser to Nasrallah had personally delivered funds to Sadr in Najaf.  Sadr himself visited Tehran and Beirut on numerous occasions.

329.　On April 18, 2004, Jaysh al Mahdi led the first major armed confrontation by Shi'a militia against U.S.-led forces in Iraq.  This same month, Sadr proclaimed that Jaysh al Mahdi was Hezbollah's "striking arm in Iraq."

330.　Jaysh al Mahdi expanded its territorial control of mixed or predominantly Shi'a neighborhoods and displaced or killed the local Sunni population.

331.　By late 2004, Jaysh al Mahdi had effectively seized control of large swaths of Iraq, including but not limited to Basra, Amarah, Najaf, Wasit, Kufa, Nasiriyah, and the entire eastern half of Baghdad. By early 2005, there were 20 Jaysh al-Mahdi brigades – all of which were trained by Hezbollah – operating out of Jaysh al Mahdi's command-and-control safe haven in Sadr City, from which Jaysh al Mahdi coordinated and launched Hezbollah-authorized attacks against Coalition forces throughout Iraq.

332.　Jaysh al Mahdi was able to gain initial control in many of the neighborhoods in and around Baghdad (such as Sadr City) by offering the Shi'a population protection and social services.

333. Mugniyah recruited fighters for the Madhi Army from Shia communities in Kuwait and Saudi Arabia, and then sent the recruits for training in Lebanon from Hezbollah.

334. Once in Lebanon, the Hezbollah sponsorship of and assistance and training given to the Mahdi Army were not a secret at all.

335. According to Abu Muhannad, a Jaysh al Mahdi fighter who was trained by Hezbollah: "We learned how to take advantage of an armored vehicle's weaknesses, and how to wait and kill the soldiers who try to escape."

336. According to the General John Abizaid, the head of U.S. Central Command, Jaysh al Mahdi fighters traveled to Lebanon to be trained by Hezbollah fighters and leadership, then returned to Iraq to foment violence against U.S. forces.

337. General Michael Hayden, director of the Central Intelligence Agency, asserted in late 2006 that Hezbollah had trained thousands of Mahdi Army and other Special Group fighters in Lebanon, and that a small number of Hezbollah leadership operatives had visited Iraq to help train additional fighters there.

338. Jaysh al Mahdi, with the full support and funding of the IRGC and the QF, conducted EFP attacks on U.S. and Coalition soldiers and convoys, including upon information and belief on the Plaintiffs herein, between 2004 and 2011.

339. At all relevant times, Jaysh al Mahdi operated as an agent of Hezbollah. A month before Jaysh al Mahdi launched its first attack as Coalition forces, Sadr pledged his fealty to Hezbollah, which he couched in Shi'a Islamic terms such that he was communicating to his followers that submission to Hezbollah is a religious duty, stating at one point, "our victorious party, Hezbollah."

340. Hezbollah's role in Jaysh al-Mahdi's activities was similar to its role in other terror

campaigns it sponsored: Hezbollah recruited, trained, armed, and directed Jaysh al-Mahdi terrorists, who carried out terrorist attacks against Americans on Hezbollah's behalf. Hezbollah Secretary-General Hassan Nasrallah was deeply involved in Jaysh al-Mahdi's campaign of terror, reportedly spending several hours daily dealing with the situation in Iraq.

341.    Immediately after Jaysh al-Mahdi's founding in April 2003, Mugniyeh began to recruit and train soldiers for Jaysh al-Mahdi. Mugniyeh soon recruited 300 terrorists for Jaysh al-Mahdi from Shi'a communities in Kuwait and Saudi Arabia, then sent those terrorists to Lebanon for training in the use of assault rifles, booby traps, and kidnapping. These 300 fighters were some of Jaysh al-Mahdi's first members.  That same month, Hezbollah opened two offices in the Iraqi cities of Basra and Safwan in order to build up its organizational and military apparatuses in Iraq. By August 2003, Hezbollah had established permanent teams of 30 to 40 operatives in Najaf to recruit and train Jaysh al-Mahdi terrorists.  At the same time, these Hezbollah operatives were acquiring weapons for Jaysh al-Mahdi.

342.    Hezbollah's involvement in Jaysh al-Mahdi's campaign of terror only grew during the subsequent months and years. By January 2004, nearly 800 Hezbollah agents had been sent to Iraq, where they were deployed to direct Jaysh al-Mahdi's terrorist campaign from key Jaysh al-Mahdi strongholds in Iraq, including, but not limited to, Sadr City, Najaf, Safwan, and Basra. Eighteen of these Hezbollah operatives were detained on charges of terrorism in February 2005. An October 2006 U.S. intelligence summary noted that 300 Hezbollah terrorists from Lebanon have joined with Jaysh al Mahdi in Najaf after travelling to Iraq on tourist visas.  Mugniyeh continued to personally supervise Jaysh al Mahdi's campaign of terror until his death in February 2008, at which point he was replaced by other Hezbollah operatives.

343.    In addition to its terrorist mastermind Imad Mugniyeh, Hezbollah deployed a litany

of its senior terrorist planners to direct Jaysh al-Mahdi's campaign of terror against Americans in Iraq, including, but not limited to, the following Hezbollah terrorists:

- *Ali Mussa Daqduq* (Senior Hezbollah Field Commander). Hezbollah directed its senior field commander, Ali Mussa Daqduq, to work with the Quds Force to instruct Jaysh al-Mahdi on the use of EFPs, mortars, rockets, and other terrorist tactics, including kidnapping operations.

- *Muhammad Kawtharani* (Nasrallah's Personal Liaison to Sadr). Hezbollah also deployed a senior cleric, Muhammad Kawtharani, to serve as a liaison to Jaysh al-Mahdi. In 2013, the U.S. Treasury Department identified Kawtharani as a member of Hezbollah's leadership who acted for Hezbollah and was responsible for terrorist operations in Iraq as the individual in charge of Hezbollah's Iraq activities. Kawtharani, as personal adviser to Nasrallah, was directly involved in coordinating attacks against Americans in Baghdad.

- *Yusuf Hashem* (Iraq Operations – Country-wide). Hezbollah also tasked another senior Hezbollah terrorist commander, Yusuf Hashem, to coordinate Hezbollah's Jaysh al-Mahdi operations in Iraq.

- *Ali Falih Hadi* (Iraq Operations – Basra and Amarah). Ali Falih Hadi was a member of Hezbollah who was based in Amarah in Basra Province and was responsible for supplying weapons to members of a Jaysh al-Mahdi/Hezbollah cell operating in Basra.

- *Hezbollah Bombmakers*. On information and belief, Hezbollah deployed one or more experienced bombmakers into Iraq to provide in-country direction to Jaysh al-Mahdi terrorists relating to the design, manufacture, storage, and maintenance of EFPs and IEDs for use against Americans in Iraq.

344.     At Hezbollah's direction, Jaysh al-Mahdi escalated its attacks on Americans in Iraq beginning in the winter of 2005. This escalation was the direct result of Hezbollah's own strategic decision to ratchet up pressure on the United Stated, thus further confirming that Jaysh al Mahdi acted as Hezbollah's agent in carrying out its terrorist agenda.

345.     Jaysh al-Mahdi fighters regularly participated in anti- American marches in which they marched under Hezbollah flags and banners. Tens of thousands of members of Jaysh al-Mahdi publicly swore fealty to Hezbollah in various marches in Sadr City in 2006 alone.

346.     On August 4, 2006, more than 10,000 members of Jaysh al-Mahdi attended a joint Jaysh al-Mahdi/Hezbollah march in Sadr City, which further demonstrated Hezbollah's control over Jaysh al-Mahdi operations. Demonstrators wore white shrouds symbolizing their willingness to die for Hezbollah, waved the Lebanese guerrillas' yellow banner and chanted slogans in support of their leader, Sheik Hassan Nasrallah.  The crowd of Jaysh al-Mahdi fighters further declared "Mahdi Army and Hezbollah are one," and chanted "Allah, Allah, give victory to Hassan Nasrallah."  The close principal-agent relationship between Hezbollah and Jaysh al-Mahdi was summed up by Jaysh al-Mahdi members' repeated declaration at the rally: "we are Hezbollah."

347.     After Hezbollah terrorist mastermind Imad Mugniyeh was killed in 2008, Jaysh al-Mahdi held a public funeral service for him where senior members of Jaysh al-Mahdi again declared their allegiance to Hezbollah.

348.     Hezbollah trained Jaysh al-Mahdi in the use of weapons and tactics that were specifically designed to target Americans in Iraq – and that Jaysh al-Mahdi in fact used successfully to perpetrate terrorist attacks against Americans in Iraq, including Plaintiffs.  In particular, Hezbollah trained members of Jaysh al-Mahdi in the deployment of EFPs, which were expressly designed to penetrate the American armor.  Hezbollah was essential to those EFP

training efforts because Hezbollah fighters had direct experience using EFPs against Israeli armor in Lebanon.  Indeed, at that point, Hezbollah was the world's foremost expert on EFPs. Hezbollah also imparted to Jaysh al-Mahdi the complex expertise required to manufacture and use EFPs, and drawing on its experience in Lebanon, Hezbollah instructed Jaysh al-Mahdi to use EFPs against American soldiers.

349.    Iran passed EFP technology to Hezbollah, which in turn passed EFP kits to its proxy groups fighting in Iraq. On information and belief, the EFP factory that Iraqi forces discovered in Jaysh al-Mahdi's Sadr City stronghold in October 2008 was built using the EFP technology that Hezbollah had provided to Jaysh al-Mahdi.  EFPs used in Iraq during this time period were exclusively associated with Hezbollah.

350.    Hezbollah's planning of Jaysh al-Mahdi's EFP attacks against Americans included: (1) targeting specific geographies in Iraq, such as Baghdad and Basra, where Jaysh al-Mahdi was permitted to launch EFP attacks; (2) instructing Jaysh al-Mahdi to use EFPs against American armored vehicles in the first instance; (3) providing technical assistance to Jaysh al-Mahdi with respect to EFP design schematics and concepts; (4) helping manufacture EFPs for use against Americans in Iraq; (5) training senior Jaysh al-Mahdi terrorist commanders in Lebanon, Baghdad, and Iran with respect to all aspects of the EFP network, from design, to manufacture, to transportation, to attack strategy; (6) training lower-level Jaysh al-Mahdi members in camps in Lebanon, Sadr City, and Iran with respect to EFP tactics; (7) preparing and distributing sophisticated, high production value Arabic-language CD-ROMs and instructional videos concerning EFPs; and (8) forward deploying senior Hezbollah terrorists, including but not limited to Daqduq, to coordinate EFP attacks against Americans.

351.    Defendants were aware of the close and extensive links between Hezbollah and

Jaysh al-Mahdi as early as 2004, based on the widespread coverage those links received in the Western and international media.

352.     Hezbollah also maintained a small group of Iranian-supported militants called the Promised Day Brigades ("PDB") to carry out attacks against Coalition Forces.

353.     The PDB has received funding, training and weapons from the IRGC and is one of the Special Groups.

354.     The PDB actively targeted U.S. forces in an attempt to disrupt security operations and further destabilize Iraq.

355.     For example, on June 28, 2011, the PDB issued a statement claiming responsibility for 10 mortar and Katyusha rocket attacks against U.S. military convoys in which U.S. officials confirmed that three U.S. troops were killed.

## 2.     KATA'IB HEZBOLLAH

356.     KH is a Special Group that received direct support from Hezbollah and Iran, including money, weapons, training in weapons use, IED construction and operation, and sniper, rocket, and mortar attacks.

357.     Historically, KH operated mainly in Shi'a areas of Baghdad, such as Sadr City, and throughout the south.

358.     On June 24, 2009, the United States designated KH an FTO.

359.     The State Department's notice of KH's FTO designation stated that:

The organization has been responsible for numerous violent terrorist attacks since 2007, including improvised explosive device bombings, rocket propelled grenade attacks, and sniper operations. Kata'ib Hezbollah also targeted the International Zone in Baghdad in a November 29, 2008 rocket attack that killed two UN workers. In addition, KH has threatened the lives of Iraqi politicians and civilians that support the legitimate political process in Iraq.

360.     KH was also simultaneously designated an SDGT under E.O. 13224, because it was

"responsible for numerous terrorist acts against Iraqi, U.S., and other targets in Iraq since 2007."

361.    The U.S. Treasury Department also designated KH pursuant to E.O. 13438.

362.    The Treasury Department's 2009 press release announcing KH's designation explained that KH had "committed, directed, supported, or posed a significant risk of committing acts of violence against Coalition and Iraqi Security Forces…."

363.    The press release also quoted then-Under Secretary for Terrorism and Financial Intelligence Stuart Levey as stating "[t]hese designations play a critical role in our efforts to protect Coalition troops, Iraqi security forces, and civilians from those who use violence against innocents to intimidate and to undermine a free and prosperous Iraq."

364.    Furthermore, the 2009 U.S. Treasury Department press release noted:

Recordings made by Kata'ib Hizballah for release to the public as propaganda videos further demonstrate that Kata'ib Hizballah conducted attacks against Coalition Forces. In mid-August 2008, Coalition Forces seized four hard drives from a storage facility associated with a Kata'ib Hizballah media facilitator.  The four hard drives included approximately 1,200 videos showing Kata'ib Hizballah's sophisticated planning and attack tactics, techniques, and procedures, and Kata'ib Hizballah's use of the most lethal weapons--including RPG-29s, IRAMs, and EFPs--against Coalition Forces in Iraq.

One of the hard drives contained 35 attack videos edited with the Kata'ib Hizballah logo in the top right corner.  Additionally, between February and September 2008, Al-Manar in Beirut, Lebanon, broadcast several videos showing Kata'ib Hizballah conducting multiple attacks against Coalition Forces in Iraq.

Immediately preceding the Government of Iraq's approval of the United States-Iraq security agreement in late November 2008, Kata'ib Hizballah posted a statement that the group would continue fighting Coalition Forces and threatened to conduct attacks against the Government of Iraq if it signed the security agreement with the United States.

365.    As noted above—and as stated by the U.S Treasury Department in its July 2009 press release—throughout 2008, *Al-Manar*, Hezbollah's official television outlet in Lebanon (and itself a designated SDGT since May 2006), played numerous videos of KH launching rocket and IED attacks against U.S. troops.

366.     In this manner, Hezbollah helped publicize KH's activities and increase its profile among leading Shi'a terrorist groups.

367.     Although KH's leadership remains murky, one individual reportedly associated with the group is Abu Mahdi al-Muhandis.

368.     Al-Muhandis is wanted in Kuwait for his alleged role in the 1983 bombings of the American and French embassies in Kuwait City, as well as for his alleged involvement in the assassination attempt on the Kuwaiti Emir in 1985.

369.     The U.S. Treasury Department designated al-Muhandis an SDGT in July 2009, and announced the designation in the same press release announcing KH's designation.

370.     The press release noted:

> As of early 2007, al-Muhandis formed a Shia militia group employing instructors from Hizballah to prepare this group and certain Jaysh al-Mahdi (JAM) Special Groups for attacks against Coalition Forces. The groups received training in guerilla warfare, handling bombs and explosives, and employing weapons--to include missiles, mortars, and sniper rifles. In another instance as of September 2007, al-Muhandis led networks that moved ammunition and weapons--to include explosively formed penetrators (EFPs)--from Iran to Iraq, distributing them to certain JAM militias to target Coalition Forces. As of mid-February 2007, al-Muhandis also ran a weapons smuggling network that moved sniper rifles through the Iran-Iraq border to Shia militias that targeted Coalition Forces.

> Al-Muhandis also provided logistical support for attacks against Iraqi Security Forces and Coalition Forces conducted by JAM Special Groups and certain Shia militias. In one instance, in April 2008, al-Muhandis facilitated the entry of trucks--containing mortars, Katyusha rockets, EFPs, and other explosive devices--from Iran to Iraq that were then delivered to JAM Special Groups in Sadr City, Baghdad. Additionally, al-Muhandis organized numerous weapons shipments to supply JAM Special Groups who were fighting Iraqi Security Forces in the Basrah and Maysan provinces during late March-early April 2008.

> In addition to facilitating weapons shipments to JAM Special Groups and certain Shia militias, al-Muhandis facilitated the movement and training of Iraq-based Shia militia members to prepare them to attack Coalition Forces. In one instance in November 2007, al-Muhandis sent JAM Special Groups

members to Iran to undergo a training course in using sniper rifles. Upon completion of the training course, the JAM Special Groups members had planned to return to Iraq and carry out special operations against Coalition Forces. Additionally, in early March 2007, al-Muhandis sent certain Shia militia members to Iran for training in guerilla warfare, light arms, marksmanship, improvised explosive devices (IED) and anti-aircraft missiles to increase the combat ability of the militias to fight Coalition Forces.

371.   In a July 2010 press briefing, U.S. General Ray Odierno identified KH as the group behind increased threats to U.S. bases in Iraq. General Odierno stated, "[T]hey are clearly connected to Iranian IRGC [Iranian Revolutionary Guard Corps]."

372.   Upon information and belief, KH was controlled by Hezbollah and acted as its agent in Iraq during the Relevant Time Period, with the support of IRGC.

### 3.   ASA'IB AHL AL-HAQ

373.   Asa'ib Ahl Al-Haq ("AAH" of the "League of the Righteous") terrorist organization is a Special Group that is controlled by, and has received direct support from, Hezbollah, including money; weapons; training in weapons use; IED construction and operation; and sniper, rocket, and mortar attacks, and that conducted assassinations and operations against Iraqi civilians, Iraqi Security Forces and Coalition Forces.

374.   AAH was originally established by Senior Sadrist and MNF-I detainee Qais al-Khazali.

375.   AAH split from al-Sadr's Jaysh al Mahdi in 2006. Since that time, AAH has conducted: thousands of IED attacks against U.S. and Iraqi forces; targeted kidnappings of Westerners and Iraqis; rocket and mortar attacks on the U.S. Embassy; murders of American and British soldiers; and assassination of Iraqi officials.

376.   AAH received significant funding and support from Iran, including IRGC-QF.

377.   Senior Hezbollah operative Ali Musa Daqduq provided training to AAH fighters.

378.    Daqduq reported to Youssef Hashim, the head of Hezbollah Special Operations.

379.    AAH was one of the Hezbollah-controlled entities responsible for the January 20, 2007 Karbala attack on the Provincial Joint Coordination Center ("PJCC").

380.    Upon information and belief, AAH was controlled by Hezbollah and acted as its agent in Iraq during the Relevant Time Period.

### K.    ALL OF THE ATTACKS AT ISSUE IN THIS COMPLAINT WERE ACTS OF INTERNATIONAL TERRORISM

381.    At no time relevant to this Action did the United States declare war or enact an Authorization for the Use of Military Force against Iran, Hezbollah or any Special Group.

382.    At no time relevant to this Action did the United States engage in an armed conflict with the military forces of Iran, or Iran's military forces or any of its agents in lawful acts of war against Coalition Forces.

383.    At no time relevant to this action did the operatives of Hezbollah, the IRGC or any other terrorist group who killed and injured Coalition Forces in Iraq and civilians carry fixed distinctive signs recognizable at a distance, carry arms openly, conduct their operations in accordance with the laws and customs of war, or enjoy any form of combatant immunity for their acts.

384.    The specific attacks alleged herein were all carried out by the Special Groups, not by armed forces of recognized governments or military forces.

385.    The deaths and injuries Plaintiffs sustained were not the result of, nor did they occur in the course of, a declared war with Iran, or an armed conflict between the United States and Iran.

386.    The conduct of Iran, Hezbollah and the Special Groups violated the laws of armed conflict (including, *e.g.*, AAH operatives masquerading as members of U.S. armed forces and

executing defenseless prisoners), and the attacks upon Iraqi and other civilians constituted a substantial, rather than an incidental, part of their objectives and conduct.

387.    The acts of the Special Groups that injured the Plaintiffs were acts of international terrorism within the meaning of 18 U.S.C. § 2331, involving violent acts intended to influence the United States by coercion (by coercing the withdrawal of Coalition Forces from Iraq) and to intimidate and coerce the Iraqi population, and were also acts constituting terrorist activities within the meaning of 8 U.S.C. § 1182(a)(3)(B)(iii)-(iv), and/or engaging in terrorism within the meaning of 22 U.S.C. § 2656f.

## V.    GENERAL ALLEGATIONS AGAINST DEFENDANTS

388.    During the Relevant Period, each Defendant was and is a "United States person" under 18 U.S.C. §§2331(2); 2332d; and 31 C.F.R. § 560.314. 18 U.S.C. § 2331(3) provides that a "person" is "any individual or entity capable of holding a legal or beneficial interest in property." Section 2332d defines "United States person" to mean any: (C) juridical person organized under the laws of the United States; or "(D) any person in the United States." 31 C.F.R. §560.314 defines "U.S. person" to include any United States citizen…entity organized under the laws of the United States or any jurisdiction within the United States (including foreign branches), or any person in the United States."

389.    Because of the blatant criminal behaviors of the Defendants, the United States banking system and U.S. anti-terrorism departments and agencies were unable to interdict trillions of USD transactions and therefore prevent the Special Groups from planning, authorizing, and/or committing acts of international terrorism, including planning, authorizing and/or committing the subject EFP attacks on the Plaintiffs herein.

390.    Court and agency documents, including criminal information, deferred prosecution agreements, consent orders, guilty pleas, executive orders, and settlement agreements all detail the

actions of the Defendants as set forth herein, and those documents are incorporated herein in full as if reproduced in this Complaint.

391. Defendants were required to monitor, detect, and disclose transactions intended to circumvent U.S. sanctions to U.S. regulators, federal law enforcement, and counter-terrorism agencies, as well as report any instance of noncompliance with these requirements.

392. Among some of the duties owed by the Defendants are the following:

a. Under the Bank Secrecy Act ("BSA"), maintain an effective anti-money-laundering ("AML") program with records to back it up as per 31 U.S.C. §5318(h) and (k) and Regulations issued thereunder;

b. Under the BSA, conduct and maintain due diligence on correspondent bank accounts held on behalf of foreign persons as per 31 U.S.C. §5318(i) and Regulations issued thereunder;

c. Under the BSA, to not establish, maintain, administer or manage a correspondent account in the United States for, or on behalf of, a foreign bank that does not have a physical presence in any country as per 31 U.S.C. §5318(j) and Regulations issued thereunder;

d. Under the BSA, establish effective "Know Your Customer" ("KYC") policies and procedures as per 31 U.S.C. §5318(l) and Regulations issued thereunder;

e. Abide by the Trading with the Enemy Act ("TWEA"), Title 50, United States Code Appendix, §§3, 5, 16, and Regulations issued thereunder;

f. Abide by the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§1701, 1702 and 1705, and Regulations issued thereunder;

g. Abide by the BSA amendments after the Patriot Act of 2001, and Regulations issued thereunder;

h. Abide by Executive Orders 12957 (March 15, 1995); 12959 (May 6, 1995); 13059 (August 19, 1997); 13067 (Nov. 3, 1997) and 13412 (Oct. 13, 2006) and related Regulations promulgated by the OFAC;

i. Abide by Financial Action Task Force ("FATF") international banking standards and practices, which have long been set forth in its so-called "Recommendations";

j. Abide by the Basel Committee ("Basel") on Banking Supervision's Prevention of Criminal Use of the Banking System for the Purpose of Money-Laundering, Statement of Principles;

k. Abide by the Wolfsberg Group's ("Wolfsberg") Anti-Money-Laundering Principles for Private Banking (2000) an its Anti-Money Laundering Principles for Correspondent Banking.

393.    The basic requirements of all of the duties of the Defendants outlined above included adopting appropriate AML, KYC, and anti-terrorist financing policies and procedures, educating all employees and personnel regarding same, and reporting any and all financial irregularities discovered to the appropriate financial authorities.

394.    The Financial Action Task Force ("FATF") is an inter-governmental body established in 1989 by the Ministers of its Member jurisdictions.  The objectives of the FATF are to set standards and promote the effective implementation of legal, regulatory and operational measures for combating money laundering, terrorist financing and other related threats to the integrity of the international financial system.

395.     In 1990, and as updated in 1996 and 2003, FATF has issued a set of 40 Recommendations, followed by a special set of Nine Special Recommendations on Terrorist Financing, all of which have evolved into the international standard for the combating of money laundering and the financing of terrorism and are known to and were ostensibly to be followed by the Defendants.

396.     The FATF's Recommendations and Nine Special Recommendations specify that banks that "suspect or have reasonable grounds to suspect that funds are linked or related to, or are to be used for terrorism, terrorist acts or terrorist organizations" are required to report their suspicions to the proper authorities. FATF's Recommendations and Nine Special Recommendations have been recognized by the International Monetary Fund ("IMF") and the World Bank ("WB")

397.     Beginning in 2000, and then produced annually after that, FATF issued its report on Money Laundering.  These annual reports regarding AML principles, along with all FATF publications, were issued to all major international banks, including the Defendants.

398.     The UN strongly urged all Member States to implement the comprehensive, international standards of AML embodied in the FATF Recommendations and the Nine Special Recommendations on Terrorist Financing.

399.     Wolfsberg is an association of 13 global banks, including HSBC, SCB, Deutsche Bank and Commerzbank, which came together in 2000 and which drafted its Anti-Money Laundering ("AML") Principles for Private Banking.  These Principles were revised in May of 2002. In January of 2002, the Wolfsberg published a Statement on the Suppression of the Financing of Terrorism and, in November of 2002, released its Anti-Money Laundering Principles for Correspondent Banking.

400.    The sum total of Wolfsberg's AML and anti-terrorist financing ("ATF") Principles is that due diligence is necessary when opening and maintaining accounts.  A bank should only endeavor to accept as clients whose source of wealth and funds can be reasonably established to be legitimate.

401.    Under the Wolfsberg Principles, the banks should meet with all clients before opening accounts and discover the following with regard to each would-be account holder: purpose and reasons for opening the account; anticipated account activity; source of wealth (with a description of the economic activity which had generated the net worth); estimated net worth; and source of the funds (description of the origin and the means of transfer to corroborate reputation information where available).

402.    In 2007, Wolfsberg issued a statement endorsing measures to enhance the transparency of international wire transfers to promote the effectiveness of global AML and ATF programs.  The measures proposed would include more detailed information about those parties conducting wire transfers, a measure aimed at the Banking Defendants' methods used to conceal their USD funds transfers on behalf of Iran through the Eurodollar market through bogus MT 202 "cover payments."

403.    In 1988, Basel promulgated its first paper on the "Prevention of Criminal Use of the Banking System for the Purpose of Money Laundering." Among other standards and guidelines issued by it at that time included:

   a.  Banks' management should ensure that business is conducted in conformity with high ethical standards and that laws and regulations pertaining to financial transactions are adhered to;

   b.  Banks should not set out to offer services or provide active service in transactions which they have good reason to suppose are associated with money-laundering activities;

    c.   Banks should cooperate fully with national law enforcement authorities to the extent permitted by specific local regulations relating to customer confidentiality;

    d.   Care should be taken to avoid providing support or assistance to customers seeking to deceive law enforcement agencies through the provision of altered, incomplete or misleading information; and

    e.   Where banks become aware of facts tending to suggest that money held on deposit derives from criminal activity or that transactions entered into are themselves criminal in purpose, appropriate measures are taken to deny such assistance, sever relations with the customer, or to close or freeze the account.

404.   Although each of the Defendants established AML programs, each intentionally and volitionally circumvented its own AML, KYC, country risk assessments, and OFAC wire monitoring policies and procedures in order to continue to perform financial services on behalf of Iran, Hezbollah, the Special Groups, and OFAC-sanctioned entities, including the Iranian Banks.

405.   Moreover, by flagrantly disregarding Basel, FATF, Wolfsberg, and other internationally-recognized banking standards for appropriately assessing country risk, and instead intentionally assessing obviously "high risk" countries as "standard", or low risk ones, they allowed trillions and trillions of USD to travel through the United States banking system without being scrutinized for illegal financial transactions involving FTOs and/or OFAC-sanctioned entities.

406.   As stated above, as part of its anti-AML and ATF endeavors, OFAC administers and enforces financial and economic sanctions against targeted foreign countries, terrorism-sponsoring organizations, and international narcotics traffickers. In those efforts, OFAC publishes its so-called Specially Designated Nationals ("SDNs") and Specially Designated Global Terrorist ("SDGT") lists, a veritable "taboo" list with which and with whom the Defendants could not transact business.

407.   Despite being specifically aware of their legal duty to refrain from financially

dealing with FTOs, SDNs, SDGTs, and SSOTs, and despite having sophisticated, state-of-the-art computer systems to detect the involvement or participation of any and all FTOs, SDNs, SDGTs, and/or SSOTs on any given financial transaction, the Defendants circumvented their own systems and as a direct result caused trillions and trillions of USD transactions to clear unfettered through the U.S. banking system, including wire transfers and other financial transactions to and from the Special Groups and individuals and agents for longtime-designated FTOs, Hezbollah and KH, and to persons and entities on the OFAC, SDN and SDGT lists.

408.   In addition, the Treasury Department adopted the Terrorist Finance Tracking Program ("TFTP") after the 9/11 attacks to give it and the CIA access to the SWIFT database so as to investigate and pursue suspicious worldwide financial transactions.  In order for the TFTP program to work, Treasury needed to have access to accurate SWIFT data in order to pursue illegal financiers of terrorism.

409.   Despite being aware of Treasury's need to have accurate SWIFT transactions in order for it to carry on its ATF endeavors, the Defendants intentionally altered SWIFT data which allowed trillions of dollars of USD to go unfettered through the U.S. financial system, including wire transfers and financial transactions involving known Special Groups and front individuals for FTOs, Hezbollah and KH, and to persons and entities on the OFAC, SDN and SDGT lists, thereby defeating the very purpose of the program and subverting the national security interests of the United States.[18]

410.   Defendants knew or were deliberately and/or recklessly indifferent to the fact that

---

[18] As part of its anti-terrorism mission, Treasury issued subpoenas to the Society for Worldwide Interbank Financial Telecommunications ("SWIFT").   SWIFT, which is a cooperative organization founded in Belgium, maintained a United States office and operates a worldwide system known as "SWIFT-NET" which is used to transmit financial transactions in the Eurodollar market, among other financial markets, in a standardized message format.  SWIFT allows financial

they were providing material support and resources to the Special Groups, in violation of 18 U.S.C. §§2333(a) and 2339B(a)(1); that they were directly or indirectly, unlawfully and willfully providing or collecting funds with the knowledge that such funds were to be used, in full or in part, to carry out acts of international terrorism, in violation of 18 U.S.C. § 2339C; and that they knowingly engaged in illegal and illicit financial transactions with Iran, a longtime designated "State Sponsor of Terrorism", in violation of 18 U.S.C. §2332d.

411.   The material financing and support of the Special Groups constituted actions which were violent or dangerous to human life, intended to intimidate or coerce a civilian population or to influence a government, and occurred outside of the United States, as giving financial support to a known terror group like Hezbollah is like giving a loaded gun to a child, as while neither transfer is in and of itself a violent act, both such acts are "dangerous to human life."

412.   Defendants' secretive, illegal and illicit financial transactions for the benefit of the Special Groups were in no way routine banking services, but rather constituted an elaborate and extensive criminal scheme by which to avoid OFAC detection of illegal financial transactions with OFAC-sanctioned entities.

413.   Defendants are also secondarily liable under JASTA, 18 U.S.C. §2333(d)(2), for aiding and abetting and conspiring with Hezbollah, a designated FTO since 1997, by knowingly providing substantial financial assistance to it.  By criminally manipulating the OFAC Sanction List Wire, by intentionally assessing incorrect "country risk" so as not to have FTOs, SDNs, and/or SDGTs "pop up" on to-be-scrutinized financial transactions, Defendants surely knew–had to know–that they were performing a "role" in the FTO Hezbollah's overall terrorist schemes.

---

institutions to send and receive information about worldwide financial transactions in a secure, standardized and reliable environment.  These subpoenas sought information and data on suspected international terrorism financial activities.

414.    The ATA defines "material support and resources" to include currency or monetary instruments, financial services, training, expert advice or assistance, weapons, explosives, and personnel. 18 U.S.C. §2339A(b)(1).

415.    The ATA defines "international terrorism" to mean activities that—

> (A) Involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States;
>
> (B) Appear to be intended (i) to intimidate or coerce a civilian population; (ii) to influence the policy of a government by intimidation or coercion; or (iii) to affect the conduct of a government by mass destruction; and
>
> (C) Occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum.

18 U.S.C. §2331(a)(1).

416.    These criminal acts on the part of Defendants not only occurred before and contemporaneously with the EFP attacks that caused Plaintiffs' injuries and deaths, but also occurred at a time when Defendants knew or were deliberately indifferent to the fact that funds they transferred to Hezbollah's agents were being used to support the Special Groups which were responsible for the EFP attacks that injured or killed Plaintiffs.

## VI.    OVERVIEW OF THE CONSPIRACY

### A.    AGREEMENT AND KNOWLEDGE

417.    As noted above, "the Conspiracy" identified in this Complaint first began in the years immediately after Iran was first designated by the United States as a State Sponsor of Terrorism in 1984.

418.    As a result of that designation, Iran developed various ways to circumvent U.S. economic sanctions levied against the regime and to facilitate the free movement of U.S. dollars that Iran obtained (largely from the sale of petroleum and natural gas) without detection by the U.S. government in order to pursue foreseeably illicit objectives, including:

a.    Concealing hundreds of billions of dollars of Iran's U.S. dollar- denominated transactions from detection, scrutiny, or monitoring by U.S. regulators, U.S. law enforcement, and/or U.S. depository institutions;

b.    Assisting Iran in transferring at least $150 million to the Special Groups, and other instruments of Iranian state- sponsored terrorism; and

c.    Assisting Iran in acquiring technology and components for its illegal Weapons of Mass Destruction program and illicit conventional arms trade.

419.    To further those objectives, Iran enlisted several Iranian state-owned banks as well as Defendant Bank Saderat Plc and various international financial institutions, including the Western Bank Defendants in this Action, which agreed to alter, falsify, or omit information from payment order messages that involved Iran or Iranian parties, in particular several Iranian banks (as noted above, referred to herein occasionally as the "Iranian Bank Co-conspirators" (including Defendant Bank Saderat Plc)), as well as IRISL, for the express purpose of concealing Iran's financial transactions in the Eurodollar market from detection, scrutiny, or monitoring by U.S. regulators, law enforcement, and/or depository institutions.

420.    The Conspiracy between Iran, the IRGC, IRISL, Defendant Bank Saderat Plc, the other Iranian Bank Co-conspirators, and the Western Bank Defendants began no later than 1997, and upon information and belief, continues to the present (though individual Defendants joined the Conspiracy at different dates).

421.    The Conspiracy orchestrated by Iran made it possible for Iran to transfer: (1) hundreds of billions in U.S. dollar-denominated funds from its Eurodollar accounts maintained by

various international banks, including the Defendants, through the United States in a manner designed to purposefully circumvent monitoring by U.S. regulators and law enforcement agencies; and (2) hundreds of millions of dollars to the Special Groups, and other terrorist organizations actively engaged in murdering and maiming U.S. servicemen and civilians in Iraq.

422.   Each of the Defendants knowingly entered into an agreement with Iran and its agents, including but not limited, to Defendant Bank Saderat Plc, other Iranian Bank Co-conspirators, including but not limited to, the Central Bank of Iran, Bank Melli (including Bank Melli's United Kingdom subsidiary Melli Bank Plc), and Bank Sepah (which are all instrumentalities of Iran), as well as the IRGC-controlled IRISL, under which the conspirators agreed to alter, falsify, or omit information from payment order messages for USD-denominated Eurodollar, trade-finance, precious metals and foreign exchange transactions that were purposefully directed at, and processed through, the United States.

423.   As alleged in detail below, each Defendant committed numerous overt acts in furtherance of the Conspiracy and knowingly and unlawfully agreed to engage in "stripping" hundreds of millions – and in some cases, billions – of U.S. dollar-denominated transactions on behalf of Iran knowing that Iran was a designated State Sponsor of Terrorism.

424.   Each Defendant entered into its agreement with Iran and the Iranian Bank Co-conspirators (including Defendant Bank Saderat Plc) aware that other co-conspirators (either the Defendants herein, or other foreign financial institutions) were also actively participating in the Conspiracy, and shared the common goal of the scheme's purpose of providing Iran and the Iranian Bank Co-conspirators (including Defendant Bank Saderat Plc) the ability to illegally transfer billions of dollars (undetected) through the United States, and were aware of many of the (often same or similar) methods being used by other members of the Conspiracy to effectuate it.

425.     Accordingly, each Defendant understood that its conduct was part of a larger scheme engineered by Iran; each Defendant knew the participation of other conspirators was essential to the Conspiracy's success; and each Defendant knew of and joined in the overriding scheme and sought to achieve and facilitate a common goal of helping Iran transfer billions of dollars through the United States while avoiding detection, scrutiny, or monitoring by U.S. regulators, U.S. law enforcement, and/or U.S. depository institutions.

426.     In addition, each Defendant also knew, or was deliberately indifferent to, several of the Conspiracy's foreseeable purposes and criminal objectives that included:

    a.   Facilitating illicit transactions totaling at least $50 million USD for the benefit of Special Groups;

    b.   Facilitating illicit transactions totaling at least $100 million in USD funds for the direct benefit of the Special Groups and billions in USD funds for the benefit of the NIOC;

    c.   Facilitating at least hundreds of illicit transactions totaling more than $60 million on behalf of IRISL including over 150 "stripped" transactions after IRISL was designated an SDN;

    d.   Facilitating tens of millions of dollars in illicit transactions on behalf of MODAFL, the IRGC, Mahan Air and other instrumentalities of Iranian state sponsored terror to further numerous violations of the U.S. trade embargo against Iran, conceal Iran's efforts to evade U.S. sanctions and enable Iran's acquisition from the United States of goods and technologies prohibited by U.S. law to be sold or transferred to Iran, including components of IEDs deployed against Coalition Forces in Iraq; and

    e.   Enabling Iran, the Iranian Bank Co-conspirators (including Defendant Bank Saderat Plc), Hezbollah and the Special Groups to plan for, conspire to, and perpetrate acts of international terrorism under 18 U.S.C. § 2331(1); homicides, attempted homicides, or conspiracies to commit homicide under 18 U.S.C. § 2332(a)-(c); bombings using destructive devices under 18 U.S.C. § 2332a; bombings and attempted bombings under 18 U.S.C. § 2332f; engaging in terrorist activity under 8 U.S.C. § 1189(a)(3)(B)(iii)-(iv); and/or engaging in terrorism under 22 U.S.C. § 2656f.

427.     As set forth below, each of the Defendants knew that Iran was a U.S.-designated State Sponsor of Terrorism, and that U.S. laws and regulations required it to fully disclose all funds

transfers through the United States made on behalf of Iran, Iranian entities and Iranian banks.

428. Despite that knowledge, each of the Defendants knowingly conspired with Iran and its agents (including Defendant Bank Saderat Plc) to violate those U.S. laws and regulations to conceal hundreds of millions (and in some cases, billions) of dollars in funds transfers routed through the Eurodollar correspondent banking network for clearance and settlement in the United States on behalf of Iran, IRISL, and the Iranian Bank Co-conspirators, including Defendant Bank Saderat Plc.

429. During the relevant time period from 2004 through 2011, and as set forth in greater detail herein, each of the Defendants knowingly agreed to join the Conspiracy; knowingly and willfully participated in the Conspiracy; knew or was deliberately indifferent to the Conspiracy's criminal purposes and objectives; took initiatives to improve its workings; and was aware of the participation of many (if not all) of its members.

## B.     ACTS AND EFFECTS

430. Through the Conspiracy, Iran provided material support to the Special Groups, which targeted American citizens in Iraq, and with substantial assistance from the Defendants, concealed and disguised the nature, location, source, and origin of the material support it provided to these terrorists, knowing and intending that the funds be used in preparation for and in carrying out acts of terrorism against Americans and others, including civilians, in Iraq.

431. As part of the Conspiracy, each of the Defendants took affirmative steps to violate U.S. criminal laws and to conceal from U.S. depository institutions, law enforcement, regulators, bank auditors, and counter-terrorism agencies the flow of hundreds of millions (and in some cases, billions) of U.S. dollars it was clearing and settling in the United States, including transfers for the

benefit of the Special Groups which were actively engaged in murdering and maiming U.S. servicemen and civilians in Iraq.

432.    The conduct of each Defendant, its awareness of other Defendants' and Co-conspirators' participation and conduct, and the resulting "glaring hole" in America's counter-financing of terrorism and sanctions architecture described by former Manhattan District Attorney Robert M. Morgenthau, provided Iran with vital access to the U.S. financial system.

433.    U.S. "dollar clearing and settlement" – primarily (in this case) through the Clearing House Interbank Payments System in New York or "CHIPS-NY" system and the Federal Reserve Bank of New York ("FRB-NY") – is an elaborate inter-bank system in the U.S. by which banks clear and settle credits and debits in their Eurodollar accounts with other banks all across the globe on a daily basis.

434.    The U.S. "dollar clearing and settlement" system is critical not only to the workings of the global economy, but provides financial institutions (and nation states) with critical, essential access to global trade-finance credit denominated in U.S. dollars.

435.    Thus, once Iran gained clandestine access to the U.S. "dollar clearing and settlement" system in New York, it could not only launder billions of dollars through its accounts in the Eurodollar market, but it could also borrow against the Eurodollar deposits it held in the Defendants' banks – facilitating further undetected transactions around the world in USD – both for illegal aims and objectives of the Conspiracy.

436.    This broad-based access to the U.S. "dollar clearing and settlement" system was essential to Iran because of the scope of Iran's global ambitions at the time, which included driving

the United States and its Coalition partners out of Iraq, dominating that country, and acquiring

Weapons of Mass Destruction.

437.    Thus, among the effects of the Conspiracy, a State Department diplomatic cable

from March 2008 noted that:

> Bank Melli and the Central Bank of Iran also provide crucial banking services to the Qods
> Force, the IRGC's terrorist supporting arm that was headed by UNSCR 1747 designee
> Commander Ghassem Soleimani. Soleimani's Qods Force leads Iranian support for the
> Taliban, Hezbollah [sic], Hamas [sic] and the Palestinian Islamic Jihad.  Entities owned or
> controlled by the IRGC or the Qods Force use Bank Melli for a variety of financial services.
> From 2002 to 2006, Bank Melli was used to send at least $100 million to the Qods Force.
> Bank Melli use of Deceptive Banking Practices … When handling financial transactions
> on behalf of the IRGC, Bank Melli has employed deceptive banking practices to obscure
> its involvement from the international banking system. For example, Bank Melli has
> requested that its name be removed from payment instructions for US dollar denominated
> transactions.

438.    In addition, absent the access to the U.S. "dollar clearing and settlement" system

afforded to Bank Saderat by the HSBC Defendants, Defendants SCB, Barclays, Credit Suisse and

Commerzbank, both Iran and Hezbollah's access to USDs would have been diminished, and Iran's

efforts to transfer large sums of U.S. dollars to Hezbollah would have been substantially impaired.

439.    By knowingly agreeing to enter into the Conspiracy, and by knowing or being

deliberately indifferent to its lethal purposes, and by committing multiple overt acts in furtherance

of the Conspiracy, the Defendants provided Iran with the means by which it could transfer more

than $150 million to the Special Groups, which were actively engaged in planning and perpetrating

the murder and maiming of hundreds of Americans in Iraq during the same period of time that the

Conspiracy was proceeding, thereby substantially enhancing Iran and the Special Groups' ability

to inflict the deaths and injuries described herein.

440.    The Conspiracy was a substantial cause in fact and a significant factor in the chain

of events leading to the Plaintiffs' deaths and injuries because the Conspiracy substantially assisted

the Special Groups in committing the acts of international terrorism that killed and injured the Plaintiffs herein, by providing them collectively with more than $200 million U.S. dollars in funding that were used, *inter alia*, to arm, train and fund Iranian terror proxies in Iraq that targeted American citizens.

441.    By knowingly agreeing to enter the Conspiracy, and participating in and committing overt acts in the course of the Conspiracy that resulted in damage and injury to the Plaintiffs, Defendants committed acts of international terrorism as defined by 18 U.S.C. §§ 2331, 2339A and 2339B that caused death and injury to the Plaintiffs in this action, and are civilly liable under 18 U.S.C. § 2333(a) of the Anti-Terrorism Act ("ATA") to the Plaintiffs, American citizens who have been killed and injured by reason of acts of international terrorism perpetrated by the Special Groups.

442.    Defendant HSBC-US not only knowingly participated in the Conspiracy, but as a U.S. person within the meaning of 18 U.S.C. § 2332d also committed further acts of international terrorism in violation of 18 U.S.C. §§ 2331 and 2332d by knowingly (or with reason to know) facilitating financial transactions with Iran, which it knew was a designated State Sponsor of Terrorism. HSBC-US's acts were a cause of the deaths and injuries sustained by the Plaintiffs in this action, and HSBC-US is therefore civilly liable under 18 U.S.C. § 2333(a) of the ATA to the Plaintiffs.

443.    Defendants Barclays, SCB, ABN Amro (RBS N.V.), and Commerzbank not only knowingly participated in the Conspiracy, but because their respective New York branches constitute U.S. persons within the meaning of 18 U.S.C. § 2332d, these Defendants also committed further acts of international terrorism in violation of 18 U.S.C. §§ 2331 and 2332d by knowingly (or with reason to know) facilitating financial transactions with Iran, which each such Defendant

knew was a designated State Sponsor of Terrorism.  Those acts were a cause of the deaths and injuries sustained by the Plaintiffs in this action, and these Defendants are therefore civilly liable under 18 U.S.C. § 2333(a) of the ATA to the Plaintiffs.

### C.   BANK SADERAT PLC's AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY

444.   On September 8, 2006, the U.S. Office of Foreign Assets Control ("OFAC") amended § 560.516 of the ITRs and excluded Bank Saderat from the Iranian U-Turn exemption.

445.   In announcing the 2006 change to the ITRs excluding Bank Saderat Iran from the U-Turn exemption, OFAC stated:

> OFAC has amended the Iranian Transactions Regulations (ITR) to cut off Bank Saderat, one of Iran's largest government-owned banks, from the U.S. financial system.  Bank Saderat has been a significant facilitator of Hezbollah's financial activities and has served as a conduit between the Government of Iran and Hezbollah….

446.   According to then-Under Secretary for Terrorism and Financial Intelligence Stuart Levey, "Bank Saderat facilitates Iran's transfer of hundreds of millions of dollars to Hezbollah and other terrorist organizations each year. We will no longer allow a bank like Saderat to do business in the American financial system, even indirectly."

447.   The Treasury Department press release announcing the changes to the ITR stated that "a Hezbollah-controlled organization [] has received $50 million directly from Iran through Bank Saderat since 2001."

448.   Assistant Treasury Secretary for Terrorist Financing Daniel Glaser testified before the Senate Committee on Banking, Housing and Urban Affairs that "Hezbollah uses Saderat to send money to other terrorist organizations as well."

449.   For many years preceding the revocation of its U-Turn exemption, Bank Saderat illegally routed its USD transactions through the United States with the assistance of various Western commercial banks, including the Defendants herein.

110

450.     From 2002 forward, Defendant Bank Saderat Plc continued Bank Saderat's existing practice of: (1) illegally routing its USD transactions through the United States; and (2) transferring tens of millions of dollars to the Special Groups.

451.     As detailed in a January 9, 2009, Deferred Prosecution Agreement entered into by Lloyds TSB Bank Plc ("Lloyds") with U.S. law enforcement, Defendant Bank Saderat Plc directed illegal funds transfers to the U.S. and worked with Lloyds to strip its USD transactions of any reference to Iran or Bank Saderat.

452.     In 2003, Lloyds exited its relationship with Bank Saderat Plc, and Defendant Credit Suisse assumed Lloyds' role of illegally transferring USD through the United States while stripping references to Bank Saderat Plc and Iran from the transactions (as set forth below and, as also discussed below, in a Deferred Prosecution Agreement that Defendant Credit Suisse signed in 2009).

453.     Notwithstanding the revocation of its access to the Iranian U-Turn exemption, Bank Saderat (and Bank Saderat Plc) continued to illegally direct USD transactions through the United States with the active assistance of the other Defendants listed herein.

454.     On February 13, 2004, Defendant SCB opened accounts for Bank Saderat Plc. It also maintained other accounts for Bank Saderat Iran, including an account at SCB, Dubai.

455.     During the relevant time period from 2004 to 2011, and as described in more detail below, Bank Saderat Plc, working in concert with SCB, financed the illegal acquisition of various U.S.-origin export-controlled goods on behalf of Mahan Air and various sub-agencies of MODAFL.

456.     For example, SCB facilitated at least 10 transactions involving Letters of Credit valued at $1,559,127, which involved the shipment of U.S.-origin export-controlled aircraft parts

sold by the Singapore-based Monarch Aviation, a company that was part of Iran's illegal procurement network, to various MODAFL sub-agencies.

457.   A sub-agency of MODAFL obtained a Letter of Credit issued by Bank Refah, Iran, and sent it to SCB's branch in Singapore (where the Iranian front company Monarch Aviation maintained accounts) while reimbursement authorization was sent to the Iran Overseas Investment Bank London, i.e. Bank Saderat Plc's predecessor, which in turn either directly financed the illegal acquisition of goods from the United States, or provided a surety for Bank Refah's payment. [19]

458.   The goods were shipped by Iran Air[20] from Kuala Lumpur Airport, Malaysia, to Tehran Airport, Iran.

459.   The LCs were refinanced by SCB's Dubai branch through its credit facility with the CBI, with payment being made to Monarch Aviation's account with SCB, Singapore through the latter's U.S. dollar account with SCB, London, which in turn received the funds into its USD nostro account with SCB's New York branch.

460.   In another instance discussed *infra*, Bank Saderat Plc knowingly sent a concealed and illegal payment via SCB's New York branch and JP Morgan Chase, New York, to SCB in

---

[19] The Reimbursing Bank usually pays the Negotiating Bank (in this case SCB) against a valid reimbursement authority received from the Issuing Bank (in this case Bank Refah) and a validated statement from the Negotiating Bank that the documents complied with LC terms, but in certain cases it only serves as a surety for the payment. SCB-London was also one of Bank Refah's correspondent banks in the UK.

[20] Iran Air was designated by the U.S. Treasury Department in 2011: "Iran's national airline carrier, Iran Air, is a commercial airline used by the IRGC and Iran's Ministry of Defense and Armed Forces Logistics (MODAFL) to transport military related equipment.… Iran Air has provided support and services to MODAFL and the IRGC through the transport and/or transfer of goods for, or on behalf of, these entities. On numerous occasions since 2000, Iran Air shipped military-related electronic parts and mechanical equipment on behalf of MODAFL."

Dubai on behalf of a MODAFL's subsidiary, the Iran Helicopter Support and Renewal Company ("IHSRC").

461. The payment facilitated IHSRC's acquisition (via a company named Jetpower) of U.S. manufactured helicopter parts through an elaborate money laundering scheme intended to conceal from U.S. authorities: (1) the unlawful acquisition of U.S.- manufactured equipment for Iran's military; (2) the complex layering of the transaction involving Bank Melli's branches in London and Hong Kong; and (3) Bank Refah and Bank Saderat's involvement with SCB.

462. The HSBC Defendants also maintained one or more accounts for Bank Saderat Plc during the relevant time period.

463. In an October 9, 2006 email, Defendant HSBC-Middle East's Regional Head of Legal and Compliance noted the U.S. government's "direct evidence against Bank Saderat particularly in relation to the alleged funding of Hezbollah" but nonetheless maintained the account(s) thereafter and continued to facilitate transactions for Bank Saderat Plc.

464. As noted *supra*, in October 2007, Bank Saderat Iran (including Defendant Bank Saderat Plc), was designated an SDGT pursuant to E.O. 13224.

465. The U.S. Treasury Department's press release regarding Bank Saderat's designation stated:

> Bank Saderat, its branches, and subsidiaries: Bank Saderat, which has approximately 3200 branch offices, has been used by the Government of Iran to channel funds to terrorist organizations, including Hezbollah and EU-designated terrorist groups Hamas, PFLP-GC, and Palestinian Islamic Jihad. For example, from 2001 to 2006, Bank Saderat transferred $50 million from the Central Bank of Iran through its subsidiary in London to its branch in Beirut for the benefit of Hezbollah fronts in Lebanon that support acts of violence.

466. As set forth below, Defendant Barclays closed its Eurodollar accounts for Bank Saderat Plc, in 2008, months after Bank Saderat Plc was designated an SDGT, and more than a year after the U.S. Treasury Department reported that "Bank Saderat facilitates Iran's transfer of

hundreds of millions of dollars to Hezbollah and other terrorist organizations each year."

467.   The HSBC Defendants, and Defendants Commerzbank, SCB, Barclays, and Credit Suisse altered, falsified, or omitted information from Eurodollar payment order messages that they facilitated on behalf of Bank Saderat (and Bank Saderat Plc) at all times knowing, or deliberately indifferent to the fact, that Bank Saderat was facilitating Iranian-sponsored terrorism and, after October 2007, knowing, or deliberately indifferent to the fact, that Bank Saderat (including Bank Saderat Plc) was an SDGT so-designated for its very role as a "significant facilitator of Hezbollah's financial activities and has served as a conduit between the Government of Iran and Hezbollah."

468.   Moreover, as a Lebanese-based terrorist organization, Hezbollah was (and remains) particularly in need of USD funds because much of the Lebanese economy is "dollarized" (i.e. banking and retail transactions, credit and debt instruments are often, if not primarily, conducted in USD funds).

469.   Accordingly, Bank Saderat Plc's provision of tens of millions of dollars to Hezbollah provided Hezbollah with substantial assistance in carrying out its terrorist activities in Iraq, including Hezbollah's participation in the terrorist attacks that killed and injured the Plaintiffs.

470.   Moreover, Plaintiffs' deaths and injuries herein were a reasonably foreseeable result of Bank Saderat Plc's provision of tens of millions of dollars to Hezbollah.

## D.   THE CENTRAL BANK OF IRAN'S AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY

471.   The Central Bank of Iran ("CBI") is fully controlled and run by individuals directly appointed by the Government of Iran.

472.   At all relevant times, the CBI has not functioned in the same manner as central banks in Western countries that are institutionally designed to be independent from political

interference, nor is its purpose limited to "regulating" Iranian banks and managing Iran's currency and internal interest rates.

473.    Instead, the CBI is an alter-ego and instrumentality of the Iranian government and its Supreme Leader, and it has routinely used Iranian banks like Bank Melli Iran and Bank Saderat Iran as conduits for terror financing and weapons proliferation on behalf of the Iranian regime.

474.    At all relevant times, the CBI was an active participant in the Conspiracy.

475.    For example, leading up to the adoption of UN Security Council Resolution 1747 (March 2007), which resulted in the freezing of assets belonging to Iran's Bank Sepah, the CBI furthered the Conspiracy by using non-Iranian financial institutions to shield Bank Sepah's assets from the impact of impending sanctions.

476.    Throughout the relevant time period, the CBI maintained Eurodollar accounts at Bank Melli Iran, Bank Melli Plc, Bank Saderat Iran and Defendant Bank Saderat Plc in various currencies, including USD.

477.    Bank Melli Iran's U.K. subsidiary (later Bank Melli Plc) managed the CBI's Eurodollar accounts in Europe.

478.    In the wake of U.S. and later European Union designations against Iranian banks (including Bank Saderat and Bank Melli), the CBI often acted as a secret proxy for those designated entities.

479.    As part of the Conspiracy, the CBI utilized Defendant Bank Saderat Plc to transfer USD funds to Hezbollah.

480.    The CBI also maintained Eurodollar accounts, and unlawfully transferred USD funds in furtherance of the Conspiracy, with the assistance of Defendants SCB, ABN Amro (RBS N.V.) and the HSBC Defendants, including facilitating billions of dollars in USD funds transfers

on behalf of the IRGC, through the aforementioned NIOC, which was designated as an SDN by the United States because it was an IRGC agent during the relevant time period.

481.     As such, illicit transfers on behalf of the NIOC at that time were not for the benefit of a legitimate agency, operation or program of Iran.[21]

482.     In addition, the Iran Threat Reduction and Syria Human Rights Act of 2012 stated that:

> It is the sense of Congress that the National Iranian Oil Company and the National Iranian Tanker Company are not only owned and controlled by the Government of Iran but that those companies provide significant support to Iran's Revolutionary Guard Corps and its affiliates.[22]

483.     Moreover, according to a published report, the National Iranian Oil Company even took an active role in support of Iran's terrorist activities in Iraq by providing intelligence in support of attacks against Coalition Forces along the Iranian border by using its own helicopters to conduct surveillance on Coalition Forces' Forward Operating Bases ("FOBs").

484.     In early 2001, and in furtherance of the Conspiracy, the CBI asked Defendant SCB to act as its correspondent bank with respect to Eurodollar payments on behalf of the NIOC.

485.     As alleged herein, SCB agreed to participate in the Conspiracy and remove identifying data on SWIFT-NET messages for these and other wire transfers.

486.     Thereafter, between 2001 and 2006, the CBI sent approximately 2,226 payment order messages for a total value of $28.9 billion to SCB in London, the vast majority of which were illegally routed through the U.S. as described herein.

---

[21] The Superseding Indictment filed in *U.S. v. Zarrab* (filed in the S.D.N.Y (1:15-cr-00867)) demonstrates that NIOC continued to participate in the Conspiracy and launder U.S. dollars through U.S. financial institutions in 2013.

[22] *See* https://www.treasury.gov/resource-center/sanctions/Documents/hr_1905_pl_112_158.pdf.

487.    During the same time period, the CBI also maintained a Eurodollar credit facility at SCB's branch in Dubai, UAE, which it used to assist Iran in illegally acquiring technology and components on behalf of MODAFL.

488.    As detailed further below, and in furtherance of the Conspiracy, the CBI and Defendant ABN Amro (RBS N.V.) (which also maintained Eurodollar accounts for the CBI, and had numerous financial and business dealings with the CBI) conspired to provide illegal material support to Iran and Iranian parties.

489.    Between 2002 and 2004, Defendant ABN Amro (RBS N.V.) accepted USD Eurodollar deposits from the CBI on a regular basis with an average deposit size in the range of $200 million USD, and the CBI instructed, and ABN Amro (RBS N.V.) agreed, to follow illegal procedures to launder USD-denominated Eurodollar deposits to the CBI's Eurodollar and local currency accounts with other European banks with branches or offices in London.

490.    In furtherance of the Conspiracy, the CBI coordinated with Defendant ABN Amro (RBS N.V.)'s Central Bank Desk in Amsterdam regarding the procedure to be followed for repayment of USD deposits to their Eurodollar accounts with European banks with offices or branches in London.

491.    This procedure stipulated that payment order messages sent to U.S. clearing banks for payment of USD funds to the CBI should not contain *any* reference to the Central Bank of Iran, or *any other* reference relating to Iran.

492.    In 2001, the CBI also approached members of the HSBC Group, specifically Defendants HSBC-Middle East and HSBC-London, to obtain their agreement to move the CBI's clearing and settlement business from National Westminster Bank Plc to the HSBC Defendants, and intended to clear USD funds transactions through Defendant HSBC-US.

493.    Pursuant to that agreement, the CBI eventually moved its Eurodollar accounts to the HSBC Defendants, and by late 2003, the CBI was one of six Iranian banks that used members of the HSBC Group for (mostly illegal) correspondent banking through the U.S. dollar clearing and settlement in New York.

494.    With Defendant HSBC Holdings' knowledge, and in furtherance of the Conspiracy, Defendants HSBC-Middle East and HSBC-London manually intervened in the processing of payment orders by the CBI by removing: the Central Bank of Iran's name; its SWIFT-NET account (identified by BIC address BMJIIRTH); and country of origin (Iran).

495.    Defendant HSBC-US also knew that other HSBC Defendants were altering and omitting information in SWIFT-NET payment order messages regarding Iranian parties, *i.e.* "stripping" these transactions, but nevertheless knowingly continued processing transactions despite that very knowledge.[23]

### E.    BANK MELLI IRAN AND MELLI BANK PLC'S AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY

496.    Bank Melli Iran, one of the largest banks in Iran, was established in 1927 by order of the Iranian Parliament.

497.    Following the Iranian Revolution in 1979, all banks in Iran were nationalized, and even today most are effectively controlled by the Iranian regime.

---

[23] In furtherance of the Conspiracy, the CBI also conducted illegal precious metals transactions, primarily in gold bullion. For example, the December 2012 Consent Order entered into between OFAC and Defendant HSBC Holdings Plc stated that:

On May 24, 2006, the London branch of HBUS acted as a clearing bank in a book entry transfer of
32,000 ounces of gold bullion, valued at $20,560,000, for the ultimate benefit of Bank Markazi, Iran [the CBI], in apparent violation of the prohibition against the "exportation . . . , directly or indirectly, from the United States, ... of any ... services to Iran or the Government of Iran," 31 C.F.R. § 560.204.

498.    Melli Bank Plc in London, England, was established in January 2002 as a wholly-owned subsidiary of Bank Melli Iran.

499.    According to the U.S. government, from 2004 to 2011, Bank Melli Iran and Melli Bank Plc in London transferred approximately $100 million USD to the IRGC-QF, which trained, armed, and funded terrorist groups that targeted, killed and maimed American and Iraqi forces and civilians.

500.    Specifically, according to the U.S. government in a November 10, 2009 diplomatic cable:

> [The] Islamic Revolutionary Guards Corps (IRGC) and IRGC-Qods Force, who channel funds to militant groups that target and kill Coalition and Iraqi forces and innocent Iraqi civilians, have used Bank Melli and other Iranian banks to move funds internationally. Bank Melli used deceptive banking practices to obscure its involvement from the international banking system by requesting that its name be removed from financial transactions when handling financial transactions on behalf of the IRGC.

501.    Bank Melli Iran and Melli Bank Plc were designated as SDNs pursuant to E.O. 13382 in October 2007, and included on OFAC's SDN list, which resulted in, *inter alia*, their exclusion from the U-Turn exemption for Iranian Eurodollar transactions.

502.    The U.S. Treasury Department press release announcing the designation stated:

> Bank Melli also provides banking services to the [Iranian Revolutionary Guard Corps] and the Qods Force. Entities owned or controlled by the IRGC or the Qods Force use Bank Melli for a variety of financial services. From 2002 to 2006, Bank Melli was used to send at least $100 million to the Qods Force. When handling financial transactions on behalf of the IRGC, Bank Melli has employed deceptive banking practices to obscure its involvement from the international banking system. For example, Bank Melli has requested that its name be removed from financial transactions.

503.    In April 2008, Assistant Treasury Secretary for Terrorist Financing Daniel Glaser testified before the House Committee on Foreign Affairs, Subcommittee on the Middle East and South Asia and the Subcommittee on Terrorism, Nonproliferation and Trade, and confirmed that:

> Entities owned or controlled by the IRGC or the Qods Force use Bank Melli for a variety

of financial services. From 2002 to 2006, Bank Melli was used to send at least $100 million to the Qods Force. When handling financial transactions on behalf of the IRGC, Bank Melli has employed deceptive banking practices to obscure its involvement from the international banking system. For example, Bank Melli has requested that its name be removed from financial transactions.

504.   In mid-2007, Bank Melli Iran's branch in Hamburg ("Bank Melli-Hamburg") transferred funds for the Defense Industries Organization ("DIO").

505.   DIO is an Iranian government-owned defense manufacturer whose name, logo and/or product tracking information was stamped on munitions found in weapons caches that were seized from the Special Groups in Iraq; including large quantities of weapons produced by DIO in 2006 and 2007 (for example, 107 millimeter artillery rockets, as well as rounds and fuses for 60 millimeter and 81 millimeter mortars.)

506.   Since at least the mid-1980s, Bank Melli has maintained Eurodollar accounts, at one time or another, with Defendants ABN Amro (RBS N.V.), Barclays, Credit Suisse, SCB, Commerzbank and the HSBC Defendants.

507.   As early as 1987, Bank Melli instructed Defendant Barclays to process Eurodollar transactions in favor of Bank Melli's London branch by referencing only Bank Melli's Eurodollar account number at Midland Bank Plc in London without referencing Bank Melli Iran's name in the SWIFT-NET payment orders.

508.   Bank Melli further instructed Barclays to send separate payment order message instructions, which included full transaction details, to Bank Melli's London Branch.

509.   Barclays agreed and assisted Bank Melli in its illegal conduct and continued to do so even *after* Bank Melli was designated by the United States and publicly identified as a major source of the IRGC's funding.

510.   No later than December 2000, Bank Melli opened a Eurodollar account with

Defendant ABN Amro (RBS N.V.)'s branch in Dubai, United Arab Emirates ("UAE") and worked with ABN Amro (RBS N.V.) to strip its U.S. dollar-denominated transactions.

511.    Similarly, in July 2003, Defendant SCB learned that a competitor was exiting the Iranian business completely and sought to pick up this business and add Eurodollar accounts for five Iranian banks at SCB-London.  Bank Melli was among the banks whose business SCB expressly sought to (and did) acquire.

512.    In January 2004, SCB decided to proceed with the Iranian business, and no later than February 13, 2004, SCB opened Eurodollar accounts for Bank Melli and thereafter participated in the Conspiracy by facilitating unlawful transactions for Bank Melli.

513.    Bank Melli Iran's branch in the UAE was instrumental in facilitating U.S. sanctions-evading trade-finance and Eurodollar payment transactions on behalf of Mahan Air and MODAFL.

514.    For example, Bank Melli issued a Letter of Credit to Mahan Air in August 2004 through SCB, Dubai in favor of a UAE-based company called Aeronautical & Security for the shipment of an aircraft engine (identified by model number CF6-50C2) manufactured by General Electric and shipped from Luxemburg to Tehran, Iran.

515.    Bank Melli UAE instructed Credit Suisse, Zurich to make the payment, which in turn instructed Bank of New York in New York (one of Credit Suisse's U.S. clearing and settlement banks) to credit SCB's New York branch for further credit to the account of SCB-Dubai, which then credited Aeronautical & Security's Eurodollar account.

516.    The following flow-chart shows the overall flow of USD funds involved with Mahan Air's illegal acquisition of a U.S.-manufactured, export-controlled aircraft engine:

**MAHAN AIR ACQUIRES AN AIRCRAFT ENGINE**

517.    In another example, Bank Refah Kargaran, Iran issued a Letter of Credit in USD to a MODAFL sub-agency through SCB, Dubai in favor of a Dubai-based company called FP Aeroparts for the illegal shipment (via Iran Air) of U.S. aircraft parts.

518.    Bank Melli served as the Reimbursing Bank on the trade-finance transaction, and it subsequently instructed Credit Suisse, Zurich to debit its Eurodollar account as part of the flow of USD funds between the LCs counterparties.

519.    As the LC transaction proceeded, Credit Suisse then further instructed The Bank of New York to pay SCB's New York branch (the clearing bank for the transaction), which further credited the USD account it maintained for SCB, Dubai with the amount due for the shipment of aircraft parts.

520.    To close-out the LC transaction, SCB, Dubai then credited the Eurodollar account it maintained on behalf of FP Aeroparts Middle East for the amount of the shipment.

521.    The following flow-chart shows the overall flow of USD funds involved with MODAFL's illegal acquisition of the U.S.-manufactured aircraft parts:



522.    As reflected in the above low-chart, and during the relevant time period, Defendant Credit Suisse maintained Eurodollar accounts in Zurich, Switzerland on behalf of Bank Melli.

523.    Credit Suisse also instructed and trained Bank Melli employees, and conspired with Bank Melli, on ways to format Bank Melli's payment orders so that the resulting SWIFT- NET messages would avoid detection by the automated filter algorithms in U.S. depository institutions' automated OFAC sanction screening software.

524.    During the relevant time period (and beginning no later than July 2003), Defendant Commerzbank also conspired with Bank Melli to route its Eurodollar clearing and settlement business through Commerzbank's correspondent banking relationships and SWIFT- NET accounts.

525.    Commerzbank further advised Bank Melli to list "non ref" in the ordering party field in all payment order messages because it would trigger a manual review of the overall Eurodollar payment transaction, thereby enabling Commerzbank personnel to ensure that the SWIFT-NET messages did not contain any information linked to Iran.

526.    Defendant HSBC-London also maintained Eurodollar accounts for Bank Melli Iran, and it used HSBC-US to provide illegal USD funds clearing and settlement services for Bank Melli during the relevant period.

527.    Yet despite the fact that several SWIFT-NET payment order messages were supposed to have been fully "stripped" by HSBC-London—before their transmittal to the U.S.—they were nevertheless blocked by the HSBC-US OFAC filter in New York because Bank Melli was referenced in error (thus placing HSBC-US on notice that HSBC-London was working in concert with Bank Melli to evade U.S. law, regulations and economic sanctions against Iran).

528.    Even with these blatant warning signs, HSBC-US continued to routinely provide Eurodollar clearing and settlement services to the HSBC Defendants, knowing full well that they were violating U.S. laws and regulations by laundering money on behalf of Bank Melli.

529.    Because, as discussed below, HSBC-US knew of this unlawful conduct—and continued to facilitate it— HSBC-US violated, *inter alia,* 18 U.S.C. § 2332d.

F.    **BANK MELLAT'S AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY**

530.    Bank Mellat provides banking services in support of Iran's Weapons of Mass

Destruction program through the Atomic Energy Organization of Iran ("AEOI") and Novin Energy Company.

531.    In 2007, Bank Mellat was designated by the U.S. Treasury Department for providing "banking services in support of Iran's nuclear entities, namely the Atomic Energy Organization of Iran (AEOI) and Novin Energy Company. Both AEOI and Novin Energy have been designated by the United States under E.O. 13382 and by the UN Security Council under UNSCRs 1737 and 1747."

532.    During the relevant time period, Bank Mellat provided financial services and maintained Eurodollar accounts for AEOI and Novin Energy Company, and as part of the Conspiracy, Bank Mellat affirmatively worked to prevent disclosure of its dollar-denominated transactions on behalf of these designated customers.

533.    In June 2006, Bank Mellat was involved in a transfer totaling over $250 million dollars into a Eurodollar account it held for Novin Energy Company.

534.    As part of the Conspiracy, the CBI effectuated the payment(s) in USD funds to Bank Mellat's Eurodollar account in London for further credit to the Eurodollar account of Bank Mellat's client – Novin Energy Company.[24]

535.    In 2007, Bank Sepah facilitated payments in USD funds to Eurodollar accounts at Bank Mellat on behalf of entities associated with Iran's Aerospace Industries Organization ("AIO"), a subsidiary of Iran's Ministry of Defense and Armed Forces Logistics ("MODAFL") that was designated by the United States on June 28, 2005.[25]

---

[24] Novin Energy Company was designated by the U.S. Treasury Department under E.O 13382 and by the United Nations Security Council in Resolution 1747.

[25] When Bank Sepah was designated by the U.S. in January 2007, the U.S. government noted that "Bank Sepah is AIO's bank of choice, and since at least 2000, Sepah has provided a variety of critical financial services to Iran's missile industry, arranging financing and processing dozens

536.    The AIO is the Iranian organization responsible for ballistic missile research, development and production activities and organizations, including the Shahid Hemmat Industries Group ("SHIG") and the Shahid Bakeri Industries Group ("SBIG"), which were both listed under U.N. Security Council Resolution 1737 and designated by the United States under E.O. 13382.

537.    Bank Mellat was designated by the United States on October 25, 2007 in connection with Weapons of Mass Destruction proliferation activities and was included on OFAC's SDN list. The designation, *inter alia,* excluded Bank Mellat from accessing the U-Turn exemption for Iranian Eurodollar transactions.

538.    In 2002, together with Iran's Bank Tejarat, Bank Mellat merged its London branch to form Persia International Bank Plc in the United Kingdom.

539.    During the relevant time period, both Defendant HSBC-London and Defendant Barclays maintained Eurodollar accounts for Persia International Bank Plc and served as its "principal bankers" in the Eurodollar market.

G.    **BANK SEPAH'S AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY**

540.    Bank Sepah is an Iranian government-owned and government-controlled financial institution.

541.    In 2007, the U.S. Treasury Department designated Bank Sepah for providing support and services to designated Iranian proliferation firms.  The designation was effectuated pursuant to E.O. 13382, due to Bank Sepah's Weapons of Mass Destruction proliferation-related activities.

542.    Bank Sepah International Plc, a wholly-owned subsidiary of Bank Sepah in the

---

of multi-million dollar transactions for AIO and its subordinates…" See, https://www.treasury.gov/press-center/press-releases/Pages/hp219.aspx.

United Kingdom, was also designated.

543.    According to the U.S. Treasury Department, Bank Sepah was the financial linchpin of Iran's missile procurement network and actively assisted Iran's pursuit of missiles capable of carrying Weapons of Mass Destruction.

544.    As a result of the designation, Bank Sepah (including Bank Sepah International Plc) was excluded from accessing the U-Turn exemption for Eurodollar transactions.

545.    During the relevant time period, Defendant HSBC-London provided illegal Eurodollar clearing and settlement services to Bank Sepah.

546.    During the relevant time period, SCB provided illegal Eurodollar clearing and settlement services for Bank Sepah, as well as facilitating US dollar- denominated Letters of Credit for Bank Sepah. SCB, as discussed *infra*, also provided Eurodollar payments and trade-finance services for Bank Saderat and Bank Melli.

547.    As detailed below, Bank Sepah, acting in concert with SCB, illegally financed the acquisition of U.S. goods on behalf of Mahan Air.

548.    For example, in February 2006, Credit Suisse in Zurich paid SCB Dubai almost $30 million dollars (cleared and settled through the United States) on behalf of Bank Sepah, which had, in turn, financed Mahan Air's acquisition of an Airbus A320-232 and several aircraft engines.[26]

549.    In another case in 2002, Bank Sepah financed (in USD funds) the purchase of U.S. aircraft parts from an Iranian front company—the Malaysian and UK exporter Downtown Trading Ltd—on behalf of a MODAFL-controlled entity.

---

[26] Part of the trade-finance transaction was cleared through Standard Chartered's New York branch, and the paperwork indicates that SCB was aware that the transaction involved U.S. origin parts prohibited by U.S. sanctions.

550.     As part of the illegal scheme, once the U.S.-manufactured goods were transported from Malaysia to Iran by Iran Air, Downtown Trading Ltd., Malaysia sent documents to its bank, Maybank, Malaysia to collect payment against the Letter of Credit.

551.     Maybank then presented documents under Bank Sepah's Letter of Credit to SCB, Dubai (the Negotiating Bank) for validation and subsequent clearing and settlement of the transaction's final Eurodollar payment through Citibank, New York.

552.     Thus, Bank Sepah, with the assistance of Maybank and SCB, financed the illegal acquisition of U.S. aircraft parts by MODAFL, and induced Citibank in New York to provide dollar clearing and settlement to consummate the transaction.

553.     As detailed below, Defendant Commerzbank AG's New York branch also provided illegal Eurodollar clearing and settlement services for Bank Sepah.

**H.     JOHN DOE DEFENDANTS' 1-50 AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY**

554.     Other non-defendant co-conspirators (including other Iranian financial institutions and entities) conspired with the named Defendants and identified non-defendant Co-conspirators herein. Plaintiffs may amend this Complaint to identify such other non-Defendant Co- conspirators as additional evidence warrants.

555.     The true names, residences and capacities, whether individual, corporate or otherwise, of Defendants John Does 1 through 50 (collectively, the "Does") are presently unknown to Plaintiffs, who therefore sue those Defendants under such fictitious names. The Does are other financial institutions, their agents, officers and/or employees that conspired with the Western Bank Defendants, Iran, and the Iranian Bank Co-conspirators (including Defendant Bank Saderat Plc). Each of the Does is responsible in some manner for the acts alleged herein and for the damages that each Plaintiff sustained.  As warranted by the evidence, Plaintiffs will amend this Complaint

to show the true names and capacities of the Does when they are ascertained and confirmed.

## I.     THE HSBC DEFENDANTS' AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY

556.     HSBC Bank PLC is one of the largest financial institutions in the world, with over $2.5 trillion in assets, 89 million customers, 300,000 employees, and 2011 profits of nearly $22 billion. HSBC, whose initials originally stood for "Hong Kong Shanghai Banking Corporation", now has operations in over 80 countries, with hundreds of affiliates spanning the globe. Its parent corporation, HSBC Holdings PLC, is headquartered in London.

557.     HSBC Group PLC is comprised of financial institutions throughout the world ("HSBC Group Affiliates") that are owned by various intermediate holding companies and ultimately, but indirectly, by HSBC Holdings.

558.     HSBC North America Holdings Inc. is an indirect subsidiary of HSBC Holdings. It is a holding company for HSBC Group's operations in the United States. HSBC Bank USA N.A. ("HSBC Bank USA") is one of the principal subsidiaries of HSBC North America Holdings Inc.

559.     HSBC Bank USA is a federally chartered banking institution which has the Office of the Comptroller of the Currency ("OCC") as its primary federal regulator.

560.     HSBC USA is headquartered in McLean, Virginia, with its principal office in New York City, New York.  It was during the Relevant Time Period subject to regulation by the New York State Department of Financial Services ("NYSDFS").  During the Relevant Time Period, HSBC Bank USA operated more than 470 bank branches throughout the U.S., managed assets totaling about $200 billion, and served around 3.8 million customers.

561.     Throughout this Complaint, Plaintiffs allege and maintain the agency relationship between and among all of the HSBC Bank Defendants, including: HSBC Group PLC; HSBC Holdings PLC; HSBC Bank PLC; and HSBC Bank USA, N.A.

562.     All of the HSBC Bank Defendants, including and through HSBC Bank USA, offered customers around the world, including individuals, small businesses, corporations, financial institutions and foreign governments, a full range of commercial and consumer banking products and related financial services, including correspondent banking practices and services and banknotes transactions, which are considered "high risk" by the financial services industry. In fact, direct access to the United States banking system and access to USD were the major reasons for HSBC establishing HSBC Bank USA in the first place.

563.     Correspondent accounts are established at banks to receive deposits from, make payments on behalf of, or handle other financial transactions for foreign financial institutions.  In essence, correspondent banking involves the facilitation of wire transfers between foreign institutions with which the foreign financial institution does not have a direct relationship.  Such correspondent accounts are generally considered high risk because the U.S. bank does not have a direct relationship with, and therefore has no due diligence information concerning, the foreign financial institution's customers who initiated the wire transfers.

564.     During the 2000s, HSBC Bank USA had its "Global Banking and Markets" line of business, with offices in more than 60 countries, and which provided a wide range of "tailored financial solutions" to major government, corporate and institutional clients.

565.     This line of business included an extensive network of correspondent banking relationships, in which HSBC Bank USA provided banks from other countries with USD accounts to transact business in the United States.  Due to its affiliates in over 80 countries, HSBC Bank USA was one of the largest providers of correspondent banking services in the world in the 2000-2012 time frame.

566.     In 2010, HSBC Bank USA had about 2,400 correspondent customers, including for

more than 80 HSBC affiliates, including affiliates in "high risk" and "unfriendly" areas, including Mexico and the Middle East.   Among other services, HSBC Bank USA provided financial institution clients with access to the U.S. financial system by handling international wire transfers, clearing a variety of USD instruments, including travelers cheques and money orders, and providing foreign exchange services.

567.   HSBC Bank USA's "Payment and Cash Management" (PCM) was a key banking division, located in New York, that supported HSBC Bank USA's correspondent relationships.

568.   In addition, as part of the PCM division, until 2010, HSBC Bank USA housed the Global Banknotes Department, which used offices in New York City, London, Hong Kong, and elsewhere to buy, sell, and ship large amounts of physical U.S. dollars.  The Banknotes Department derived its income from the trading, transportation, and storage of bulk cash, doing business primarily with other banks and currency exchange businesses, but also with HSBC affiliates.

569.   Through its correspondent banking and PCM businesses, HSBC Bank USA had become one of the largest facilitators of cash transfers in the world.  Between 2005 and 2009, the total number of PCM wire transactions at HBUS grew from 20.4 million to 30.2 million transfers per year, with a total annual dollar volume that climbed from $62.4 trillion to $94.5 trillion.

570.   In 2008, HSBC Bank USA processed about 600,000 wire transfers per week.   In 2009, PCM was the third largest participant in the CHIPS wire transfer service which provided over 95% of USD wire transfers across U.S. borders and nearly half of all wire transfers within the United States, totaling $1.5 trillion per day and over $400 trillion in 2011.

571.   HSBC had hundreds of affiliates located in over 80 countries.  At least 80 HSBC affiliates have turned to HSBC Bank USA for access to USD and the U.S. financial system.  And as a preview of things to come, herein was the problem:  HSBC affiliates worldwide, including

those who regularly dealt with FTOs, SDNs, SDGTs, and SSOT wanted, needed and corporately demanded access to USD and the United States banking system.

572.     These affiliates typically interacted with HSBC Bank USA by opening a correspondent account at HSBC Bank USA headquarters in New York.  Many used the account to clear USD wire transfers; some used the account to cash USD instruments like travelers cheques or money orders; and still others used the account for foreign exchange purposes. In addition, some opened a separate account to buy or sell physical USD as part of HSBC Bank USA's wholesale banknotes business, until it was shuttered in 2010.

573.     HSBC affiliates have accounted for a large portion of HSBC Bank USA's USD activities. In 2009, for example, HSBC determined that "HSBC Group affiliates clear[ed] virtually all USD payments through accounts held at HSBC Bank USA, representing 63% of all USD payments processed by HSBC Bank USA."

574.     HSBC also calculated that, over an eight-year period, its USD clearing business had increased over 200%, from processing an average daily amount of $185 billion in 2001, to $377 billion in 2009.  HSBC Bank USA also executed transactions through HSBC affiliates in other countries. It had been estimated that, in 2009, HSBC Bank USA processed 19.4 million transactions, involving $45.9 trillion, through HSBC affiliates.

575.     As stated above, to mitigate this risk, the BSA, FATF, the Wolfsberg Group and Basel Committee banking standards accepted worldwide required financial institutions to conduct due diligence on all non-U.S. entities for which it maintained correspondent accounts.  There is no exception for foreign financial institutions with the same parent company.  In other words, HSBC Bank USA must have exercised due diligence on its own fellow HSBC entities worldwide, and this it failed or more likely refused to do.

576.     On April 30, 2003, HSBC Bank USA's predecessor entity entered into a Written Agreement with the Federal Reserve Bank of New York and the New York State Department Banking Department to address acknowledged severe deficiencies in its AML, KYC, due diligence, and internal control programs.

577.     In other words, HSBC Bank USA acknowledged even before the Relevant Time Period that it was not abiding by the BSA and its Regulations, did not have proper internal controls over "Suspicious Activity Reports" ("SARS"), and did not have appropriate internal controls to know just which persons and/or entities were in fact involved in a myriad of financial transactions, exactly at a time frame when the demands put on it by HSBC Group affiliates for correspondent banking services were going through the roof.

578.     As the world was soon to realize, HSBC Group was so callous, so greedy, so utterly devoid of corporate morality that through the correspondent banking services HSBC Bank USA offered, it had become a conduit for illegal proceeds directly connected to the Islamic Republic of Iran and Hezbollah.

579.     Even before the April 2003 agreement with the Federal Reserve, HSBC was well aware of the Senate Permanent Subcommittee on Governmental Affair's March 1, 2 and 6, 2001 hearing on the "Role of U.S. Correspondent Banking in International Money Laundering."  S.Hrg. 108-633 (March 1, 2, and 6, 2001).  The Subcommittee noted then: "U.S. banks, through the correspondent accounts they provide to foreign banks, have become conduits for dirty money flowing into the American financial system and have, as a result, facilitated illicit enterprises, including drug trafficking and financial frauds…Correspondent accounts in U.S. banks give the owners and clients of poorly regulated, poorly managed, sometimes corrupt, foreign banks with

weak or no anti-money laundering controls direct access to the U.S. financial system and the freedom to move money with the United States and around the world."

580.    However, the 9/11 attacks, Senate AML hearings, and an agreed-to Written Agreement with the Federal Reserve and the New York State Banking Department could not stop, or much less deter, HSBC from engaging in financial services with and on behalf of international terrorist organizations.

581.    And as the sad but true evidence and record demonstrate, these institutional shortcomings of HSBC Group and HSBC Bank USA were not merely negligent, but rather absolutely intentional and criminal–HSBC knew exactly what it was doing.

582.    Even though HSBC had not shown any significant improvement in its AML, KYC, internal controls and due diligence after being subject to the April 30, 2003 Written Agreement with the Federal Reserve, for whatever reasons HSBC Bank USA was let off the hook in the middle of 2006.

583.    By September of 2010, the Office of the Comptroller of the Currency ("OCC") issued a lengthy (31 pages) Supervisory Letter citing HSBC Bank USA again for severe AML deficiencies.  In October of 2010, the OCC issued a Cease and Desist Order requiring HSBC to strengthen multiple aspects of its AML program for a second time.

584.    The cited inadequacies included: a massive backlog of over 17,000 alerts identifying possible "Suspicious Activity Reports" to be generated and then sent to U.S. law enforcement; ineffective methods of spotting "SAR" activities; a total failure to conduct any due diligence to assess the risks of HSBC affiliates before opening correspondent accounts for them; a total failure by HSBC Bank USA to conduct any AML monitoring of $15 billion in bulk cash transactions with those same HSBC affiliates; a failure to monitor $60 trillion in annual wire

transfer activity by customers domiciled in countries rated inappropriately by HSBC Bank USA as "low risk"; unqualified AML staffing; inadequate AML resources; and AML leadership problems.

585.    In fact, there was a period of three years or so, from 2006 through 2009, where, incredibly, HSBC Bank USA had in effect "turned off" its OFAC Wire Filter System for checking on prohibited financial transactions involving its fellow HSBC affiliates around the globe.  This was a blatant, intentional and flagrant violation of United States banking, AML and anti-terrorism financing laws which allowed trillions of USD to flow through the U.S. banking system unfettered and unchecked for ties to FTOs like Hezbollah.

586.    The Cease and Desist Order was very similar to the 2003 Order.  OCC found that HSBC continued to have very severe BSA and AML deficiencies; that it continued to inadequately deal with possible SARs; that it continued to lack appropriate internal controls for customer due diligence; that it continued to rate obviously "high risk" countries for AML abuses as "low risk", and thus avoid countless "alerts" for suspicious if not criminal activities which would have needed to be reported to U.S. law enforcement; and that HSBC had not responded to some 83 AML "Matters Requiring Attention" ("MRAs") issued by the OCC to the HSBC Bank USA Board of Directors between 2005-2009.

587.    During the Relevant Time Period, HSBC Bank USA AML personnel would intentionally misspell or add a "dash" or an out-of-place punctuation symbol in the middle of the names of OFAC Sanction List entities (FTOs, SDNs, and/or SDGTs) in the Wire Filter System, thus criminally avoiding having financial transactions involving such forbidden entities to even register on the "alerts", as the Wire Filter System only read exact names and did not pick up misspellings or any slight variation in the name.

588.     For example, during the Relevant Time Period, HSBC Bank USA criminally inputted the incorrect spellings (or inserted out-of-place punctuation symbols) of known Hezbollah agents, including Kairaba Supermarket, Congo Futur, Kassim Jajideen, Ali Tajideen, Husayn Tajideen, Tajco, and Tajco Limited, thus allowing Hezbollah to continue to launder financial contributions to it through HSBC.   All of the persons and entities, other than Kassim Tajideen (who was designated on May 27, 2009), were designated as SDGTs on December 9, 2010.

589.     During the Relevant Time Period, when a conscientious HSBC Bank USA AML employee raised questions about the Bank approving, and not generating "alerts", concerning financial transactions for designated FTO, Hamas, Jeff Kraft, an HSBC Bank USA Senior Vice-President, pulled the employee into a private conference room, and said:

> "Do you know what would happen if the government found out about the "compliance error" email?  They would shut us down.  Do you fucking understand we are under a Cease and Desist Order and you are putting in writing that we have a compliance error?  Gary Peterson (then the HSBC Bank USA Chief Compliance Officer) would fire you in two seconds if he found out about this…"

590.     Upon information and belief, HSBC Bank USA, with consistent pressure from HSBC Group during the Relevant Time Period, laundered billions of USD for designated FTO, Hezbollah, and/or for known or suspected Hezbollah Agents.

591.     And then, on July 17, 2012, the Senate Committee of Homeland Security and Governmental Affairs Permanent Subcommittee on Investigations conducted its now-famous hearing: "U.S. Vulnerabilities to Money Laundering, Drugs, and Terrorist Financing:  HSBC Case History", and those who heard about it or read about it would soon come to know the extent of the vast criminal enterprise that is HSBC.

592.     Incredibly, this Subcommittee of Congress found that HSBC Bank USA and HSBC Group were deficient in absolutely every BSA or AML area or category covered by the two

previous Agreements/Orders from governmental authorities in 2003 and 2010, as discussed above.

593.    The Subcommittee, after analyzing some 1.4 million documents and taking

testimony from current and former HSBC management employees, made these Findings:

> **(1) Longstanding Severe AML Deficiencies**. **HBUS operated its correspondent accounts for foreign financial institutions with longstanding, severe AML deficiencies**, including a dysfunctional AML monitoring system for account and wire transfer activity, an unacceptable backlog of 17,000 unreviewed alerts, insufficient staffing, inappropriate country and client risk assessments, and late or missing Suspicious Activity Reports, exposing the United States to money laundering, drug trafficking, and terrorist financing risks.

> **(2) Taking on High Risk Affiliates.** HBUS failed to assess the AML risks associated with HSBC affiliates before opening correspondent accounts for them, failed to identify high risk affiliates, and failed for years to treat HBMX as a high risk accountholder.

> **(3) Circumventing OFAC Prohibitions.** For years in connection with Iranian U-turn transactions, HSBC allowed two non-U.S. affiliates to engage in conduct to avoid triggering the OFAC filter and individualized transaction reviews. While HBUS insisted, when asked, that HSBC affiliates provide fully transparent transaction information, when it obtained evidence that some affiliates were acting to circumvent the OFAC filter, **HBUS failed to take decisive action to confront those affiliates and put an end to conduct which even some within the bank viewed as deceptive.**

> **(4) Disregarding Terrorist Links. HBUS provided U.S. correspondent accounts to some foreign banks despite evidence of links to terrorist financing.**

594.    The history of HSBC Bank USA's AML program during the 2000-2012 time frame

demonstrates just how far gone HSBC Group was with regard to avoiding United States anti-

terrorism and AML laws were concerned, and how much of a blind eye HSBC Bank USA would

turn to avoid conflict with HSBC Group affiliates and their management.

595.    HSBC Bank USA's Chief Compliance Officer from 2000 to 2008 was Carolyn

Wind.  She also held the AML Director title from 2000 to 2003; and then from 2007 to 2008. When Wind raised concerns over systemic understaffing of the Bank AML and Compliance Departments to the HSBC North America Holdings Board of Directors in late 2007, she was terminated.

596.   Ms. Wind's successor, Lesley Midzain, held the same two titles Carolyn Wind had held, but for only two years, 2007 to 2009, at which time she was dismissed by HSBC Bank USA because both the OCC and the Federal Reserve concluded she did "not possess the technical knowledge or industry experience to continue as the BSA/AML officer."  Similarly, in 2009, the OCC concluded that Midzain did not have the requisite expertise for her position.  HSBC Bank USA removed her from her AML position.

597.   Ms. Midzain's successor, a former Treasury official named Wyndham Clark, came on board amidst an intensifying OCC investigation (again) of longstanding and very serious AML issues at HSBC Bank USA.  Clark quickly determined that the HSBC Bank USA AML Department was only in existence because it had to be, not because anyone in HSBC Bank USA or HSBC Group management truly wanted to reform the Bank's overall AML performance.

598.   Clark quickly determined, and advised the HSBC North America Holdings Board of Directors, that HSBC Bank USA had the highest risk profile of any bank he had ever examined, and that the Bank's systems and controls were inconsistent with the high AML risk profile.  On May 10, 2010, Clark emailed a colleague in Compliance: "With every passing day I become more concerned…if that's even possible."

599.   By July of 2010, Clark resigned with this email:

> "[T]he bank has not provided me the proper authority or reporting
> structure that is necessary for the responsibility and liability that this
> position holds, thereby impairing my ability to direct and manage the
> AML program effectively.  This has resulted in most of the critical

decisions in Compliance and AML being made by senior Management who have minimal expertise in compliance, AML or our regulatory environment, or for that matter, knowledge of the bank (HBUS) where most of our AML risk resides. Until we appoint senior compliance management that have the requisite knowledge and skills in these areas, reduce our current reliance on consultants to fill our knowledge gap, and provide the AML Director appropriate authority, we will continue to have limited credibility with the regulators."

600.    As if two previous governmental Agreements and/or Cease and Desist Orders were not enough, finally, after the Senate hearing and further investigation by five governmental bodies–the OCC; the United States Department of Justice ("DOJ"); the Financial Crimes Enforcement Network ("FinCEN"), part of the Department of Treasury; the Board of Governors of the Federal Reserve System ("Fed"); and the New York County District Attorney's Office–HSBC entered into five different Settlement Agreements, Consent Orders, and/or Deferred Prosecution Agreements ("DPAs") on or about December 11 and 12, 2012.  All told, HSBC was fined to the tune of $1.9 billion by these various governmental entities which amount, it was widely reported, represented about five weeks of Bank profits based upon 2011 numbers.  This was the third time in ten years that HSBC Bank USA had been the subject of multiple governmental Cease and Desist Orders and Agreements assessed against it for flagrant violations of U.S. banking and AML laws.

601.    In the "Statement of Facts" attached to the DPA entered into between the DOJ, the New York District Attorney's Office ("NYDAO"), and HSBC Bank USA and HSBC Holdings, HSBC admitted that if the criminal matter were to proceed to trial, the DOJ/NYDAO would prove, beyond a reasonable doubt, that:

    a.  HSBC Bank USA failed to adequately monitor over $200 trillion in wire transfers between 2006 and 2009 from customers located in countries that HSBC Bank USA classified as "standard" or "medium" risk;

    b.  HSBC Bank USA failed to adequately monitor billions of dollars in purchases of physical USD ("Banknotes") between 2006 and 2009 from HSBC Group affiliates;

    c. HSBC Bank USA failed to provide adequate staffing and other resources to maintain an effective AML program;

    d. Despite the fact that it was required by the BSA to conduct due diligence on its fellow HSBC Group affiliates for which it maintained correspondent accounts, HSBC Bank USA failed to conduct such due diligence, and this was in large part due to a formal policy to not conduct such due diligence set forth in an HSBC Bank USA AML Procedures Manual;

    e. HSBC Bank USA failed to monitor wire transfers for correspondent accounts by knowingly inappropriately setting the "risk category" for customers' accounts and therefore not having such transactions be subject to the "alerts" on the Wire Filter System;

    f. Despite the fact that HSBC Bank USA's "Banknotes" line of business was considered "high risk", from 2006 through 2009, the Banknotes' AML Compliance Department consisted of one, or at times two, people;

    g. In the fact of known AML deficiencies and high risk lines of business, HSBC Bank USA further reduced the resources available to its AML program in order to cut costs and increase profits;

    h. By 2007, only one year after the Written Agreement with the OCC had been lifted, HSBC Bank USA had fewer AML employees than required by its own internal plans;

    i. As to HSBC Holdings, from the mid-1990s through at least September of 2006, it violated both U.S. and New York State criminal laws by knowingly and willfully moving hundreds of millions of dollars through the U.S. financial system on behalf of banks located in Iran and elsewhere, and persons listed as parties or jurisdictions sanctioned by the Office of Foreign Assets Control ("OFAC") in violation of U.S. economic sanctions;

    j. As to HSBC Holdings, that it violated New York State Penal Law, Sections 175.05 and 175.10, which make it a crime to "with intent to defraud…make or cause to a false entry in the business records of an enterprise or prevent the making of a true entry or cause the omission thereof in the business records of an enterprise."

    k. During the Relevant Time Period, HSBC Bank USA processed hundreds of millions of dollars in transactions involving Sanctioned Entities in violation of U.S. sanctions.

602. Whatever one may think of the size of the monetary penalties, the OCC $500 million "civil penalty" was its largest ever at that time.  In its press release, the OCC stated that:

> "Today's $500 million penalty against HSBC for violating the BSA is the largest penalty ever assessed by the OCC.  The size of the penalty reflects the severity and duration of the violations…The actions taken against HSBC are a milestone for BSA compliance

and enforcement that also serve to remind us that we must remain vigilant against these abuses and continue to work to prevent criminals and terrorists from taking advantage of our nation's financial institutions. The action also highlights the importance of banks' effectively managing operational risk and the consequence of failing to do so."

603. Likewise, the Fed's $165 million civil monetary penalty against HSBC Holdings and HSBC North America Holdings was at that time the largest ever assessed by it and was assessed because of "unsafe and unsound practices related to insufficient compliance with BSA and AML requirements, and U.S. economic sanctions…Investigations also found compliance gaps at the firm's subsidiaries in Europe and the Middle East that enabled sanctioned entities to illegally route dollar payments through the U.S. financial system."

604. In the Fed's Order of Assessment of a Civil Money Penalty Issued Upon Consent Pursuant to the Federal Deposit Insurance Act, which was signed by authorized HSBC representatives, HSBC Holdings and HSBC North America Holdings, Inc. admitted:

a. That it violated the BSA by willfully failing to establish and maintain an effective AML program and willfully failing to establish due diligence for foreign correspondent accounts; and

b. That it willfully violated the International Emergency Economic Powers Act ("IEEPA") by violating or attempting to violate regulations restricting economic transactions with Iran.

605. On December 11, 2012, the DOJ announced that HSBC Holdings and HSBC Bank USA had agreed to a Deferred Prosecution Agreement ("DPA") in consideration of a $1.256 billion forfeiture. Portions of the press release by the DOJ speak volumes:

A four-count felony criminal information was filed today in federal court in the Eastern District of New York charging HSBC with willfully failing to maintain an effective anti-money laundering (AML) program, willfully failing to conduct due diligence on its foreign correspondent affiliates, violating IEEPA and violating TWEA. HSBC has waived federal indictment, agreed to the filing of the information, and has accepted responsibility for its criminal conduct and that of its employees.

606.   In its December 11, 2012, press release announcing the $875 million total settlement amount with HSBC, the Treasury Department announced:

> The penalties reflect the damage to the integrity of the U.S. financial system inflicted by HSBC, and the federal government's intolerance of behavior and business practices that disregard BSA requirements and U.S. sanctions regimes.
> "These settlements implicate willful and dangerous practices by one of the world's biggest banks," said Under Secretary for Terrorism and Financial Intelligence David S. Cohen. "HSBC absolutely knew the risks of the business it pursued, yet it ignored specific, obvious warnings."

607.   The HSBC Defendants have a longstanding relationship with Iran.

608.   In 1999, HSBC Group established a relationship with the Tehran office of Bank Melli Iran, and it launched an "Iran Representative" office in Tehran, Iran that same year.

609.   In December 2000, HSBC Group members entered into a $500 million project finance agreement with six Iranian commercial banks: Bank Saderat Iran, Bank Melli Iran, Bank Mellat, Bank Tejarat, Bank Sepah and the Export Development Bank of Iran ("EDBI").

610.   Beginning in the late 1990s, Defendant HBSC-Europe and Defendant HSBC-Middle East devised a procedure whereby their Iranian Bank Co-conspirators put a cautionary note in their SWIFT-NET payment order messages including language such as, "*care sanctioned country,*" "*do not mention our name in NY,*" and "*do not mention Iran.*"

611.   Eurodollar payment transactions with these cautionary notes automatically fell into what Defendant HSBC-Europe termed a "repair queue," where employees of HBSC-Europe and HSBC-Middle East manually removed all references to Iranian-sanctioned entities from the SWIFT-NET messages associated with each transaction.

612.   Between 2001 and 2007, the HSBC Defendants actively participated in the Conspiracy by repeatedly undertaking various methods to facilitate Eurodollar payments, trade

finance and foreign exchange transactions on behalf of Iran through the United States that would evade U.S. sanctions by disguising Iran's financial activities as its USD funds were cleared and settled by U.S. financial institutions, including Defendant HSBC-US.

613.    Unlawful Iranian transfers of USD funds from HSBC-Europe and HSBC-Middle East were sent through the HSBC Group's USD correspondent accounts at HSBC-US by:

    a.    Deleting references to Iran from the payment instructions (a.k.a. "stripping" the transactions), or otherwise altering the SWIFT-NET messages, to either omit or falsify information that would have otherwise indicated Iran's involvement in the transaction; and

    b.    Styling transactions as bank-to-bank "cover" transactions between two non-Iranian banks, solely because the MT 202 payment order message format used for such transactions did not expressly obligate HSBC to identify the transaction's originator and beneficiary, thus avoiding any disclosure of the transaction's Iranian connections, and blocking HSBC- US's electronic filter algorithms from recognizing the transaction, let alone assessing whether it qualified for any OFAC exemption or license.

614.    Defendant HSBC-Europe created detailed plans to avoid triggering HSBC-US's automated OFAC filter software and reduce the need for "manual intervention" (e.g. the re-formatting Eurodollar transactions), thus sparing HSBC-Europe's employees from the need to manually alter the SWIFT-NET messages in order to remove references that might otherwise identify the presence of Iranian parties to the transaction, and associated scrutiny.

615.    This enabled the HSBC Defendants' business with Iran in the Eurodollar market to proceed quickly and profitably.

616.    In 2010, facing U.S. government investigations, HSBC-US hired Deloitte LLP as its outside auditor to identify and examine HSBC Group's OFAC sensitive USD funds transactions involving Iran and other prohibited countries or persons that went through the bank.

617.    That "review" identified more than 25,000 illegal transactions that involved Iran, worth a total of more than $19.4 billion in USD funds.

618.    The payment orders had been sent to HSBC-US and other financial institutions in the United States without referencing Iran, ensuring that the Eurodollar payment transactions would be processed without delay and not be blocked nor rejected by the algorithms in the automated OFAC filtering systems.

619.    The HSBC Defendants deliberately amended SWIFT-NET payment order messages and used MT 202 cover payments to conceal the nature of the transactions from HSBC-US automated OFAC sanction screening filters and those of other financial institutions in the United States, and HSBC-US was aware that the other HSBC Defendants used such methods to alter payment order messages.

620.    At the same time, the HSBC Defendants further trained, mentored and educated their Iranian Co-conspirators on how to deceptively format SWIFT-NET payment order messages, *inter alia*, to avoid detection and scrutiny by U.S. financial institutions, thus ensuring that Iran could solicit other conspirators to facilitate Eurodollar payments in a like manner.

621.    Accordingly, the HSBC Defendants' (and other Defendants' and Co- conspirators') willingness to process payments in this manner enabled Iran to flood the global financial system with undetectable U.S. dollar payment transactions and effectuate—what would have otherwise been preventable—transfers of USD funds to Hezbollah and the IRGC.

622.    Defendant HSBC Holdings was aware of Defendants HBSC-Europe and HSBC-Middle East's involvement in the Conspiracy with Iran as early as 2000.

623.    For example, HSBC Group AML Compliance Head Susan Wright received an email on June 9, 2000, from Bob Cooper, an HSBC colleague, informing Wright of an existing procedure that the HSBC Defendants were already employing to avoid OFAC filter detection.

624.    Cooper explained:

a.  A client bank had been "*automatically replacing a remitter's name with that of*" the client bank and that bank was utilizing bank-to-bank "cover payments" because the payment message formats did not expressly require identification of either the underlying party originating the transaction or the transaction's ultimate beneficiary.

b.  In the future, for OFAC sensitive transactions, that bank would "*arrange cover for the payment using MT202/203 remittances*."

c.  In addition, that bank planned to send a separate 'MT100 message' to the recipient bank, providing full payment details for the originator and ultimate beneficiary.

625.  Cooper's email overtly acknowledged that "[i]n this way a payment in US$ can be made for an individual or company on the OFAC list, without the name being 'detected' by the OFAC filters that all US banks would apply."

626.  Several days later, on June 14, 2000, Wright forwarded Cooper's June 9, 2000 email to the then-current Head of HSBC Group Compliance, Matthew King.

627.  In her cover email, Wright stated that the "practice" detailed by Cooper was "unacceptable" and informed King that it was her position that:

a.  "We advised them that this was contrary to SWIFT guidelines (drawn up to address FATF concerns re money laundering via wire transfers) which required that the full details (names and addresses) of remitters and beneficiaries are included."

b.  "From a Group perspective I consider the continuation of this practice [the client bank's future plan to conceal OFAC sensitive transactions behind bank-to-bank transfers] to be unacceptable as a deliberate and calculated method to avoid US OFAC sanctions and has the potential to raise serious regulatory concerns and embarrass the Group."

628.  Senior HSBC Group officials were aware of the Conspiracy, including the specific methods and overt acts by which Iran, the Iranian banks and the HSBC Defendants were carrying it out.

629.  However, despite this awareness, senior compliance officials of HSBC Group and its subsidiary banks and entities (including compliance officials at Defendants HSBC Holdings,

HSBC-Europe, HSBC-Middle East, and HSBC-US) did not put an end to this illicit banking "practice" with Iran. Instead, with clear knowledge of its purpose—and awareness that other banks participated in the Conspiracy—they knowingly employed similar techniques to evade OFAC requirements, thus allowing the HSBC Defendants to continue deploying and refining their respective "procedures" to facilitate illegal Eurodollar payments from and for Iran in USD funds.

630.    In late 2000, in coordination with the CBI, HSBC signed a project finance framework agreement with six Iranian commercial banks: including Bank Melli, Bank Saderat, Bank Mellat, Bank Tejarat, Bank Sepah and the Export Development Bank of Iran.

### 1.    HSBC-EUROPE'S 2001 "BANK MELLI PROPOSAL"

631.    In or around January 2001, Bank Melli's London branch maintained Eurodollar accounts with several other major international banks, but was interested in establishing a relationship with HSBC that would give HSBC the majority of Bank Melli's USD funds clearing and settlement business.

632.    In an April 30, 2001 letter, Defendant HSBC-Europe presented Bank Melli in London with a proposal (the "Bank Melli Proposal") for processing Bank Melli payments. HSBC-Europe's proposal boasted that HSBC-Europe was "…confident that we have found a solution to processing your payments with minimal manual intervention."

633.    The Bank Melli Iran Proposal expressly underscored that, if it adopted HSBC-Europe's "solution," Bank Melli would not be identified as a sender in any payment order message and, thus, HSBC-Europe would ensure that Iranian transactions involving USD funds would not run into any 'speed bumps' or other obstacles.

634.    The "solution" provided specific alternative wording, as it explained:

"The key is to always populate field 52 – if you do not have an ordering party then quote 'One of our Clients,' never leave blank.  This means that the outgoing payment instruction from HSBC will not quote 'Bank Melli' as sender – just HSBC London and whatever is in

field 52. This then negates the need to quote 'DO NOT MENTION OUR NAME IN NEW YORK' in field 72."

635. HSBC-Europe's proposal further requested, "In order to test our proposed solution we would appreciate if you used the following templates when submitting your next payments to the following customer, or alternatively submit a USD 1 test payment" and provided the following:

**MT202**
20:     *Your Ref....*
21:     *Related Ref....*
32:     *Amount/currency/Value date....*
50:     **DO NOT QUOTE IF IRANIAN**
52:     *Customer Name* **OR** *One of our clients* **MUST BE COMPLETED**
53:     **/68296908**
54:
56:
57:     *Beneficiary Banker (SWIFT codes where possible)*
58:     *Beneficiary (SWIFT codes where possible)*
70:     *Any Payments details for beneficiary...*
72:     **Please leave blank**
**MT100**
Pay as above.
(Emphasis in the original.)

636. Thus, the Bank Melli Proposal documented the HSBC Defendants' active coordination and participation in the Conspiracy to illegally remove, omit or falsify essential information from SWIFT-NET messages so as not to trigger OFAC sanctions screening filters or otherwise permit HSBC-US or other U.S depository institutions to detect Iranian transactions in USD funds.[27]

637. In 2001, John Wilkinson served as HSBC-Europe's Institutional Banking Relationship Manager for HSBC-Europe's Bank Melli account.

638. In a June 28, 2001 email titled "**Re: Bank Melli**" to HSBC-US Wilkinson discussed

---

[27] An internal HSBC memorandum that was associated with the Bank Melli Proposal also makes clear HSBC's awareness of Defendant Standard Chartered Bank's role as NIOC's primary (Western) banker at the time.

the Bank Melli Proposal, describing HSBC-Europe's "usual method" to alter the wording of Iranian payment order messages, and the rationale for doing so:

- "Once the proposition goes live, we have instructed Bank Melli to alter the format of its [sic] payments to achieve straight through processing. The field 52 input of 'one of our clients' is a standard phrase used by MPD [Multicurrency Payments Department] in these situations."

- "Since sending the letter we have further asked them to only put 'One of our clients' in field 52, thus removing the chance of them inputting an 'Iranian referenced' customer name, that causes fall out of the cover payment sent to HSBC-US and a breach of OFAC regulations."

639.    In further support of his position to continue this standard 'procedure,' Wilkinson explained that a payment involving an Iranian bank had been blocked because HSBC-Europe's MPD [Multicurrency Payments Department] "failed to spot the poor input and did not follow the normal procedure of altering the payment."

640.    In other words, the HSBC Defendants' "normal" procedure was to conspire with Iranian banks, including Bank Melli, to *deliberately* alter payment order messages prior to sending them to New York for the express purpose of avoiding detection and analysis by U.S. banks, regulators and law enforcement.

641.    In an email exchange in October 2001 between David Bagley, Defendant HSBC-Middle East's Regional Head of Legal and Compliance, and Matthew King, a member (and later Head of) HSBC Group's Audit Department, King noted:

We also have to bear in mind pending US legislation which will in effect give the US extraterritorial authority over foreign banks, particularly if we are unfortunate enough to process a payment which turns out to be connected to terrorism. My own view therefore is that some of the routes traditionally used to avoid the impact of US OFAC sanctions may no longer be acceptable.

642.    HSBC Group AML Head Susan Wright and Money Laundering Control Officer John Allison received copies of King's email.

643.    King's email further confirms that senior executives and managers within the HSBC Group comprehended what the HSBC Defendants (and other foreign banks) had "traditionally" been doing for years when they used "routes" (a euphemism for altering payment order messages prior to routing them to U.S. financial institutions through SWIFT-NET) to avoid disclosing a transaction's Iranian connections, and that some of those transactions might prove to be "connected to terrorism."

644.    A January 2003 memorandum authored by HSBC-Middle East and disseminated to other members of the HSBC Defendants confirms not only the HSBC Defendants' ongoing participation in the Conspiracy, but also their knowledge of the participation of other co-conspirators, and Iran's desire to further evade U.S. sanctions.

645.    The memorandum stated in relevant part:

- "It is believed that some service providers amend the payments to ensure Iran is not mentioned in the body of the payment instruction to their USD correspondent.  This process minimizes the risk of payment being referred to OFAC."

- "Currently, it is estimated that Iranian banks issue up to 700 USD payments a day using their USD providers, mainly banks in the UK and Europe, which in turn use their New York USD correspondents to effect the payments."

646.    In addition to acknowledging the existence of the Conspiracy, the HSBC-Middle East memorandum also advised:

"[T]here is substantial income opportunity to sell a USD payments proposition to Iranian banks in view of the impending FATF regulations...The [requirements of the] new regulations…increases the risk of Iranian payments being held in the USA as they may fall foul of the OFAC regulations.  The Iranian Banks have now prioritized this issue and are now actively seeking a solution from their banks, including HSBC."

647.    From at least 2003 forward, HSBC provided banking and payment services in the Eurodollar market to, among other Iranian entities, the NIOC (which, as noted previously, was

later designated pursuant to E.O. 13382 and identified as an agent or affiliate of the IRGC during the relevant time period).[28]

648.    Over the course of the next several years, the HSBC Defendants continued their participation in the Conspiracy.

649.    In an October 9, 2006 email, David Bagley [HSBC-Middle East's Regional Head of Legal and Compliance] informed senior HSBC Group officials that key U.S. policymakers were "…in favour of withdrawing the U-Turn exemption from all Iranian banks.  This on the basis that, whilst having direct evidence against Bank Saderat particularly in relation to the alleged funding of Hezbollah, they suspected all major Iranian State owned banks of involvement in terrorist funding and WMD [weapons of mass destruction] procurement."

650.    Further demonstrating his awareness of the risks HSBC was engaged in with Iran, Bagley was listed as the contact person on the April 19, 2007 Wolfsberg Group press release calling for more transparency for international wire transfers "to promote the effectiveness of global anti-money laundering and anti-terrorist financing programs."

651.    Eight months later, in a June 8, 2007 email, Bagley informed HSBC Holding's CEO, Michael Geoghegan, and others, that "[U.S. Treasury Under Secretary for Counter Terrorist Financing and Sanctions] Levey essentially threatened that if HSBC did not withdraw from relationships with [redacted] we may well make ourselves a target for action in the US."

---

[28] The HSBC Defendants also provided Eurodollar, trade-finance, and foreign exchange services for NIOC. For example, the aforementioned January 2003 HSBC-Middle East memorandum stated that:

> L/C's [Letters of Credit] issued for Iranian Companies Abroad – Various Group Offices. HSBC offices are developing relationships with Iranian Government and non-Government companies.  The L/C's issued are normally denominated in USD. Following NIOC's acceptance of HSBC as one of its listed banks, HSBC Bank Middle East now handles Iran's oil export L/C's.  Turnover for this business is about USD400M [million] per year.

652.    Bagley's email thus confirmed that various relationships continued to exist in the Eurodollar market with Iran and Iranian banks, including Bank Saderat.

653.    Bagley not only acknowledged that HSBC had "…an agency banking relationship in HSBC-EUROPE both for [redacted] and other Iranian banks," but he confessed that "[t]here are further complications surrounding the process of closure with all Iranian banks as we have some USD 9m in reimbursements due from Sepah, where we are running off trade lines, where we may need cooperation from Central Bank of Iran."

654.    On December 11, 2012, the U.S. Department of Justice ("DOJ") announced that Defendants HSBC Holdings and HSBC-US had admitted to Anti-Money Laundering ("AML") and OFAC sanctions violations, and had agreed to enter into a Deferred Prosecution Agreement and pay a $1.256 billion forfeiture.  As explained further *infra*, DOJ issued a press release announcing the DPA, and summarizing the HSBC Defendants' illegal conduct.

655.    In connection with the DPA, DOJ filed a four-count felony criminal information against HSBC Holdings and HSBC-US, charging them with: (1) willfully failing to maintain an effective AML program; (2) willfully failing to conduct due diligence on their foreign correspondent affiliates; (3) violating the International Emergency Economic Powers Act ("IEEPA"); and (4) violating the Trading with the Enemy Act ("TWEA"). HSBC Holdings and HSBC-US waived federal indictment, agreed to the filing of the information, and claimed to have accepted responsibility for HSBC's and its employees' criminal conduct.

656.    Despite its agreement to overhaul its U.S. and global compliance functions, HSBC remained a conduit for illicit funds.

657.    On December 9, 2010, the U.S. Treasury Department designated Tajco, describing it as "a multipurpose, multinational business venture involved in international trade as well as real

estate and presided over by Ali Husayn and Kassim Tajideen. Since at least December 2007, Ali

Tajideen used Tajco Sarl, operating as Tajco Company LLC, as the primary entity to purchase and

develop properties in Lebanon on behalf of Hizballah."

658.    The designation also covered Kairaba Supermarket, a subsidiary business of Tajco

Ltd.

659.    A July 13, 2012 article published by *Reuters* entitled "Special Report: HSBC's

Money-Laundering Crackdown Riddled With Lapses" reported that an HSBC-US compliance

officer had identified suspicious transactions involving Hezbollah, specifically Tajco and Kairaba

Supermarket.

660.    In December 2013, the Treasury Department announced that Defendant HSBC- US

agreed to remit $32,400 to settle potential civil liability for three apparent violations of the Global

Terrorism Sanctions Regulations, 31 C.F.R. Part 594.

661.    The fine reflected the fact that HSBC-US facilitated transactions in late 2010 and

early 2011 worth about $40,000 that benefited Tajco.

662.    Although a relatively small sum, the facilitation of terrorism financing for

Hezbollah a considerable time after Defendants HSBC Holdings and HSBC-US began negotiating

their deal with DOJ, strongly suggests that, as of early 2011, the HSBC Defendants had not

seriously remediated their AML/CFT controls and procedures, even after being caught committing

hundreds of felonies.

### 2.    DEFENDANT HSBC-US'S AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY IN VIOLATION OF 18 U.S.C. § 2332d

663.    As alleged in greater detail below, even though at all relevant times Defendant

HSBC-US was aware that: the HSBC Defendants were participating in the Conspiracy to

unlawfully transmit Iranian USD funds through U.S. banks (including HSBC-US); and

periodically complained about Defendants HSBC-Middle East and HSBC-London's conduct and proposed new procedures and policies for HSBC Group members that would have provided HSBC-US improved transparency, HSBC-US took no measures to prevent HSBC-US from facilitating hundreds of millions of dollars of payments to Iran in violation of 18 U.S.C. § 2332d. Accordingly, in addition to violating § 2332d, HSBC-US's conduct evidenced its agreement to continue participating in the Conspiracy despite its complaints, its knowledge or deliberate indifference to the Conspiracy's criminal objectives and purposes, and its commission of multiple overt acts in furtherance of the Conspiracy.

664.    One key example of HSBC-US's failure to take substantive measures to ensure that it would not facilitate the HSBC Defendants' provision of illegal material support and services to Iran is reflected in a July 12, 2001 e-mail to senior employees at HSBC-US (containing a memorandum authored by HSBC Group Representative for Iran, John Richards).

665.    Richards's memorandum outlined the business opportunities members of the HSBC Group were presented with in connection with prospects to expand and grow HSBC Group's relationships with Iran, the CBI and Bank Melli, explaining:

    a.    "We have been approached by the Central Bank of Iran to take back their USD clearing business from Natwest. In principal I am keen to do this but on the clear proviso that it can be done profitably and on a sustainable basis."

    b.    "One of our key objectives for the year is to develop HSBC's Asset Management activities in Iran and with the Central Bank now managing the oil price stabilization fund amounting to some USD10bn there is considerable scope for this. Obviously many foreign banks are chasing the same business and so we need to demonstrate some competitive or relational advantage.  The proposal from the Central Bank was therefore not unwelcome…The Central Bank manages their transactions through Bank Melli London…"

    c.    "In summary if we can make this business independently profitable and sustainable the benefits that we can derive particularly from the Treasury Asset Management and Investment spin offs will be substantial."

666.    Richards's memorandum also demonstrates the HSBC Defendants' awareness that other foreign banks (including Defendants) were eagerly pursuing U.S. dollar clearing and settlement business with the CBI in the Eurodollar market.

667.    On July 12, 2001, Denise Reilly, HSBC-US's Senior Manager in Payment Operations, sent an e-mail titled "Re: Bank Melli" to various senior HSBC-US employees in which she stated, "It was relayed to us that the Group (with the Backing of Bond) [the Chairman] was looking to significantly grow our presence in Iran." Reilly also explained that the "current lines of credit [for Iran] were reported to be $800m, trade lines of $150m and growth was anticipated in trade, cash management and internet banking."

668.    Thus, HSBC-US senior employees understood the significance to the HSBC Defendants of their Iranian business and specifically, the HSBC Defendants' relationship with Bank Melli.

669.    As early as 2001, senior HSBC-US payments, compliance and business managers were informed that Iranian Eurodollar payment transactions were being sent by Defendant HSBC-London to HSBC-US for clearing and settlement in USD funds after references to Iran had been deleted.

670.    HSBC-US employees were also informed of an HSBC-London proposal to streamline the processing of Iranian U-turn transactions by omitting references to Iran so that the payment orders would not be halted by OFAC's sanctions screening filter in the United States. Emails at the time show that senior HSBC-US officials expressed discomfort with the HSBC-London proposal, but took no other action to stop or prevent the activity already occurring.

671.     As noted above, a senior HSBC-US employee received an e-mail on June 28, 2001 titled "*Re: Bank Melli*," which described HSBC-London's "usual method" of altering payment order messages and the reasons for doing so.

672.     Another example of HSBC-US' knowledge and acquiescence in the Conspiracy is memorialized in a November 14, 2002 memorandum entitled "COMPLIANCE-OFAC ISSUES IN GENERAL AND SPECIFIC TO IRAN" authored by HSBC-London's Multicurrency Payments Department Head Malcolm Eastwood ("the Eastwood Memorandum").

673.     The Eastwood Memorandum was sent to both HSBC-US and HSBC-London employees and forwarded to additional HSBC-US employees in separate emails.

674.     The Eastwood Memorandum discussed both HSBC's "cover payment method" of evading U.S. sanctions and the specific actions taken by HSBC to modify the contents of payment messages. In relevant parts, the Eastwood Memorandum stated:

- "As the custodian of HSBC-Europe's payments operation I currently feel that we may be exposing ourselves to unnecessary and unacceptable Reputational and Operational Risk when we are handling payments originating from FIs [financial institutions] domiciled in or who are a local branch of an FI domiciled in an OFAC regulated country."

- "HSBC-Europe's historical practice has been to send these types of payments where the U Turn principal applies (ie funds are generally moving from an European bank to another European bank for the credit of an OFAC regulated entity) via the Cover Payment method.  This means that the payment instructions received by HSBC-US contains no mention of the country or entity involved. My understanding is that this has been accepted practice for many years and that HSBC-Europe IBL hold accounts, some in USD for FIs domiciled in these countries ie Cuban, Iranian etc."

- "The Iranian banks continue to send us what I describe as conditional payment instructions which for HSBC-Europe require an element of amendment by ourselves.  This introduces operational risk and under FATF principles we should not be amending these payments instructions.  Acceptance of these items over many years means that we are bound by the precedents currently in place, and I believe that we need to break these precedents…"

- "[W]e need…[t]o agree a 'template' payment instruction for these U Turn Payments which can be used by PCM Sales and the RM team and sent to the Iranian Banks stipulating that payments must be formatted in this way, confirming that we will be sending these via the Serial method and that any deviation from this template will be at the Iranian Banks own risk."

- "Whilst I am told that there are significant business opportunities particularly with countries such as Iran there are also substantial Reputational and Operational Risks, not to mention financial losses associated with it."

675.    In addition, HSBC-US's OFAC filter occasionally stopped an Iranian-related transaction, sent by an HSBC Group affiliate, in which the identifying information had inadvertently been retained, demonstrating that undisclosed Iranian U-Turn exemption transactions continued to be sent through HSBC-US correspondent accounts.

676.    US employees were copied on similar memoranda issued by other HSBC Defendants during the relevant period. For example, a January 2003 memorandum circulated by HSBC-Middle East (and received by several HSBC-US employees) also noted that "[t]he Group now has an excellent relationship with all Iranian banks and some very larger Iranian corporates such as National Iranian Oil Co, National Petrochemical Co, National Iranian Gas Co, National Iranian Steel Co, top Iranian insurance companies, Ministry of Power, Ministry of Post and Telecommunications, etc."

677.    The memorandum also confirmed the HSBC Defendants' awareness that other non-Iranian banks were participating in the Conspiracy, stating:

- "It is believed that some service providers amend the payments to ensure Iran is not mentioned in the body of the payment instruction to their USD correspondent.  This process minimizes the risk of payment being referred to OFAC."

- "Currently, it is estimated that Iranian banks issue up to 700 USD payments a day using their USD providers, mainly banks in the UK and Europe, which in turn use their New York USD correspondents to effect the payments."

- "[T]here is substantial income opportunity to sell a USD payments

> Proposition to Iranian banks in view the impending FATF regulations. The [requirements of the] new regulations increases the risk of Iranian payments being held in the USA as they may fall foul of the OFAC regulations. The Iranian Banks have now prioritized this issue and are now actively seeking a solution from their banks, including HSBC."

678.    An October 2003 document entitled "IRAN-STRATEGY PAPER" circulated to senior HSBC-US employees further documented the HSBC Defendants' eagerness to facilitate USD funds transfers for Iran, noting: "One of the reasons to accelerate our process of engagement is to demonstrate, to the authorities within Iran, that we are committed to the development of their country. This is seen to be particularly important given the more aggressive/pragmatic approach to Iranian business adopted by French and German competitor banks."

679.    Nevertheless, despite being copied on such memos, HSBC-US took no further action to stop the unlawful activities.

680.    Even when HSBC-US blocked Iranian payment transactions, it failed to take further action to ensure that other HSBC Defendants would not continue these illegal practices.

681.    For example, in late December 2002, HSBC-US's OFAC sanctions screening filter stopped and rejected a payment order listing Bank Melli as the originator of the SWIFT-NET message that contained a field that read, "**Do not mention our name in NY.**"

682.    An internal HSBC-US email dated December 30, 2002, informed HSBC-US's compliance team about the Bank Melli payment, which once again confirmed the HSBC Defendants' ongoing process of altering payment order messages.

683.    On June 13, 2003, HSBC-US's OFAC filter stopped another transaction, this time for $150,000 in USD funds, because it included both a reference to Bank Melli and the words "*do not mention our name*."

684.    In a June 16, 2003 email entitled "PLC-Re do not mention our name," HSBC-US

compliance officers were notified about the June 13 blocked transaction and received additional confirmation of the HSBC Defendants' illegal practice of altering fields within Iranian payment order messages for the express purpose of escaping detection in the United States.

685.    During 2004, in furtherance of the Conspiracy, HSBC Group members sent approximately *7,000* Iranian Eurodollar transactions through various SWIFT-NET network accounts for clearance and settlement by Defendant HSBC-US and other correspondent banks in the United States without disclosing their source.

686.    HSBC-US did not report any of the HSBC Defendants' illegal conduct involving Iran to any of its regulators or to U.S. law enforcement at that time.

687.    During 2005, in furtherance of the Conspiracy, HSBC-London and HSBC-Middle East together sent about *5,700* Iranian Eurodollar transactions through various SWIFT-NET network accounts for clearance and settlement by Defendant HSBC-US and other correspondent banks in the United States without disclosing their source.

688.    On April 19, 2005, HSBC-US's OFAC filter again stopped a $362,000 payment order from Bank Melli because it contained the phrase "*do not mention our name in New York*."

689.    HSBC-London re-submitted the same payment on April 22, 2005, but HSBC-US stopped it again, this time sending HSBC-London a SWIFT-NET message requesting full disclosure of the name and address of the underlying originator and ultimate beneficiary of the USD funds.

690.    In early May 2005, HSBC-US stopped a $6.9 million USD payment order originating with Defendant Credit Suisse in Zurich because the SWIFT-NET message details included the phrase "*Bank Melli Iran.*"

691.    In fact, forty-four of the payments stopped by HSBC-US's OFAC filter in May 2005 alone (inadvertently) disclosed Iranian involvement.

692.    On June 3, 2005, HSBC-US informed Defendant HSBC Holdings that additional HSBC-London transfers in the amounts of $1.9 million USD and $160,000 USD had been stopped by HSBC-US due to the lack of full disclosure of the originator, beneficiary, and purpose of the payment transaction.

693.    HSBC-London responded that both payment orders were foreign exchange related, the originators were Bank Tejarat and Bank Melli,[29] and the beneficiaries of the USD funds were Persia International Bank and Defendant Credit Suisse's Zurich office, respectively.

694.    HSBC-US responded by requesting that HSBC-London follow up with the banks to obtain the names and addresses of the initial originators and ultimate beneficiaries, as well as confirmation of the underlying purpose of the payments.

695.    According to information provided by Bank Melli through HSBC-London, the $160,000 payment denoted an internal transfer from Bank Melli's Eurodollar account with HSBC-London to Bank Melli's Eurodollar account with Defendant Credit Suisse's Zurich office.

696.    From July 2005 to June 2006, HSBC-Middle East sent more than 2,500 Iranian Eurodollar transactions – through its various SWIFT-NET network accounts for clearance and settlement by Defendant HSBC-US and/or other correspondent banks in the United States – that illegally concealed the required data relating to Iran.

697.    On November 23, 2005, in an email entitled "Cover payment processed to Credit Suisse re 'Bank Melli' – USD 100,000," an HSBC-US OFAC Compliance officer notified HSBC-London that, on November 7, 2005, a $100,000 transaction involving Bank Melli had been

---

[29] HSBC-London also maintained correspondent accounts for Bank Refah.

processed through HSBC-London's USD account at HSBC-US without transparent documentation:

> We are bringing this to your attention as this situation indicates that cover payment involving Iran are still being processed by PLC [referring to HSBC-London]. It was our understanding that Group payments involving Iran would be fully disclosed as to the originators and beneficiaries.

698.    In furtherance of the Conspiracy, from April 2006 through December 2007, about 50% of the estimated *700* Iranian Eurodollar payment transactions sent by HSBC-London – through its various SWIFT-NET network accounts for clearance and settlement by Defendant HSBC-US and/or other correspondent banks in the United States – continued to not disclose their connection to Iran.

699.    In addition, through March 2010, HSBC-US was the conduit for at least twenty-four post-U.S. designation Eurodollar transactions on behalf of IRISL and/or its various subsidiaries and front companies.

700.    During the relevant time period, HSBC-US knew that Iran was a designated State Sponsor of Terrorism, and that HSBC-US's USD clearing and settlement operations with CHIPS-NY (Eurodollar clearing and settlement), CLS Bank (foreign exchange) and FRB-NY (domestic USD clearing and settlement and central bank lender of last resort for the Eurodollar market) were being used by the HSBC Defendants to facilitate unlawful transactions in USD funds on behalf of Iran in furtherance of the Conspiracy.

701.    As noted above, on December 11, 2012, Defendants HSBC Holdings and HSBC-US entered into a Deferred Prosecution Agreement with DOJ.

702.    DOJ issued a press release announcing the 2012 DPA's entry, including the fact that the DPA resulted in HSBC Holdings and HSBC-US admitting to AML and sanctions violations, as well as the fact that they would pay a $1.256 billion USD forfeiture.

703.     In addition to the $1.256 billion forfeiture under the DPA, HSBC Holdings and HSBC-US also agreed to pay $665 million in civil penalties – $500 million to the OCC and $165 million to the Federal Reserve – for the HSBC Defendants' AML/CFT program violations with Iran and other countries and entities.

704.     DOJ's press release announcing the DPA quoted then-Assistant Attorney General Lanny Breuer:

> HSBC is being held accountable for stunning failures of oversight – and worse – that led the bank to permit narcotics traffickers and others to launder hundreds of millions of dollars through HSBC subsidiaries, and to facilitate hundreds of millions more in transactions with sanctioned countries.  The record of dysfunction that prevailed at HSBC for many years was astonishing.

705.     The United States Attorney for the Eastern District of New York Loretta Lynch was quoted as stating:

> HSBC's willful flouting of U.S. sanctions laws and regulations resulted in the processing of hundreds of millions of dollars in OFAC-prohibited transactions.  Today's historic agreement, which imposes the largest penalty in any [Bank Secrecy Act] prosecution to date, makes it clear that all corporate citizens, no matter how large, must be held accountable for their actions.

706.     Manhattan District Attorney Cyrus R. Vance Jr. was quoted in the same press release as stating:

> New York is a center of international finance, and those who use our banks as a vehicle for international crime will not be tolerated. … Sanctions enforcement is of vital importance to our national security and the integrity of our financial system.  The fight against money laundering and terror financing requires global cooperation, and our joint investigations in this and other related cases highlight the importance of coordination in the enforcement of U.S. sanctions.

## J.     DEFENDANT BARCLAYS' AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY

707.     Until at least May 2008, Defendant Barclays maintained correspondent banking relationships with several of the Iranian Bank Co-conspirators, including Bank Saderat and Bank Melli.

708.   Barclays is a member of SWIFT-Brussels and has historically used the SWIFT-NET system to transmit international payment messages from and for financial institutions around the world.

709.   Barclays originally processed USD payment messages through numerous global locations.

710.   Over time, Barclays consolidated its USD payment processing so that the payments were predominately processed at Barclays' Payment Processing Centre located in Poole, England ("Poole").

711.   Barclays knowingly and willfully engaged in conduct that caused its New York branch and other financial institutions in the United States to process Eurodollar payment transactions in violation of U.S. sanctions.

712.   As part of this effort to evade U.S. sanctions against Iran, Barclays:

    a.   Followed instructions from Iran and its agents not to mention their names in USD payment transaction messages sent to Barclays-New York and to other U.S. financial institutions for clearance and settlement in USD funds;

    b.   Routed transactions through an internal Barclays sundry account, thereby hiding the payment transactions' connection to Iranian entities;

    c.   Amended or reformatted SWIFT-NET payment order messages to remove information identifying Iranian entities involved in the transfer of USD funds; and

    d.   Re-sent Iranian entities' SWIFT-NET MT 103 payment order messages as cover payments to take advantage of the lack of transparency as to the ultimate originator/beneficiary that was achieved by using the MT 202 bank-to-bank cover payment message format.

713.   Beginning in 1987, Bank Melli Iran instructed Barclays to process USD transactions in favor of Bank Melli's London branch by referencing only Bank Melli's Eurodollar account number at Midland Bank Plc and without referencing Bank Melli's name.

714. Bank Melli further instructed Barclays to send separate payment order instructions, which included full details about the Eurodollar payment transactions to Midland Bank Plc and Bank Melli's London Branch.

715. In response, Barclays memorialized Bank Melli's instructions for Eurodollar market transactions in a memorandum sent by its Head Office to Barclays' international offices, and, as early as the late 1990s, included them in Barclays' "List of Correspondents" ("LOC"), which contained information related to Barclays' correspondent banking relationships and assisted Barclays' employees in effectuating international payment transactions involving USD funds.

716. Barclays' LOC contained instructions on how to process payments for both sanctioned and non-sanctioned banks with which Barclays had correspondent relationships.

717. Over time, the LOC grew to include instructions for payments related to several of Barclays' correspondent bank clients and included instructions to use cover payments (SWIFT-NET MT 202 payment order messages) when processing payments in USD funds for clearing and settlement in the United States, and omitting the names of U.S.-sanctions targets from the payment order messages so that U.S. financial institutions could not identify the sanctions nexus of the payments.

718. In a November 1987 Head Office Circular, Barclays distributed payment instructions received from an Iranian bank directing Barclays "to amend the procedures governing the transfer of U.S. Dollars for any purpose in favour of our London branch" and to route such payments "without mentioning the name of our bank."

719. The reason for, and effect of, these instructions was to disguise Iranian sanctioned entity payments from Barclays' correspondents in the United States so that such correspondents would unwittingly process the illegal payments.

720.     Barclays' employees followed the instructions in the LOC when processing USD payments involving sanctioned Iranian banks, thereby ensuring that the name of the bank would not appear in any MT 202 cover payment messages sent to Barclays' New York branch for clearing and settlement through CHIPS-NY and FRB-NY. For example, with regard to USD payments sent on behalf of an Iranian bank, the LOC stated, "[t]he cover MT202 for the direct Payment Order to be arranged by the remitting Bank without mentioning [the Iranian bank's] name ...."

721.     Barclays' LOC also contained instructions to contact the remitter or beneficiary for routing instructions for certain payments of USD funds involving Iranian sanctioned entities.  The general instructions for Iranian banks stated:

### USD PAYMENTS TO IRAN

> Certain payments may be blocked by the US Authorities.  Therefore, any branch with a USD transfer is advised to contact the remitter beneficiary or beneficiary's bankers to request specific routing instructions.

722.     Barclays' standard operating procedures allowed and even educated its employees on how to bypass the sanction screening algorithms in both Poole's and the U.S. financial institution's OFAC filters to permit illegal payment transactions in USD funds.

723.     Pursuant to these "standard" procedures, when the Poole filter identified a Eurodollar payment transaction that referenced an Iranian entity, that payment order message was stopped for further review by Barclays' employees in Poole.

724.     If the Poole-based employees found that the payment order message referenced an Iranian entity, they would follow one of the following procedures: (i) return the payment order message to the remitting entity via a pre-formatted fax cover sheet; (ii) alter or delete fields in the SWIFT-NET payment order message; or (iii) change the message type from a serial payment (MT 103) to a cover payment (MT 202) in order to hide any connection to the Iranian entity.

725.    The then-Senior Manager for Barclays Group Payments Industry Management in Poole explained that if the MT 202 payment order message contained beneficiary information that caused it to be stopped by the OFAC filter in the U.K, that information was removed to ensure the payment transaction was not stopped by the OFAC filter when resubmitted.

726.    The same Senior Manager noted that he was aware that Defendant Barclays' payment operators amended payment order messages in order to facilitate the transfer of USD funds to Iran and that this was a "common practice" at Barclays.

727.    As noted above, consistent with Barclays' "standard" procedures, when an Iranian payment was flagged by the Poole OFAC filter, Barclays' employees generally returned the flagged payment order message to the original remitting bank.

728.    Barclays' employees used a specific fax cover sheet to advise the remitting area of Barclays that the payment message had been cancelled and would further identify the specific words in the payment message that had caused the message to be stopped by the Poole sanctions screening filter.

729.    The Barclays fax cover sheet contained the following language:

> OFAC ITEM: Wording below is contained in the message and does not comply with the Office of Foreign Assets Control regulations applicable to all payments sent via the U.S.A. Payments to U.S.A. must NOT contain the word listed below.

730.    Subsequently, because Barclays was advising the remitting bank of the prohibited language, some of these payment order messages would thereafter be re-sent by the remitting bank on the SWIFT-NET network without the "offending" language.

731.    This deliberate omission enabled the payment order message to pass through the Poole sanctions screening filter without being blocked, and then clear and settle in USD funds by Barclays' New York branch and unwitting U.S. financial institutions.

732.    In November 2001, the use of the fax cover sheet was identified by Barclays' internal auditors as problematic because (according to a Barclays internal audit report) "without adequate guidance the recipient of the fax advice may not be aware of the implications and may merely remove the offending text and re-submit the payment without any wider consideration."

733.    In early 2002, as a result of this internal audit report, the language of the fax template was re-worded in an attempt to mitigate these issues.  The fax language was changed to:

> OFAC ITEM: Wording below is contained in the message and does not comply with the U.S.A. / U.K. / E.C. / U.N. Sanctions.

734.    Despite the altered wording in the fax cover sheet, no implementing guidance was circulated, and Barclays' "standard" practices nevertheless continued, as did the resubmission of prohibited OFAC-sanctioned transactions with the offending text removed.

735.    Barclays' employees generated internal correspondence that documented Barclays' awareness and acceptance of the fact that transactions were being processed via MT 202 cover payments for the specific purpose of hiding the identity of Iranian entities in order to ensure that Barclays could continue its unfettered processing of USD funds transfers involving Iranian entities through Barclays' New York branch.

736.    For example, one Barclays employee explained in an email:

> [W]e can get around [OFAC seizure] by sending only cover payments to US banks and then make MT103 direct to beneficiary's bank.  The MT202 cover must not mention of [sic] the offending entity which could cause funds to be seized.   A good example is Cuba which the US says we shouldn't do business with but we do.

737.     Barclays' employees understood the advantage of using bank-to-bank cover payments.  The cover payment message format (MT 202), with its limited information fields, was a better mechanism to process OFAC-prohibited transactions than using a more detailed serial payment message format (MT 103).

738.    A Barclays employee noted in an email: "If we were to route the payment via the serial payment method ... the payment would clearly be seized by the US authorities" but by using cover payments, "the US Treasury [would] remain blissfully unaware of [the payment's] existence."

739.    In December 2002, internal correspondence also brazenly acknowledged Barclays' use of MT 202 cover payment messages to detour U.S. Iranian sanctions, stating:

> To circumvent US legislation, [Barclays is] currently rout[ing] US$ items for sanctioned institutions via unnamed account numbers, without mention of the sanctioned party. For customer transfers, payment cover is routed via MT202 to New York, naming only the account holding bank.  A direct MT103 is them [sic] sent to the account holding bank. Further investigation suggests that we are carrying out this practice on behalf of four [Iranian bank] customers….

740.    A January 2004 report provided to Barclays' Group Risk Oversight Committee noted that a recent failure "illustrat[ed] why the whole sanctions process needs to be reviewed and brought up to date."

741.    In July 2004, an internal assessment of Barclays' payments processing explained:

> Cover payments are an issue for this project as they are effectively a way of by passing [sic] sanctions....  There is nothing in these payment messages [MT 103 and MT 202] that identifies them as linked for the purpose of screening.

742.    In April 2005, Barclays noted in an internal memo the risk of using MT 202 cover payments rather than MT 103 serial payments, and also acknowledged that other financial institutions such as the Western Bank Defendants facilitated payments for Iran in the same manner:

> Changing to different message types would be much more expensive to us. *Moral risk exists if we carry on using cover payments but that is what the industry does*. I[n] M[y] H[umble] O[pinion] we should carry on using cover payments and accept that there is a risk of these being used on occasion to hide true beneficiaries (who may or may not be sanctioned individuals or entities).

743.    In the spring of 2006, Barclays' senior management learned that four cover

payments involving sanctioned parties had been routed through Barclays' New York branch and were processed because the cover payments did not mention the sanctioned beneficiary or originator.

744. Throughout this entire time period, Barclays knew that Iran was a designated State Sponsor of Terrorism and knew that Barclays was facilitating unlawful payments on behalf of Iran in furtherance of the Conspiracy.

745. Barclays also continued to facilitate unlawful payments on behalf of Bank Saderat *after* Barclays knew that Bank Saderat had been designated an SDGT for enabling the transfer of USD funds to Hezbollah.

746. Barclays also continued facilitating unlawful Eurodollar payments on behalf of Bank Melli *after* Barclays knew that Bank Melli had been designated by the United States in part for its enabling the transfer of USD funds to the IRGC.

747. On August 18, 2010, DOJ announced that Barclays had entered into a Deferred Prosecution Agreement with federal and New York State prosecutors and agreed to forfeit $298 million dollars in connection with violations of IEEPA and TWEA.

748. A criminal information was filed on August 16, 2010, in the U.S. District Court for the District of Columbia charging Barclays with one count of violating the IEEPA, and one count of violating TWEA. Barclays waived indictment, agreed to the filing of the information, and accepted and acknowledged responsibility for its criminal conduct.

749. In the press release announcing the DPA, then-FBI Assistant Director-in-Charge Janice K. Fedarcyk was quoted stating:

> Barclays Bank has admitted a decade-long pattern of violating U.S. banking laws, and taking certain steps to conceal prohibited transactions. Corporate responsibility entails more than just acting discreetly on behalf of one's clients. It means, first and foremost, acting lawfully.

### K. DEFENDANT SCB'S AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY

#### 1. SCB Conspired to Conceal Iran's Financial Activities and Transactions From Detection, Scrutiny, and Monitoring By U.S. Regulators, Law Enforcement, and/or Depository Institutions.

750. Defendant SCB provided, *inter alia*, trade-finance, Eurodollar and foreign exchange banking services to Iranian clients starting in or about 1993.

751. At some point thereafter, SCB began formulating plans to participate in and further the Conspiracy with Iran.

752. For example, on June 1, 1995, SCB's General Counsel wrote an e-mail advising SCB's regulatory compliance staff: "if SCB London were to ignore OFACs regulations AND SCB NY were not involved in any way & (2) had no knowledge of SCB Londons [sic] activities & (3) could not be said to be in a position to control SCB London, then IF OFAC discovered SCB London's [sic] breach, there is nothing they could do against SCB London, or more importantly against SCBNY."

753. The SCB General Counsel also instructed that a memorandum containing this plan was "highly confidential & MUST NOT be sent to the US."

754. In the ensuing years, SCB actively conspired with the CBI, Bank Melli Iran, Bank Saderat plc's predecessor (Iran Overseas Investment Bank) and many other entities to assist Iran in evading U.S. sanctions.

755. SCB's role in the Conspiracy grew dramatically in early 2001, when the CBI approached SCB to act as the Central Bank of Iran's recipient bank for U.S. dollar proceeds from daily oil sales made by the NIOC in the Eurodollar market.[30]

---

[30] At some point, SCB Dubai also opened a Eurodollar credit facility for the CBI.

756.     An e-mail dated February 19, 2001, from SCB's Head of Inbound Sales, Institutional Banking, characterized the CBI's solicitation of SCB as "very prestigious" because "in essence, SCB would be acting as Treasurer to the CBI ..."

757.     Thus, SCB was knowingly laundering billions of dollars in violation of multiple U.S. laws for the benefit of, among others, the IRGC.

758.     In a follow up e-mail dated March 23, 2001, SCB's Group Legal Advisor wrote to its Product Manager, Corporate & Institutional Banking and its General Counsel (the e-mail was also forwarded to SCB's Group Head of Audit) that "our payment instructions [for Iranian Clients] should not identify the client or the purpose of the payment."

759.     SCB and the CBI quickly developed operating procedures for USD funds transfers to mask the involvement of Iranian entities in payment orders sent to SCB's New York branch ("SCB-NY").

760.     When the beneficiary bank of a CBI Eurodollar payment transaction was an Iranian bank, SCB-London would send a SWIFT-NET MT 100 or MT 103 to the beneficiary bank's non-U.S., non-Iranian correspondent bank with full details of the Iranian beneficiary bank, and a separate MT 202 to SCB-NY with no mention of the Iranian beneficiary bank.

761.     In fact, SCB-London set up routing rules within its payment system to route all incoming SWIFT-NET messages from the CBI to a repair queue, meaning that the payments were subject to manual review and processing by wire operators, to prevent SCB - London from automatically processing outbound payment instructions for clearance and settlement in the United States with a reference to the CBI in the payment message.

762.     SCB - London's payment processing team initially instructed the CBI to insert SCB - London's SWIFT-NET BIC address (identified as SCBLGB2L) in field 52 (ordering institution)

of its incoming payment order messages so that SCB's payment system would not populate that field with the CBI's SWIFT-NET BIC address (identified as BMJIIRTH).

763.     When the CBI failed to remove its BIC address and insert SCB's BIC address into each SWIFT-NET message, SCB - London wire operators would manually change field 52 to reference SCB - London's BIC in order to mask the CBI's involvement in the payments.

764.     SCB's willingness to further the Conspiracy in this manner attracted more illicit business.

765.     As early as February 2002, several additional Iranian banks approached SCB - London to discuss the possibility of opening new accounts.

766.     SCB - London's Legal, Compliance, and Cash Management groups identified the need for written procedures for the operation of these additional Iranian banks' dollar-denominated accounts.

767.     SCB's central role in the Conspiracy was memorialized in an internal memorandum regarding SCB's procedures for processing payments sent through the United States from the Iranian banks.

768.     The document was entitled "Standard Chartered Bank Cash Management Services UK - Quality Operating Procedure: Iranian Bank Processing."

769.     It was first issued to SCB London staff on February 20, 2004, and included detailed instructions regarding the omission of the Iranian remitting bank's BIC:

> Ensure that if the field 52 of the payment is blank or that of the remitting bank that it is overtyped at the repair stage to a "." (Note: if this is not done then the Iranian Bank SWIFT code may appear - depending on routing - in the payment message being sent to [SCB-NY]).

770.     In addition to inserting a "." in field 52, the memorandum also instructed staff to use cover payments to process Iranian bank payments, which resulted in SCB London omitting

any reference to the involvement of Iranian beneficiaries or beneficiary banks in SWIFT-NET payment order messages sent to SCB's New York branch.

771.    This element of the Conspiracy was particularly important to Defendant Bank Saderat Plc which repeatedly served as the Reimbursing Bank on Letters of Credit for other Iranian banks that were financing various illegal, sanctions-evading transactions on behalf of the IRGC and MODAFL through the United States.

772.    Approximately 60,000 payments related to Iran, totaling $250 billion, were eventually processed by SCB as part of the Conspiracy.

773.    An e-mail dated March 9, 2003, from SCB's Head of Transactional Banking Solutions, UK/Europe Corporate & Institutional Banking to several of SCB's wholesale bank business managers indicates that SCB learned that another bank was "*withdrawing their services*" with one of its Iranian client banks "primarily for reputational risk reasons."

774.    In a memorandum accompanying the news of the aforementioned bank's reduction in Iranian business entitled "Summary of the Risks/Issues to be Addressed with Regard to Iranian Bank USD Clearing that Require Management Direction from Middle East Senior Management Team," the risks posed by additional Iranian business that might "trigger an action" from OFAC, "leaving SCB exposed, with potential reputational damage" were considered, but ultimately rejected in favor of pursuing additional Iranian business.

775.    An October 15, 2003 e-mail from SCB's Manager, Cash Management Services, London to SCB's Product Manager, Corporate & Institutional Banking and its Head of Cash Management Services, UK (forwarded to SCB's Head of Legal & Compliance, Americas and Head of Legal for Corporate & Institutional Banking) outlined how the CBI was instructed to "send in their MT 202's with a [SCB London's business identifier code] as this is what we required

them to do in the initial set up of the account.  Therefore, the payments going to NY do not appear to NY to have come from an Iranian Bank."

776.    SCB utilized such schemes to cloak the dollar clearing activities of Iran, Hezbollah, and their Agents and Proxies and thereby shield those transactions from regulatory scrutiny. During the Relevant Time Period, OFAC required U.S. financial institutions to filter all USD clearing transactions so as to identify those involving sanctioned entities, and then to freeze suspect transactions pending investigation.  This system could (a) delay transaction processing; (b) require that OFAC be advised of information surrounding a transaction; and (c) ultimately result in the rejection of a transaction. SCB therefore wire-stripped to ensure the automatic and unobstructed clearance of Iranian transactions in New York.

777.    During the Relevant Time Period, SCB conspired with Iran and Hezbollah to route nearly 60,000 different USD payments through SCB-NY after first stripping information from wire transfer messages used to identify Iran, Hezbollah, and Hezbollah's agents.

778.    For nearly a decade, SCB programmatically engaged in deceptive and fraudulent misconduct in order to move at least $250 billion in nearly 60,000 transactions through SCB-NY on behalf of Iran, Hezbollah, and Hezbollah's agents that were then subject to U.S. economic sanctions, including Iranian sanctioned entities, and then covered up its transgressions.  These institutions included no less than the CBI, as well as Bank Saderat and Bank Melli, both of which are also Iranian Entities.

779.    These transactions generated at least hundreds of millions in fees for SCB, and left the U.S. financial system vulnerable to terrorists and deprived law enforcement investigators of crucial information used to track all manner of criminal activity.

780.    When SCB anticipated that its business with the Iranian Bank Co-conspirators,

including Defendant Bank Saderat Plc, would grow too large for SCB employees to manually "repair" the payment order messages for New York bound wire transfers, SCB automated the process by building an electronic repair system with "specific repair queues" for each Iranian client.

781.    SCB's payment "Quality Operations Procedures" manual contained instructions on how to manually "repair" or "over-type field 52 as [SCB London]" in SWIFT-NET MT 202 payment message fields to hide CBI's role as originator of the MT 202 cover payment transactions SCB was processing through New York in USD funds.

782.    In October 2004, SCB consented to a formal enforcement action and executed a written agreement with the N.Y. State Banking Department and the Federal Reserve Board of New York ("FRB-NY"), which required SCB to adopt sound Bank Secrecy Act and Anti-Money Laundering ("BSA/AML") practices with respect to foreign bank correspondent accounts (the "Written Agreement").

783.    The Written Agreement arose as a result of identified flaws in AML risk controls at SCB's New York branch and it required SCB to adopt sound AML practices with respect to foreign bank correspondent accounts.

784.    The Written Agreement also required SCB to hire an independent consultant to conduct a retrospective transaction review for the period of July 2002 through October 2004.

785.    The review was intended to identify suspicious activity involving accounts or transactions at, by, or through SCB's New York branch.

786.    SCB failed to inform the N.Y. State Banking Department and the Federal Reserve Board of New York that its London and Dubai operations were secretly clearing hundreds of

billions of dollars through SCB's New York branch at the same time that it was promising to reform its AML practices.

787.   SCB also failed to inform the N.Y. State Banking Department and the Federal Reserve Board of New York that its London, Dubai, Bahrain, Singapore and Hong Kong operations were secretly helping MODAFL and the IRGC evade U.S. sanctions at a time when they were illegally acquiring a wide range of U.S. equipment and technologies, including components for IEDs and EFPs used to kill and maim Coalition Forces in Iraq.

788.   SCB retained Deloitte & Touche LLP ("Deloitte") to conduct the required "independent" review and to report its findings to the regulators.

789.   On August 30, 2005, and again on September 17, 2005, Deloitte provided SCB confidential historical transaction review reports that Deloitte had prepared for two other major foreign banking clients that were under investigation for OFAC violations and money laundering activities.

790.   Deloitte's reports contained detailed and highly confidential information concerning foreign banks involved in illegal U.S. dollar clearing activities.

791.   SCB then asked Deloitte to delete from its draft "independent" report any reference to certain types of payments that could ultimately reveal SCB's illegal Iranian-related practices.

792.   In an e-mail dated October 1, 2005, SCB's Group Head of Legal & Compliance, Wholesale Bank, forwarding the *Quality Operating Procedure* to SCB's Group Head of Compliance and Regulatory Risk, its Group Legal Advisor and its Head of Financial Crime Risk Systems and Monitoring, observed that "read in isolation, is clearly ... designed to hide, deliberately, the Iranian connection of payments."

793.   A few days later, in an e-mail dated October 8, 2005, Deloitte's Global Leader of

Anti-Money Laundering/Trade Sanctions Division wrote to SCB's Head of Compliance, that Deloitte had "agreed" to accede to SCB's request that Deloitte delete from its draft "independent" report any reference to certain types of payments that could ultimately reveal SCB's illegal Iranian U-Turn practices because "this is too much and too politically sensitive for both SCB and Deloitte. That is why I drafted the watered-down version."

794.    In a December 1, 2005 internal memorandum entitled "*Project Gazelle*," SCB's Group Head of Compliance and Regulatory Risk and its CEO in the United Arab Emirates wrote to SCB's Group Executive Director for Risk and its Group Head of Global Markets, acknowledging that SCB repair procedures for U-Turn exemption transactions did "not provide assurance that it does not relate to a prohibited transaction, and therefore SCB NY is exposed to the risk of a breach of sanctions."

795.    A February 23, 2006 internal memorandum entitled "Iranian Business" sent from SCB's General Counsel to SCB's Audit and Risk Committee confirmed SCB's continued recognition that the Conspiracy was expressly designed to enable Iran and the Iranian Bank Co-conspirators (including Defendant Bank Saderat Plc) to evade U.S. detection of their transactions and confirmed that "certain US$ clearing transactions handled in London were processed with the name of the Iranian Bank excluded or removed from the 'remitter field'" despite the "requirement that due diligence in respect of 'U-turn' payments should be undertaken by our office in New York."

796.    In September 2006, New York State regulators requested that SCB provide them with statistics on Iranian U-Turns SCB handled, including the number and dollar volume of such transactions for a 12-month period.

797.    In response, SCB searched its records for 2005 and 2006.

798. In a September 26, 2006 email from SCB's Project Manager for the Lookback Review to SCB's Head of Cash Management Services (2002-2005) and Head of Compliance (2005-2007) at SCB's New York branch, SCB's Head of Operations and Head of Cash SCB identified 2,626 transactions totaling over $16 billion (for Iranian banks).

799. Faced with the prospect of disclosing *billions* of dollars in Iranian transactions, SCB's New York branch's Head of Compliance was directed by his superiors at SCB to provide instead only ***four days*** of U-Turn data to regulators; these four days were masquerading as a log covering two-years of transaction data.

800. In October 2006, the CEO for SCB's U.S. Operations e-mailed the SCB Group Executive Director in London:

> Firstly, we believe [the Iranian business] needs urgent reviewing at the Group level to evaluate if its returns and strategic benefits are . . . still commensurate with the potential to cause very serious or even catastrophic reputational damage to the Group. Secondly, there is equally importantly potential of risk of subjecting management in US and London (e.g. you and I) and elsewhere to personal reputational damages and/or serious criminal liability.

801. CB's Group Executive Director responded (as quoted by a SCB's New York branch officer): "You f---ing Americans. Who are you to tell us, the rest of the world, that we're not going to deal with Iranians."

802. In 2007, SCB successfully convinced the N.Y. State Banking Department and FRBNY to lift their consent order on SCB based on the watered down D&T report and its other fraudulent disclosures.

803. As noted above, from approximately January 2001 through 2007, SCB transferred at least $250 billion through SCB's New York branch on behalf of the Iranian Bank Co-conspirators, including Bank Melli Iran and the CBI, as well as Defendant Bank Saderat Plc.

804.     SCB's New York branch processed approximately 60,000 wire transfers on behalf of the Iranian Bank Co-conspirators, with roughly half the transactions originating with SCB's London office, and the other half with SCB's branch in Dubai, UAE.

805.     In early 2009, after being contacted by U.S. law enforcement authorities, SCB conducted yet another "internal investigation" into its OFAC sanctions screening procedures, business practices and technology.

806.     Nonetheless, SCB's New York branch was the conduit for at least 50 post-U.S. designation transactions on behalf of IRISL and its various front companies through June 2010.

807.     As of 2011, however, even after its internal investigation and open law enforcement investigations commenced in the U.S., the New York State Banking Department still found that SCB's New York branch had:

   a.     No documented evidence of investigation before the release of funds for transactions with parties whose names matched the OFAC-sanctioned list; and

   b.     Outsourced SCB's New York branch's entire OFAC compliance process to Chennai, India, with no evidence of any oversight or communication between the Chennai and SCB's New York branch.

   **2.     SCB Facilitated Transactions On Behalf of MODAFL, Mahan Air and Other Instrumentalities of Iranian State-Sponsored Terror (Including a Hezbollah Affiliated Entity) in Furtherance of Numerous Violations of the U.S. Trade Embargo, Thereby Substantially Contributing to the Plaintiffs' Injuries.**

808.     From at least 2001 to 2007, SCB illegally facilitated more than 1,300 Letters of Credit through stripping or cover payment methods that purposefully concealed the participation of Iranian counterparties in the transactions.[31]

---

[31] A more accurate accounting would probably exceed 9,000 trade-finance and Eurodollar payment transactions.

809.    Many of those LCs were issued for the benefit of Iran's military / terror apparatus, facilitating and financing the IRGC's, MODAFL's and Hezbollah's illegal acquisitions of materials and technologies, including materials unlawfully obtained from the United States and components for IEDs and EFPs used against Coalition Forces in Iraq.

810.    SCB knowingly facilitated and financed the illegal export to Iran of U.S.-manufactured, export-controlled defense and dual-use products worth tens of millions of dollars. These were acquired by various Iranian-controlled front companies on behalf of, *inter alia*, the following entities:

    a.    Mahan Air;

    b.    Four MODAFL subsidiaries: the AIO, the IACI, the IHRSC, and HESA;

    c.    The Iran Power Development Company ("IPDC"), MAPNA and Zener Electronics Services (an agent of Hezbollah);

    d.    The National Iranian Oil Company ("NIOC") and several of its subsidiaries; and

    e.    Khoram Sanat Producing Co. – Iran.

811.    None of these aforementioned entities is (or was) a legitimate agency, operation, or program of the Iranian government.

812.    On the contrary, Mahan Air is an SDGT that, according to the U.S. government, (1) "facilitated the covert travel of suspected IRGC-QF officers into and out of Iraq;" (2) "facilitated IRGC-QF arms shipments"; and (3) "transported personnel, weapons and goods on behalf of Hezbollah. [sic]"

813.    Mahan Air was also later identified as the conduit to Iran of *thousands* of radio frequency modules recovered by Coalition Forces in Iraq from IED devices that were used to target, kill and maim U.S. and Coalition Forces.

814.    Similarly, MODAFL is the principal procurement arm of Iran's military and terror apparatus.

815.    The Mapna Group is also a key component of MODAFL and the IRGC's procurement chain.

816.    Abbas Aliaabadi, Chairman of Mapna International FZE and President of the Mapna Group, is a former member of the Iranian Ministry of Construction Jihad and of the Iranian Air Force.  Aliaabadi was also a key member of the Ministry of Culture & Islamic Guidance instrumental in the creation of Hezbollah and has close links to the IRGC.

817.    During the relevant time period, the National Iranian Oil Company was not only controlled by the IRGC but also served as the lifeblood of the Iranian regime's illicit financing activities, providing it with access to billions of dollars in oil and natural gas revenues that enabled the IRGC to gain access (through the Conspiracy) to the global financial system.

818.    SCB knowingly conspired with Iran to facilitate illicit trade for all of these entities in violation of U.S. law, thereby substantially assisting Iran in its criminal (and specifically terrorist) conduct in Iraq.  The foreseeable consequence of that assistance was to enable Iran, the IRGC and Hezbollah to kill or wound, or try to kill, or conspire to kill more Americans in Iraq.

819.    At all relevant times, SCB was fully aware of both the Iran Trade Regulations and the Export Administration Regulations, the U.S. State Department's United States Munitions List ("USML") and their many restrictions.

a.    <u>**SCB Knowingly Provided Illegal Financing to Mahan Air.**</u>

820.    Between 2000 and 2006, SCB facilitated LCs for the benefit of Mahan Air totaling more than $120 million.

180

821.    As noted above, the Treasury Department designated Mahan Air in 2011, finding

that:

>    Mahan Air also facilitated the covert travel of suspected IRGC-QF officers
>    into and out of Iraq by bypassing normal security procedures and not
>    including information on flight manifests to eliminate records of the IRGC-
>    QF travel.
>
>    Mahan Air crews have facilitated IRGC-QF arms shipments. Funds were
>    also transferred via Mahan Air for the procurement of controlled goods by
>    the IRGC- QF.
>
>    In addition to the reasons for which Mahan Air is being designated today,
>    Mahan Air also provides transportation services to Hezbollah [sic], a
>    Lebanon-based designated Foreign Terrorist Organization. Mahan Air has
>    transported personnel, weapons and goods on behalf of Hezbollah [sic] and
>    omitted from Mahan Air cargo manifests secret weapons shipments bound
>    for Hezbollah [sic].

822.    Mahan Air also transported to Iran *thousands* of radio frequency modules illegally

imported by OPTO Electronics in Singapore, NEL Electronics PTE Ltd. and Corezing

International PTE Ltd. from the United States.[32]

823.    These modules were recovered by Coalition Forces in Iraq from IED devices that

were used to target U.S. and Coalition Forces.

824.    The modules had encryption capabilities and a particularly long range that allowed

the Special Groups' operatives to operate them across significant distances.

825.    In 2008, Mahan Air transported the IED components from Singapore and Thailand

to Tehran, Iran.

---

[32] *See*, Superseding Indictment in *U.S. v. Larijani* at:
https://www.justice.gov/opa/file/837996/download.

826.   Under Secretary of Commerce Eric L. Hirschhorn described this supply chain as "egregious conduct by foreign companies and individuals who have endangered the lives of U.S. and coalition forces in Iraq."

827.   Five LCs facilitated by SCB listed Mahan Air as the "Applicant" and involved the illegal acquisition of materials ranging from aviation parts to a U.S. shipment of an Airbus A320.

828.   The Issuing Banks for the LC included Defendant Bank Saderat Plc, Bank Melli Iran and Bank Sepah.

829.   SCB's New York branch served as the clearing bank for these LCs.

830.   Furthermore, in another transaction, Mahan Air was the listed Beneficiary of a $21 million dollar LC facilitating the leasing of several second-hand Airbus A320s from Europe.[33]

831.   In facilitating these trade-finance transactions, often for explicitly "Non-EAR 99" goods of U.S. origin – i.e. products on the Commerce Control List, SCB knew that it was (1) working with Iranian banks, (2) concealing the Iranian connection to the trade-finance and Eurodollar transactions and (3) facilitating the unlawful delivery of these U.S. export controlled parts or products to Iranian entities in Iran.

832.   For at least two transactions facilitated on behalf of Mahan Air (including one for export controlled goods of entirely U.S. origin), Credit Suisse in Zurich facilitated the payment on the LC to SCB, Dubai, and on at least one of those transactions, the payment was routed by Credit Suisse in Zurich through New York on behalf of Bank Melli in the UAE with the transaction being cleared and settled in USD funds by SCB's New York branch.

---

[33] Mahan Air was the target of a Temporary Denial Order ("TDO") by the U.S. Department of Commerce in March 2008 for, *inter alia*, "knowingly re-exporting to Iran three US-origin aircraft, specifically Boeing 747." The Bureau of Industry and Security's TDO was renewed subsequently several times.

833.    On one occasion, Mahan Air purchased an Airbus (aircraft) using Blue Sky Aviation as its intermediary. SCB, Dubai provided the nearly $30 million to Blue Sky for the purchase, and Bank Sepah (Iran) guaranteed the payment through a re-payment made by Credit Suisse on its behalf in 2006.

834.    The front companies for the Special Groups listed as beneficiaries of the LCs facilitated by SCB included Sirjanco Trading LLC ("Sirjanco") and Blue Sky Aviation Co FZE ("BSA FZE" or "BSA"), both later designated by the U.S. Treasury as SDGTs, in part, because of the illegal sanctions evading conduct facilitated and enabled by SCB.

835.    Hamidreza Malekouti Pour served simultaneously as the Regional Manager for Mahan Air in the UAE, and Managing Director of Sirjanco and BSA FZE – effectively demonstrating how these companies are all part of the same IRGC supply chain. Pour has also been designated as an SDGT for, *inter alia*, supplying equipment to the IRGC-QF.

836.    When designated by the U.S. Treasury Department in 2013 as a Specially Designated Global Terrorist,[34] Sirjanco was described as "a United Arab Emirates-based company designated pursuant to E.O. 13224 for acting for or on behalf of Mahan Air.

837.    Sirjanco was established specifically to serve as a financial front for Mahan Air. Sirjanco has also served as a front for Mahan Air's acquisition of aircraft.  Additionally, Iran's IRGC-QF has used Sirjanco to procure sanctioned goods."

838.    A 2005 LC facilitated by SCB listed Mahan as the Applicant, and Sirjanco as the beneficiary, for a total of $32,500,000.

839.    Bank Melli financed the payment through Credit Suisse, which sent the payment

---

[34] Sirjanco was previously the target of a Temporary Denial Order by the U.S. Department of Commerce in 2011.

order through New York (clearing and settling in USD funds through SCB's New York branch).

840.     The payment was made by SCB, Dubai to Sirjanco's account with Bank Saderat, Dubai.

841.     At least two other LCs facilitated by SCB listed Mahan Air as the Applicant, and Blue Sky Aviation as the Beneficiary, for a total of over $60,000,000.[35] All told, between 2000 and 2006, SCB facilitated at least 11 LCs for the "Blue Sky Group" for a total of more than $125 million.

842.     When the U.S. Treasury Department designated Blue Sky Aviation in 2014, it described it as "a UAE-based company that is owned or controlled by Mahan Air and acts for or on behalf of the airline.

843.     BSA FZE's primary function has been to serve as a payment channel for Mahan Air to obscure the origination of funds. Mahan Air has used BSA to make payments to oil suppliers, and purchase aircraft, engines, and parts."

844.     In sum, SCB was vital to Mahan Air's continued operations and its ability to facilitate travel by IRGC-QF officers and arms shipments in and out of Iraq, transport IED technologies into Iraq as well as transit personnel, weapons and goods on behalf of Hezbollah, which helped facilitate terrorist attacks in Iraq during the relevant time period.

845.     While neither Mahan Air nor Blue Sky Aviation was designated as a terrorist at the time the LCs identified above were financed, SCB engaged in criminal conduct in furtherance of the Conspiracy in order to aid these IRGC supply chain entities to evade U.S. sanctions knowing that its own conduct was illegal.

---

[35] Plaintiffs' estimates are based on only one Promontory report.  SCB's historical relationship with the Blue Sky Group was the subject of a separate Promontory Report not (yet) available.

846.    At the time it agreed to engage in overt acts in furtherance of the Conspiracy, SCB knew that: (1) Iran was a U.S.-designated State Sponsor of Terrorism; (2) the U.S. had imposed strict sanctions and export controls on Iran and Iranian trade; (3) Mahan Air was seeking to illegally acquire U.S. export controlled defense and dual-use materials; and (4) Mahan Air was using front companies to do so.

847.    In sum, SCB affirmatively chose to facilitate Iran's illegal conduct and provide material support to its terror apparatus, including Mahan Air, Blue Sky Aviation and Sirjanco.  All of these entities were later designated as SDGTs in part because of the types of` trade-finance and Eurodollar transactions facilitated by SCB.

### b.    SCB Knowingly Provided Illegal Financing to MODAFL Companies: AIO, IACI, IHRSC and HESA.

848.    Iran's Ministry of Defense and Armed Forces Logistics (MODAFL) operates the [Iran] Aviation Industries Organization (IAIO), the Aerospace Industries Organization (AIO) and the Defense Industries Organization (DIO). MODAFL was designated by the United States on October 25, 2007.[36]

849.    The AIO was designated on June 28, 2005 for weapons proliferation. SCB knowingly provided financing for both the AIO directly, and for 3 major sub- agencies of MODAFL's IAIO: the Iran Aircraft Industries ("IACI")[37] a/k/a SAHA, the Iran Helicopter Support and Renewal Company ("IHSRC") a/k/a PANHA, and the Iran Aircraft Manufacturing Industrial

---

[36] MODAFL was also sanctioned, pursuant to the Arms Export Control Act and the Export Administration Act, in November 2000.

[37] IACI was also formerly listed by the European Union on July 26, 2010, and described as an entity that "[m]anufactures, repairs, and conducts overhauls of airplanes and aircraft engines and procures aviation-related parts often of US-origin typically via foreign intermediaries. IACI and its subsidiaries also have been detected using a worldwide network of brokers seeking to procure aviation-related goods." IACI was also formerly sanctioned by Switzerland, Norway, Japan, Australia, Canada, and the UK. It was designated by the United States in 2013.

Company ("IAMI" a/k/a "HESA"). Support for any of these entities, as sub-agencies of MODAFL

and the IAIO, was not for legitimate agencies, operations or programs of Iran.



i.      **SCB Trade-Finance Transactions with MODAFL's Aerospace Industries Organization (AIO)**

850.    In 2002, SCB facilitated an LC for MODAFL's Aerospace Industries Organization

that cleared through SCB's New York branch valued at $57,662 USD for the illegal purchase of

U.S. export controlled goods.[38]

---

[38] AIO was reportedly responsible for developing anti-tank guided weapons; artillery rocket systems; anti- tank missiles; precision machining and metal forming for a variety of Iranian weapons systems.

851.    That transaction was not for the benefit of any legitimate agencies, operations or programs of Iran.

**ii.    SCB Trade-Finance Transactions with MODAFL's [Iran] Aviation Industries Organization (IAIO)**

852.    On numerous additional occasions, SCB illegally facilitated trade-finance and Eurodollar transactions on behalf of other MODAFL sub-agencies, including HESA.

853.    On September 17, 2008, the U.S. Treasury Department designated HESA,[39] finding that it is:

> owned or controlled by MODAFL, and also because it has provided support to the Iranian Revolutionary Guard Corps (IRGC). The IRGC, which was designated under Executive Order 13382 on October 25, 2007, is considered to be the military vanguard of Iran and has been outspoken about its willingness to proliferate ballistic missiles capable of carrying WMD.

> HESA utilizes its own facilities for the inspection, maintenance, repair overhaul research, development, and manufacture of military and civilian aircraft and related military logistic systems. HESA conducts research on, development of, production of, and flight operations for unmanned aerial vehicles (UAVs) in Iran. The IRGC utilizes the "Ababil" UAV, manufactured by HESA. HESA produces different variants of the Ababil UAV, which can be used for surveillance and attack. Farasakht Industries is a subsidiary of HESA that specializes in the manufacturing of various aerospace tools and equipment.

**(A)    SCB's Trade-Finance Transactions with MODAFL-IAIO  Front Company Downtown Trading Ltd.**

854.    Between 1998 and 2002, SCB facilitated ten LCs involving a company based in Malaysia (and with links to a same named company registered in the U.K.), Downtown Trading Ltd ("Downtown Trading").

---

[39] HESA was previously identified in a document distributed by the German government in July 2005, warning of its potentially illicit activities. It was also identified by the UK government in February 1998 as having procured goods and/or technology for WMD programs.

855.    The total value of these ten LCs involving Downtown Trading amounted to $1,067,575.

856.    MODAFL-IAIO's subsidiary Iran Aircraft Industries ("IACI") was the Applicant on these LCs, *i.e.* the purchaser of the U.S. origin aircraft engine parts in question for seven of these transactions, while Downtown Trading was the reported Beneficiary.

857.    In most or all of these transactions, primarily those for 2002, Bank Sepah (Iran) served as the Issuing Bank, Bank Sepah (London) served as the Reimbursing Bank, SCB Dubai served as the Negotiating Bank, and SCB's New York branch helped facilitate the transactions by serving as the Clearing Bank.

858.    With respect to at least four of these transactions, the U.S. aircraft parts were transported by Iran Air, later designated as "a commercial airline used by the IRGC and Iran's Ministry of Defense and Armed Forces Logistics (MODAFL) to transport military related equipment Iran Air has provided support and services to MODAFL and the IRGC through the transport and/or transfer of goods for, or on behalf of, these entities."

859.    IACI's illegal procurements were often financed by Bank Sepah (as the Issuing Bank), but SCB in Dubai frequently served as the Negotiating Bank and SCB's New York branch usually served as the Clearing Bank for these same trade-finance transactions, in at least one case paying Citibank in New York the fund due.

860.    Citibank then paid Maybank, Malaysia, which effected the ultimate payment to the Eurodollar account of Downtown Trading.

861.    SCB also facilitated similar LCs in USD funds for Downtown Trading after April 2005.

862.    In facilitating these transactions – 70% of which explicitly involved export-

controlled "Non-EAR 99" goods of U.S. origin (*i.e.* products on the Commerce Control List) – SCB knew that it was: (1) working with Iranian banks; (2) concealing the Iranian connection to the transactions; (3) facilitating the unlawful delivery of goods on the U.S. Commerce Control List to Iran's military and/or the IRGC; and (4) that these transactions were not for legitimate agencies, operations, or programs of Iran.

### (B)    SCB's Trade-Finance Transactions with MODAFL-IAIO Front Company Mac Aviation

863.    Mac Aviation is an Irish trading company incorporated in 1993 that purported to engage in the purchase and sale of aircraft and helicopter parts.

864.    The company and its owners[40] were indicted in 2008 for, among other things, violations of the IEEPA, the ITR, and U.S. export controls.

865.    During the relevant time period, Mac Aviation was a customer of SCB in London.

866.    According to the indictment, between June 2005 and July 2008 Mac Aviation solicited purchase orders from customers in Iran for U.S. origin aircraft parts and then forwarded these requests for the parts to U.S. companies.

867.    The indictment further alleges that Mac Aviation wired funds to banks in the U.S. as payment for these parts, and concealed from U.S. sellers the ultimate end-use and Iranian end-users of the purchased parts.

868.    The indictment also alleges that Mac Aviation caused the export of these parts from the U.S. to third countries, including Malaysia, before sending their shipments onward to Iran.

869.    At least one of those shipments, directed by Mac Aviation in February 2006,

---

[40] In 1994, one of the owners of Mac Aviation, Thomas McGuinn, was convicted by a Florida court for exporting defense products to Iran. He pled guilty and was sentenced on April 19, 1996, to time served and 3 years of supervision on release. McGuinn was also barred from receiving licenses for exporting U.S. defense articles.

resulted in a shipment to be made from a firm called Microset Systems Sdn Bhd in Kuala Lumpur, Malaysia, to Sasadja Moavanate Bazargani in Tehran, Iran, an alter ego of Iran's Defense Industries Organization (DIO), which had been designated by Germany, the United Nations, and the United States as a procurer of unlawful weapons components beginning as early as 2005.

870.    As noted above, weapons caches seized from the Special Groups by Coalition Forces in Iraq included many 107 mm artillery rockets with closely clustered DIO lot numbers and production dates between 2005 and 2007, as well as rounds and fuses for 60 mm and 81 mm mortars with DIO lot markings and 2006 production dates.

871.    In another example, in January 2006, police in the southern Iraqi city of Amara, near the Iranian border, captured seventy blocks of TNT explosives and seventy-nine blocks of plastic explosive, which were used by the Special Groups as components of IEDs, all with markings and lot numbers showing that they were produced by DIO.

872.    In July 2010, the DOJ obtained a 27-count superseding indictment in *USA v. Mac Aviation et al.* charging the company and its officers with:

> purchasing F-5 fighter aircraft parts, helicopter engines and other aircraft components from U.S. firms and illegally exporting them to Iran.…
>
> […] Beginning as early as August 2005… through July 2008, the defendants solicited purchase orders from customers in Iran for U.S.- origin aircraft engines and parts and then sent requests for aircraft components to U.S. companies.  These parts included helicopter engines, aircraft bolts and vanes, and canopy panels for the F-5 fighter aircraft.  The defendants wired money to banks in the U.S. as payment for these parts and concealed from U.S. sellers the ultimate end-use and end-users of the purchased parts.
>
> The defendants caused these parts to be exported from the U.S. to third countries like Malaysia before causing them to be transshipped to Iran. […]
>
> From 2005 […  to] 2006, the defendants caused canopy panels designed for the F-5 fighter aircraft, valued at approximately $44,500, to be exported from the U.S. to Iran.  The defendants falsely stated that the end user for the F-5 panels was the Republic of Nigeria. Instead, the panels were sold by the

defendants to Sasadja Moavanate Bazargani, in Tehran, Iran for $86,400. The purchase was arranged through the Iran Aircraft Manufacturing Industrial Company, known by its Iranian acronym as HESA.

873.    According to the superseding indictment, Mac Aviation also shipped fifteen helicopter engines to Iran Aircraft Industrial Manufacturing Company ("HESA").

874.    These included ten Rolls-Royce Model 250 C-20B turboshaft engines, and five Rolls-Royce Model 250 C-20R2 turboshaft engines.

875.    Rolls-Royce Model 250 engines are used on HESA's 278 Shahed (military) helicopters (converted or adapted from the design of the American Bell 206B-III "Jet Ranger" and Bell 206L "Long Ranger" aircraft) flown by and developed for the IRGC.

876.    Between 2001 and 2005, SCB facilitated at least 21 LCs involving Mac Aviation for a total of close to $8 million dollars.

877.    In each case, Mac Aviation was the nominal purchaser of the aircraft parts (Applicant), and the listed importer was either Iran Aircraft Industries ("IACI"), Iran Helicopter Support and Renewal Industries ("IHSRC"), or Iran Aircraft Manufacturing Industrial Company ("HESA").[41]

878.    Most, if not all of these LCs appear to have been financed, at least in part, by:

> Bank Saderat in London (IOVB) serving as the Reimbursing Bank; Bank Refah Iran serving as the Issuing Bank; Standard Chartered Bank in London serving as the Advising Bank; SCB in Dubai serving as the Negotiating Bank; and Standard Chartered Bank's New York branch serving as the Clearing Bank.

---

[41] Iran used an Iranian national named Hossein Ali Khoshnevisrad as an intermediary. Khoshnevisrad used two Iranian companies – Ariasa AG (Tehran) and Onakish Co. (Kish Island, Iran) – to deal directly with Mac Aviation. Khoshnevisrad was arrested in the U.S. in 2009 and "charged with purchasing helicopter engines and advanced aerial cameras for fighter bombers from U.S. firms and illegally exporting them to Iran using companies in Malaysia, Ireland and the Netherlands. Among the alleged recipients of these U.S. goods was ... HESA."

879.   Some of the transactions were financed through the CBI's Eurodollar credit line with SCB.

880.   The other transactions were financed through reimbursements in USD funds claimed by SCB, London primarily from Defendant Bank Saderat Plc with funds deposited received into SCB London's U.S. dollar account with SCB's New York branch for further credit to the Eurodollar account of Mac Aviation (SCB's customer).

881.   Iran Air was often used to deliver the illegally procured equipment to Iran.

882.   Notably, Bank Refah Iran was designated on February 17, 2011, by the U.S. Treasury Department for:

> providing financial services to the Iranian Ministry of Defense and Armed Forces Logistics (MODAFL) and the Iran Aircraft Manufacturing Industrial Company (HESA). In recent years, Bank Refah has facilitated millions of dollars of weapons-related purchases by MODAFL.  These purchases included missiles and tanks and enabled Iran's leadership to maintain its fighter jets and submarines.  Bank Refah also facilitated payments from HESA to businesses and individuals linked to Iran's weapons-related procurement.[42]

883.   SCB's financing of MODAFL's clandestine and illegal acquisition of U.S. military (aircraft) spare parts did not fund or facilitate Iran's legitimate agencies, operations, or programs.

884.   Rather, SCB actively participated in a criminal conspiracy to help Iran's military and terror apparatus obtain critical machinery and equipment and aircraft spare parts it desperately needed to sustain its violent and unlawful activities.

---

[42] Standard Chartered Bank maintained correspondent accounts for Bank Refah in Bangladesh, China, Hong Kong, India, Indonesia, Japan, South Korea, Malaysia, Qatar, Singapore, Sri Lanka, Taiwan, Thailand and UAE.

(C)     SCB's Trade-Finance Transactions with MODAFL-IAIO  Front Company Monarch Aviation (Singapore)

885.    Monarch Aviation was an Iranian front company based in Singapore that was owned and controlled by husband and wife, Brian Douglas Woodford, a UK citizen, and Laura Wang-Woodford, a dual U.S. and UK citizen.

886.    It purported to be a manufacturer, dealer, and repairer of aircrafts and related parts. At least during the period between 2001 and 2007, SCB in Singapore ("SCB-Singapore") maintained accounts for Monarch Aviation, Brian Douglas Woodford, and Laura Wang-Woodford.

887.    At least one Monarch Aviation account at the SCB-Singapore Battery Road branch was listed as account number ACU- 26-0-000106-3.

888.    Defendant Credit Suisse's Singapore Branch at 80 Raffles Place also maintained a U.S. dollar account for Monarch Aviation with the account number K0100340.01.

889.    On January 15, 2003, Woodford and Wang-Woodford were indicted for, among other things, violations of the IEEPA, and U.S. export control laws.[43]

890.    Laura Wang-Woodford was arrested on December 23, 2007, and later pled guilty to conspiring to violate the U.S. trade embargo by exporting U.S. origin aircraft components to Iran.

891.    According to the Superseding Indictment, between January 1998 and December 2007, Monarch Aviation, Jungda International Pte Ltd. (a Singapore based successor to Monarch Aviation), Brian Douglas Woodford and his wife, Laura Wang-Woodford, exported U.S. aircraft parts to Singapore and Malaysia, and then re-exported those items to companies in Tehran, Iran,

---

[43] A Superseding Indictment was returned on May 22, 2008.

without obtaining the required U.S. government licenses, while falsely listing their companies as the ultimate recipients of the parts on export documents filed with the U.S. government.

892.    Specifically, according to the Superseding Indictment and the U.S. Justice Department's Sentencing Recommendation, the funds transferred by Monarch Aviation paid for Boeing CH-47 ("Chinook") helicopter parts, including vane assemblies and bevel gears that were listed under category VIII on the United States Munitions List ("USML") and illegally exported to Iran.

893.    The vane assemblies, part number 2-080-090-02 and national stock number ("NSN")[44] 2840-01-022-7142, and bevel gears, part number 2-080-013-03 and NSN 3020-00-860-7419, were manufactured by Honeywell International Inc., commercial and government entity ("CAGE")[45] code 99193, in Phoenix, Arizona.

894.    These export controlled, U.S. manufactured helicopter parts were used in Iran's fleet of Boeing CH-47 Chinook heavy-lift utility helicopters that were refurbished by HESA.

895.    Iran's CH-47 helicopters are operated by the Islamic Republic of Iran Army Aviation ("IRIAA") and the Islamic Republic of Iran Air Force ("IRIAF").

896.    The Superseding Indictment also listed the following parts, *inter alia*, that were illegally exported to Iran by Monarch Aviation: o-rings, shear bolts, bushings, and rotary wing shields.

897.    The o-rings, identified by part numbers S6135-20059-102 (NSN 5331-01-270-

---

[44] The U.S. National Stock Number (NSN) is a unique thirteen-digit numerical identifier assigned to each part used by the U.S. Department of Defense (DOD).  The NSN system is managed by DOD's Defense Logistics Agency ("DLA").  The DLA system of NSNs was mandated by the 1952 Defense Cataloging and Standardization Act (Pub L No 82-436)

[45] The CAGE code is a unique identifier assigned to, *inter alia*, U.S. defense contractors and DOD maintenance facilities.  The CAGE code provides a standardized method of identifying a given government or defense contractor facility at a specific location.

1765) and S6135-20059-106 (NSN 5331-01-270-1766), were manufactured by Sikorsky Aircraft Corporation (CAGE code 78266) in Stamford, Connecticut.

898.    These export controlled, U.S. manufactured parts were used in Iran's fleet of Sikorsky SH-3D ("Sea King") medium-lift utility/anti-submarine warfare helicopters that were refurbished by Iran HESA.

899.    Iran's SH-3D helicopters are operated by the Islamic Republic of Iran Navy Aviation ("IRINA").

900.    The following parts were manufactured by Bell Helicopter Textron, Inc. (CAGE code 97499) in Fort Worth, Texas:

   a.    Shear bolts, identified by part number NAS625-44 (NSN 5306-00-924-6261);

   b.    Bushings, identified by part number 205-030-477-11 (NSN 1560-00-413-1492); and

   c.    Rotary-wing shields, identified by part number 204-012-118-1 (NSN 1615-00-865-7914).

901.    These export controlled, U.S. manufactured parts were used in the following Iranian rotary-wing aircraft:

   a.    Bell AH-1J ("Cobra") air-assault helicopters (refurbished by HESA);

   b.    Bell UH-1 ("Iroquois") utility transport helicopters (refurbished by HESA);

   c.    Iranian Helicopter Support and Renewal Company ("PAHNA") 2091 ("Toufan") air-assault helicopters (the PAHNA 2091 is an Iranian remanufactured version of the Bell AH-1J helicopter); and

   d.    PAHNA 2-75 ("Shabaviz") utility transport helicopters (the PAHNA 2-75 is an Iranian remanufactured version of the Bell UH-1 helicopter).

902.    Iran's fleet of Bell AH-1J, Bell UH-1, PAHNA 2091 and PAHNA 2-75 helicopters are operated by the Iranian Revolutionary Guard Corps Air Force ("IRGC-AF") and IRIAA.

903.    From 1998 to 2005 (and likely thereafter), SCB facilitated at least 10 LCs financed by the CBI and Bank Refah with a total value of more than $1.5 million dollars involving the shipment of U.S. origin aircraft parts sold by Monarch Aviation to MODAFL's sub-agencies Iran Aircraft Industries ("IACI"), Iran Helicopter Support and Renewal Co. ("IHSRC"), and HESA.

904.    Defendant Bank Saderat Plc served as the Reimbursing Bank on most, if not all, of these transactions, which cleared through SCB's New York branch on their way to Monarch Aviation's accounts at SCB in Singapore.

905.    The aircraft parts were transported by Iran Air from Kuala Lumpur Airport, Malaysia, to Tehran Airport, Iran.

906.    SCB in Dubai served as the Negotiating Bank, and funds from the financing were paid to Monarch Aviation's account with SCB, Singapore through SCB Singapore's account with SCB, London, which in turn received the funds into its U.S. Dollar nostro account with SCB's New York branch from SCB - Bahrain's Offshore Booking Unit ("OBU").[46]

907.    In sum, various overseas branches of SCB conspired with multiple MODAFL sub-agencies and Monarch Aviation, and used SCB's New York branch to both assist Iran's military in illegally acquiring contraband U.S. goods and to illegally disguise the illicit financing of those acquisitions through the SCB's New York accounts.[47]

908.    SCB facilitated at least 316 additional transactions totaling $12,110,565 in USD funds that involved Monarch Aviation at its accounts at SCB in Singapore.  Dozens of those transactions post-date Woodford and Wang-Woodford's 2003 indictment.

---

[46] SCB, Bahrain's Offshore Booking Unit sent proceeds of the Eurodollar loan as payment of Letter of Credit through SCB's New York branch to credit SCB London's USD account in New York for further payment to SCB Singapore.

[47] SCB, Singapore presented documents under Bank Refah Letter of Credit to SCB, Dubai (the Negotiating Bank) for negotiation and payment in USD funds through SCB's New York branch.

909.    SCB's financing of MODAFL's clandestine and illegal acquisition of U.S. military spare parts through Monarch Aviation did not fund or facilitate Iran's legitimate agencies, operations, or programs. Rather, SCB actively participated in a criminal conspiracy to help Iran's military and terror apparatus obtain critical machinery and (aircraft) spare parts it desperately needed to sustain its violent and unlawful activities.

### (D)    SCB's Trade Finance Transactions with MODAFL-IAIO Front Company Jetpower Industrial Ltd (Hong Kong)

910.    Jetpower Industrial Ltd ("Jetpower") was a Hong-Kong based Iranian front company purporting to be a trading company in aircraft parts controlled by Hok Shek Chan, a/k/a John Chan.

911.    In 2011, Chan was sentenced to 42 months for conspiring to illegally export, and attempting to illegally export, 10 indicators, used in C-130 military flight simulators, in violation of the Arms Export Control Act.

912.    According to the U.S. Department of Justice:

> In 1993, Chan's company, Jetpower Industrial, was convicted in Hong Kong of export violations related to his export of U.S. military parts to Iran. Chan then changed his business practices to avoid detection. Rather than shipping U.S. origin goods directly from Hong Kong to Iran, Chan set up a sophisticated procurement network involving front companies and an experienced freight forwarder in Malaysia. Using his network, the defendant was engaged in the illegal procurement and export of aircraft parts from the U.S. for customers located in Iran, including several military related entities in Iran such as the Iranian Air Force, in direct violation of the U.S. Embargo against Iran since 1997.

913.    In fact, according to U.S. officials, Jetpower repeatedly and illicitly exported arms to Iran prior to Mr. Chan's arrest and conviction.[48]

---

[48] At least one Jetpower shipment was seized by UAE officials in 2007 along with several other

914.     At all relevant times, Jetpower was a customer of Bank Melli in Hong Kong.

915.     The full scope of SCB's involvement with and facilitation of Jetpower was extensive (involving at least dozens of transactions) but not yet fully known.

916.     Illegal payments totaling close to $3 million dollars have specifically been identified, but the totals could be much higher.

917.     What is clear is that SCB repeatedly and knowingly facilitated the illegal shipment of U.S. origin aircraft parts sold by Jetpower to one of MODAFL's sub-agencies (IHSRC), and that Jetpower was a significant link in Iran's illegal weapons procurement chain.

918.     For example, in 2001-2002, Bank Refah (the Issuing Bank) issued a LC to MODAFL's sub-agency IHSRC that was to be reimbursed by Bank Saderat Plc (known then as Iran Overseas Investment Bank), then amended the LC to be available with SCB-Dubai. SCB's branches in New York, Singapore and Hong Kong were all instrumental in enabling Jetpower's receipt of payments at its Eurodollar account(s) with Bank Melli in Hong Kong.

919.     When Jetpower transported the contraband goods (U.S. helicopter parts) to MODAFL (using Iran Air), it asked Bank Melli in Hong Kong to present the documents required under the LC for payment to SCB Dubai.

920.     However, in many instances, SCB Dubai took at least four extra steps before Bank Melli in Hong Kong received the Eurodollar payment for Jetpower.

921.     Upon acceptance of the documents from Bank Melli, SCB Dubai used the CBI's Eurodollar credit facility with SCB Dubai and sent instructions for a Eurodollar loan to be issued by SCB, Bahrain.

---

containers that U.S. officials feared might contain parts or materials that could be used in manufacturing IEDs and EFPs. Bank Mellat financed the transaction, and—according to the LC supporting documentation—the goods were consigned to HESA.

922.     SCB, Bahrain booked the loan and sent the proceeds in USD funds as payment under the Letter of Credit through SCB's New York branch to National Westminster Bank's New York correspondent account for further credit to National Westminster, London for the Eurodollar account of its customer, Bank Melli, London.

923.     SCB, Dubai then sent instructions to Bank Melli, London to pay Bank Melli, Hong Kong upon receipt of USD funds.

924.     Variations on this process were undertaken on multiple LCs in USD funds for the benefit of MODAFL's sub-agency.

925.     In these cases, SCB, Bahrain knowingly cleared U.S. dollars through SCB's New York branch for the illegal trade-finance transactions by repackaging the payments on the LCs as loans that secretly routed through the U.S. to Bank Melli Iran through various British banks.

926.     Jetpower, in most cases, ultimately received payment in USD funds to its Eurodollar bank account with Bank Melli Plc's branch in Hong Kong for these illicit transactions with IHSRC.

927.     According to BIS-Basel and the Hong Kong Monetary Authority ("HKMA"),[49] all USD transfers from SCB-Hong Kong to Jetpower's account with Bank Melli Plc's Hong Kong branch were cleared by the Hong Kong Clearing House Automated Transfer System, and settled by HSBC's Hong Kong subsidiary.

928.     None of this illegal conduct was undertaken for the benefit of a legitimate agency, operation or program of Iran.

---

[49] HKMA is the *de facto* central bank of Hong Kong.

c. **SCB's Trade-Finance Transactions Iran Power Development Company ("IPDC"), MAPNA and Zener Electronics Services (an agent of Hezbollah)**

929. The Iran Power Development Company ("IPDC"), an Iranian government-controlled entity, has worked extensively for years with a network of Iranian companies known as the Mapna Group.[50]

930. Mapna International FZE is a UAE-based subsidiary. One of its directors, Mousa Refan, previously served as the first commander of the Air Force of the "Army of the Guardians of the Islamic Revolution [IRGC]."[51]

931. Another director, Afshin Rezaei, pled guilty in the U.S. District Court for the Northern District of Georgia on April 24, 2008, to:

> one count of violating the IEEPA for the unlicensed export of computers to Iran via the United Arab Emirates. The computers were controlled for anti-terrorism reasons. On May 15, 2008, Rezaei was sentenced to six months of prison (credit for time served), followed by three years of supervised release, and agreed to forfeit $50,000. On February 18, 2010, a 10-year denial of export privileges was imposed on Rezaei, pursuant to Section 11(h) of the EAA.

932. During the relevant time period, Mapna International maintained a Eurodollar account with SCB, Dubai.

933. Between 2001 and 2007, SCB facilitated at least 280 Letters of Credit involving Mapna International FZE (as Beneficiary). In most cases, SCB, Dubai acted[52] as the Advising

---

[50] The Mapna Group lists on its website 41 subsidiaries, some of which were listed by the British government in 2011 as entities of concern for Weapons of Mass Destruction-related procurement.

[51] As noted above, Abbas Aliaabadi, Mapna International FZE's chairman, is a former member of the Iranian Ministry of Construction Jihad and of the Iranian Air Force and former member of the Ministry of Culture & Islamic Guidance, instrumental in the creation of Hezbollah and with close links to the IRGC.

[52] Mapna's subsidiary, Mobin Petrochemicals, was added to the SDN list on June 16, 2010 (and removed from the SDN list in January 2016 as part of the Joint Comprehensive Plan of Action). During the relevant time period, it maintained a USD account with HSBC.

Bank on these transactions.

934.    At least nine Letters of Credit involved SCB's New York branch serving as the Clearing Bank for the transactions, and in some cases, SCB-London served as the Reimbursing Bank.

935.    SCB facilitated at least 7 LCs – totaling $1,384,972 in USD funds – that involved the illegal shipment of U.S. origin goods to the Iran Power Development Company.

936.    The CBI served as the Issuing Bank on several of these LCs, and six of those seven involved goods shipped by IRISL.

937.    Of particular note, between 2003 and 2004, SCB knowingly facilitated at least four unlawful USD funds transfer transactions (cleared through its New York branch) that involved Eurodollar payments to Zener Electronics (UAE), a procurement company for Hezbollah.[53]

938.    The IPDC was listed as the Applicant for these transactions, and Mapna was identified as the 1st Beneficiary, but assigned the payments under the Letters of Credit to Zener Electronics (UAE) as a "2nd Beneficiary."

939.    Each unlawful trade-finance transaction involved U.S. goods.

940.    The Central Bank of Iran acted as the Issuing Bank on at least two of the transactions and SCB, Dubai acted as the Advising and Negotiating Bank.[54]

941.    On at least one occasion, SCB-London served as the Reimbursing Bank for the

---

[53]In June 2014, the U.S. Commerce Department identified Zener Electronics as "involved in activities contrary to the national security and foreign policy interests of the United States, specifically the activities described under paragraph (b)(1) (Supporting persons engaged in acts of terror) of § 744.11 of the EAR" and noted its attempts "to procure U.S. technology on behalf of persons involved in activities contrary to the national security and foreign policy interests of the United States. Specifically, these persons have been involved in supplying U.S.-origin items to persons designated by the Secretary of State as Foreign Terrorist Organizations without the required authorizations."

[54]On at least one occasion, SCB London also served as the Reimbursing Bank.

payment to Zener Electronics, sending the credit through its New York branch to SCB Dubai's account with SCB in New York.

942.    Upon receipt of the funds to its USD account with SCB in New York, SCB, Dubai instructed SCB's New York branch to forward the funds to JP Morgan Chase in New York, which held an account for the Commercial Bank of Dubai.

943.    The Commercial Bank of Dubai, in turn, credited the account of its customer, Zener Electronics.

944.    These illicit transfers on behalf of Mapna resulted in payments to Zener Electronics (a key link in Hezbollah's illicit supply chain) and were not for the benefit of a legitimate agency, operation or program of Iran. In a Superseding Indictment filed in federal court on March 30, 2016, Mapna was again implicated in the Conspiracy.[55]

945.    This time, DOJ charged multiple individuals with covert transactions in 2011 through a U.S. bank, wherein Mapna's name was omitted from the transaction to hide its identity as a counterparty.

### d.    SCB's Trade-Finance Transactions with National Iranian Oil Company (NIOC) Subsidiaries

946.    The Iranian Helicopter Aviation Company, Ahwaz Pipe Mill Co. and Kala Naft[56] are all subsidiaries of NIOC, which (as noted *supra*) was controlled by the IRGC during the relevant time period.

947.    Between 1999 and 2001, SCB knowingly facilitated two illegal transactions totaling $750,744 on behalf of the Iranian Helicopter Aviation Company (listed as the Applicant).

---

[55] See *U.S. v. Za*rrab filed in the S.D.N.Y (1:15-cr-00867).
[56] Kala Naft was designated by the United States in 2010.

948.    The Beneficiary listed on both LCs was Limo Sarl.  The goods involved in these transactions were U.S. origin helicopter parts.

949.    Payments for both transactions were cleared through SCB's New York branch, and refinanced under the CBI's Eurodollar credit facility with SCB, Dubai.

950.    The Paris-based Limo Sarl was directed by a Ms. Laleh Moein, reported to have also been in the employ of Iran's Ministry of Intelligence and Security ("MOIS").[57]

951.    Between 2002 and 2004, SCB knowingly facilitated four (4) illegal transactions totaling $611,713 that involved U.S. origin goods illegally transported to Iran on behalf of Kala Naft.

952.    At least two of these transactions had SCB New York's branch serving as its Clearing Bank.

953.    As early as February 1998, Kala Naft was identified by the UK government "as having procured goods and/or technology for weapons of mass destruction programs."

954.    Kala Naft was also publicly identified as a NIOC subsidiary in a 2003 Commerce Department action that further stated that Kala Naft was a recipient of illegally exported U.S. origin oilfield equipment from the U.S.

955.    Between 2001 and 2006, SCB knowingly facilitated at least two illegal transactions totaling $593,307 that involved U.S. origin goods illegally transported to Iran on behalf of Ahwaz Pipe Mill Co.

956.    The CBI was used as the Refinancing Bank, and SCB's New York branch served as the Clearing Bank.

---

[57] MOIS was designated by the U.S. for, *inter alia*, providing support to terrorist groups, including Hezbollah.

957.    The listed beneficiary of the Ahwaz Pipe Mill Co. trade-finance transactions was a Cypriot company named Polygon Co. Ltd.

958.    Polygon's managing director and its owner had previously been indicted on November 19, 1992, in the Southern District of Florida for illegally conspiring to export oil field equipment and other goods, services and technology to Libya, demonstrating its history of illicit sanctions evasion on behalf of a State Sponsor of Terrorism.

959.    The litany of trade-finance and Eurodollar transactions discussed *supra* often involved counterparties (such as Mac Aviation, Jetpower and Polygon) with established track records of criminal activity on behalf of Iran.

> **e.  SCB's Trade-Finance Transactions with Iranian Front Company Khoram Sanat Producing Co. – Iran**

960.    On June 20, 2005, SCB facilitated Khoram Sanat Producing Co.'s purchase of electromotors for hydraulic presses worth $2.79 million dollars.

961.    The company is likely a subsidiary of another Iranian company known as "Alborz Steel."

962.    The nominal purchaser of the equipment was an Iranian front company in the UAE called Diamonds Steel.[58]

963.    Diamonds Steel maintained one or more accounts with SCB, Dubai.

964.    Between 2001 and 2007, SCB, Dubai facilitated at least 173 transactions involving Diamonds Steel, totaling more than $130 million.

965.    The aforementioned electromotors were illegally purchased from the United States

---

[58] SCB facilitated at least a dozen transactions on behalf of Diamonds Steel, mostly for the benefit of Alborz Steel, Iran. Many of these transactions involved both Bank Melli Iran, as well as Credit Suisse in Switzerland, acting on behalf of Bank Melli Iran or Bank Melli, Dubai.

with the LC facilitated by SCB's New York branch, which served as the Clearing Bank for the transaction, while SCB, Dubai served as the Advising Bank.[59]

966. SCB facilitated this transaction despite the fact that the machinery required an export license because the equipment could be used for terrorist purposes.[60]

967. Specifically, hydraulic presses are the precise type of machinery required to manufacture EFPs.[61]

968. The production of an EFP shaped-charge munition requires at least a 10-ton hydraulic press in order to form sheets of copper and steel, respectively, into the necessary shaped-charge geometry for defeating the plating of American armored vehicles of the type used by the U.S. military in Iraq.

969. Even assuming a steep mark-up in costs of delivery, SCB financed Iran's acquisition of approximately fifty (50) hydraulic presses capable of manufacturing more than a hundred EFPs per day.[62]

970. The hydraulic press machinery was transported to Iran by IRISL.

---

[59] This occurred during a period of time (between 2004 and 2007) when SCB's New York branch was subject to a formal supervisory action by the New York State Banking Department and the Federal Reserve Bank of New York ("FRBNY") for other regulatory compliance failures involving the Bank Secrecy Act (BSA"), anti-money laundering policies and procedures ("AML"), and OFAC regulations.

[60] The product was designated with an ECCN of 2B999 (for Anti-Terrorism reasons) under Supplement 1 to Section 774 of the Commerce Control List (CCL).

[61] SCB facilitated another Letter of Credit on May 12, 2005, involving Khoram Sanat (as Applicant) and Diamonds Steel (as Beneficiary) for over $1.9 million for goods described as "Back Up Roll Change Carriage, Spare Back Up Roll with Chuck and Main Gear Box." These standard terms are used to describe metal working equipment that may be integrated into large hydraulic presses or deployed as stand-alone equipment stations.

[62] The dangers of Iran possessing hydraulic press equipment were evident from a 2009 reported incident wherein Turkish authorities, at the request of the U.S., halted a convoy of trucks heading from Iran to Syria that contained a large hydraulic press and punch press. The U.S. requested this action because "these items are likely intended for the production of explosively formed penetrators (EFPs)."

971.    Because Letters of Credit are intrinsically about the submission of detailed paperwork and required SCB (Credit Suisse and other Defendants) to examine and retain the documentation evidencing Iran's illegal procurement chain, SCB's knowledge of its role in the Conspiracy is indisputable.

972.    Furthermore, because Iran's illegal procurement chain was dependent on access to U.S. dollars, SCB's (and other Defendants') participation in the Conspiracy was essential to its success.

973.    In sum, SCB was integral to Iran's inherently lethal and illegal conduct, which included a wide variety of money laundering techniques in the service of weapons procurement, arms shipments, acquisition of WMDs, and terror financing that substantially and foreseeably assisted MODAFL, the IRGC and Hezbollah in their campaign of violence and terror against Coalition Forces in Iraq.

### 3.    Regulatory Actions and Criminal Investigations Against SCB, 2012 – Present

974.    In 2011, the New York State Department of Financial Services ("DFS") again investigated SCB-NY for the very same issues and problems which had led to the SCB 2004 Written Agreement with DFS and FRBNY: illegal financial transactions with U.S. sanctioned entities, most notably Iran, Hezbollah and their Agents and Proxies, and woefully inadequate compliance with longstanding BSA, AML, SAR, and OFAC statutory and regulatory requirements.

975.    On August 6, 2012, the DFS issued an Order Pursuant to New York Banking Law § 39, which fined SCB $340 million and detailed its legal and regulatory violations, its involvement in the conspiracy to provide of illegal banking services to Iran, which allowed terrorists to access the U.S. financial system.  That Order, among other things, stated as follows:

For almost ten years, SCB schemed with the Government of Iran and hid from regulators roughly 60,000 secret transactions, involving at least $250 billion, and reaping SCB hundreds of millions of dollars in fees. SCB's actions left the U.S. financial system vulnerable to terrorists, weapons dealers, drug kingpins, corrupt regimes, and deprived law enforcement investigators of crucial information used to track all manner of criminal activity.

In its evident zeal to make hundreds of millions of dollars at almost any cost, SCB undertook a course of conduct that included: falsifying business records; offering false instruments for filing; failing to maintain accurate books and records of all transactions effected and all actions taken on behalf of SCB; obstructing governmental administration; failing to report misconduct to the Department [of Financial Services] in a timely manner; evading Federal sanctions; and numerous other violations of law that, as with the above, have an impact upon the safety and soundness of SCB's New York branch and the Department's confidence in SCB's character, credibility and fitness as a financial institution licensed to conduct business under the laws of this State [of New York].

From January 2001 through 2007, SCB conspired with its Iranian Clients to route nearly 60,000 different USD payments through SCB's New York branch after first stripping information from wire transfer messages used to identify sanctioned countries, individuals and entities . . .SCB intentionally withheld material information from New York and Federal regulators in its effort to service Iranian Clients.

"In short, SCB operated as a rogue institution" and that employees internally knew that its business dealings with Iran could subject U.S. and London management to "*serious criminal liability*." SCB's success in USD clearing for Iranian Clients stems from the documented willingness of its most senior management to deceive regulators and violate U.S. law. Worse yet, SCB apparently adopted this strategy with full knowledge of the risks involved."

976.    On September 21, 2012, SCB and the DFS executed a Consent Order resolving charges that, from at least 2001 through 2007, SCB provided Eurodollar clearing and settlement services to Iranian customers subject to U.S. economic sanctions, with respect to approximately 59,000 transactions totaling approximately $250 billion, through SCB's New York branch.

977.    DFS concluded that "SCB operated as a rogue institution."

978.     On December 10, 2012, DOJ announced that SCB had agreed to forfeit $227 million to the Justice Department for conspiring to violate the IEEPA, and that the forfeiture was part of Deferred Prosecution Agreements SCB entered into with DOJ and the Manhattan District Attorney's office for illegally moving millions of dollars through the U.S. financial system on behalf of, *inter alia*, sanctioned Iranian entities. SCB also entered into settlement agreements with OFAC and the Board of Governors of the Federal Reserve System, as well as with DFS.

979.     DOJ filed a criminal information charging SCB with one count of knowingly and willfully conspiring to violate IEEPA. SCB waived the federal indictment, agreed to the filing of the information and, according to DOJ's press release, "accepted responsibility for its criminal conduct and that of its employees."

980.     DOJ's 2012 press release announcing the Deferred Prosecution Agreement quoted then-Assistant Attorney General Lanny Bruer as stating: "[f]or years, Standard Chartered Bank deliberately violated U.S. laws governing transactions involving Sudan, Iran, and other countries subject to U.S. sanctions.  The United States expects a minimum standard of behavior from all financial institutions that enjoy the benefits of the U.S. financial system. Standard Chartered Bank's conduct was flagrant and unacceptable.  Together with the Treasury Department and our state and local partners, we will continue our unrelenting efforts to hold accountable financial institutions that intentionally mislead regulators to do business with sanctioned countries."

981.     Manhattan District Attorney Cyrus Vance Jr. stated in the press release: "Investigations of financial institutions, businesses, and individuals who violate U.S. sanctions by misusing banks in New York are vitally important to national security and the integrity of our banking system.  Banks occupy positions of trust. It is a bedrock principle that they must deal honestly with their regulators. I will accept nothing less; too much is at stake for the people of New

York and this country.  These cases give teeth to sanctions enforcement, send a strong message about the need for transparency in international banking, and ultimately contribute to the fight against money laundering and terror financing."

982.    Prior to entering into the 2012 DPA and its settlement with DFS, SCB retained Promontory Financial Group, LLC ("Promontory") in 2009 to provide "consulting services in connection with the identification and collection of historical transaction records relating to cross-border financial transactions."

983.    In the first half of 2010, SCB reported to various regulators, including the New York State Banking Department ("NYSBD"), DFS's predecessor, that it had engaged in conduct related to the evasion of U.S. sanctions.

984.    On April 15, 2010, SCB hired Promontory again to identify, collect and review historical transaction records implicating sanctions violations.

985.    Thereafter, Promontory produced a number of reports and made various presentations to government authorities, including the NYSBD (later DFS).

986.    These Promontory reports included, *inter alia*, interim reports throughout 2010, final reports in January and March of 2011, as well as updates to those final reports in October 2011.

987.    DFS relied in part upon the work conducted and presented by Promontory to identify the scope of SCB's improper conduct prior to entering into the September 21, 2012 Consent Order.

988.    On June 18, 2013, Deloitte entered into a Settlement Agreement with DFS wherein it agreed, *inter alia*, to pay a penalty of $10 million for misusing confidential information from other bank defendants.

989.   For example, Deloitte provided SCB with copies of transaction review reports that Deloitte had prepared for these other clients and suggested to SCB management that they be used as templates for SCB's transactions review report, and agreeing to SCB's request that Deloitte remove a recommendation from its written final report explaining how "cover payment" messages used by SWIFT-NET (MT 202s) could be manipulated by banks to evade U.S. money laundering controls.

990.   On August 19, 2014, DFS announced an order regarding SCB's failures to remediate AML/CFT compliance problems as required in SCB's 2012 settlement with DFS.

991.   Under the August 2014 DFS order, SCB was required to: (1) suspend dollar clearing through SCB's New York branch for high-risk retail business clients at SCB's Hong Kong subsidiary; (2) exit high-risk client relationships within certain business lines at SCB's branches in the UAE; (3) decline new dollar-clearing clients or accounts across its operations without prior approval from DFS; (4) pay a $300 million penalty; and (5) take other remedial steps.

992.   Additionally, according to an October 29, 2014 article in *The New York Times*, federal and Manhattan prosecutors have reopened their investigation into SCB.

993.   *The New York Times* reported that prosecutors were questioning whether SCB failed to disclose the extent of its wrongdoing to the government, thus imperiling SCB's 2012 settlement.

994.   In August 2015, DFS issued a "Report on Investigation of Promontory Financial Group, LLC."

995.   The DFS report stated that:

> On April 15, 2010, Promontory was engaged by Standard Chartered's counsel to identify, collect and review historical transaction records "with certain countries or certain Specially Designated Nationals ("SDNs")

subject to sanctions" administered by OFAC. The engagement was known as Project Green.

As part of the engagement, Promontory produced a number of reports and made various presentations to the Bank and government authorities, including the NYSBD. These reports included interim reports throughout 2010, final reports in January and March of 2011, and updates to those final reports in October 2011.

In connection with the Department's investigation of Standard Chartered, the Department relied in part upon the work conducted and presented by Promontory to identify the scope of the Bank's improper conduct and to determine an appropriate resolution of the investigation.

996.    DFS ultimately concluded that "There are numerous instances where Promontory, at the direction of the Bank or its counsel, or at its own initiative, made changes to 'soften' and 'tone down' the language used in its reports, avoid additional questions from regulators, omit red flag terms or otherwise make the reports more favorable to the Bank."

997.    Examples identified by DFS included a written communication on January 19, 2011, wherein "the Bank's counsel wrote to Promontory that the title of a particular slide entitled 'The 77 non-u-turn payments fell into 3 categories' – meaning the transactions were potential OFAC violations – should be made 'more bland' and suggested a rewording to 'Categories identified in Amendment Analysis.' Promontory made the change to the more vague language requested by the Bank."

998.    The DFS Report further found that "Promontory omitted certain timelines from the reports that would have indicated an increase in violations over time."

999.    The Report went on to cite a December 17, 2010 statement by a senior analyst at Promontory explaining:

Generally, the timelines serve a strong purpose with the Jersey payments. That is, there appears to be a positive trend over time to reduce the involvement with potential violations. **This will not be true with Dubai. I have a strong suspicion that people will not want to show the timelines**

**for Dubai ([a particular client for which the Bank processed prohibited transactions] for example shows an upwardly sloping curve of violations)**. If we are going to go ahead with the visuals across the workstreams, we should be cognizant of the graphics showing painful information and expect strong pushback from the bank and [the Bank's counsel]. (Emphasis added.)

1000.   As described above, SCB's Dubai operations were a central hub for the IRGC's and MODAFL's illegal procurement efforts.

1001.   In August 2015, *The New York Times* reported that SCB was once again under investigation: "The Justice Department is examining whether it committed sanctions violations beyond those covered in the 2012 deal, which centered on what the bank called 'Project Gazelle,' an effort to forge 'new relationships with Iranian companies.'"

1002.   The *Financial Times* also reported in September 2015:

> Documents seen by the FT suggest that StanChart continued to seek new business from Iranian and Iran-connected companies after it had committed in 2007 to stop working with such clients. These activities include foreign exchange transactions that, people familiar with StanChart operations say, would have involved the US dollar….

> The material reviewed by the FT depicts a bank — one of the few foreign lenders with a license [sic] to operate in the country — determined to keep working with Iranian companies. The status of numerous Iranian and Iran-connected entities was still being reviewed by StanChart as late as 2013, according to documents seen by the FT. These included entities that had internal "markers" and "blocks" placed against them, a way for the bank to flag up concern about links to Tehran. Many accounts belonging to Iranian or Iran-connected entities were indeed closed by 2007, as StanChart promised. But some, like Bank Saderat — which had sanctions imposed in 2006, or Bank Sepah — still had open accounts with no markers against them.

1003.   Even as edited to be favorable to SCB, the 2011 Promontory Report provides a window into the vast array of wrongdoings undertaken by SCB in concert with Iran and its agents.[63]

1004.   As the Negotiating Bank on numerous illegal Iranian Letters of Credit, SCB received the detailed documentation for the shipment of goods, and knew that it was helping Iran's military and terrorist apparatus acquire prohibited U.S. goods and dual-use technologies.

1005.   In sum, as the Negotiating Bank on numerous illegal Iranian transactions for Mahan Air and various MODAFL sub-agencies, and as an active conduit and money-launderer for the CBI and other sanctioned Iranian banks, SCB knew that: (1) it was dealing with Iran's military and terrorist apparatus; (2) it was conspiring to evade U.S. export sanctions; (3) it was laundering money in USD funds for Iran's military and terrorist apparatus; (4) its own customers were front companies for Iran's military and terrorist apparatus; (5) that these customers were actively engaged in sanctions evasion and money laundering; and (6) that none of this illegal conduct was undertaken for the benefit of a legitimate agency, operation or program of Iran.

1006.   Despite this extensive history of egregious and criminal conduct, SCB's chairman claimed in early 2013 that SCB's illegal conduct were "clerical errors" and not "willful acts: "We had no willful act to avoid sanctions; you know, mistakes are made–clerical errors–and we talked about last year a number of transactions which clearly were clerical errors or mistakes that were made."

1007.   The USG took the unusual step of forcing SCB to apologize for those statements

---

[63] Other Promontory reports that have not (for the time being) been publicly disclosed, detail Standard Chartered's Dubai operations and SCB's activities on behalf of the CBI, as well as its role in financing, *inter alia*, Blue Sky Aviation's acquisitions of various materials and technologies.

and issue an accurate statement about SCB's purposeful, illegal conduct. In response to the USG demand, SCB's chairman stated:

> "My statement that SCB 'had no willful act to avoid sanctions' was wrong, and directly contradicts SCB's acceptance of responsibility in the deferred prosecution agreement and accompanying factual statement. Standard Chartered Bank, together with me, Mr. Peter Sands and Mr. Richard Meddings, who jointly hosted the press conference, retract the comment I made as both legally and factually incorrect.  To be clear, Standard Chartered Bank unequivocally acknowledges and accepts responsibility, on behalf of the Bank and its employees, for past knowing and willful criminal conduct in violating U.S. economic sanctions laws and regulations, and related New York criminal laws, as set out in the Deferred Prosecution Agreement. I, Mr. Sands, Mr. Meddings, and Standard Chartered Bank apologize for the statements I made to the contrary."

1008.   Thus, even after avoiding criminal prosecution for its illegal conduct, SCB—only months after entering into the Deferred Prosecution Agreements ("DPAs")—continued to refuse to accept responsibility for its violations of U.S. sanctions and participation in the Conspiracy.

1009.   The criminal conduct of SCB is representative of the criminal conduct exhibited by the other defendant Banks.  Each made millions moving billions for Iran and its agent and proxy, Hezbollah.

1010.   In sum, SCB was integral to Iran's inherently lethal and illegal conduct, which included a wide variety of money laundering techniques in the service of weapons procurement, arms shipments, acquisition of WMDs, and terror financing that substantially and foreseeably assisted MODAFL, the IRGC and Hezbollah in their campaign of violence and terror against Coalition Forces in Iraq, including the EFP and other attacks against the Plaintiffs herein.

1011.   Lastly, SCB chose to use its presence in the United States (and its New York branch specifically) to effectuate its crimes.

### L.     DEFENDANT ROYAL BANK OF SCOTLAND N.V.'S AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY

1012.   As alleged above, Defendant RBS N.V. is the legal successor to ABN Amro Bank. As noted above, this Defendant is referred to herein as "ABN Amro (RBS N.V.)"

1013.   In May 1995, top officials of ABN Amro (RBS N.V.) in Amsterdam e-mailed the entire management of ABN Amro (RBS N.V.) in Europe, Asia, South America, Africa, the Caribbean, and North America, advising them that any financial transactions in USD funds undertaken for or on behalf of Iranian persons or banks were subject to seizure or blocking in the United States.

1014.   Soon after President Clinton signed the Executive Order implementing sanctions against Iran in May 1995, Iranian banks sought the services of ABN Amro (RBS N.V.) and other banks in aiding Iran to circumvent U.S. laws.

1015.   ABN Amro (RBS N.V.) employees were aware of these requests, discussed these requests with the other Co-conspirator banks, and thereafter approved of ABN Amro (RBS N.V.) conducting the illegal transactions, contrary to the advice of outside counsel retained by ABN Amro (RBS N.V.) that its involvement in such transactions would potentially violate U.S. law.

1016.   From approximately 1995 until in or about 2005, ABN Amro (RBS N.V.) conspired with the Iranian Bank Co-conspirators (including the CBI, Bank Melli Iran and Defendant Bank Saderat Plc) and their agents to conceal evidence of ABN Amro (RBS N.V.)'s financial transactions from the U.S. government, law enforcement, and intelligence agencies, as well as U.S. financial institutions charged with detecting and blocking certain Iranian transactions.

1017.   ABN Amro (RBS N.V.) was, at the same time, aware that numerous other non-Iranian financial institutions were engaged in the Conspiracy to conceal evidence of the Iranian Bank Co-conspirators' financial transactions from the U.S. government, law enforcement and

intelligence agencies, as well as U.S. financial institutions charged with detecting and blocking certain Iranian transactions.

1018.   From approximately 1995 until in or about 2005, ABN Amro (RBS N.V.) furthered the Conspiracy by methodically removing and/or falsifying payment messages on its funds transfer systems to disguise the movement of hundreds of millions of U.S. dollars illegally through the U.S. financial system on behalf of the Iranian Bank Co-conspirators (including Bank Melli Iran).

1019.   In furtherance of the Conspiracy, ABN Amro (RBS N.V.) and the Iranian Bank Co-conspirators developed methods by which ABN Amro (RBS N.V.) would format USD payments so that such payments would evade U.S. sanctions and detection by automated filters used by financial institutions in the United States.

1020.   When ABN Amro (RBS N.V.) employees received payment messages from the Iranian Bank Co-conspirators that contained certain words that could trigger a U.S. bank's automated OFAC filter software algorithms, ABN Amro (RBS N.V.) would manually alter or amend the messages (i.e. "strip" the transactions) to ensure that the transaction would go undetected when it was cleared and settled by financial institutions in the United States.

1021.   ABN Amro (RBS N.V.) thereby caused financial institutions in the United States to process transactions involving the Iranian Bank Co-conspirators that U.S. financial institutions would not otherwise have processed.

1022.   Like SCB, certain offices, branches, and subsidiaries of ABN Amro (RBS N.V.) also altered Letters of Credit and foreign exchange transactions involving USD funds by replacing the names of the Iranian Bank Co-conspirators (including Bank Melli Iran) on those transactions.

1023.   Beginning as early as 1995 and continuing until in or about 2005, ABN Amro (RBS N.V.) undertook various acts in furtherance of the Conspiracy. For example: The Dubai branch of

ABN created procedures and guidelines to facilitate the processing of prohibited USD transactions.

1024.   For instance, one section of the ABN payment manual entitled "Special Conditions" listed specific instructions on how to effectuate these payments and avoid OFAC filters.

1025.   A specific instruction from this manual stated: "Payments by order of Iranian Banks …maintaining accounts with ABN, Dubai are to be handled with extra care to ensure the wordings "Iran" etc. are not mentioned in the payment due to OFAC regulations."

1026.   In June 1995, an Iranian Bank Co-conspirator requested of ABN Amro (RBS N.V.) officials in Dubai that ABN Amro (RBS N.V.) act as a conduit for all U.S. dollar transactions for that Iranian bank in Dubai.

1027.   The Iranian bank requested that all of its USD funds transfer be routed through, or be issued in the name of, ABN Amro (RBS N.V.) and carry no reference to the fact that these payments were issued on its behalf, and that all of its U.S. dollar receipts would come into ABN Amro (RBS N.V.)'s account.

1028.   Thereafter, ABN Amro (RBS N.V.) undertook various specific acts to conceal its actions on Iran's behalf.

1029.   ABN Amro (RBS N.V.) instructed the Iranian Bank Co-conspirators to include the code word "SPARE" in their payment messages through the bank so that ABN Amro (RBS N.V.) could first segregate these messages from normal message payment processing, and then amend the message by removing/altering any potentially problematic text, i.e. any reference to Iran.

1030.   The payment message would then be stopped by ABN Amro (RBS N.V.), routed into a special queue, and manually altered to avoid being blocked by any OFAC sanctions screening filters.

1031.  In this manner, ABN Amro (RBS N.V.) assisted sanctioned entities, and ensured the processing of transactions by formatting payment order messages so that they would not be rejected or blocked by OFAC filters at financial institutions in the United States.

1032.  ABN Amro (RBS N.V.) added to its payment manuals the "Special Conditions" that were to be used on behalf of the Iranian Bank Co-conspirators in order to evade detection and circumvent the laws of the United States.

1033.  ABN Amro (RBS N.V.) used these same or materially similar procedures with respect to Letters of Credit in USD funds, and the processing of USD denominated checks and traveler's checks.

1034.  ABN Amro (RBS N.V.) and the Iranian Bank Co-conspirators knew and discussed the fact that without such alterations, amendments, and code words, the automated OFAC filters at clearing banks in the United States would likely halt most of the payment messages and other transactions, and, in many cases, would reject or block the sanctions-related transactions and report the same to OFAC.

1035.  ABN Amro (RBS N.V.) also removed the names, BICs, and any other identifying information of the Iranian Bank Co-conspirators in the payment order messages sent to ABN Amro (RBS N.V.)'s U.S. correspondent banks.

1036.  In order to circumvent U.S. sanctions, certain Iranian Bank Co-conspirators requested that ABN Amro (RBS N.V.) omit their names and BICs from payment order messages sent by ABN Amro (RBS N.V.) to ABN Amro (RBS N.V.)'s U.S. correspondent banks.  ABN Amro (RBS N.V.) complied with the requests of these Iranian Bank Co-conspirators, and omitted their names and identifiers in order to help bypass the OFAC filtering mechanisms of U.S. financial institutions.

1037.   ABN Amro (RBS N.V.) also used SWIFT-NET MT 202 cover payment messages to shield the identities of the Iranian Bank Co-conspirators.

1038.   Instead of using serial MT 103 payment messages that require the names and details of counter-parties to transactions, ABN Amro (RBS N.V.) began using MT 202 cover payment messages expressly for the purpose of avoiding revealing the true identity of the ordering customer and beneficiary party for U.S. dollar payments sent through financial institutions in the United States.

1039.   The Central Bank of Iran coordinated with ABN Amro (RBS N.V.)'s Central Bank Desk in Amsterdam regarding the procedure to be followed for repayment of USD deposits to their accounts with European Banks in London.

1040.   This procedure stipulated that payment order messages sent to U.S. clearing banks for payment of USD funds to the CBI should not contain any reference to the Central Bank of Iran or any other reference relating to Iran.

1041.   In or about June and July 1995, officials at ABN Amro (RBS N.V.)'s Amsterdam Headquarters and New York offices were advised by outside U.S. counsel that the proposal by Iranian banks for ABN Amro (RBS N.V.) to serve as a conduit or means to bypass and avoid the sanctions imposed by the United States upon Iran risked breaching U.S. law.

1042.   An internal memorandum generated by ABN Amro (RBS N.V.) at the time stated "[t]he fund transfer mechanics proposed by [the first Iranian Bank] are an attempt to circumvent the Iranian trade embargo. Given that violations of the Executive Order and OFAC regulations carry substantial penalties, not to mention the negative publicity, the [first Iranian Bank] proposal must be strictly scrutinized and ABN Amro must weigh the risks before proceeding with any such transfers."

1043.  Also in June 1995, another Iranian Bank Co-conspirator sent a written communication to certain banks in the UAE and the Iranian Bank's correspondent banks instructing those banks to undertake USD funds transfers for the Iranian bank in the name of a European financial institution "WITHOUT MENTIONING OUR BANK'S NAME" to defeat and circumvent the sanctions imposed upon Iran by the United States.

1044.  Like the first request, the Iranian Bank Co-conspirator's request was forwarded to officials located in several departments of the Amsterdam Headquarters of ABN Amro (RBS N.V.).

1045.  As early as 1997, in an internal strategy paper for the Middle East and Africa region named "Desert Spring," prepared by ABN Amro (RBS N.V.)'s Middle East and Africa Regional Office, ABN Amro (RBS N.V.) described a "product initiative" with "opportunities in LC discounting for Central Bank and Bank Melli, Iran" and "deposit mobilization from Iranian nationals."

1046.  On or about February 5, 2000, an official at the Dubai branch of ABN Amro (RBS N.V.) wrote to a Regional Director of one of the Iranian Bank Co-conspirators assuring him that ABN Amro (RBS N.V.) would take care of carrying out the scheme to evade and defeat the U.S. sanctions.

1047.  The ABN Amro (RBS N.V.) official's note stated: "[w]e understand the special nature of your US$ transactions and will ensure that all operations departments concerned are properly briefed regarding this, as well."

1048.  A July 19, 2003 e-mail written by John Ciccarone, Head of ABN Amro (RBS N.V.)'s USD Payments Product Management at ABN Amro (RBS N.V.)'s New York branch,

discussed the use of MT 202 cover payments, stating: "There is no way the payment will get stopped as all NY ever sees is a bank to bank instruction."

1049.   Also in 2003, Diane Perrin, a member of ABN Amro (RBS N.V.)'s Group Compliance team at the Defendant's Amsterdam Head Office, stated that "as a European Institution, we do not comply with US Sanctions because those sanctions are politically motivated."

1050.   A 2003 memorandum entitled "Proposal for Establishing a Representative Office in Tehran, Iran" drafted by ABN Amro (RBS N.V.)'s Country Representative in the UAE, Jan Willem van den Bosch, similarly stated:

> The Central Bank of Iran is faced with difficulties for USD denominated clearing transactions due to sanctions imposed by the US.  The OFAC filter impounds all Iran related payments and receipts in the US.  The Swiss and other European Banks have worked out a solution for this.  The payment instructions are sent directly to the beneficiary's bank and cover payment is made to the beneficiary bank's US Correspondent as inter-bank payments.

1051.   Bosch later coordinated the meeting in Dubai between ABN Amro (RBS N.V.)'s Managing Board Member and CFO Tom De Swann and top functionaries of the CBI, including Aziz Farrashi, CBI's Director General.

1052.   During the meeting with the CBI's officials, ABN Amro (RBS N.V.) officials discussed the establishment of the Representative Office by ABN Amro (RBS N.V.) in Tehran and further business development, including the acceptance of USD deposits by the CBI's Desk in Amsterdam.

1053.   In an April 20, 2004 e-mail, the aforementioned Philbin mentioned the possibility of using a Jersey Special Purpose Vehicle as a way to circumvent OFAC restrictions:

> Mike Louwerens [ABN Amro's Vice President and Senior Analyst of Country Risk Management Department] mentioned this to me today and sent the attached.  The structure below is very interesting and could have

applicability for the banks in Iran as well.  But whether that is the case or not, what is clear is that this structure envisages our making and receiving payments in USD which will clear through AA in New York.  And for which Mike Bowman sees no objection. I am sending a second note in which OEM (Maarten Seckel) gives a go ahead based on Bowman's nihil obstat.  The Way for our doing significant business with the Iranian banks in cash may yet be clear.

1054.   On July 23, 2004, ABN Amro (RBS N.V.) and its New York branch entered into a Written Agreement with the Federal Reserve Banks of New York and Chicago (collectively, the "Reserve Banks") and other regulators that had detected deficiencies at ABN Amro (RBS N.V.)'s New York Branch relating to AML policies, procedures, and practices that included:

a pattern of previously undisclosed unsafe and unsound practices warranting further enforcement action…. A. ABN AMRO lacked adequate risk management and legal review policies and procedures to ensure compliance with applicable U.S. law, and failed to adhere to those policies and procedures that it did have.  As a result, one of ABN AMRO's overseas branches was able to develop and implement "special procedures" for certain funds transfers, check clearing operations, and letter of credit transactions that were designed and used to circumvent the compliance systems established by the Branches to ensure compliance with the laws of the U.S. In particular, the "special procedures" circumvented the Branches' systems for ensuring compliance with the regulations issued by the Office of Foreign Assets Control ("OFAC") (31 C.F.R. Chapter V).

1055.   U.S. regulators also found that "[p]rior to August 1, 2004, the New York Branch processed wire transfers originated by Bank Melli Iran, a financial institution owned or controlled by the Government of Iran.  The payment instructions on the wire transfers had been modified by one of ABN Amro's overseas branches such that any reference to Bank Melli Iran was removed."

1056.   U.S. regulators also found that "[p]rior to August 1, 2004, the Branches advised a number of letters of credit issued by Bank Melli Iran.  The letters of credit had been reissued by one of ABN Amro's overseas branches such that any reference to Bank Melli Iran was removed."

1057.   As DOJ later concluded: "Each year between and including 1996 and 2004, ABN

caused ABN's U.S. affiliate to file false, misleading, and inaccurate Annual Reports of Blocked Property to OFAC. In each of those reports, the U.S. affiliate of ABN certified to OFAC that all information provided was accurate and that all material facts in connection with the report had been set forth."

1058.   Nonetheless, in September 2004, Michael Louwerens, ABN Amro (RBS N.V.)'s Vice President and Senior Analyst of Country Risk Management Department, travelled to Iran at the behest of ABN Amro (RBS N.V.)'s Head Office and reported back that he had communicated with the Chief Representative of HSBC in Tehran (presumably John Richards) and concluded that ABN Amro (RBS N.V.)'s payment procedures (to conceal Iranian financial activity) were in line with prevailing market practices of HSBC and other banks.

1059.   In addition, ABN Amro (RBS N.V.)'s then New York branch was the conduit for at least 90 post-U.S. designation transactions on behalf of IRISL and its various front companies through March, 2010.

1060.   On May 10, 2010, DOJ issued a press release announcing that ABN Amro's successor entity, Defendant Royal Bank of Scotland N.V., had agreed to forfeit $500 million to the United States in connection with a conspiracy to defraud the United States, to violate the IEEPA, the TWEA, and the Bank Secrecy Act ("BSA").

1061.   In connection with a Deferred Prosecution Agreement ABN Amro (RBS N.V.) entered into, a criminal information was filed in the U.S. District Court for the District of Columbia charging the Defendant with one count of violating the BSA, and one count of conspiracy to defraud the United States and violate the IEEPA and the TWEA.  ABN Amro (RBS N.V.) waived indictment, agreed to the filing of the information, and, according to the press release "accepted and acknowledged responsibility for its conduct."

1062.   According to the criminal information, ABN Amro (RBS N.V.)'s participation in the conspiracy continued "until in or about December 2007." Prior to that time, ABN Amro (RBS N.V.) willfully and knowingly conspired, *inter alia*, to "engage in financial transactions with entities affiliated with Iran … in violation of the International Emergency Economic Powers Act, Title 50, United States Code, Section 1705, and regulations and embargoes issued thereunder…."

1063.   The criminal information confirmed that ABN Amro (RBS N.V.) was an active participant in the Conspiracy.

1064.   The criminal information stated that: "It was part of the conspiracy that the defendant discussed with the co-conspirators how to format United States Dollar message payments so that such payments would avoid detection by automated filters used by financial institutions in the United States and thus evade United States sanctions."

1065.   The criminal information further stated that: "It was part of the conspiracy that the defendant removed names and references to the co-conspirators in United States Dollar message payments routed through the United States."

1066.   The criminal information further stated that: "It was part of the conspiracy that the defendant altered the names and references to the co-conspirators in United States Dollar message payments routed through the United States."

1067.   The criminal information further stated that: "It was part of the conspiracy that the defendant instructed the co-conspirators to use code words in United States Dollar payment messages."

1068.   Additionally, the criminal information stated that: "It was part of the conspiracy that the defendant created a special processing queue to manually and materially alter any of the

co-conspirators' United States Dollar message payments that were to be routed through the United States."

1069.  The criminal information also stated that: "It was part of the conspiracy that the defendant created "Special Conditions" in the defendant's payment manuals in order to process any co-conspirators' United States Dollar transactions."

1070.  Finally, the criminal information further stated that: "It was part of the conspiracy that the defendant caused its United States affiliates to submit materially false and misleading reports or statements to the United States Department of the Treasury, OFAC."

## M.  DEFENDANT CREDIT SUISSE'S AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY

1071.  Like the other Defendants in this Action, Credit Suisse worked hand-in-glove with Iran and Iranian Bank Co-conspirators acting at Iran's behest to develop procedures to structure USD payments in ways that would evade U.S. sanctions and leave U.S. regulators, law enforcement and financial institutions blind as to Iran's financial activities.

1072.  To this end, Credit Suisse worked diligently to (1) develop methods that would avoid disclosing the true originators and/or beneficiaries of Iranian transactions that it was clearing and settling in the United States; (2) delete or omit certain information when transactions were to be processed through the United States; and (3) provide incorrect information in USD funds transfer instructions executed through the United States on behalf of U.S.-sanctioned individuals and entities.

1073.  Credit Suisse worked closely with Bank Melli, Bank Saderat, and Iran's Atomic Energy Organization (and other designated Weapons of Mass Destruction proliferators) for many years.

1074.  Before 2003, Credit Suisse was an active participant in the Conspiracy, but the

225

sheer volume of its illegal conduct accelerated greatly in 2003 when Lloyds exited its Iran business and Bank Melli Plc, Defendant Bank Saderat Plc, and other Iranian agents moved their accounts to Credit Suisse.

1075.   For the next two years, Credit Suisse became one of the main USD funds clearing banks for the Iranian banking system, quadrupling in only 3 years the number of Iranian U.S. dollar payments, from approximately 49,000 in 2002 to nearly 200,000 in 2005.

1076.   The procedures Credit Suisse developed and refined over time to assist Iran were embodied in internal directives, memoranda, e-mails between Credit Suisse and its Iranian bank clients and internal e-mails involving, among others, a Credit Suisse Bank Payments Sector Head, Credit Suisse's Treasury and Trade Finance Departments, and the Head of Credit Suisse's Iran Desk.

1077.   Since at least the mid-1990s, when it first agreed to assist Iran in carrying out the Conspiracy, Credit Suisse's Iran Desk began adding internal warnings to the accounts of its Iranian bank clients, instructing Credit Suisse employees: "*Do not mention the name of the Iranian bank in payment orders*."

1078.   Such warnings ensured that payment orders given by the Iranian Bank Co-conspirators would not be processed automatically, but rather would be manually reviewed, "corrected" if necessary, and effectuated by Credit Suisse employees.

1079.   For example, in June 1995, the Credit Suisse representative office in Dubai, United Arab Emirates, issued a memorandum recognizing Iran and the Iranian bank's general scheme to ensure that any foreign banks the Iranian Bank Co-conspirators did business with masked their transactions, and accordingly advised:

> Following the decision by the American authorities to declare a unilateral embargo against the Islamic Republic of Iran on April 30th, (an Iranian

bank) approached Credit Suisse to open (a type of correspondent banking account for U.S. dollar transactions). Crucial to them was that the name of the bank would not be mentioned on the transfer orders... Subsequently, (the Iranian bank) was informed that though payments in such a way are basically feasible, to omit the name of the bank could lead to some problems. Meanwhile, operations through this account have started... Some transfers have been rejected by the American banks as the name of (the Iranian bank) appears under the rubric 'Ordering Bank.' Question: a) what can be done to avoid this?

1080.   Almost immediately after President Clinton issued E.O. Nos. 12957, 12959, and 13059, which strengthened existing U.S. sanctions against Iran, the Iranian Bank Co-conspirators began requesting that Credit Suisse omit their names and BICs from payment messages Credit Suisse sent to its U.S. correspondent banks.

1081.   Credit Suisse complied with the Iranian Bank Co-conspirators' illegal requests and purposefully omitted their names and identifiers in order to help bypass U.S. financial institutions' sanctions filters.

1082.   After a 1998 corporate reorganization, in order to further its ongoing efforts to evade U.S. sanctions and ensure that other U.S. financial institutions would automatically process this new stream of payments, Credit Suisse notified its Iranian clients about the change in USD funds clearing and settlement from Credit Suisse First Boston AG ("CSFB") to third- party U.S. correspondents, and provided them with a pamphlet entitled "How to transfer USD payments."

1083.   The pamphlet provided detailed payment order formatting instructions for USD funds transfers on how to avoid triggering U.S. OFAC sanction screening filters.

1084.   In a 1998 letter to an Iranian Bank Co-conspirator explaining the transfer of its USD clearing services to the Bank of New York, New York, Defendant Credit Suisse wrote: In order to provide your esteemed institution with our clearing services in U.S. Dollars, we have introduced a procedure to facilitate your USD payments through our clearing system. The change of our USD-

clearer to Bank of New York, New York, will not affect our mutual relationship on any clearing transaction in U.S. Dollars as long as the established procedure will be followed.

1085.   Beginning as early as 1995 and continuing through 2005, Credit Suisse, both internally and in coordination with the Iranian Bank Co-conspirators, created procedures and guidelines to facilitate the processing of prohibited USD transactions by its U.S. correspondent banks, primarily the Bank of New York, New York.

1086.   By using Credit Suisse's internal processing system, employees manually keyed in "Order of a Customer" when Iranian payments had to be processed as serial payments through U.S. banks.

1087.   This procedure was promoted at Credit Suisse, as demonstrated by an email from a Team Leader in the Bank Payments Unit:

> In order to put an end, once and for all, to the discussions regarding the processing of USD payment orders of Iranian banks, I have worked out various examples that are to be considered binding for everyone.

1088.   Attached to the email were several screenshots of Credit Suisse's payment application illustrating how to format payment order messages to ensure that they would pass through the U.S. financial institutions undetected by U.S. OFAC sanction screening filters.

1089.   For example, one such screenshot showed all incoming payment messages listing an Iranian bank as the ordering institution in SWIFT-NET payment order message field "52" and contained the following explicit instructions: "Population of field 52 with 'one of our clients' in case of serial payments via the US."

1090.   A second screenshot showed an incoming payment with the reference "without mentioning our banks [sic] name" in field 52 and contained the following instructions: "Population of field 52 with 'one of our clients' in case of serial payments."

1091.   Until 2004, Credit Suisse's use of "Order of a Customer" was its standard procedure for processing bank payment messages involving Credit Suisse's Iranian customers.

1092.   Credit Suisse's internal communications also reveal a continual dialogue about evading U.S. sanctions spanning approximately a decade, assessing how to better process Iranian transactions in order to promote and increase business from existing and future Iranian clients.

1093.   In February 1999, Credit Suisse's Iran Desk added internal warnings to the Customer Information Files (or "CIFs") it maintained for the accounts of its Iranian bank customers, expressly directing Credit Suisse employees: "Do not mention the name of the Iranian bank in payment orders."

1094.   Credit Suisse documented similar directives in subsequent years. For example, in 2002, another warning was loaded in the CIF that likewise stated: "FOR USD-PAYMENTS OUTSIDE CREDIT SUISSE/CS FIRST BOSTON DO NOT MENTION THE NAME OF THE IRANIAN BANK."

1095.   Credit Suisse later decided to remove warnings from the CIFs and replaced them with long-term instructions concerning Iranian entities that instructed: "Execute USD payment orders always with direct order and cover payment." These instructions explained that they were intended to ensure (according to Credit Suisse's internal documentation) that "an Iranian origin will never be named in USD payments carried out for Iranian banks (because of the US sanctions)!"

1096.   An internal Credit Suisse memorandum dated March 12, 1999, stated:

> Payment orders in USD can only be paid via the American clearing, if the name of the Iranian party is not mentioned (US sanctions). Otherwise, the amounts are returned by the American banks. Even though corresponding warnings have been loaded, there (sic) almost every week cases that are processed incorrectly by us.

1097.   Between 2000 and 2004, Credit Suisse's Iran Desk provided similar instructions to its Iranian Bank Co-conspirator clients via a standard letter, which stated in part: "The most important issue is that you and/or your correspondents do not mention your good bank's name in field 52."

1098.   Credit Suisse's Iran Desk also informed Iranian Bank Co-conspirator clients that Credit Suisse would utilize cover payments to effect payments to or through the United States, stating in one memorandum, for example, "[o]ur payment department will stop all USD payments initiated by your fine bank in any case and shall be effected [by]... 'Direct payment order and cover payment order.'"

1099.   In order to prevent straight-through processing of all payment orders sent by Iranian Bank Co-conspirators, Credit Suisse configured its payment system to interdict the payments for manual review.

1100.   Credit Suisse employees then reviewed the payments to ensure that they contained no references to Iran. If such references were detected, Credit Suisse employees would either delete the reference, or contact the Iranian Bank Co-conspirators to request further instructions.

1101.   Over time, Credit Suisse employees developed practices to omit information on the involvement of Iranian Bank Co-conspirators, including:

   a.   Entering in an empty field, or replacing the name of the Iranian Bank Co-conspirators with, "Order of a Customer" or a similar phrase instead of the actual name of the ordering institution in SWIFT-NET payment order messages;

   b.   Forwarding payment messages received from Iranian Bank Co-conspirators falsely referencing "Credit Suisse" or Credit Suisse's SWIFT-NET account code (identified by BIC address CRESCHZZ) instead of an Iranian bank as the originating institution. For example, a November 2000 email circulated by a team leader in Credit Suisse's Bank Payments Unit contained screenshots of an incoming payment order from an Iranian bank co-conspirator in which Credit Suisse was listed as the ordering institution in field "52" of the SWIFT-NET payment message. The instructions were to make no changes to the misleading information in the

SWIFT-NET message's field "52" for serial payment messages made to U.S. financial institutions;

c.    Inserting "Credit Suisse" as the ordering institution in payments originating with an Iranian Bank Co-conspirator;

d.    Removing all references to Iranian names, addresses, cities, and telephone numbers from customer payments;

e.    Substituting abbreviations for Iranian customer names. For example, in an April 16, 2003 email, the Head of Credit Suisse's Iran Desk wrote to the Credit Suisse representative office in Tehran, "entry to their account works when account number plus XXX is stipulated as beneficiary. What is also important of course is that applicant will give details of final beneficiary as reference for the beneficiary, then it should work;" and

f.    Converting SWIFT-NET MT 103 Messages to SWIFT-NET MT 202 Messages to hide the details of Iranian transactions, and using MT 202 cover payment messages approximately 95% of the time to facilitate outgoing customer payments involving Iran or Iranian parties.

1102.   A September 24, 2003 Credit Suisse internal email sent from a team leader in Customer Payments to a Sector Head within Customer Payments, described Credit Suisse's Iranian U.S. dollar processing:

The procedure is identical for all Iranian banks: 1) We attempt to send all USD payments directly to the bank of the beneficiary. Only cover payments are made through the US. In such cases, the ordering institution is not disclosed. 2) Should 1) not be possible (if the beneficiary bank is an American bank, or if no Swift connection or no correspondent was named), then the payment will be made though America. We make sure that the ordering institution is not mentioned (this has been programmed into the system as a default) and that the ordering customer has no connection to 'Iran'. 3) Should 1) and 2) not be possible, then the payment order will be forwarded to Investigations for further clarifications with the ordering institution.

1103.   In addition, Credit Suisse actually instructed its Iranian Bank Co-conspirator customers on how to format U.S. dollar payments so that such payments would evade U.S. sanctions and detection by automated filters used by U.S. financial institutions.

1104.   Payment instructions included a letter from Credit Suisse's Iran Desk to an Iranian customer dated October 16, 2003, that stated: "This is to provide you our recommendation for the entry of funds how to handle bank-to-bank payments on your account with Credit Suisse and the following procedures should be applied in order to avoid any difficulties."

1105.   In December 2003, an Iranian bank asked Credit Suisse for an additional USD account identifying the Iranian beneficiary bank only by a designated abbreviation (first letter of each word constituting the bank's name, together with the abbreviation commonly used for a type of legal entity, i.e., Plc).

1106.   On January 28, 2004, Credit Suisse confirmed that it had opened the requested account, writing to the Iranian bank: "Reference is made to the various conversations and your email, dated December 18, 2003 wherein you asked us to open a new USD account...Now, we would like to confirm the account number …."

1107.   In addition, Credit Suisse promised the Iranian Bank Co-conspirators, including Bank Saderat and Bank Melli, that no messages would leave Credit Suisse without being first hand-checked by a Credit Suisse employee to ensure that they had been formatted to avoid U.S. OFAC filters.

1108.   Credit Suisse also took a further step in the Conspiracy beyond training the Iranian Bank Co-conspirators on how to format their payment messages to evade the OFAC filters; it also gave Iranian Bank Co-conspirators materials to use for training other banks on how to prepare payment messages to evade U.S. OFAC filters and sanctions regimes.

1109.   In August 2003, Credit Suisse reached an agreement with the London branches of a number of Iranian Bank Co-conspirators to take over the banks' London branches' U.S. dollar clearing activity.

232

1110.   As a result of this agreement, Credit Suisse became one of the main USD clearing banks for the Iranian banking system.

1111.   Through its subsidiary Credit Suisse Asset Management Limited, United Kingdom ("CSAM"), Credit Suisse used code words for Iranian customers, including Iranian Bank Co-conspirators, when executing trades involving U.S. securities that were transmitted through the U.S.

1112.   Credit Suisse knew that without such alterations, amendments, and code words, automated OFAC filters at U.S. clearing banks would likely halt the payment order messages and securities transactions, and, in many cases, reject or block the sanctions-related transactions and report the same to OFAC.

1113.   Credit Suisse manipulated payment order messages and removed any identifying reference to sanctioned countries and entities so that the OFAC filters at the U.S. clearing banks would not be able to identify the transactions, and the transactions would be automatically processed without detection.

1114.   In July 2004, the Swiss Federal Banking Commission issued an ordinance to implement the Financial Action Task Force ("FATF")'s Special Recommendation on Terrorist Financing VII.

1115.   The ordinance required the disclosure of the remitter in payment orders, and prompted Credit Suisse to issue an internal directive prohibiting the use of the "Order of a Customer" method when making international wire transfers.

1116.  In April 2004, in preparation for the implementation of the ordinance, Credit Suisse's Iran Desk began to inform its Iranian Bank Co-conspirator clients that neither "Order of

a Customer" nor "Credit Suisse" could be used to replace references to Iranian banks on payment messages.

1117.   Credit Suisse again, however, provided information about the use of the cover payment method to send USD payments, ensuring that the Iranian Bank Co-conspirators (and, by extension, Iran and the IRGC-QF) remained cognizant of other means of ensuring an uninterrupted flow of surreptitious USD.

1118.   Although Credit Suisse's payment processing units ceased to use the "Order of a Customer" method following the Swiss Federal Banking Commission's July 2004 ordinance, Credit Suisse employees nonetheless continued removing and/or altering information in SWIFT payment order messages sent to one of its U.S. correspondent banks.

1119.   For example, in May 2005, an internal Credit Suisse email stated:

> If we do not have a key contact with the beneficiary's bank, we have to carry out the payment via the US, e.g. via BKTRUS33. However, no reference to Iran may be made in the field reserved for information on the ordering party (no Iranian telephone numbers either). No such reference should be made in fields 70 or 72 either.

1120.   Between March 2004 and November 2005, Credit Suisse repeatedly sent letters to its Iranian Bank Co-Conspirator customers describing its internal procedures for forwarding Iranian payment orders as:

> Our Payment department will stop all USD-payments initiated by your fine bank in any case and shall be effected as outlined in the drawing "Direct payment order and cover payment order."

1121.   From August 2003 to November 2006, Credit Suisse illegally processed electronic funds transfers, in the aggregate amount of at least $480,072,032, through financial institutions located in the United States for the benefit of Iran and Iranian financial institutions.

234

1122.   For a brief period of time, Credit Suisse became one of the main U.S. dollar clearing and settlement banks for the Iranian banking system.

1123.   In January 2006, Credit Suisse established a "Sensitive Countries" Task Force to implement the exit decision and ultimately ceased U.S. dollar clearing transactions for Iran in November 2006.

1124.   On September 11, 2006, Credit Suisse directed its payments centers to discontinue certain prohibited payments by an Iranian Bank Co-conspirator. Using the MT 202 cover payment method, during the six weeks from September 11, 2006 to October 27, 2006, Credit Suisse nevertheless processed 54 outbound payments involving that Iranian Bank Co- conspirator, the total value of which was in excess of $8 million.

1125.   As described *supra*, Credit Suisse also facilitated payments on Letters of Credit involving Mahan Air's illegal purchase of U.S. aircraft and aircraft parts.

1126.   These included the illegal purchase of an aircraft engine and an Airbus A320-232 financed by Bank Melli, Bank Refah and Bank Sepah.

1127.   In each case, Credit Suisse directed USD payments through the United States in furtherance of the Conspiracy.

1128.   In March 2007, following the Deferred Prosecution Agreements of Lloyds and ABN Amro (RBS N.V.), Credit Suisse commenced an internal investigation of its historic USD funds clearing business involving U.S.-sanctioned countries and persons. Shortly thereafter, Credit Suisse was contacted by U.S. and New York law enforcement officials.

1129.   On December 16, 2009, DOJ issued a press release announcing that Credit Suisse had agreed to forfeit $536 million in USD funds to the United States and to the Manhattan District Attorney's Office in connection with violations of the IEEPA and New York State law, as a result

of violations relating to transactions Credit Suisse illegally conducted on behalf of customers from, *inter alia*, Iran.

1130.   In connection with a DPA that Credit Suisse entered into, DOJ filed a criminal information in the U.S. District Court for the District of Columbia charging Credit Suisse with one count of violating the IEEPA.  Credit Suisse waived the indictment, agreed to the filing of the information, and, according to the press release, accepted and acknowledged responsibility for its criminal conduct.

1131.   Credit Suisse also simultaneously entered into an agreement with OFAC to settle its violations of the IEEPA and agreed to a civil forfeiture as part of the DPA it entered into with DOJ, the Manhattan District Attorney's Office and OFAC.

1132.   The press release announcing the agreements quoted then-Treasury Under-Secretary for Terrorism and Financial Intelligence Stuart Levey as stating "[t]his case provides a timely lesson about how Iran seeks to involve others in deceptive conduct to evade legal and regulatory controls.  Those who do business with Iran expose themselves to the risk, and the consequences, of participating in transactions supporting proliferation, terrorism or sanctions evasion."

## N.     **DEFENDANT COMMERZBANK AG'S  AGREEMENT TO,  AND PARTICIPATION IN, THE CONSPIRACY**

1133.   As noted in a criminal information entered in connection with, as discussed below, a March 11, 2015 Deferred Prosecution Agreement between Defendant Commerzbank and DOJ:

> COMMERZBANK AG and others … unlawfully, willfully and knowingly combined, conspired, confederated and agreed with one another and with others to commit offenses against the United States, that is, to engage in financial transactions with Sanctioned Entities and SDNs in violation of IEEPA, and the executive orders and regulations issued thereunder.… The goal of the conspiracy was for COMMERZBANK and others …to enrich themselves by engaging in a conspiracy and a scheme to violate IEEPA, and the executive orders and regulations issued thereunder.  A further goal of

> the conspiracy was for COMMERZBANK and others … to violate
> executive orders and regulations prohibiting the exportation, directly and
> indirectly, of services from the United States to Sanctioned Entities and
> SDNs.

1134.   Like many of the other Defendants who entered into the Conspiracy, Commerzbank

adopted a variety of methods to facilitate Iran's illegal goals.

1135.   In particular, Commerzbank worked with Bank Sepah, Bank Melli, Bank Saderat

and Bank Refah to facilitate the goals of the Conspiracy, stripping, altering or changing tens of

thousands of SWIFT-NET payment order messages.

1136.   Since 2002, Commerzbank also appears to have engaged in various illegal gold

transactions on behalf of the CBI, including trading orders through its New York branch while

disguising the Iranian source of the trades.

1137.   A March 2015 Amended Complaint filed in a qui tam case against Defendant

Commerzbank AG stated that:

> the gold trade has been essential to Iran's withstanding the increasingly
> restrictive U.S. sanctions. It has a substantial amount of gold reserves,
> amounting to $112 billion in gold, which it accumulated in part by trading
> oil for gold. It used gold to preserve its wealth especially to withstand the
> devaluation of its currency and to engage in trading that would bypass U.S.
> sanctions. [64]

1138.   On April 17, 2003, Commerzbank finalized a policy document entitled "Routing

Instructions Iranian banks for USD payments." This policy admonished employees to "[u]nder no

circumstances mention the Iranian background in the cover order." In other words, the German-

based recipients of this policy were instructed to never mention Iranian customers nor Iranian

connections to any payment messages sent to the United States.

---

[64] In July 2015, Commerzbank settled the qui tam case, 13-cv-8095 (S.D.N.Y. 2013), for
approximately $866,000.

1139.  Taking advantage of the fact that Lloyds and other competitors were exiting the Iran market, Commerzbank solicited more Iranian clients.

1140.  The resulting increase in the volume and significance of Iranian business at Commerzbank led to the establishment of a centralized process for handling certain Iranian dollar denominated payments within Commerzbank, and the Defendant designated one group of employees within Commerzbank's Frankfurt Back Office to manually process those payments. The task of this group was to review payments and amend them if necessary, to ensure that they would not get stopped by OFAC filters when sent to financial institutions in the United States, including Commerzbank's New York branch.

1141.  This increase in volume was in part due to illicit trade-finance, foreign exchange, and Eurodollar transactions undertaken by Commerzbank on behalf of Bank Refah, Bank Sepah, Bank Melli and Bank Saderat.

1142.  In July 2003, a Back Office employee emailed other bank employees explaining that two state-owned Iranian banks, Bank Melli and Bank Saderat, wanted to begin routing their entire USD funds clearing business through Commerzbank.  The Back Office employee closed his email by writing, "If for whatever reason [Commerzbank] New York inquires why our turnover has increase [sic] so dramatically under no circumstances may anyone mention that there is a connection to the clearing of Iranian banks!!!!!!!!!!!!!" (Exclamation marks in the original).

1143.  On September 17, 2003, a Back Office employee sent an email advising a major Iranian Bank that maintained a US dollar account with Commerzbank to list "non ref" in the ordering party field in all of its future payment messages.

1144.  The author of the email had tested Commerzbank's compliance systems in Frankfurt, and knew that writing "non ref" would trigger a manual review of the payment, thereby

enabling Commerzbank personnel to ensure that the messages did not contain any information revealing the true Iranian involvement in the transaction.

1145.   In fact, Commerzbank personnel explained to employees of Iranian bank clients the kinds of information that could lead to payments being delayed, rejected, or blocked within the United States, and encouraged the Iranian banks to omit this type of information from their payment orders so that Commerzbank employees would not have to manually remove it.

1146.   For example, Bank Sepah's UK subsidiary (Bank Sepah International Plc) provided its Iranian customers with routing instructions for "payments to our US Dollar account from outside the United States" noting the SWIFT Code for Commerzbank's New York branch and the Bank's account number at Commerzbank followed by the instruction:

> Please ensure that no mention is made of any recognisable Iranian entity in any message sent through the United States.

1147.   On October 13, 2003, the Head of Commerzbank's Internal Audit division emailed a member of Commerzbank's senior management advising that Iranian bank names in payment messages transiting through the United States were being "neutralized" and warned that "it raises concerns if we consciously reference the suppression of the ordering party in our work procedures in order to avoid difficulties in the processing of payments with the U.S.A."

1148.   On November 19, 2003, a memo was circulated to senior management memorializing the internal rules Commerzbank had developed for processing Iranian payments, including using MT 202 cover transactions (*i.e.*, splitting a payment into two messages and sending a MT 103 to the foreign (non-U.S.) branch of the beneficiary and an MT 202 to the clearing institution in the United States), and using serial MT 103 messages that manually replaced the name of the (Iranian) ordering party with the bank code for Commerzbank Frankfurt to avoid detection by U.S. authorities.

1149.  It appears that Commerzbank may have ceased stripping some transactions in July 2004, relying primarily on cover payments (MT 202 payment order messages) to effectuate its unlawful conduct.  At the same time, Commerzbank conspired with Bank Melli to facilitate over one hundred (100) checks totaling approximately $2 million in USD funds that Commerzbank issued for illegal payments in the United States.

1150.  However, as noted *supra*, Bank Sepah International Plc (Bank Sepah's UK subsidiary) provided "stripping" instructions to its clients even in 2006 directing that U.S. dollars wire transfers be sent through Commerzbank's New York branch.

1151.  DOJ described "the rigor with which the Bank enforced the policy during this period" by citing an email from a Back Office employee who wrote about Commerzbank's procedures for facilitating the Conspiracy "NO EXPERIMENTS PLEASE!!! Have fun with this and greetings."

1152.  This ongoing conduct involving both "stripping" transactions and converting otherwise transparent SWIFT-NET MT 103 messages into opaque MT 202 cover transactions resulted in tens of millions of dollars being illegally transferred on Iran's behalf.

1153.  However, parallel to its illegal conduct on behalf of Bank Sepah, Bank Saderat and Bank Melli, as noted above, Commerzbank also directly coordinated with IRISL in laundering U.S. dollars through the United States despite the fact that IRISL was Iran's primary means of transporting both conventional and non-conventional weapons.

1154.  Between 2002 and 2008 (and upon information and belief, even later), Commerzbank worked directly with IRISL to facilitate illicit payments through the United States.

1155.  In January 2005, Commerzbank's New York branch rejected a series of payment transactions on behalf of Lancelin Shipping Company Ltd., an IRISL-formed entity registered in

240

Cyprus, because the payment messages contained references to IRISL Europe GmbH, a wholly-owned IRISL subsidiary registered in Hamburg and designated by the United States in 2008.

1156.  This prompted a direct meeting between the relationship managers in Commerzbank's Hamburg branch and employees from IRISL on January 24, 2005.

1157.  A memorandum summarizing the meeting noted that: "[d]ue to the tense political relations between Iran and the U.S., sanctions that have existed for some years against Iran and Iranian companies have been tightened…. The number of rejected payments recently increased sharply since the word "IRISL" results in inquiries at foreign banks. Based on inquiries from Commerzbank, New York we assume that it appears as a term on the embargo list."

1158.  In a written presentation that Commerzbank delivered to IRISL on January 25, 2005, following the in-person meeting, the Hamburg relationship manager stated: "[t]he current rejections show that IRISL is in the OFAC list."

1159.  The presentation then explained that "payments which are sent through a ... subsidiary are unlikely to be rejected to our present knowledge."

1160.  Commerzbank ultimately adopted a process it termed a "safe payments solution" by which IRISL initiated USD funds transfers through the U.S., using the accounts of less conspicuous subsidiaries to prevent its New York branch or other clearing banks from flagging IRISL U.S. dollar transactions.

1161.  Moreover, to assist IRISL in its bookkeeping, Commerzbank would sweep those accounts daily and zero them out so that IRISL could keep track of which USD funds belonged to it – as opposed to its subsidiaries.

1162.  On April 18, 2006, Commerzbank's New York branch rejected a payment on behalf of Lancelin, citing "US sanctions against Iran." As a result, Commerzbank altered the structure of

the "safe payment solution," suggesting the use of two other subsidiaries to process payments on behalf of IRISL and IRISL Europe GmbH.

1163.   In fact, in only four months following IRISL's U.S. designation in 2008, Commerzbank illegally transferred almost $40 million on behalf of IRISL subsidiaries and related entities through Commerzbank's New York branch and other U.S. financial institutions.

1164.   These post-designation transactions, laundered by CommerzBank through the U.S. financial system, were self-evidently not for the benefit of a legitimate agency, operation or program of Iran.

1165.   Only months earlier, a U.S. State Department diplomatic cable warned of an IRISL-flagged vessel in China loaded with cargo containing weapons for Iran's Defense Industries Organization ("DIO").

1166.   The 2008 diplomatic cable further warned of the dangers of ongoing conventional arms transfers from China to Iran, "particularly given Iran's clear policy of providing arms and other support to Iraqi insurgents and terrorist groups like the Taliban and Hezbollah…. We have specific information that Chinese weapons and components for weapons transferred to Iran are being used against U.S. and Coalition Forces in Iraq, which is a grave U.S. concern."

1167.   Less than a year after Commerzbank in Hamburg provided IRISL with at least $40 million in illegal (post-designation) USD transactions in October 2009, U.S. troops boarded a German-owned freighter, the *Hansa India*, in the Gulf of Suez and found eight containers full of ammunition, and headed to Syria from Iran.

1168.   The *Hansa India* was registered to the Hamburg-based shipping company Leonhardt & Blumberg, but had in fact been under charter to IRISL for several years.

1169.   The *Hansa India* carried seven containers of small arms ammunition, as well as one

container containing copper discs, which constitute, as noted *supra*, a key component in EFPs used to kill and maim many of the Plaintiffs herein.

1170.   Although Commerzbank worked to shield its New York branch from knowing all of the details of its illicit activities on behalf of Iran and IRISL, Commerzbank's New York branch was nonetheless aware that it was being used to facilitate unlawful conduct.

1171.   For example, in June 2006, in response to a request from the new Chief Compliance Officer asking if there were any concerns they wanted her to share with the new Global Head of Compliance in Germany, a New York compliance employee responded "[p]ersistent disregarding of OFAC rules by foreign branches. Hamburg is notorious for it."

1172.   In February 2007, Commerzbank's then Chief Executive Officer Klaus-Peter Mueller and Board Member Martin Blessing met with U.S. Treasury Deputy Secretary Robert Kimmitt. In the meeting, Mueller complained about the portrayal of Commerzbank by *The Wall Street Journal* (in a January 2007 article) which he said made it appear that the Bank was trying to evade sanctions on Iran. "This," claimed Mueller "is far from the case."

1173.   *The Wall Street Journal* reported on January 10, 2007 that "Commerzbank AG, Germany's second largest bank, said it will stop handling dollar transactions for Iran at its New York branch by Jan. 31." It went on to report that "[a]t present, Commerzbank handles both dollar and euro transactions for Iran's state owned banks. Like several other European banks, it will cease handling only dollar transactions."

1174.   *The Wall Street Journal* article went on to report:

> The risks of doing business with Iran are the same in all currencies," said Mr. [Stuart] Levey. Intelligence officials say Bank Saderat, a large, state-controlled Iranian bank placed on a U.S. Treasury blacklist in October for allegedly funding terrorism, has been able to process dollar transactions through Commerzbank's New York branch in recent months by using the accounts of two other Iranian banks.  Commerzbank says it ceased dealing

with Saderat after it was put on the U.S. blacklist and has no knowledge of any subsequent transactions. "Commerzbank has no knowledge of Bank Saderat directly or indirectly using the accounts of other Iranian banks to process dollar transactions," the bank said in a statement. Commerzbank, in a response to an inquiry from The Wall Street Journal about its dealings with Iran, also said "all such [dollar clearing] transactions are currently being phased out" as of Jan. 31. It added that "any clearing conducted by our U.S. operations is in strict compliance" with U.S. government regulations.

1175.   Commerzbank's assurances to *The Wall Street Journal*, like its assurances to U.S. Treasury Deputy Secretary Robert Kimmitt, were plainly false.

1176.   As noted above, on September 10, 2008, the U.S. designated IRISL, IRISL Europe GmbH, and several IRISL subsidiaries based on evidence that the IRISL network of companies was engaged in WMD proliferation activity and the fact that "IRISL has pursued new strategies which could afford it the potential to evade future detection of military shipments."

1177.   The next day, on September 11, 2008, a senior official at OFAC personally forwarded the press release announcing IRISL's SDN designation to the Head of Compliance at Commerzbank in New York.

1178.   The press release was then forwarded to Commerzbank employees in Germany with responsibilities related to IRISL. In the email, the relationship manager noted that the U.S. government alleged "that IRISL as Iranian government carrier systematically circumvents the Iranian arms embargo."

1179.   Nonetheless, between September 10, 2008, and December 31, 2008 alone, Commerzbank illegally directed close to $40 million on behalf of IRISL subsidiaries and related entities through the United States.

### O.   DEFENDANT DEUTSCHE BANK AG'S AGREEMENT TO,  AND PARTICIPATION IN, THE CONSPIRACY

1180.   Deutsche Bank AG ("DB") was at the Relevant Time Period and is today one of the largest banking institutions in the world, with greater than 98,000 employees and total assets in excess of $1.2 trillion, with its world headquarters located in Frankfurt, Germany, and with offices in over 70 countries.  DB and its various international subsidiaries offered a full panoply of financial services to their customers, including the clearing of USD-denominated financial transactions.

1181.   Deutsche Bank AG New York Branch ("DBNY") is a foreign bank branch of DB that is located in New York City and is licensed, supervised, and regulated by the New York State Department of Financial Services and which conducted correspondent banking and United States Dollar ("USD")-clearing transactions on behalf of DB and its customers during the Relevant Time Period.

1182.   DB agreed to be a part of, and was in fact a part of, the Conspiracy in this matter. As part of its participation in the conspiracy, DB and DBNY agreed to and did in fact provide Iran, the Iranian Banks, Hezbollah, and the Shia Proxy Groups with access to the U.S. financial system when all such entities were blacklisted from such participation; USD; expert advice, and financial services.

1183.   At the time DB agreed to become part of, and did in fact participate in the conspiracy in this matter, it did so with full knowledge that:

a.   Iran had been continuously designated by the United States Government as a State Sponsor of Terrorism since 1984; and

b.   The very purpose for the U.S.-imposed financial and economic sanctions was to incentivize Iran to stop sponsoring international terrorism and its concomitant

attempts to acquire Weapons of Mass Destruction; and

c.     For decades, the Iranian Banks, the IRGC, QF, MODAFL, Mahan Air, and NIOC were part of the Iranian State apparatus; and

d.     Since the 1980s, Hezbollah had been an agent of the Iranian State for purposes of perpetrating acts of international terrorism worldwide; and

e.     Iran would often use 'cover entities', including purported 'charitable organizations', to finance global terrorism; and

f.     For decades, Iran had sponsored, financed and participated in various international terrorist activities and incidents worldwide.

1184.   At the time DB agreed to become part of, and did in fact participate in the conspiracy in this matter, it knew that if it violated any of the existing laws which constituted the Iranian financial and economic sanctions, it risked losing its banking license to conduct business in or with the United States financial system.

1185.   From at least 1999 through 2006, DB and DBNY used non-transparent methods and practices to conduct more than 27,000 USD-clearing transactions valued at over $10.86 billion on behalf of Iran and other then-sanctioned entities, including entities "designated" on the "Specially Designated Nationals" ("SDNs") List.

1186.   In so doing, DB and DBNY effectively concealed the relationship of a sanctioned or possibly-sanctioned Iranian party to the transactions by knowingly processing these non-transparent transactions using methods such as (i) removing from SWIFT payment messages information that identified an underlying party to the transaction as an entity subject to U.S. sanctions; (ii) using non-transparent cover payments, which enabled the bank to send payment messages to the U.S. that did not include information identifying an underlying party to the

transactions as a possibly-sanctioned entity; and (iii) including notes or code words, or instructing sanctioned customers to include certain notes or code words, in payment messages to ensure bank staff employed special processing to hide any sanctions relationship before sending the payments to the U.S.

1187.   By knowingly and intentionally processing USD transactions on behalf of sanctioned Iranian entities using non-transparent methods, DB and DBNY thus failed to generate, keep and maintain accurate records as to those transactions, thus further subverting U.S. authorities' and regulators' attempts to implement U.S. sanctions against Iran and the Iranian Banks.

1188.   The brazenness and audaciousness with which DB and its banking employees conspired with and aided and abetted Iranian-sanctioned entities was startling, as evidenced by:

    a.    Bank staff in overseas offices handling Message Type 103 serial payment messages, which required full identifying information about the parties to the transaction, would affirmatively remove that identifying information, thus concealing that the transaction involved Iran or the Iranian Banks.

    b.    Management personnel were quoted as saying that "specific precautionary measures that required a great deal of expertise" were employed by DB to camouflage Iranian transactions;

    c.    When the standard "cover payment" processing was not possible so as to avoid identifying an Iranian transaction, "we will arrange for the order to be dropped...into a further repair queue, where the references to the principal [Iran] will then be eliminated";

    d.    Some payments that were rejected by DBNY due to a suspected Iranian connection

to the transaction were simply resubmitted to a different U.S. correspondent bank by the overseas office;

e.  The "special processing" that DB used to handle Iranian-involved transactions was anything but "business as usual"; it required manual intervention by DB employees to identify and process the payments that needed "repair" so as to avoid the sanctions-related suspicions in the U.S.;

f.  When customers who received this "special processing" questioned the higher fees they had to pay for such service, they were told that "this is what was necessary in order to circumvent the U.S.-based sanctions controls";

g.  DB's "bank relationship managers" worked with Iranian sanctioned entities' customers in the process of concealing the details about their payments from U.S. correspondent banks;

h.  Iranian customers were told to include "special notes" or "code words" in their payment messages that would trigger special handling by DB before the payment would be sent to the U.S.;

i.  Iranian customers would note things like "PLS DON'T MENTION THE NAME OF BANK SADERAT IRAN OR IRAN IN THE USA..." or "THE NAME BANK MELLI OR MARKAZI SHOULD NOT BE MENTIONED...IMPORTANT: NO IRANIAN NAMES TO BE MENTIONED WHEN MAKING PAYMENT TO NEW YORK...";

j.  DB's "OFAC-safe" handling processes were "selling points" when soliciting new business from sanctioned customers;

k.  The practice of DB having non-transparent payment processing was not isolated or

248

limited to a specific manager or small group of staff, but rather was pervasive and wide-spread throughout various different overseas offices;

l.      DB's illegal payment processing actually became part of a DB Training Manual for newly-hired staff personnel in an overseas DB office.

1189.   In 2015, and based upon the long course of conduct described above, DB and DBNY entered into Consent Orders with the Board of Governors of the United States Federal Reserve System and the New York State Department of Financial Services ("NYSDFS").  In these Consent Orders, DB and DBNY conceded the accuracy of the above-referenced facts and course of conduct; that its employees and staff members were acting within the course and scope of their employment and affiliation with DB and DBNY when they so acted; and that various violations of various federal and state laws had been perpetrated, and intentionally so, by and on behalf of DB and DBNY.

1190.   Pursuant to the Consent Order entered into between DB/DBNY and the NYSDFS, DB agreed to pay a fine or penalty in the amount of $200,000,000.00.

1191.   Pursuant to the Consent Order entered into between DB/DBNY and the Federal Reserve, DB agreed to pay a fine or penalty in the amount of $58,000,000.00.

1192.   Earlier that same year, DB and DBNY entered into a Deferred Prosecution Agreement ("DPA") with the United States Department of Justice, Criminal Division, Fraud Section and Anti-Trust Division regarding the long course of conduct described above.  In that DPA, DB/DBNY agreed to pay a monetary penalty in the amount of $625,000,000.00 into the United States Treasury.

1193.   During the Relevant Period, DB transferred money to certain charitable organizations that were actually fronts for Iran.

1194.   DB deliberately and repeatedly (more than 27,000 times) used a New York account to support the same terrorist organizations who perpetrated the terrorist attacks against Plaintiffs or their family members.

1195.   Although the transfers at issue vary in time and location to a degree, such transfers substantively constitute a single course of conduct by DB that entailed violations of U.S. law in the same manner with respect to all Plaintiffs' claims.

### P.   DEFENDANTS' AIDING AND ABETTING OF HEZBOLLAH THROUGH DIRECT FUNDING OF HEZBOLLAH'S AGENTS

1196.   Throughout the Relevant Time Period, Defendants facilitated financial transactions for Hezbollah, either directly through Defendants' own customers, or indirectly through Defendants' role as correspondent banks for various Arab banks.

1197.   During the Relevant Time Period, Defendants and their affiliates undertook financial transactions involving OFAC-sanctioned entities and/or Hezbollah agents.   The aggregate dollar value of these transactions during the Relevant Time Period was in the hundreds of millions of dollars.

1198.   An example of providing direct financial assistance to a Hezbollah agent is Defendant Commerzbank knowingly, or with deliberate indifference to the fact, maintaining account number 7001688 for an open and notorious Hezbollah fundraising agent in Germany known as Waisenkinderprojekt Libanon e.V. ("the Orphans Project Lebanon e.V.").

1199.   Despite prior public German government reports identifying its customer as a Hezbollah fundraising organization, and the fact that on July 24, 2007 the United States designated[65] the Lebanese organization that was primary recipient of funds donated from the account (Hezbollah's Martyrs Foundation), Commerzbank knowingly, or with deliberate

---

[65] *See* https://www.treasury.gov/press-center/press-releases/Pages/hp503.aspx.

indifference to the fact, continued to provide financial services to Waisenkinderprojekt Libanon e.V. and hence continued to transfer funds to Hezbollah.

1200.   In addition to working directly with Hezbollah's agents as bank customers, Defendants also aided and abetted Hezbollah during the Relevant Time Period through their role as correspondent banks.   In doing so, Defendants enabled Hezbollah's agents to access the Eurodollar market without being subjected to the AML and anti-terrorist financing controls that existed during the Relevant Time Period.

1201.   Defendants' facilitation of Hezbollah's agents' access to the Eurodollar market provided substantial assistance to Hezbollah.   The attacks committed by Hezbollah and its terror proxies in Iraq were only possible because Hezbollah was able to access the financial resources required to carry out the attacks.   As discussed previously, Hezbollah required access to the Eurodollar market in order to fund its operations in Iraq, and this access could only be gained through the knowing and active participation of Defendants.

1202.   The Hezbollah agents who were assisted by Defendants included Kairaba Supermarket, Congo Futur, Kassim Jajideen, Ali Tajideen, Husayn Tajideen, Tajco, and Tajco Limited, among others.   Many of these entities were eventually designated and subject to OFAC monitoring, but Defendants evaded that monitoring by omitting or intentionally altering information.   For example, Defendants would intentionally misspell the names of certain entities that were associated with Hezbollah, thereby bypassing the monitoring systems put in place to detect suspect transactions.

1203.   Defendants were generally aware that they were playing a general role in Hezbollah's violent or life-threatening activities.   Defendants knew, or were deliberately

indifferent, that the Hezbollah agents they were dealing with were funneling money to Hezbollah and its terrorist operations.

1204.   As just one example, and based upon information and belief, Defendants operated as correspondent banks during the Relevant Time Period for transactions involving Jihad Al Bina, a Lebanon-based construction company formed and operated by Hezbollah that was designated by the Treasury Department in February 2007 pursuant to E.O. 13224.

1205.   Jihad al-Bina is also referred to as "Construction for the Sake of the Holy Struggle," a loose translation of its Arabic name. The organization is modeled after a similar firm established in Iran after the Islamic revolution.  Jihad al-Bina selects projects based on political considerations that serve the overall objectives of Hezbollah.  According to the Treasury Department, Jihad al-Bina receives direct funding from Iran, is run by Hezbollah members, and is overseen by Hezbollah's Shura Council, at the head of which sits Hezbollah Secretary General Hassan Nasrallah.

1206.  In 1993, Jihad al-Bina had only a $1.8 million budget.  By November 2006, however, the firm's budget had ballooned to hundreds of millions of dollars.

1207.   Jihad al-Bina is an example of a Hezbollah-controlled agent that directly interacted with Defendants via the correspondent banking process, thereby gaining access to the Eurodollar market.  Defendants knew of, or were deliberately indifferent to, Jihad al-Bina's role as a fundraising agent for Hezbollah's terrorist activities.  Even a cursory examination of Jihad al-Bina during the Relevant Time Period would have revealed its connection to Hezbollah.  For example, a 1999 report by the United Nations determined that Jihad al-Bina selects projects based on political considerations that serve the overall objectives of Hezbollah.

## VII.   PLAINTIFFS

1208.  Each of the acts of international terrorism described below was committed by

Hezbollah (including its Iraqi agents, the Special Groups) ... and was planned and/or authorized by Hezbollah.  Without Defendants' conduct and material support, as identified in this Complaint, Hezbollah and its agents would not have had the funding or material support necessary to carry out these terrorist acts.

## ATTACK 1: JULY 14, 2005 - KIRKUK, IRAQ

### A.    James Donaldson

1209.   Specialist James Donaldson was a citizen and national of the United States and a member of the United States Army when he was wounded in Kirkuk, Iraq on July 14, 2005. Donaldson is a resident of the State of Idaho.

1210.   On that date at about 6:42 a.m., Specialist Donaldson, along with two other Soldiers riding in an M1114 HUMVEE as part of a three-vehicle convoy, were on a patrol at C25 Sector, Kirkuk, Iraq, when an EFP detonated from the side of the vehicle in which he was riding, thus causing both legs to be blown off and other very serious physical and emotional injuries.

1211.   The convoy of which Specialist Donaldson was a part of was traveling back to Forward Operating Base ("FOB") Normandy when the EFP attack occurred.

1212.   Photographs of the blown-up HUMVEE vehicle revealed that its armor had circular holes, a signature finding of EFP devices.

1213.   The SIGACT report specifically indicated that this IED strike was a "possible shape charge" that penetrated Specialist Donaldson's M1114 up-armored HUMVEE door armor "consistent with an EFP strike."

1214.   As a result of the EFP attack, Specialist Donaldson lost both legs, his right leg below the knee, and his left leg above the knee; and experienced multiple other and additional physical and emotional injuries, including multiple debridement procedures, treatments for multiple infections, loss of the right dominant index finger, causing permanent radial nerve damage

in the right forearm resulting in lost grip strength, traumatic brain injury ("TBI"), post-concussive syndrome, anxiety, cognitive disorder, and sleep apnea.

1215.   As a result of the EFP attack, and the physical and emotional injuries he suffered as a direct result therefrom, Specialist Donaldson has experienced severe physical and emotional pain and suffering in the past and will experience same into the indeterminable future; has incurred medical bills for medical and rehabilitation services rendered and will incur same into the indeterminable future; has incurred an overwhelming loss of income and earnings capacity and will experience same into the indeterminable future; has experienced permanent injuries to his person and psyche; and has experienced severe mental anguish, anxiety and depression and will experience same into the indeterminable future.

## ATTACK 2: JULY 27, 2005 – CAMP ASHRAF, IRAQ

### B.      The Butler Family

1216.   Specialist Adrian Josiah Butler was a citizen and national of the United States and a member of the United States Army when he was killed in Iraq on July 27, 2005.

1217.   On that date, Specialist Butler was positioned as the gunner of an M1114 HUMVEE vehicle traveling on Route Dover in Baghdad, Iraq, when an IED detonated nearby, thus causing the death of Specialist Butler.

1218.   The Final Autopsy Report concluded that Specialist Butler died due to "multiple blast injuries" in the subject attack such that his entire torso was blown off at the sacrum level. Later, the charred lower body torso and parts of Specialist Butler had to be identified with DNA to match the torso with what was left of his body.

1219.   Plaintiff, Peggy Donaldson, was at the time of Specialist Butler's death and still is a citizen of the United States and a resident of the State of Michigan.  She is the Mother of Adrian Josiah Butler.

1220.   Plaintiff, Eldridge Butler, was at the time of Specialist Butler's death and still is a citizen of the United States and a resident of the State of Michigan.  He is the Brother of Adrian Josiah Butler.

1221.   Plaintiff, Peggy Donaldson, brings an action individually and on behalf of the Estate of Adrian Josiah Butler, as its Personal Representative in Wayne County, Michigan, under File No.: 2018-841373-DE.

1222.   As a direct result of the IED attack, and the resulting wrongful death of Adrian Josiah Butler, the Estate of Adrian Butler is entitled to recover for the substantial economic and earnings capacity loss.

1223.   As a direct result of the IED attack, and the resulting death of Adrian Josiah Butler, Plaintiffs, Peggy Donaldson and Eldridge Butler, have experienced various solatium-related damages, including intentional infliction of severe emotional distress, severe mental anguish, extreme emotional pain and suffering, a loss of society, companionship, comfort, advice and counsel, and substantial economic loss.

**C.     The Tollefson Family**

1224.   Specialist John Olliver Tollefson was a citizen and national of the United States and a member of the United States Army when he was killed in Iraq on July 27, 2005.

1225.   On that date, Specialist Tollefson was riding in an M1114 HUMVEE vehicle traveling on Route Dover in Baghdad, Iraq, when an IED detonated nearby, thus causing the death of Specialist Tollefson.

1226.   Plaintiff, Walter Tollefson, was at the time of Specialist Tollefson's death and still is a citizen of the United States and a resident of the State of Wisconsin.  He is the Father of John Olliver Tollefson.

1227.   Plaintiff, Mary Steinman, was at the time of Specialist Tollefson's death and still is a citizen of the United States and a resident of the State of Wisconsin.  She is the Mother of John Olliver Tollefson.

1228.   Plaintiff, Jessica Mecklenburg, was at the time of Specialist Tollefson's death and still is a citizen of the United States and a resident of the State of Wisconsin.  She is the Sister of John Olliver Tollefson.

1229.   Plaintiff, Kathryn Miller, was at the time of Specialist Tollefson's death and still is a citizen of the United States and a resident of the State of Wisconsin.  She is the Sister of John Olliver Tollefson.

1230.   Plaintiff, Walter Tollefson, brings an action individually and on behalf of the Estate of John Olliver Tollefson, as its Personal Representative in Fond du Lac County, Wisconsin, under File No.: 2018PR00047.

1231.   As a direct result of the IED attack, and the resulting wrongful death of John Olliver Tollefson, the Estate of John Tollefson is entitled to recover for the substantial economic and earnings capacity loss.

1232.   As a direct result of the IED attack, and the resulting death of John Olliver Tollefson, Plaintiffs, Walter Tollefson, Mary Steinman, Jessica Mecklenburg, and Kathryn Miller have experienced various solatium-related damages, including intentional infliction of severe emotional distress, severe mental anguish, extreme emotional pain and suffering, a loss of society, companionship, comfort, advice and counsel, and substantial economic loss.

### ATTACK 3: SEPTEMBER 26, 2005 - SHU'AIBA, IRAQ

**D.      The Wendling Family**

1233.   Specialist Michael Jacob Wendling was a citizen and national of the United States and a member of the United States Army when he was killed in Iraq on September 26, 2005.

1234.   On that date, Specialist Wendling was driving a vehicle along Main Supply Route ("MSR") Tampa as part of a 40-vehicle convoy near Basra City, near its intersection with Route Heart/Tampa, when an EFP detonated near the vehicle, causing a massive explosion and major blast injuries to Wendling which later that day caused his death.

1235.   Plaintiff, Randall Wendling, was at the time of Specialist Wendling's death and still is a citizen of the United States and a resident of the State of Wisconsin.  He is the Father of Michael Wendling.

1236.   Plaintiff, Carrie Wendling, was at the time of Specialist Wendling's death and still is a citizen of the United States and a resident of the State of Wisconsin.  She is the Mother of Michael Wendling.

1237.   Plaintiff, Randall Wendling, brings an action individually and on behalf of the Estate of Michael Wendling, as its Personal Representative in Dodge County, Wisconsin under File No.: 2018PR000224.

1238.   As a direct result of the EFP attack, and the resulting wrongful death of Michael Wendling, the Estate of Michael Wendling is entitled to recover for pain and suffering experienced by Michael Wendling between the time of the EFP attack and his death, and for the substantial economic and earnings capacity loss.

1239.   As a direct result of the EFP attack, and the resulting death of Michael Wendling, Plaintiffs, Randall Wendling and Carrie Wendling have experienced various solatium-related damages, including intentional infliction of severe emotional distress, severe mental anguish, extreme emotional pain and suffering, a loss of society, companionship, comfort, advice and counsel, and substantial economic loss.

## ATTACK 4: SEPTEMBER 26, 2005 - AL RAHMANIYAH DISTRICT, BAGHDAD, IRAQ

**E.     The Allen Family**

1240.   Sergeant Howard Allen was a citizen and national of the United States and a member of the United States Army when he was killed in Iraq on September 26, 2005.

1241.   On that date, Sergeant Allen was riding in an M1114 HUMVEE vehicle near the Al Shu'ala district in Baghdad when an EFP detonated from an overpass median located near the vehicle, causing a massive explosion, thus causing the death of Sergeant Allen.

1242.   Plaintiff, Diane Pennington, was at the time of Sergeant Allen's death and still is a citizen of the United States and a resident of the State of Arizona.  She is the Sister of Sergeant Allen.

1243.   Plaintiff, D.A., a Minor, was at the time of Sergeant Allen's death and still is a citizen of the United States and a resident of the State of Arizona.  He is the son of Sergeant Allen.

1244.   Plaintiff, Diane Pennington, brings an action individually and on behalf of the Estate of Howard Allen, as its Personal Representative in Dodge County, Arizona under File No.: 2018PR000224.

1245.   As a direct result of the EFP attack, and the resulting wrongful death of Howard Allen, the Estate of Howard Allen is entitled to recover for the substantial economic and earnings capacity loss.

1246.   As a direct result of the EFP attack, and the resulting death of Howard Allen, Plaintiffs, Diane Pennington, individually and as the legal guardian of D.A., a Minor, have experienced various solatium-related damages, including intentional infliction of severe emotional distress, severe mental anguish, extreme emotional pain and suffering, a loss of society, companionship, comfort, advice and counsel, and substantial economic loss.

## ATTACK 5:  OCTOBER 23, 2005 - RUSAFA DISTRICT, BAGHDAD, IRAQ

**F.      The Anderson Family**

1247.   Sergeant Bryan Anderson was a citizen and national of the United States and a member of the United States Army when he was seriously wounded in Iraq on October 23, 2005. He is a citizen and resident of the State of Illinois.

1248.   On that date at about noon, Sergeant Anderson was riding in an up-armored HUMVEE vehicle traveling in the Rusafa District of Baghdad, which is very close to Sadr City, when a massive explosion occurred from the left side of the vehicle, causing circular holes to pierce through the sides of the vehicle and copper shrapnel pieces to blow off Sergeant Anderson's legs, ultimately resulting in above-the-knee amputations of both of Sergeant Anderson's legs, and causing other and further very serious physical and emotional injuries.

1249.   Photographs of the blown-up HUMVEE vehicle revealed that its armor had circular holes, a signature finding of EFP devices.

1250.   Subsequent to the attack, Sergeant Anderson's health care providers removed copper fragments lodged in and throughout his person, another signature finding of EFP detonations.

1251.   The SIGACT report concluded that it was an EFP device which was involved in the explosion.

1252.   As a result of the attack, Sergeant Anderson lost both legs above-the-knee and his left arm below-the-elbow; severely damaged and suffered fractures to his right (dominant) hand and fingers; had shrapnel fragments blow into and all over his body; had his right lung collapse; experienced multiple surgeries to address and treat his injuries; developed decubitus ulcers on his person due to his immobility caused by his various injuries; developed heterotopic ossification on

his two leg stumps; and has experienced psychological problems and issues from the horrific experience and as a result of all of his physical injuries.

1253.   As a result of the EFP attack, and the physical and emotional injuries he suffered as a direct result therefrom, Sergeant Anderson has experienced severe physical and emotional pain and suffering in the past and will experience same into the indeterminable future; has incurred medical bills for medical and rehabilitation services rendered and will incur same into the indeterminable future; has incurred an overwhelming loss of income and earnings capacity and will experience same into the indeterminable future; has experienced permanent injuries to his person and psyche; and has experienced severe mental anguish, anxiety and depression and will experience same into the indeterminable future.

1254.   Plaintiff, Janet Waswo, was at the time of Sergeant Anderson's attack and still is a citizen of the United States and a resident of the State of Illinois.  She is the Mother of Sergeant Anderson.

1255.   Plaintiff, James Waswo, was at the time of Sergeant Anderson's attack and still is a citizen of the United States and a resident of the State of Illinois.  He is the Step-Father of Sergeant Anderson.  James Waswo has, for most of the Life of Sergeant Anderson, acted as a "Father figure" to and for Sergeant Anderson and raised Sergeant Anderson as if he were his own son.

1256.   Plaintiff, Robert Anderson, was at the time of Sergeant Anderson's attack and still is a citizen of the United States and a resident of the State of Illinois.  He is the Brother of Sergeant Anderson.

1257.   Plaintiff, Briana Waswo, was at the time of Sergeant Anderson's attack and still is a citizen of the United States and a resident of the State of Illinois.  She is the Sister of Sergeant Anderson.

1258.   As a direct result of the EFP attack, and the resulting serious physical and emotional injuries sustained by Bryan Anderson, Plaintiffs, Janet Waswo, James Waswo, Robert Anderson, and Briana Waswo, have experienced various solatium-related damages, including intentional infliction of severe emotional distress, severe mental anguish, extreme emotional pain and suffering, and substantial economic loss.

## ATTACK 6:  DECEMBER 4, 2005 - BAGHDAD, IRAQ

### G.     The Cuka Family

1259.   Staff Sergeant Daniel Cuka was a citizen and national of the United States and a member of the United States Army when he was killed in Iraq on December 4, 2005.

1260.   On that date, Staff Sergeant Cuka was on a patrol in a three-vehicle convoy of M1114 HUMVEE vehicles near the Jurf Naddaf neighborhood near Jisr Diyala, Iraq, just east of Baghdad, when two separate arrays of EFPs detonated near the HUMVEE vehicle in which he was riding, thus causing a massive explosion, killing Cuka and another Soldier in the convoy, and injuring three other Soldiers in the convoy.

1261.   After the attack, the Special Group Kata'ib Hezbollah, released a video displaying the entire attack and took credit for it.

1262.   Plaintiff, Melissa Kay Cuka, was at the time of Daniel Cuka's death and still is a citizen of the United States and a resident of the State of South Dakota.  She is the Widow and Wife of Daniel Cuka.

1263.   Plaintiff, Abigail Rose Cuka, was at the time of Daniel Cuka's death and still is a citizen of the United States and a resident of the State of South Dakota.  She is the Daughter of Daniel Cuka.

1264.   Plaintiff, A.M.C., a Minor, being represented by his legal guardian, Melissa Kay Cuka, was at the time of Daniel Cuka's death and still is a citizen of the United States and a resident of the State of South Dakota. He is the Son of Daniel Cuka.

1265.   Plaintiff, Melissa Kay Cuka, brings an action individually and on behalf of the Estate of Staff Sergeant Daniel Cuka as its Personal Representative in Yankton County, South Dakota under Pro. # 18-46.

1266.   As a direct result of the EFP attack, and the resulting wrongful death of Daniel Cuka, the Estate of Daniel Cuka is entitled to recover for the substantial economic and earnings capacity loss.

1267.   As a direct result of the EFP attack, and the resulting death of Daniel Cuka, Plaintiffs, Melissa Kay Cuka, Abigail Rose Cuka, and A.M.C., a Minor, have experienced various solatium-related damages, including intentional infliction of severe emotional distress, severe mental anguish, extreme emotional pain and suffering, a loss of society, companionship, comfort, advice and counsel, and substantial economic loss.

## H.     The Schild Family

1268.   Sergeant First Class Richard Schild was a citizen and national of the United States and a member of the United States Army when he was killed in Iraq on December 4, 2005.

1269.   On that date, Sergeant First Class Schild was on a patrol in a three-vehicle convoy of M1114 HUMVEE vehicles near Baghdad Al Jadeeda when two separate arrays of EFPs detonated near the HUMVEE vehicle in which he was riding, thus causing a massive explosion,

killing Schild and another Soldier in the convoy, and injuring  three other Soldiers in the convoy.

1270.   The Army's Certificate of Death concluded that "projectile shrapnel injuries due to blast" were the cause of Sergeant First Class Schild's death.

1271.   After the attack, the Special Group Kata'ib Hezbollah, released a video displaying the entire attack and took credit for it.

1272.   Plaintiff, Kay Schild, was at the time of Richard Schild's death and still is a citizen of the United States and a resident of the State of South Dakota.  She is the Widow and Wife of Richard Schild.

1273.   Plaintiff, Ke.S., a Minor, being represented by her legal guardian, Kay Schild, was at the time of Richard Schild's death and still is a citizen of the United States and a resident of the State of South Dakota.  She is the Daughter of Richard Schild.

1274.   Plaintiff, Ko.S., a Minor, being represented by his legal guardian, Kay Schild, was at the time of Richard Schild's death and still is a citizen of the United States and a resident of the State of South Dakota.  He is the Son of Richard Schild.

1275.   Plaintiff, Colleen Schild, was at the time of Richard Schild's death and still is a citizen of the United States and a resident of the State of South Dakota.  She is the Mother of Richard Schild.

1276.   Plaintiff, Bruce Schild, was at the time of Richard Schild's death and still is a citizen of the United States and a resident of the State of South Dakota.  He is the Brother of Richard Schild.

1277.   Plaintiff, Brooks Schild, was at the time of Richard Schild's death and still is a citizen of the United States and a resident of the State of South Dakota.  He is the Brother of Richard Schild.

1278.   Plaintiff, Kay Schild, brings an action individually and on behalf of the Estate of Richard Schild, as its Personal Representative in Bon Homme County, South Dakota under File No.: 2018PR00022.

1279.   As a direct result of the EFP attack, and the resulting wrongful death of Richard Schild, the Estate of Richard Schild is entitled to recover for the substantial economic and earnings capacity loss.

1280.   As a direct result of the EFP attack, and the resulting death of Richard Schild, Plaintiffs, Kay Schild, Ke.S, a Minor, Ko.S., a Minor, Colleen Schild, Bruce Schild, and Brooks Schild have experienced various solatium-related damages, including intentional infliction of severe emotional distress, severe mental anguish, extreme emotional pain and suffering, a loss of society, companionship, comfort, advice and counsel, and substantial economic loss.

## ATTACK 7:  APRIL 12, 2006 - MISIAB, IRAQ

### I.      The Calderon Family

1281.   Specialist/Tanker Roland Calderon was a citizen and national of the United States and a member of the United States Army when he was killed in Iraq on April 12, 2006.

1282.   On that date, Calderon was driving an up-armored M1114 HUMVEE and was the second such vehicle in a convoy, when two EFPs detonated at or near his vehicle near Al Misiab, Iraq, thus killing Calderon

1283.   The so-called "CEXC" ("Combined Explosives Exploitation Cell") concluded that the pattern of holes in the M1114 HUMVEE indicated that the devices were in fact EFPs.

1284.   Plaintiff, Mirtha Ponce, was at the time of Roland Calderon's death and still is a citizen of the United States and is a resident of the State of Georgia. She is the Widow and Wife of Roland Calderon and is the Personal Representative of the Estate of Roland Calderon in Hardee County, Florida under File No.: 252018CP000032.

1285.   Plaintiff, A.R.C., a Minor, represented by his legal guardian Mirtha Ponce, was at the time of Rolando Calderon's death and still is a citizen of the United States and is a resident of the State of Georgia. He is the Son of Roland Calderon.

1286.   Plaintiff, A.J.C., a Minor, represented by his legal guardian, Mirtha Ponce, was at the time of Roland Calderon's death and still is a citizen of the United States and is a resident of the State of Georgia. He is the Son of Roland Calderon.

1287.   Plaintiff, Rosa Milagro, was at the time of Roland Calderon's death and still is a citizen of the United States and is a resident of the State of Florida. She is the Mother of Roland Calderon.

1288.   Plaintiff, Saul Rauda, was at the time of Roland Calderon's death and still is a citizen of the United States and is a resident of the State of Florida. He is the Step-Father of Roland Calderon.

1289.   Plaintiff, Yeny Rauda, was at the time of Roland Calderon's death and still is a citizen of the United States and is a resident of the State of Florida. She is the Sister of Roland Calderon.

1290.   Plaintiff, Jasmyn Rauda, was at the time of Roland Calderon's death and still is a citizen of the United States and is a resident of the State of Florida. She is the Sister of Roland Calderon.

1291.   Plaintiff, Evelyn Rauda, was at the time of Roland Calderon's death and still is a citizen of the United States and a resident of the State of Florida. She is the Sister of Roland Calderon.

1292.   As a direct result of the EFP attack, and the resulting wrongful death of Roland Calderon, the Estate of Roland Calderon is entitled to recover for the substantial economic and earnings capacity loss.

1293.   As a direct result of the EFP attack, and the resulting death of Roland Calderon, Plaintiffs, Mirtha Ponce, A.R.C., a Minor, A.J.C., a Minor, Rosa Milagro, Saul Rauda, Yeny Rauda, Jasmyn Rauda, and Evelyn Rauda have experienced various solatium-related damages, including intentional infliction of severe emotional distress, severe mental anguish, extreme emotional pain and suffering, a loss of society, companionship, comfort, advice and counsel, and substantial economic loss.

## ATTACK 8: APRIL 18, 2006 - BAGHDAD, IRAQ

### J.    The Weikel Family

1294.   Captain Ian Weikel was a citizen and national of the United States and a member of the United States Army when he was killed in Iraq on April 18, 2006.

1295.   The AR 15-6 Investigative Report indicates that on that, the armored HUMVEE vehicle in which Captain Weikel was riding was blown up by an EFP near the intersection of Alternative Supply Route ("ASR") Vernon and Main Supply Route ("MSR") Tampa just north of Baghdad, Iraq.

1296.   The AR 15-6 Investigative Report concluded that "the circular shapes of the penetrations are consistent with previous EFP attacks.  Further evidence was collected from inside the vehicle in the form of copper fragmentation.  Melted copper is the projectile material used in EFPs."

1297.   Captain Weikel was not killed in the attack, but died later on an operating table as health care providers tried to stabilize his condition.

1298.   Upon information and belief, the specific Special Group perpetrating this attack was Jaysh al-Mahdi.

1299.   Plaintiff, Wendy Green, was at the time of Ian Weikel's death and still is a citizen of the United States and is a resident of the State of Minnesota.  She is the Widow and Wife of Ian Weikel.

1300.   Plaintiff, J.T.W., a Minor, represented by his legal guardian, Wendy Green, was at the time of Ian Weikel's death and still is a citizen of the United States and is a resident of the State of Minnesota. He is the Son of Ian Weikel.

1301.   Plaintiff, Chad Weikel, was at the time of Ian Weikel's death and still is a citizen of the United States and is a resident of the State of Colorado.  He is the Brother of Ian Weikel.

1302.   Plaintiff, Wendy Green, brings an action individually and on behalf of the Estate of Ian Weikel, as its Personal Representative in Bell County, Texas under Case No.: 26076.

1303.   As a direct result of the EFP attack, and the resulting wrongful death of Ian Weikel, the Estate of Ian Weikel is entitled to recover for the pain, suffering, and mental anguish experienced by Ian Weikel between the time of the EFP attack and his death, and for the substantial economic and earnings capacity loss.

1304.   As a direct result of the EFP attack, and the resulting wrongful death of Ian Weikel, Plaintiffs, Wendy Green, J.T.W., a Minor, and Chad Weikel have experienced various solatium-related damages, including intentional infliction of severe emotional distress, severe mental anguish, extreme emotional pain and suffering, a loss of society, companionship, comfort, advice and counsel, and substantial economic loss.

## ATTACK 9: APRIL 20, 2006 – SHUHADA AL SYDIA, BAGHDAD, IRAQ

### K.      The Teeters Family

1305.   Sergeant Brandon Teeters was a citizen and national of the United States and a

member of the United States Army when he died on May12, 2006, due to blast injuries sustained in an EFP attack in the Dora Zone of Baghdad on April 20, 2006.

1306.   On that date, Sergeant Teeters was riding in an M2A2 Bradley Fighting Vehicle just west of the intersection of Baghdad Road and the Dora Expressway in the Shuhada Al Sydia section of Baghdad.  Sergeant Teeters was in the "gunner" position in the vehicle when an array of EFPs detonated, causing a massive explosion, thus causing five Soldiers to be seriously injured, and one, Sergeant Teeters, to die subsequently from his blast injuries sustained at that time.

1307.   Sergeant Teeters suffered burns over 80% of his body before being removed, alive, from the Bradley Fighting Vehicle.

1308.   The Army concluded that a copper-shaped EFP hit the fuel cell on the M2A2 Bradley Fighting Vehicle in which Sergeant Teeters was then riding, thus causing a huge fire within the vehicle.

1309.   Plaintiff, Tammy Richard, was at the time of Brandon Teeters' death and still is a citizen of the United States and a resident of the State of Louisiana.  She is the Mother of Brandon Teeters.

1310.   Plaintiff, Glenn Richard, was at the time of Brandon Teeters' death and still is a citizen of the United States and a resident of the State of Louisiana.  He is the Father of Brandon Teeters.

1311.   Plaintiff, Heather Richard, was at the time of Brandon Teeters' death and still is a citizen of the United States and a resident of the State of Louisiana.  She is the Sister of Brandon Teeters.

1312.   Plaintiff, Tammy Richard, brings an action individually and on behalf of the Estate of Brandon Teeters, as its Independent Administratrix in the Parish of St. Mary, Louisiana under Docket No.: 20960.

1313.   As a direct result of the EFP attack, and the resulting wrongful death of Brandon Teeters, the Estate of Brandon Teeters is entitled to recover for the pain, suffering, and mental anguish experienced by Brandon Teeters between the time of the EFP attack and his death, and for the substantial economic and earnings capacity loss.

1314.   As a direct result of the EFP attack, and the resulting wrongful death of Brandon Teeters, Plaintiffs, Glenn Richard, Tammy Richard and Heather Richard have experienced various solatium-related damages, including intentional infliction of severe emotional distress, severe mental anguish, extreme emotional pain and suffering, a loss of society, companionship, comfort, advice and counsel, and substantial economic loss.

## ATTACK 10: APRIL 28, 2006 - BAGHDAD, IRAQ

### L.   The Herlem Family

1315.   Staff Sergeant Bryant Anthony Herlem was a citizen and national of the United States and a member of the United States Army when he was killed in Iraq on April 28, 2006.

1316.   On that date, Staff Sergeant Herlem was riding in a M1114 just southwest of the intersection of Baghdad Road and the Dora Expressway in the Shuhada Al Sydia section of Baghdad, when the lead vehicle in a convoy struck an IED, causing a secondary IED located in a hollowed-out log to detonate near the M1114 Herlem was riding in, killing him and another Soldier instantly.

1317.   Plaintiff, LaNita Herlem, was at the time of Bryant Herlem's death and still is a citizen of the United States and a resident of the State of Texas.  She is the Widow and Wife of Staff Sergeant Herlem.

1318.   Plaintiff, LaNita Herlem, brings an action individually and on behalf of the Estate of Staff Sergeant Herlem, as its Independent Administratrix in Bell County, Texas under Docket No.: 25,895.

1319.   As a direct result of the IED attack, and the resulting wrongful death of Staff Sergeant Herlem, the Estate of Bryant Herlem is entitled to recover for the substantial economic and earnings capacity loss.

1320.   As a direct result of the IED attack, and the resulting death of Staff Sergeant Herlem, Plaintiff, LaNita Herlem has experienced various solatium-related damages, including intentional infliction of severe emotional distress, severe mental anguish, extreme emotional pain and suffering, a loss of society, companionship, comfort, advice and counsel, and substantial economic loss.

## ATTACK 11: MAY 5, 2006 - BAGHDAD, IRAQ

### M.      The Torres Family

1321.   Private First Class Teodoro Torres was a citizen and national of the United States and a member of the United States Army when he was killed in Iraq on May 5, 2006.

1322.   On that date, Private Torres was riding in a convoy of four M1114 HUMVEE vehicles on a patrol on Highway 8 just to the north of Al Hillah and south of Baghdad, when an array of five to eight EFPs detonated and blew up the first vehicle in the convoy in which Torres was riding in the gunner's cupola, thus killing him.

1323.   The Certificate of Death indicated that Private Torres was killed by "blast injuries of the pelvis and lower extremities."

1324.   Plaintiff, Yarissa Torres, was at the time of Teodoro Torres' death and still is a citizen of the United States and a resident of the State of New York. She is the Widow of Teodoro Torres.

1325.   Plaintiff, Yarissa Torres, brings an action individually and on behalf of the Estate of Teodoro Torres, as its Personal Representative in Taylor County, Texas under Case No.: 29516.

1326.   As a direct result of the EFP attack, and the resulting wrongful death of Teodoro Torres, the Estate of Teodoro Torres is entitled to recover for the substantial economic and earnings capacity loss.

1327.   As a direct result of the EFP attack, and the resulting death of Teodoro Torres, Plaintiff, Yarissa Torres, has experienced various solatium-related damages, including intentional infliction of severe emotional distress, severe mental anguish, extreme emotional pain and suffering, a loss of society, companionship, comfort, advice and counsel, and substantial economic loss.

## ATTACK 12: MAY 8, 2006 – RUSTAMIYAH BAGHDAD, IRAQ

### N.   The Mesa Family

1328.   Retired Sergeant First Class Rudy Guerrero Mesa was a citizen and national of the United States and civilian contractor when he was killed in Rustamiyah Baghdad, Iraq on May 8, 2006.

1329.   On that date, Mesa was riding in an M1114 HUMVEE vehicle just outside of Forward Operating Base ("FOB") Rustamiyah when an EFP detonation occurred, thus killing Mesa.

1330.   Plaintiff, Velia F. Mesa, was at the time of Rudy Mesa's death and still is a citizen of the United States and a resident of the State of Texas. She is the Widow and Wife of Rudy Guerrero Mesa.

1331.   Plaintiff, Velia A. Mesa, was at the time of Rudy Mesa's death and still is a citizen of the United States and a resident of the State of Texas. She is the Daughter of Rudy Guerrero Mesa.

1332. Plaintiff, Lucy Rigby, was at the time of Rudy Mesa's death and still is a citizen of the United States and a resident of the State of Texas. She is the Daughter of Rudy Guerrero Mesa.

1333. Plaintiff, Luis Aguilar, was at the time of Rudy Mesa's death and still is a citizen of the United States and a resident of the State of Texas. He is the Step-Son of Rudy Guerrero Mesa.

1334. Plaintiff, Manuel Aguilar, was at the time of Rudy Mesa's death and still is a citizen of the United States and a resident of the State of Texas. He is the Step-Son of Rudy Guerrero Mesa.

1335. Plaintiff, Velia F. Mesa, brings an action individually and on behalf of the Estate of Rudy Guerrero Mesa, as its Personal Representative in Caldwell County, Texas under Case No.: 10371.

1336. As a direct result of the EFP attack, and the resulting wrongful death of Rudy Guerrero Mesa, the Estate of Rudy Mesa is entitled to recover for the substantial economic and earnings capacity loss.

1337. As a direct result of the EFP attack, and the resulting wrongful death of Rudy Guerrero Mesa, Plaintiffs, Velia Mesa, Velia A. Mesa, Lucy Rigby, Luis Aguilar and Manuel Aguilar have experienced various solatium-related damages, including intentional infliction of severe emotional distress, severe mental anguish, extreme emotional pain and suffering, a loss of society, companionship, comfort, advice and counsel, and substantial economic loss.

## ATTACK 13: JULY 2, 2006 – KIRKUK, IRAQ

### O. The Paupore Family

1338. Specialist Nicholas Paupore was a citizen and national of the United States and a member of the United States Army when he was seriously injured in Iraq on July 2, 2006. Paupore is a resident of the State of Virginia.

1339.   On that date, Specialist Paupore was on a patrol riding in an M114 HUMVEE vehicle along Route Ford, along with five other similar vehicles, near Kirkuk, Iraq, when a series of EFPs detonated just adjacent to and underneath the vehicle in which he was riding, thus causing his right leg to be blown off and other very serious physical and emotional injuries.

1340.   Investigation of the blown-up HUMVEE vehicle revealed that its armor had been penetrated by copper slugs, a signature finding of EFP devices.

1341.   As a result of the EFP attack, Specialist Paupore lost his right leg above the knee, along with multiple other and additional physical and emotional injuries, including multiple debridement procedures, treatments for multiple infections, a mangled left thigh and right forearm from shrapnel, permanent radial nerve damage in the right forearm resulting in lost grip strength, traumatic brain injury ("TBI"), post-concussive syndrome, cognitive disorder, and sleep apnea.

1342.   As a result of the EFP attack, and the physical and emotional injuries he suffered as a direct result therefrom, Specialist Paupore has experienced severe physical and emotional pain and suffering in the past and will experience same into the indeterminable future; has incurred medical bills for medical and rehabilitation services rendered and will incur same into the indeterminable future; has incurred an overwhelming loss of income and earnings capacity and will experience same into the indeterminable future; has experienced permanent injuries to his person and psyche; and has experienced severe mental anguish, anxiety and depression and will experience same into the indeterminable future.

1343.   Plaintiff, Maria Paupore, was at the time of Nicholas Paupore's attack and still is a citizen of the United States and is a resident of the State of Virginia. She is the Wife of Nicholas Paupore.

1344.   Plaintiff, M.P., a Minor, represented by her legal guardian, Maria Paupore, was at

the time of Nicholas Paupore's attack and still is a citizen of the United States and a resident of the State of Virginia.  She is the Daughter of Nicholas Paupore.

1345.   Plaintiff, Cody Paupore, was at the time of Nicholas Paupore's attack and still is a citizen of the United States and is a resident of the State of Virginia. He is the Son of Nicholas Paupore.

1346.   Plaintiff, Sharon Osborne, was at the time of Nicholas Paupore's attack and still is a citizen of the United States and is a resident of the State of Michigan. She is the Mother of Nicholas Paupore.

1347.   Plaintiff, Thomas Paupore, was at the time of Nicholas Paupore's attack and still is a citizen of the United States and is a resident of the State of Arizona. He is the Father of Nicholas Paupore.

1348.   Plaintiff, Leslie Paupore Bueno, was at the time of Nicholas Paupore's attack and still is a citizen of the United States and is a resident of the State of Arizona. She is the Sister of Nicholas Paupore.

1349.   Plaintiff, Joe Paupore, was at the time of Nicholas Paupore's attack and still is a citizen of the United States and is a resident of the State of Michigan. He is the Brother of Nicholas Paupore.

1350.   As a result of the EFP attack, and the physical and emotional injuries suffered by Nicholas Paupore as a direct result therefrom, Plaintiffs, Maria Paupore, M.P., a Minor, Cody Paupore, Sharon Osborne, Thomas Paupore, Leslie Paupore Bueno, and Joe Paupore, have experienced various solatium-related damages, including intentional infliction of severe emotional distress, severe mental anguish, extreme emotional pain and suffering, and substantial economic loss.

## P.       The Saaristo Family

1351.   Sergeant Brian Saaristo was a citizen and national of the United States and a member of the United States Army when he was seriously injured in Iraq on July 2, 2006.  Saaristo is a resident of the State of Minnesota.

1352.   On that date, Sergeant Saaristo was on a  patrol riding in an M114 HUMVEE vehicle in the front passenger seat, along with five other similar vehicles, near Kirkuk, Iraq, when a series of EFPs detonated just adjacent to and underneath the vehicle in which he was riding, thus causing both of his legs to be sheared off below the knees, along with other very serious physical and emotional injuries.

1353.   Investigation of the blown-up HUMVEE vehicle revealed that its armor had been penetrated by copper slugs, a signature finding of EFP devices.

1354.   As a result of the EFP attack, Sergeant Saaristo lost both of his legs below the knee, along with multiple other and additional physical and emotional injuries, including multiple debridement procedures, treatments for multiple infections, hypertrophic ossification, "phantom pain" in the areas where his legs should be, hearing loss, and an anxiety disorder.

1355.   As a result of the EFP attack, and the physical and emotional injuries he suffered as a direct result therefrom, Brian Saaristo has experienced severe physical and emotional pain and suffering in the past and will experience same into the indeterminable future; has incurred medical bills for medical and rehabilitation services rendered and will incur same into the indeterminable future; has incurred an overwhelming loss of income and earnings capacity and will experience same into the indeterminable future; has experienced permanent injuries to his person and psyche; and has experienced severe mental anguish, anxiety and depression and will experience same into the indeterminable future.

1356.   Plaintiff, Cheryl Saaristo, was at the time of Brian Saaristo's attack and still is a citizen of the United States and is a resident of the State of Minnesota. She is the Wife of Brian Saaristo.

1357.   Plaintiff, L.M.S., a Minor, represented by her Mother, Cheryl Saaristo, was at the time of Brian Saaristo's attack and still is a citizen of the United States and a resident of the State of Minnesota.  She is the Daughter of Brian Saaristo.

1358.   Plaintiff, B.D.S., Jr., a Minor, represented by his Mother, Cheryl Saaristo, was at the time of Brian Saaristo's attack and still is a citizen of the United States and a resident of the State of Minnesota.  He is the Son of Brian Saaristo.

1359.   Plaintiff, Shirley Ann Saaristo, was at the time of Brian Saaristo's attack and still is a citizen of the United States and a resident of the State of Minnesota. She is the Mother of Brian Saaristo.

1360.   Plaintiff, Brenda Angell, was at the time of Brian Saaristo's attack and still is a citizen of the United States and a resident of the State of Minnesota. She is Sister of Brian Saaristo.

1361.   Plaintiff, Barbara Liimatainen, was at the time of Brian Saaristo's attack and still is a citizen of the United States and a resident of the State of Minnesota. She is the Sister of Brian Saaristo.

1362.   As a result of the EFP attack, and the physical and emotional injuries suffered by Brian Saaristo, Plaintiffs, Cheryl Saaristo, L.M.S., a Minor, and B.D.S., Jr., a Minor, Shirley Ann Saaristo, Brenda Angell, and Barbara Liimatainen have experienced various solatium-related damages, including intentional infliction of severe emotional distress, severe mental anguish, extreme emotional pain and suffering, and substantial economic loss.

## ATTACK 14: JULY 31, 2006 – AL NUMANIYAH, IRAQ

**Q.     The Ford Family**

1363.   Specialist Joshua Ford was a citizen and national of the United States and a member of the United States Army when he was killed in Iraq on July 31, 2006.

1364.   On that date, Specialist Ford was driving a Bobtail truck which was vehicle No. 20 in a long convoy of 24 tractor trucks, fuel trucks, trailers, and HUMVEEs and vehicles along Alternate Supply Route ("ASR") Kiev, Zone 514, near the checkpoint outside of the entrance to the Numaniyah Iraqi Army Base near Hillah, when his truck was blown off course by an EFP detonation.

1365.   The Army's investigation into this EFP attack concluded that the penetrations in the truck Specialist Ford was then driving were consistent with and distinctive of an EFP array.

1366.   Specialist Ford died soon after the EFP attack due to blast and shrapnel-related injuries all over his person.

1367.   Plaintiff, Lonnie Ford, was at the time of Specialist Ford's death and still is a citizen of the United States and domiciled in the State of Nebraska. He is the Father of Joshua Ford.

1368.   Plaintiff, Linda Mattison-Ford, was at the time of Specialist Ford's death and still is a citizen of the United States and domiciled in the State of Nebraska. She is the step-Mother of Joshua Ford.

1369.   Plaintiff, Jessica Matson, was at the time of Specialist Ford's death and still is a citizen of the United States and a resident of the State of Nebraska. She is the Sister of Joshua Ford.

1370.   Plaintiff, Shawn Ford, was at the time of Specialist Ford's death and still is a citizen of the United States and resident of the State of Nebraska. She is the Sister of Joshua Ford.

1371.   Plaintiff, Lonnie Ford, brings an action individually and on behalf of the Estate of

Joshua Ford, as its Personal Representative in Thurston County, Nebraska under Case No.: 18-2.

1372. As a direct result of the EFP attack, and the resulting wrongful death of Joshua Ford, the Estate of Joshua Ford is entitled to recover for the pain and suffering experienced by Joshua Ford between the time of the EFP attack and his death, and for the substantial economic and earnings capacity loss.

1373. As a direct result of the EFP attack, and the resulting wrongful death of Joshua Ford, Plaintiffs, Lonnie Ford, Linda Mattison-Ford, Jessica Matson, and Shawn Ford, have experienced various solatium-related damages, including intentional infliction of severe emotional distress, severe mental anguish, extreme emotional pain and suffering, a loss of society, companionship, comfort, advice and counsel, and substantial economic loss.

## ATTACK 15: AUGUST 24, 2006 - BAGHDAD, IRAQ

### R. The Thorne Family

1374. Private First Class William Thorne was a citizen and national of the United States and a member of the United States Army when he was killed in Iraq on August 24, 2006.

1375. On August 24, 2006, Private Thorne was operating an M1114 HUMVEE armored vehicle in an area just south of Baghdad when an IED detonated nearby, thus killing Private Thorne.

1376. Plaintiff, Corey Schlenker, was at the time of Private Thorne's death and still is a citizen of the United States and a resident of the State of South Dakota. She is the Widow and Wife of William Thorne.

1377. Plaintiff, Karen Thorne, was at the time of Private Thorne's death and still is a citizen of the United States and a resident of the State of Iowa. She is the Mother of William Thorne.

1378. Plaintiff, Doyle Thorne, was at the time of Private Thorne's death and still is a

citizen of the United States and a resident of the State of Iowa. He is the Brother of William Thorne.

1379.   Plaintiff, Joey Robinson, was at the time of Private Thorne's death and still is a citizen of the United States and a resident of the State of Nebraska. She is the Sister of William Thorne.

1380.   Plaintiff, Corey Schlenker, brings an action individually and on behalf of the Estate of William Thorne, as its Personal Representative in Sioux County, Iowa under Probate No.: ESPR 019907.

1381.   As a direct result of the IED attack, and the resulting wrongful death of William Thorne, the Estate of William Thorne is entitled to recover for the pain and suffering experienced by William Thorne between the time of the IED attack and his death, and for the substantial economic and earnings capacity loss.

1382.   As a direct result of the IED attack, and the resulting wrongful death of William Thorne, Plaintiffs, Corey Schlenker, Karen Thorne, Doyle Thorne, and Joey Thorne, have experienced various solatium-related damages, including intentional infliction of severe emotional distress, severe mental anguish, extreme emotional pain and suffering, a loss of society, companionship, comfort, advice and counsel, and substantial economic loss.

## ATTACK 16: SEPTEMBER 3, 2006 - RUSTAMIYAH BAGHDAD, IRAQ

### S.      The Merrill Family

1383.   Sergeant Jason L. Merrill was a citizen and national of the United States and a member of the United States Army when he was killed in Iraq on September 3, 2006.

1384.   On September 3, 2006, Sergeant Merrill was operating an M1151 HUMVEE armored vehicle just outside of Baghdad southbound on Route Wildcat as part of a four-vehicle convoy, when a three-array EFP detonated nearby, thus killing Sergeant Merrill.

1385.   The United States Armed Forces' Explosive Ordinance Disposal ("EOD") unit

determined that Sergeant Merrill's lead M1151 was in fact hit with a three-array EFP.

1386.   Plaintiff, Timothy Merrill, was at the time of Sergeant Merrill's death and still is a citizen of the United States and a resident of the State of Arizona. He is the Father of Sergeant Jason L. Merrill.

1387.   Plaintiff, Wanda Sue Merrill, was at the time of Sergeant Merrill's death and still is a citizen of the United States and a resident of the State of Arizona. She is the Mother of Sergeant Jason L. Merrill.

1388.   Plaintiff, Alyssa Merrill, was at the time of Sergeant Merrill's death and still is a citizen of the United States and a resident of the State of Arizona. She is the Sister of Sergeant Jason L. Merrill.

1389.   Plaintiff, Amber Piraneo, was at the time of Sergeant Merrill's death and still is a citizen of the United States and a resident of the State of Arizona. She is the Sister of Sergeant Jason L. Merrill.

1390.   Plaintiff, Ashlea Lewis, was at the time of Sergeant Merrill's death and still is a citizen of the United States and a resident of the State of Arizona. She is the Sister of Sergeant Jason L. Merrill.

1391.   Plaintiff, Timothy Merrill, brings an action individually and on behalf of the Estate of Sergeant Jason L. Merrill, as its Personal Representative in Maricopa County, Arizona under Probate No. PB2018-002366.

1392.   As a direct result of the EFP attack, and the resulting wrongful death of Jason Merrill, the Estate of Jason Merrill is entitled to recover for the pain and suffering experienced by Jason Merrill between the time of the EFP attack and his death, and for the substantial economic and earnings capacity loss.

1393.   As a direct result of the EFP attack, and the resulting wrongful death of Sergeant Jason Merrill, Plaintiffs, Timothy Merrill, Wanda Sue Merrill, Alyssa Merrill, Amber Piraneo, and Ashlea Lewis, have experienced various solatium-related damages, including intentional infliction of severe emotional distress, severe mental anguish, extreme emotional pain and suffering, a loss of society, companionship, comfort, advice and counsel, and substantial economic loss.

## ATTACK 17: SEPTEMBER 7, 2006 - SADR CITY, IRAQ

### T.      The Botts Family

1394.   Sergeant John Botts was a citizen and national of the United States and a member of the United States Army Military Police when he was seriously injured in Iraq on September 7, 2006.  Botts is a resident of the State of Texas.

1395.   On that date, Sergeant Botts was acting as Team Leader/Truck Commander of a Military Police Company and riding in the front passenger seat of an unarmored M1114 HUMVEE vehicle in a patrol convoy just east of Sadr City, Iraq, when an EFP suddenly detonated next to the vehicle, causing him to experience a traumatic amputation of his left leg and additional very serious physical and emotional injuries as a result of the blast.

1396.   Botts' unit had been on "high alert" for the presence of insurgents from the Mahdi Army a/k/a Jaysh al-Mahdi in the region in and around Sadr City, and had been briefed on the placement of EFPs along roadways in this region by these insurgents.

1397.   Upon information and belief, the specific Special Group perpetrating this attack was Jaysh al-Mahdi.

1398.   Investigation of the blown-up HUMVEE vehicle revealed penetration patterns, circular in nature, which are signature findings of an EFP attack.

1399.   As a result of the EFP attack, John Botts lost almost his entire left leg, along with multiple other and additional physical and emotional injuries, including a major right tibia fracture,

a major soft tissue injury to his right calf, facial burns, shrapnel pieces lodged throughout his body, multiple debridement procedures, treatments for multiple infections and osteomyelitis, "phantom pain" in the area where his left leg should be, hepatitis C from bad transfusions, strength, traumatic brain injury ("TBI"), post-traumatic stress disorder ("PTSD"), anxiety, and depression.

1400.   As a result of the EFP attack, and the physical and emotional injuries he suffered as a direct result therefrom, John Botts has experienced severe physical and emotional pain and suffering in the past and will experience same into the indeterminable future; has incurred medical bills for medical and rehabilitation services rendered and will incur same into the indeterminable future; has incurred an overwhelming loss of income and earnings capacity and will experience same into the indeterminable future; has experienced permanent injuries to his person and psyche; and has experienced severe mental anguish, anxiety and depression and will experience same into the indeterminable future.

1401.   Plaintiff, Jennifer Botts, was at the time of John Botts' attack and still is a citizen of the United States and a resident of the State of Texas. She is the Wife of John Botts.

1402.   Plaintiff, Dara Botts, was at the time of John Botts' attack and still is a citizen of the United States and a resident of the State of Tennessee. She is the Mother of John Botts.

1403.   Plaintiff, John Stephen "Steve" Botts, was at the time of John Botts' attack and still is a citizen of the United States and a resident of the State of Tennessee. He is the Father of John Botts.

1404.   Plaintiff, Elizabeth Cunningham, was at the time of John Botts' attack and still is a citizen of the United States and a resident of the State of Tennessee. She is the Sister of John Botts.

1405.   As a result of the EFP attack, and the physical and emotional injuries suffered by John Botts as a direct result therefrom, Plaintiffs, Jennifer Botts, Dara Botts, John Stephen "Steve"

Botts, and Elizabeth Cunningham have suffered and experienced intentional infliction of severe emotional distress and loss of consortium-related damages.

## ATTACK 18: SEPTEMBER 12, 2006 - AL KIFL, IRAQ

U.      **The Perez Family**

1406.   Second Lieutenant Emily Perez was a citizen and national of the United States and was a member of the United States Army when she was killed in Iraq on September 9, 2006.

1407.   On that date, Second Lieutenant Perez was providing security as the lead vehicle in a 21-vehicle convoy near Al Kifl, Iraq, riding as the front passenger in an M1114 HUMVEE armored vehicle when an array of five EFPs detonated near the vehicle, causing a massive explosion, thus causing her death and serious physical injuries to another Soldier in the vehicle.

1408.   Plaintiff, Daniel Perez, was at the time of Emily Perez's death and still is a citizen of the United States and a resident of the State of Georgia. He is the Father of Emily J.T. Perez.

1409.   Plaintiff, Vicki Perez, was at the time of Emily Perez's death and still is a citizen of the United States and a resident of the State of Georgia. She is the Mother of Emily J.T. Perez.

1410.   Plaintiff, Kevyn Perez, was at the time of Emily Perez's death and still is a citizen of the United States and a resident of the State of Maryland. He is the Brother of Emily J.T. Perez.

1411.   Plaintiff, Daniel Perez, brings an action individually and on behalf of the Estate of 2LT Emily J.T. Perez, as its Personal Representative in Bell County, Texas under Case No.: 33577.

1412.   As a direct result of the EFP attack, and the resulting wrongful death of Emily Perez, the Estate of Emily Perez is entitled to recover for any pain and suffering experienced by Emily Perez between the time of the EFP attack and her death, and for the substantial economic and earnings capacity loss.

1413.   As a direct result of the EFP attack, and the resulting death of Emily Perez, Plaintiffs, Daniel Perez, Vicki Perez, and Kevyn Perez have experienced various solatium-related

damages, including intentional infliction of severe emotional distress, severe mental anguish, extreme emotional pain and suffering, a loss of society, companionship, comfort, advice and counsel, and substantial economic loss.

## ATTACK 19: OCTOBER 11, 2006 – SADR CITY BAGHDAD, IRAQ

### V.    The Beem Family

1414.   Staff Sergeant Brian Beem was a citizen and national of the United States and the Army Platoon Leader of the Stryker Vehicle Crew C11 as a member of the 1st Platoon, C Troop, 4th Squadron, 14th Cavalry, 172nd Stryker Brigade when he was wounded in Iraq on October 11, 2006. Beem is a resident of Colorado.

1415.   On that date at approximately 1:30 a.m., Staff Sergeant Beem was riding on the back-left hatch in a Stryker Reconnaissance Variant Vehicle when an EFP detonated near his vehicle, causing a massive explosion which, in turn, caused very serious personal injuries to Beem.

1416.   Investigation of the blown-up HUMVEE vehicle revealed penetration patterns, circular in nature, which are signature findings of an EFP attack.

1417.   As a result of the EFP attack, Staff Sergeant Beem lost almost his entire left leg, along with multiple other and additional physical and emotional injuries, including a major right tibia fracture, a major soft tissue injury to his right calf, facial burns, shrapnel pieces lodged throughout his body,  multiple debridement procedures, treatments for multiple infections and osteomyelitis, "phantom pain" in the area where his left leg should be, hepatitis C from bad transfusions, strength, traumatic brain injury ("TBI"), post-traumatic stress disorder ("PTSD"), anxiety, and depression.

1418.   As a result of the EFP attack, and the physical and emotional injuries he suffered as a direct result therefrom, Staff Sergeant Beem has experienced severe physical and emotional pain and suffering in the past and will experience same into the indeterminable future; has incurred

medical bills for medical and rehabilitation services rendered and will incur same into the indeterminable future; has incurred an overwhelming loss of income and earnings capacity and will experience same into the indeterminable future; has experienced permanent injuries to his person and psyche; and has experienced severe mental anguish, anxiety and depression and will experience same into the indeterminable future.

1419.   Plaintiff, Elizabeth Beem, was at the time of the attack and still is a citizen of the United States and resident of the State of Colorado. She is the Wife of Brian Beem.

1420.   Plaintiff, Diane Beem, was at the time of the attack and still is a citizen of the United States and resident of the State of New York. She is the Mother of Brian Beem.

1421.   Plaintiff, Joseph Beem, was at the time of the attack and still is a citizen of the United States and resident of the State of New York. He is the Father of Brian Beem.

1422.   Plaintiff, Cassandra Beem, was at the time of the attack and still is a citizen of the United States and resident of the State of Colorado. She is the Daughter of Brian Beem.

1423.   Plaintiff, Kaitlyn Beem, was at the time of the attack and still is a citizen of the United States and resident of the State of Colorado. She is the Daughter of Brian Beem.

1424.   Plaintiff, K.B., a Minor, represented by her legal guardian, Brian Beem, was at the time of the attack and still is a citizen of the United States and a resident of the State of Colorado. She is the Daughter of Brian Beem.

1425.   Plaintiff, Cynthia Colón, was at the time of the attack and still is a citizen of the United States and resident of the State of Tennessee. She is the Sister of Brian Beem.

1426.   Plaintiff, Joseph Beem, Jr., was at the time of the attack and still is a citizen of the United States and resident of the State of Virginia. He is the Brother of Brian Beem.

1427.   As a result of the EFP attack, and the physical and emotional injuries suffered by

Brian Beem as a direct result therefrom, Plaintiffs, Elizabeth Beem, Diane Beem, Joseph Beem, Cassandra Beem, Kaitlyn Beem, K.B., a Minor, Cynthia Colón and Joseph Beem, Jr. have suffered and experienced intentional infliction of severe emotional distress and loss of consortium-related damages.

### W.     The Sowinski Family

1428.   Sergeant Nicholas Sowinski was a citizen and national of the United States as well as a member of the Stryker Vehicle Crew C11 of the 1st Platoon, C Troop, 4th Squadron, 14th Cavalry, 172nd Stryker Brigade and a member of the United States Army when he was killed in Iraq on October 11, 2006.

1429.   On that date, Sergeant Sowinski was riding as a Gunner in a Stryker Reconnaissance Variant Vehicle when an EFP detonated near his vehicle, causing a massive explosion which, in turn, caused Sergeant Sowinski's death.

1430.   Plaintiff, Diane Traynor Sowinski, was at the time of Nicholas Sowinski's death and still is a citizen of the United States and a resident of the State of Arizona. She is the Mother of Nicholas Sowinski.

1431.   Plaintiff, Jared Sowinski, was at the time of Nicholas Sowinski's death and still is a citizen of the United States and a resident of the State of Arizona. He is the Brother of Nicholas Sowinski.

1432.   Plaintiff, Austin Sowinski, was at the time of Nicholas Sowinski's death and still is a citizen of the United States and a resident of the State of Arizona. He is the Brother of Nicholas Sowinski.

1433.   Plaintiff, Diane Traynor Sowinski, brings an action individually and on behalf of the Estate of Nicholas Sowinski, as its Personal Representative, in Superior Court of Arizona, Yavapai County, under No: P1300PB201800102.

1434.   As a direct result of the EFP attack, and the resulting wrongful death of Nicholas Sowinski, the Estate of Nicholas Sowinski is entitled to recover for any pain and suffering experienced by Nicholas Sowinski between the time of the EFP attack and his death, and for the substantial economic and earnings capacity loss.

1435.   As a direct result of the EFP attack, and the resulting wrongful death of Nicholas Sowinski, Plaintiffs, Diane Traynor Sowinski, Jared Sowinski, and Austin Sowinski have experienced various solatium-related damages, including intentional infliction of severe emotional distress, severe mental anguish, extreme emotional pain and suffering, loss of society, companionship, comfort, advice and counsel, and substantial economic loss.

## ATTACK 20: OCTOBER 16, 2006 - SAFWAN, IRAQ

### X.      The Byers Family

1436.   Senior Airman Brandon Byers was a citizen and national of the United States and a member of the United States Air Force under the 586th ESFS Army Command when he was wounded in Iraq on October 16, 2006. Senior Airman Byers is a resident of Texas.

1437.   On that date at approximately 1800 hours, Senior Airman Byers was the gunner in the fourth-in-line HUMVEE, heading for supplies in Kuwait from Camp Bucca, when an EFP detonated through the rear of his vehicle, causing a massive explosion which caused very serious personal injuries to Byers.

1438.   Investigation of the blown-up HUMVEE vehicle revealed penetration patterns, circular in nature, which are signature findings of an EFP attack.

1439.   As a result of the EFP attack, Senior Airman Byers sustained a severe wound to his

right hand, clipping an artery and blowing out the bone and tendons in his right hand, along with multiple other and additional physical and emotional injuries, including footdrop of the left leg leaving clusters of nerve damage; shrapnel lodged into his leg knee causing multiple debridement procedures, treatments for multiple infections, osteomyelitis, and two left total-knee replacements; traumatic brain injury ("TBI"), post-traumatic stress disorder ("PTSD"), anxiety, and depression.

1440.   After almost seven years of therapy and failed surgeries to repair his leg, Senior Airman Byers eventually had an above-the-knee amputation of the left leg performed in September of 2013.

1441.   Senior Airman Byers now suffers from "phantom pain" in the area where his left leg would otherwise be.

1442.   As a result of the EFP attack, and the physical and emotional injuries he suffered as a direct result therefrom, Senior Airman Byers has experienced severe physical and emotional pain and suffering in the past and will experience same into the indeterminable future; has incurred medical bills for medical and rehabilitation services rendered and will incur same into the indeterminable future; has incurred an overwhelming loss of income and earnings capacity and will experience same into the indeterminable future; has experienced permanent injuries to his person and psyche; and has experienced severe mental anguish, anxiety and depression and will experience same into the indeterminable future.

1443.  Plaintiff, Megan Byers, was at the time of Brandon Byers' attack and still is a citizen of the United States and a resident of the State of Arizona Texas. She is the Wife of Brandon Byers.

1444.   Plaintiff, C.B., a Minor, was at the time of Brandon Byers' attack and still is a citizen of the United States and a resident of the State of Arizona Texas. She is the daughter of

Brandon Byers.

1445.   As a result of the EFP attack, and the physical and emotional injuries suffered by Brandon Byers as a direct result therefrom, Plaintiffs, Megan Byers and C.B., a Minor, have suffered and experienced intentional infliction of severe emotional distress and loss of consortium-related damages.

## ATTACK 21: NOVEMBER 2, 2006 - BAGHDAD, IRAQ

### Y.     The Gage Family

1446.   Staff Sergeant Joseph Gage was a citizen and national of the United States and a member of the United States Army when he was killed in Iraq on November 2, 2006.

1447.   On that date, Staff Sergeant Gage was sitting in the right front passenger seat of an M1114 HUMVEE vehicle, the lead vehicle in a four-vehicle convoy traveling in the Ziyouna neighborhood of eastern Baghdad, when an EFP detonated near his vehicle, sending a six-inch round copper slug penetrating into the passenger side, thus killing all four vehicle occupants, including Gage.

1448.   Plaintiff, Samantha Gage, was at the time of Joseph Gage's death and still is a citizen of the United States and a resident of the State of Michigan. She is the Widow and Wife of Joseph Gage.

1449.   Plaintiff, M.G., a Minor, represented by his legal guardian, Samantha Gage, was at the time of Joseph Gage's death and still is a citizen of the United States and a resident of the State of Michigan. He is the Son of Joseph Gage.

1450.   Plaintiff, Randy Gage, was at the time of Joseph Gage's death and still is a citizen of the United States and a resident of the State of California. He is the Father of Joseph Gage.

1451.   Plaintiff, Tamara Gage, was at the time of Joseph Gage's death and still is a citizen of the United States and a resident of the State of California.  She is the Step-Mother of Joseph Gage.

1452.   Plaintiff, Julia Rosa, was at the time of Joseph Gage's death and still is a citizen of the United States and a resident of the State of California. She is the Sister of Joseph Gage.

1453.   Plaintiff, Samantha Gage, brings an action individually and on behalf of the Estate of Joseph Gage, as its Personal Representative Commonwealth of Kentucky Court of Justice, County of Christian, Kentucky under Case No.: 18-P-237.

1454.   As a direct result of the EFP attack, and the resulting wrongful death of Joseph Gage, the Estate of Joseph Gage is entitled to recover for any pain and suffering experienced by Joseph Gage between the time of the EFP attack and his death, and for the substantial economic and earnings capacity loss.

1455.   As a direct result of the EFP attack, and the resulting wrongful death of Joseph Gage, Plaintiffs, Samantha Gage, M.G., a Minor, Randy Gage, Tamara Gage and Julia Rosa have experienced various solatium-related damages, including intentional infliction of severe emotional distress, severe mental anguish, extreme emotional pain and suffering, loss of society, companionship, comfort, advice and counsel, and substantial economic loss.

### ATTACK 22: NOVEMBER 6, 2006 – BAGHDAD, IRAQ

**Z.     The White Family**

1456.   Sergeant Lucas T. White was a citizen and national of the United States and a member of the United States Army when he was killed in Iraq on November 6, 2006.

1457.   On that date, Sergeant White was riding as a passenger in a Stryker Fighting Vehicle traveling near the Ghazaliya neighborhood in the western outskirts of Baghdad, when an EFP detonated near his vehicle, causing Sergeant White's death.

1458.   Plaintiff, Jennifer White, was at the time of Lucas T. White's death and still is a citizen of the United States and a resident of the State of Idaho. She is the Widow and Wife of Sergeant White.

1459.   Plaintiff, Julia Brooks, was at the time of Lucas T. White's death and still is a citizen of the United States and a resident of the State of Montana.  She is the Mother of Sergeant Lucas T. White.

1460.   Plaintiff, Lyle Brooks, was at the time of Lucas T. White's death and still is a citizen of the United States and a resident of the State of Montana.  He is the Step-Father of Sergeant Lucas T. White.

1461.   Plaintiff, Marcus Ramos, was at the time of Lucas T. White's death and still is a citizen of the United States and a resident of the State of Montana.  He is the Brother of Sergeant Lucas T. White.

1462.   Plaintiff, Jennifer White, brings an action individually and on behalf of the Estate of Sergeant Lucas T. White, as its Personal Representative in the Superior Court of Washington, County of Grant, under No..: 18-4-00178-13.

1463.   As a direct result of the EFP attack, and the resulting wrongful death of Sergeant Lucas T. White, the Estate of Lucas White is entitled to recover for any pain and suffering experienced by Lucas T. White between the time of the EFP attack and his death, and for the substantial economic and earnings capacity loss.

1464.   As a direct result of the EFP attack, and the resulting wrongful death of Sergeant Lucas T. White, Plaintiffs, Jennifer White, Julia Brooks, Lyle Brooks, and Marcus Ramos have experienced various solatium-related damages, including intentional infliction of severe emotional distress, severe mental anguish, extreme emotional pain and suffering, loss of society,

companionship, comfort, advice and counsel, and substantial economic loss.

## ATTACK 23: NOVEMBER 13, 2006 - AL-WAHDA, IRAQ

### AA.    The Cope Family

1465.   Sergeant Joshua Cope was a citizen and national of the United States and a member of the United States Army when he was seriously injured in Iraq on November 13, 2006.  Cope is a resident of the State of Florida.

1466.   On that date, Sergeant Cope was the Team Dismount Leader riding in the back passenger seat of an M1151 HUMVEE armored vehicle, which was the lead vehicle in a five-vehicle convoy, in what was thought to be a normal presence patrol near the Al Wahda neighborhood of Baghdad, Iraq, when an array of EFPs detonated alongside the vehicle, causing a massive blast which killed two occupants and seriously injured two others, including Sergeant Cope.

1467.   As a result of the EFP attack, Sergeant Cope lost both of his legs above the knee, along with multiple other and additional physical and emotional injuries, including a major right-hand injury resulting in permanent paralysis and 80% loss of feeling in his dominant hand, permanent damage to his left thumb, "phantom pain" in the areas where both of his legs should be, extensive nerve damage resulting in nerve pain in his stump areas, chronic low back and neck pain, post-traumatic stress disorder ("PTSD"), flashbacks, nightmares, depression, anxiety, memory loss, and traumatic brain injury ("TBI").

1468.   As a result of the EFP attack, and the physical and emotional injuries he suffered as a direct result therefrom, Joshua Cope has experienced severe physical and emotional pain and suffering in the past and will experience same into the indeterminable future; has incurred medical bills for medical and rehabilitation services rendered and will incur same into the indeterminable future; has incurred an overwhelming loss of income and earnings capacity and will experience

same into the indeterminable future; has experienced permanent injuries to his person and psyche; and has experienced severe mental anguish, anxiety and depression and will experience same into the indeterminable future.

1469.   Plaintiff, Erica Cope, was at the time of Joshua Cope's attack and still is a citizen of the United States and a resident of the State of Florida. She is the former Wife of Joshua Cope, but was married to Joshua Cope at the time of the November 13, 2006, EFP attack.

1470.   Plaintiff, L.K.C., a Minor, represented by her Mother, Erica Cope, was at the time of Joshua Cope's attack and still is a citizen of the United States and a resident of the State of Florida.  She is the Daughter of Joshua Cope.

1471.   Plaintiff, Linda Cope, was at the time of Joshua Cope's attack and still is a citizen of the United States and a resident of the State of Florida. She is the Mother of Joshua Cope.

1472.   Plaintiff, Philip Cope, was at the time of Joshua Cope's attack and still is a citizen of the United States and a resident of the State of Florida. He is Father of Joshua Cope.

1473.   Plaintiff, Jacob Cope, was at the time of Joshua Cope's attack and still is a citizen of the United States and a resident of the State of Florida. He is the Brother of Joshua Cope.

1474.   Plaintiff, Jonathan Cope, was at the time of Joshua Cope's attack and still is a citizen of the United States and a resident of the State of Florida. He is the Brother of Joshua Cope.

1475.   As a result of the EFP attack, and the physical and emotional injuries suffered by Joshua Cope as a direct result therefrom, Plaintiffs, Erica Cope, L.K.C., a Minor, Linda Cope, Philip Cope, Jacob Cope, and Jonathan Cope have suffered and experienced intentional infliction of severe emotional distress and loss of consortium-related damages.

## ATTACK 24: NOVEMBER 25, 2006 - AL JUDIAH, IRAQ

**BB.     The Morris Family**

1476.   Sergeant Daniel Morris was a citizen and national of the United States and a member of the United States Army when he was killed in Iraq on November 25, 2006.

1477.   On that date, Sergeant Morris was riding on a routine patrol on Route Dover near Al Judiah, Iraq, Diyal Province, near the Khan Bani Sad Air Base, in an armored M1114 HUMVEE vehicle when an array of three EFPs detonated near the vehicle, causing a massive explosion, thus eventually causing the death of Morris and very serious injuries to two other Soldiers.  Morris died later the same day outside a medical treatment facility while awaiting medical care for his blast injuries.

1478.   The Army Weapons Intelligence Team and the Explosive Ordinance Disposal ("WIT/EOD") concluded that because of the copper residue that was evident around the points where the M1114 HUMVEE's armor was penetrated, this was an EFP attack.

1479.   Plaintiff, Glenn Morris, was at the time of Daniel Morris' death and still is a citizen of the United States and a resident of the State of Tennessee.  He is the Father of Daniel Morris.

1480.   Plaintiff, Amy Morris, was at the time of Daniel Morris' death and still is a citizen of the United States and a resident of the State of Tennessee.  She is the Mother of Daniel Morris.

1481.   Plaintiff, Adam Morris, was at the time of Daniel Morris' death and still is a citizen of the United States and a resident of the State of Tennessee.  He is the Brother of Daniel Morris.

1482.   Plaintiff, Cassidy Morris, was at the time of Daniel Morris' death and still is a citizen of the United States and a resident of the State of Tennessee. She is the Sister of Daniel Morris.

1483.   Plaintiff, Amy Morris, brings an action individually and on behalf of the Estate of Daniel Morris, as its Personal Representative in Anderson County, Tennessee under File No.: 18PB307.

1484.   As a direct result of the EFP attack, and the resulting wrongful death of Daniel Morris, the Estate of Daniel Morris is entitled to recover for any pain and suffering experienced by Daniel Morris between the time of the EFP attack and his death, and for the substantial economic and earnings capacity loss.

1485.   As a direct result of the EFP attack, and the resulting wrongful death of Daniel Morris, Plaintiffs, Glenn Morris, Amy Morris, Adam Morris, and Cassidy Morris have experienced various solatium-related damages, including intentional infliction of severe emotional distress, severe mental anguish, extreme emotional pain and suffering, loss of society, companionship, comfort, advice and counsel, and substantial economic loss.

### ATTACK 25: DECEMBER 25, 2006 – TOBJI, BAGHDAD, IRAQ

**CC.     The Nelson Family**

1486.   Private First Class Andrew Nelson was a citizen and national of the United States and a member of the United States Army when he was killed in Iraq on December 25, 2006.

1487.   On that date, Private First Class Nelson was performing a security patrol in the Tobji neighborhood of Baghdad and was riding in an RG-31 Nyala Mine Protected Vehicle when an array of at least four separate EFPs detonated near the vehicle, causing a massive explosion, thus causing the death of Nelson and one other Soldier.

1488.   The Army's Explosive Ordinance Disposal ("EOD") and Combined Explosive Exploitation Cell ("CEXC") concluded that the copper fragments found in Nelson's brain and in the RG-31 vehicle verified that this was an EFP attack.

1489.   Plaintiff, Kristie Pearson, was at the time of Andrew Nelson's death and still is a

citizen of the United States and a resident of the State of Minnesota.  She is the Widow and Wife of Andrew Nelson.  She brings an action individually and on behalf of the Estate of Andrew Nelson, as its Personal Representative in Clinton County, Michigan under File No.: 2018-30173-DE.

1490.  As a direct result of the EFP attack, and the resulting wrongful death of Andrew Nelson, the Estate of Andrew Nelson is entitled to recover for any pain and suffering experienced by Andrew Nelson between the time of the EFP attack and his death, and for the substantial economic and earnings capacity loss.

1491.  As a direct result of the EFP attack, and the resulting wrongful death of Andrew Nelson, Plaintiff, Kristie Pearson has experienced various solatium-related damages, including intentional infliction of severe emotional distress, severe mental anguish, extreme emotional pain and suffering, loss of society, companionship, comfort, advice and counsel, and substantial economic loss.

**DD.    The Preston Family**

1492.  Specialist Aaron Preston was a citizen and national of the United States and a member of the United States Army when he was killed in Iraq on December 25, 2006.

1493.  On that date, Specialist Preston was performing a security patrol in the Tobji neighborhood of Baghdad and was riding in an RG-31 Nyala Mine Protected Vehicle when an array of at least four separate EFPs detonated near the vehicle, causing a massive explosion, thus causing the death of Preston and one other Soldier.

1494.  The Army's Explosive Ordinance Disposal ("EOD") and Combined Explosive Exploitation Cell ("CEXC") concluded that the copper fragments found in one of the occupants' brain and in the RG-31 vehicle verified that this was an EFP attack.

1495.   Plaintiff, Mariah Coward, was at the time of Aaron Preston's death and still is a citizen of the United States and a resident of the State of Texas.  She is the Sister of Aaron Preston.

1496.   As a direct result of the EFP attack, and the resulting wrongful death of Aaron Preston, Plaintiff, Mariah Coward, has experienced various solatium-related damages, including intentional infliction of severe emotional distress, severe mental anguish, extreme emotional pain and suffering, loss of society, companionship, comfort, advice and counsel, and substantial economic loss.

## ATTACK 26: JANUARY 22, 2007 - BAGHDAD, IRAQ

### EE.    Derek Gagne

1497.   Specialist Derek Gagne was a citizen and national of the United States when he was seriously injured in Iraq on January 22, 2007.  Gagne is a resident of the State of Michigan.

1498.   On that date, Specialist Gagne was positioned as the gunner riding in an M1114 HUMVEE armored vehicle traveling from Baghdad Airport on Route Pluto to Forward Operating Base ("FOB") Rustamiyah, which was the third vehicle in a six-vehicle convoy, when a multiple array of EFPs detonated near the right side of the vehicle, killing two Soldiers and causing serious physical and emotional injuries to Gagne and another Soldier.

1499.   The Army's Explosive Ordinance Disposal ("EOD") verified that this was a multiple array EFP attack.

1500.   As a result of the EFP attack, Derek Gagne sustained a below-the-knee amputation of his right leg, lost toes on his left leg, lost his left eye, lost his hearing in his left ear, and various severe facial injuries.

1501.   As a result of the EFP attack, and the physical and emotional injuries he suffered as a direct result therefrom, Derek Gagne has experienced severe physical and emotional pain and suffering in the past and will experience same into the indeterminable future; has incurred medical

bills for medical and rehabilitation services rendered and will incur same into the indeterminable future; has incurred an overwhelming loss of income and earnings capacity and will experience same into the indeterminable future; has experienced permanent injuries to his person and psyche; and has experienced severe mental anguish, anxiety and depression and will experience same into the indeterminable future.

1502.   Plaintiff, Faye Mroczkowski, was at the time of Derek Gagne's attack and still is a citizen of the United States and a resident of the State of Michigan.  She is the Mother of Derek Gagne.

1503.   As a result of the EFP attack, and the physical and emotional injuries suffered by Derek Gagne as a direct result therefrom, Plaintiff, Faye Mroczkowski, suffered and experienced intentional infliction of severe emotional distress and loss of consortium-related damages.

**FF.   The Stout Family**

1504.   Specialist Brandon Stout was a citizen and national of the United States and a member of the United States Army when he was killed in Iraq on January 22, 2007.

1505.   On that date, Specialist Stout was riding in an M1114 HUMVEE armored vehicle traveling from Baghdad Airport on Route Pluto to Forward Operating Base ("FOB") Rustamiyah which was the third vehicle in a six-vehicle convoy when a multiple array of EFPs detonated near the right side of the vehicle, causing a massive explosion, thus killing Stout and another Soldier and causing serious physical and emotional injuries to two other Soldiers.

1506.   The Army's Explosive Ordinance Disposal ("EOD") verified that this was a multiple array EFP attack.

1507.   Plaintiff, Audrey Barber, was at the time of Brandon Stout's death and still is a citizen of the United States and a resident of the State of Michigan.  She is the Widow of Brandon

Stout. She brings an action individually and on behalf of the Estate of Brandon Stout, as its Personal Representative in Kent County, Michigan, under File No.: 18-204, 429-DE.

1508. Plaintiff, William Stout, was at the time of Brandon Stout's death and still is a citizen of the United States and a resident of the State of Georgia. He is the Father of Brandon Stout.

1509. Plaintiff, Tamara Stout, was at the time of Brandon Stout's death and still is a citizen of the United States and a resident of the State of Georgia. She is the Step-Mother of Brandon Stout.

1510. Plaintiff, Callie McGee, was at the time of Brandon Stout's death and still is a citizen of the United States and a resident of the State of Georgia. She is the Sister of Brandon Stout.

1511. Plaintiff, Stephanie Benefield, was at the time of Brandon Stout's death and still is a citizen of the United States and a resident of the State of Georgia. She is the Sister of Brandon Stout.

1512. As a direct result of the EFP attack, and the resulting wrongful death of Brandon Stout, the Estate of Brandon Stout is entitled to recover for any pain and suffering experienced by Brandon Stout between the time of the EFP attack and his death, and for the substantial economic and earnings capacity loss.

1513. As a direct result of the EFP attack, and the resulting wrongful death of Brandon Stout, Plaintiffs, Audrey Barber, William Stout, Tamara Stout, Callie McGee, Stephanie Benefield have experienced various solatium-related damages, including intentional infliction of severe emotional distress, severe mental anguish, extreme emotional pain and suffering, loss of society, companionship, comfort, advice and counsel, and substantial economic loss.

GG.    **The Wager Family**

1514.   Sergeant Michelle Wager was a citizen and national of the United States and was a member of the United States Army when she was seriously injured in Iraq on January 22, 2007. Wager is a citizen of the State of Michigan.

1515.   On that date, Sergeant Wager was riding as the right front-seat passenger in an M1114 HUMVEE armored vehicle traveling from Baghdad Airport on Route Pluto to Forward Operating Base ("FOB") Rustamiyah, which was the third vehicle in a six-vehicle convoy, when a multiple array of EFPs detonated near the right side of the vehicle, killing two Soldiers and causing serious physical and emotional injuries to Wager and another Soldier.

1516.   The Army's Explosive Ordinance Disposal ("EOD") verified that this was a multiple array EFP attack.

1517.   As a result of the EFP attack, Sergeant Wager sustained an above-the-knee amputation of her left leg, an open right femur fracture with tissue loss at the right hip, a right ankle injury, severe blood loss, "phantom pain" in the areas where her left leg should be, post-traumatic stress disorder ("PTSD"), traumatic brain injury ("TBI"), and infertility.

1518.   Plaintiff, Melinda Igo, was at the time of Michelle Wager's attack and still is a citizen of the United States and a resident of the State of Ohio. She is the Mother of Michelle Wager.

1519.   Plaintiff, Alicia Igo, was at the time of Michelle Wager's attack and still is a citizen of the United States and a resident of the State of Ohio. She is the Sister of Michelle Wager.

1520.   Plaintiff, Ashley Lewis, was at the time of Michelle Wager's attack and still is a citizen of the United States and a resident of the State of Ohio. She is the Sister of Michelle Wager.

1521.   Plaintiff, Devin Igo, was at the time of Michelle Wager's attack and still is a citizen

of the United States and a resident of the State of Ohio. He is the Brother of Michelle Wager.

1522.   As a result of the EFP attack, and the physical and emotional injuries she suffered as a direct result therefrom, Michelle Wager has experienced severe physical and emotional pain and suffering in the past and will experience same into the indeterminable future; has incurred medical bills for medical and rehabilitation services rendered and will incur same into the indeterminable future; has incurred an overwhelming loss of income and earnings capacity and will experience same into the indeterminable future; has experienced permanent injuries to her person and psyche; and has experienced severe mental anguish, anxiety and depression and will experience same into the indeterminable future.

1523.   As a result of the EFP attack, and the physical and emotional injuries suffered by Michelle Wager as a direct result therefrom, Plaintiffs, Melinda Igo, Alicia Igo, Ashley Lewis and Devin Igo have suffered and experienced intentional infliction of severe emotional distress and loss of consortium-related damages.

## ATTACK 27: FEBRUARY 7, 2007 - AL DULOIYA, IRAQ

### HH.   The Vendela Family

1524.   Staff Sergeant Travis Vendela was a citizen and national of the United States and a member of the United States Army when he was seriously injured in Iraq on February 7, 2007. Vendela is a resident of the State of Utah.

1525.   On that date, Staff Sergeant Vendela was acting as a Scout Sniper with his unit tasked with the responsibility of tracking down Special Groups insurgents known to be distributing, planting, and detonating IEDs in the area of his patrol, when an IED detonated near the vehicle, causing a massive explosion, thus causing very serious physical and emotional injuries to Staff Sergeant Vendela.

1526.   As a result of the IED attack, Staff Sergeant Vendela lost both of his legs due to

amputation, broke his neck at the C3-C5 levels and eventually had to undergo a cervical fusion at those levels, separated facets in his lower back, separated his sacroiliac joint and had to undergo an operative procedure to stabilize the area, fractured his right jawbone, fractured his left humerus (upper arm), experienced hemorrhagic shock, suffered a traumatic brain injury ("TBI"), underwent a fasciotomy procedure in his right forearm to save that arm, had multiple shrapnel fragments imbed throughout areas of his body, had a tracheostomy performed, experienced hypertrophic ossification, suffered post-traumatic stress disorder ("PTSD"), anxiety, sleep deprivation, and depression.

1527.   As a result of the IED attack, and the physical and emotional injuries he suffered as a direct result therefrom, Travis Vendela has experienced severe physical and emotional pain and suffering in the past and will experience same into the indeterminable future; has incurred medical bills for medical and rehabilitation services rendered and will incur same into the indeterminable future; has incurred an overwhelming loss of income and earnings capacity and will experience same into the indeterminable future; has experienced permanent injuries to his person and psyche; and has experienced severe mental anguish, anxiety and depression and will experience same into the indeterminable future.

1528.   Plaintiff, Marianne Vendela, was at the time of Travis Vendela's attack and still is a citizen of the United States and a resident of the State of Arizona. She is the Mother of Travis Vendela.

1529.   As a result of the EFP attack, and the physical and emotional injuries suffered by Travis Vendela as a direct result therefrom, Plaintiff, Marianne Vendela, has suffered and experienced intentional infliction of severe emotional distress and loss of consortium-related damages.

## ATTACK 28: FEBRUARY 27, 2007 - BAGHDAD, IRAQ

**II.     The Cadavero Family**

1530.   Sergeant Jonathan Cadavero was a citizen and national of the United States and a member of the United States Army when he was killed in Iraq on February 27, 2007.

1531.   On that date, Sergeant Cadavero was acting as a Medic with his unit near Yusufiya, southwest of Baghdad, riding in a vehicle when an EFP detonated nearby, thus causing a massive explosion which caused Sergeant Cadavero's death.

1532.   After the attack, the Special Group Kata'ib Hezbollah, released a video displaying the entire attack and took credit for it.

1533.   Plaintiff, Nadia Cadavero, was at the time of Jonathan Cadavero's death and still is a citizen of the United States and a resident of the State of New York. She is the Mother of Jonathan Cadavero.

1534.   Plaintiff, Michelle Dearing, was at the time of Jonathan Cadavero's death and still is a citizen of the United States and a resident of the State of Maryland.  She is the Widow of Jonathan Cadavero.

1535.   Plaintiff, David Cadavero, was at the time of Jonathan Cadavero's death and still is a citizen of the United States and a resident of the State of New Jersey.  He is the Father of Jonathan Cadavero.

1536.   Plaintiff, Kristia Markarian, was at the time of Jonathan Cadavero's death and still is a citizen of the United States and a resident of the State of New Jersey. She is the Sister of Jonathan Cadavero.

1537.   Plaintiff, Nadia Cadavero, brings an action individually and on behalf of the Estate of Jonathan Cadavero, as its Personal Representative in Orange County, New York under File No.: 2007-309/A.

1538.   As a direct result of the EFP attack, and the resulting wrongful death of Jonathan Cadavero, the Estate of Jonathan Cadavero is entitled to recover for any pain and suffering experienced by Jonathan Cadavero between the time of the EFP attack and his death, and for the substantial economic and earnings capacity loss.

1539.   As a direct result of the EFP attack, and the resulting wrongful death of Jonathan Cadavero, Plaintiffs, Nadia Cadavero, Michelle Dearing, David Cadavero, and Kristia Markarian have experienced various solatium-related damages, including intentional infliction of severe emotional distress, severe mental anguish, extreme emotional pain and suffering, loss of society, companionship, comfort, advice and counsel, and substantial economic loss.

### ATTACK 29: MARCH 2, 2007 – SAFWAN, IRAQ

**JJ.    The Young Family**

1540.   Specialist Christopher D. Young was a citizen and national of the United States and a member of the United States Army when he was killed in Iraq on March 2, 2007.

1541.   On that date, Specialist Christopher D. Young was riding in an M1114 HUMVEE vehicle traveling northwest-bound on Alternative Supply Route ("ASR") Sioux Falls near the Safwan Overpass near Safwan, Iraq, when an EFP detonation occurred, thus killing Specialist Young.

1542.   Plaintiff, Gina Wright, was at the time of Christopher D. Young's death and still is a citizen of the United States and a resident of the State of California. She is the Mother of Christopher D. Young.

1543.   As a direct result of the EFP attack, and the resulting wrongful death of Christopher

D. Young, Plaintiff, Gina Wright has experienced various solatium-related damages, including intentional infliction of severe emotional distress, severe mental anguish, extreme emotional pain and suffering, loss of society, companionship, comfort, advice and counsel, and substantial economic loss.

### ATTACK 30: MARCH 5, 2007 - BAQUBAH, IRAQ

**KK.  The Harris Family**

1544.   Sergeant Blake Harris was a citizen and national of the United States and a member of the United States Army when he was killed in Iraq on March 5, 2007.

1545.   On that date, Sergeant Harris was riding in an M1114 HUMVEE armored vehicle traveling in the city of Baqubah in the Diyala province when an IED detonated near his vehicle, causing a massive explosion which, in turn, caused Harris' and two other American Soldiers' deaths.

1546.   Plaintiff, Joanna Harris, was at the time of Blake Harris' death and still is a citizen of the United States and a resident of the State of Colorado. She is the Widow of Blake Harris.

1547.   Plaintiff, J.H., a Minor, represented by his legal guardian, Joanna Harris, was at the time of Blake Harris' death and still is a citizen of the United States and a resident of the State of Colorado. He is the Son of Blake Harris.

1548.   Plaintiff, Deborah Harris, was at the time of Blake Harris' death and still is a citizen of the United States and a resident of the State of Colorado. She is the Mother of Blake Harris.

1549.   Plaintiff, Joanna Harris brings an action individually and on behalf of the Estate of Blake Harris, as its Personal Representative in Bell County, Texas under Probate No. 27445.

1550.   As a direct result of the IED attack, and the resulting wrongful death of Blake Harris, the Estate of Blake Harris is entitled to recover for any pain and suffering experienced by

Blake Harris between the time of the IED attack and his death, and for the substantial economic and earnings capacity loss.

1551.   As a direct result of the IED attack, and the resulting wrongful death of Blake Harris, Plaintiffs, Joanna Harris, J.H., a Minor, and Deborah Harris, have experienced various solatium-related damages, including intentional infliction of severe emotional distress, severe mental anguish, extreme emotional pain and suffering, loss of society, companionship, comfort, advice and counsel, and substantial economic loss.

**LL.    The Mayo Family**

1552.   Private First Class Barry Mayo was a citizen and national of the United States and a member of the United States Army when he was killed in Iraq on March 5, 2007.

1553.   On that date, Private First Class Mayo was riding in an M1114 HUMVEE armored vehicle traveling in the city of Baqubah in the Diyala province when an IED, consisting of two 125mm high explosive shells, detonated near his vehicle and caused a massive explosion which killed Private First Class Mayo and two other American Soldiers.

1554.   Plaintiff, John Mayo, was at the time of Barry Mayo's death and still is a citizen of the United States and a resident of the State of Texas. He is the Father of Barry Mayo.

1555.   Plaintiff, Kimberly Yarbrough, was at the time of Barry Mayo's death and still is a citizen of the United States and a resident of the State of Texas. She is the Mother of Barry Mayo.

1556.   Plaintiff, Andy Mayo, is a citizen of the United States and a resident of the State of Texas.  He is the Brother of Barry Mayo.

1557.   Plaintiff, John Mayo, brings an action individually and on behalf of the Estate of Barry Mayo, as its Personal Representative in Bell County, Texas, under Case No.: 33575.

1558.    As a direct result of the EFP attack, and the resulting wrongful death of Barry

Mayo, the Estate of Barry Mayo is entitled to recover for any pain and suffering experienced by Barry Mayo between the time of the IED attack and his death, and for the substantial economic and earnings capacity loss.

1559.   As a direct result of the IED attack, and the resulting wrongful death of Barry Mayo, Plaintiffs, John Mayo, Kimberly Yarbrough, and Andy Mayo, have experienced various solatium-related damages, including intentional infliction of severe emotional distress, severe mental anguish, extreme emotional pain and suffering, loss of society, companionship, comfort, advice and counsel, and substantial economic loss.

**MM.   The Russell Family**

1560.   Specialist Ryan Russell was a citizen and national of the United States and a member of the United States Army when he was killed in Iraq on March 5, 2007.

1561.   On that date, Specialist Ryan was in an M1114 HUMVEE armored vehicle traveling in the city of Baqubah in the Diyala province when an IED detonated near his vehicle, causing a massive explosion which caused Specialist Ryan's and two other American Soldiers' deaths.

1562.   Plaintiff, Kathy Moore, was at the time of Ryan Russell's death and still is a citizen of the United States and a resident of the State of North Carolina. She is the Mother of Ryan Russell.

1563.   Plaintiff, Thomas Moore, Jr., was at the time of Ryan Russell's death and still is a citizen of the United States and a resident of the State of North Carolina. He is the Step-Father of Ryan Russell.

1564.   Plaintiff, Kathy Moore, brings an action individually and on behalf of the Estate of Ryan Russell, as its Personal Representative in Bell County, Texas, under File No.: 27037.

1565.   As a direct result of the IED attack, and the resulting wrongful death of Ryan Russell, the Estate of Ryan Russell is entitled to recover for any pain and suffering experienced by Ryan Russell between the time of the IED attack and his death, and for the substantial economic and earnings capacity loss.

1566.   As a direct result of the IED attack, and the resulting wrongful death of Ryan Russell, Plaintiffs, Kathy Moore and Thomas Moore, Jr., have experienced various solatium-related damages, including intentional infliction of severe emotional distress, severe mental anguish, extreme emotional pain and suffering, loss of society, companionship, comfort, advice and counsel, and substantial economic loss.

## ATTACK 31: MAY 8, 2007 - PASMAYA, IRAQ

### NN.   The Martinez Family

1567.   Private First Class Saul Martinez was a citizen and national of the United States and a member of the United States Army when he was seriously injured in Iraq on May 8, 2007. Martinez is a resident of the State of Montana.

1568.   On that date, Private First Class Martinez was acting as a Gunner in a convoy of four M1114 HUMVEE armored vehicles traveling near Pasmaya, Iraq, southeast of Baghdad, escorting Colonel Grigsby to a destination, when an array of EFPs detonated adjacent to his vehicle, causing a massive explosion and sending it airborne and rolling, thus killing three of the vehicle occupants and seriously injuring Martinez.

1569.   Upon information and belief, the specific Special Group perpetrating this attack was Jaysh al-Mahdi.

1570.   As a result of the EFP attack, Saul Martinez had an above-the-knee amputation of his right leg, a below-the-knee amputation of his left leg, a traumatic brain injury ("TBI") which results in regular fatigue and forgetfulness, a major hole or gap in his right gluteal (buttocks) area

from shrapnel, hypertrophic ossification, an IV infiltration on his right forearm, and post-traumatic stress disorder ("PTSD"), depression and anxiety.

1571.   As a result of the EFP attack, and the physical and emotional injuries he suffered as a direct result therefrom, Saul Martinez has experienced severe physical and emotional pain and suffering in the past and will experience same into the indeterminable future; has incurred medical bills for medical and rehabilitation services rendered and will incur same into the indeterminable future; has incurred an overwhelming loss of income and earnings capacity and will experience same into the indeterminable future; has experienced permanent injuries to his person and psyche; and has experienced severe mental anguish, anxiety and depression and will experience same into the indeterminable future.

1572.   Plaintiff, Sarah Martinez, was at the time of Saul Martinez's attack and still is a citizen of the United States and a resident of the State of Montana. She is the Wife of Saul Martinez.

1573.   As a result of the EFP attack, and the physical and emotional injuries suffered by Saul Martinez as a direct result therefrom, Plaintiff, Sarah Martinez, has suffered and experienced intentional infliction of severe emotional distress and loss of consortium-related damages.

**OO.    The Blake Stephens Estate**

1574.   Sergeant Blake Stephens was a citizen and national of the United States and a member of the United States Army when he was killed in Iraq on May 8, 2007.

1575.   On that date, Sergeant Stephens was acting as the Commander, and sitting in the front passenger seat, of the lead vehicle in a convoy of four M1114 HUMVEE armored vehicles traveling near Pasmaya, Iraq, southeast of Baghdad escorting Colonel Grigsby to a destination when an array of EFPs detonated adjacent to his vehicle, causing a massive explosion and sending

it airborne and rolling, thus killing three of the vehicle occupants, including Sergeant Stephens, and seriously injuring another.

1576.   Upon information and belief, the specific Special Group perpetrating this attack was Jaysh al-Mahdi.

1577.   Plaintiff, Erin Dructor, was at the time of Blake Stephens' death and still is a citizen of the United States and a resident of the State of California. She is the Widow of Blake Stephens.

1578.   Plaintiff, Erin Dructor, brings an action individually and on behalf of the Estate of Blake Stephens, as its Personal Representative in Bannock County, Idaho, under Case No.: CV-2018-967-IE.

1579.   As a direct result of the EFP attack, and the resulting wrongful death of Blake Stephens, the Estate of Blake Stephens is entitled to recover for any pain and suffering experienced by Blake Stephens between the time of the EFP attack and his death, and for the substantial economic and earnings capacity loss.

1580.   As a direct result of the EFP attack, and the resulting wrongful death of Blake Stephens, Plaintiff, Erin Dructor has experienced various solatium-related damages, including intentional infliction of severe emotional distress, severe mental anguish, extreme emotional pain and suffering, loss of society, companionship, comfort, advice and counsel, and substantial economic loss.

## ATTACK 32: MAY 14, 2007 – AMIL DISTRICT, BAGHDAD, IRAQ

### PP.    The Altman Family

1581.   Specialist Jake Altman was a citizen and national of the United States and a member of the United States Army when he was seriously injured in Iraq on May 14, 2007.  Altman is a resident of the State of North Carolina.

1582.   On that date, Specialist Altman was inside of a one-man reconnaissance vehicle, an

M1151 armored HUMVEE vehicle traveling in the Amil District of Baghdad from Forward Operating Base ("FOB") Falcon to FOB Liberty on Route Vernon, when an EFP detonated right next to the vehicle, causing a massive explosion which, in turn, caused very serious personal injuries to Altman.

1583.   As a result of the EFP attack, Jake Altman lost his right hand and forearm up to his elbow, had shrapnel fragments explode into various parts and areas of his body, most notably in his entire left leg, had to have operative procedures on both knees to remove shrapnel fragments, had to undergo a fasciotomy procedure in his left leg to save that leg from an amputation, fractured his left pointer finger, fractured the bottom of his left femur bone, fractured his left toe, and was diagnosed with post-traumatic stress disorder ("PTSD").

1584.   As a result of the EFP attack, and the physical and emotional injuries he suffered as a direct result therefrom, Jake Altman has experienced severe physical and emotional pain and suffering in the past and will experience same into the indeterminable future; has incurred medical bills for medical and rehabilitation services rendered and will incur same into the indeterminable future; has incurred an overwhelming loss of income and earnings capacity and will experience same into the indeterminable future; has experienced permanent injuries to his person and psyche; and has experienced severe mental anguish, anxiety and depression and will experience same into the indeterminable future.

1585.   Plaintiff, Nadja Altman, was at the time of Jake Altman's attack and still is a citizen of the United States and a resident of the State of North Carolina. She is the Wife of Jake Altman.

1586.   Plaintiff, J.A., a Minor, represented by his legal guardian, Nadja Altman, was at the time of Jake Altman's attack and still is a citizen of the United States and a resident of the State of North Carolina. He is the Son of Jake Altman.

1587.   Plaintiff, Gloria Prosser, was at the time of Jake Altman's attack and still is a citizen of the United States and a resident of the State of North Carolina. She is the Mother of Jake Altman.

1588.   Plaintiff, Charles Altman, was at the time of Jake Altman's attack and still is a citizen of the United States and a resident of the State of North Carolina. He is the Brother of Jake Altman.

1589.   Plaintiff, Michael Altman, was at the time of Jake Altman's attack and still is a citizen of the United States and a resident of the State of Colorado. He is the Brother of Jake Altman.

1590.   As a result of the EFP attack, and the physical and emotional injuries suffered by Jake Altman as a direct result therefrom, Plaintiffs, Nadja Altman, J.A., a Minor, Gloria Prosser, Charles Altman and Michael Altman have suffered and experienced intentional infliction of severe emotional distress and loss of consortium-related damages.

### ATTACK 33: MAY 18, 2007 - BAGHDAD, IRAQ

**QQ.   The Brown Family**

1591.   Sergeant First Class Scott Brown was a citizen and national of the United States and a member of the United States Army when he was killed in Iraq on May 18, 2007.

1592.   On that date, Sergeant First Class Brown was on a patrol riding in an M1151 HUMVEE vehicle on Bravo Road heading towards Forward Operating Base ("FOB") Liberty in or very near to the Al-Hurriya neighborhood of western Baghdad when an IED detonated just adjacent to and underneath the vehicle in which he was riding, thus causing Sergeant First Class Brown's death.

1593.    Plaintiff, Taylor Brown, was at the time of Scott Brown's death and still is a citizen of the United States and a resident of the State of Wisconsin. He is the Son of Scott Brown.

1594.   Plaintiff, Taylor Brown, brings an action individually and on behalf of the Estate

of Sergeant First Class Scott Brown, as its Personal Representative in Waukesha County, Wisconsin, under Case No.: 16 PR 658.

1595.   As a direct result of the EFP attack, and the resulting wrongful death of Sergeant First Class Scott Brown, the proper parties Plaintiff in the Wrongful Death action can and should recover for any pain and suffering experienced by Sergeant First Class Scott Brown between the time of the EFP attack and his death, and for the substantial economic loss caused by his death.

1596.   As a direct result of the EFP attack, and the resulting wrongful death of Sergeant First Class Scott Brown, Plaintiff, Taylor Brown has experienced various solatium-related damages, including intentional infliction of severe emotional distress, severe mental anguish, extreme emotional pain and suffering, loss of society, companionship, comfort, advice and counsel, and substantial economic loss.

## ATTACK 34: MAY 18, 2007 – NASIRIYAH, IRAQ

### RR.   The Dahlman Family

1597.   Private First Class Louis Dahlman was a citizen and national of the United States and a member of the United States Army when he was seriously injured in Iraq on May 19, 2007. He is a resident of the State of Texas.

1598.   On that date, Private First Class Dahlman was serving as the "Gunner" riding in a lead M1114 HUMVEE armored vehicle providing armed escort for a convoy heading north from Tallil Air Force Base to Camp Scania in Southern Iraq.

1599.   As the lead HUMVEE approached an overpass, an EFP detonated, creating an overwhelming explosion and causing fire and a huge copper slug to rip through it, thus destroying the vehicle and causing the violent death of two occupants and serious physical and emotional injuries to the other two, including Private First Class Dahlman.

1600.   The Army later confirmed the presence of EFPs at the accident site when it picked up the destroyed HUMVEE.

1601.   As a result of the EFP attack, Louis Dahlman had most of his jaw, mouth and teeth blown off his person, lost much facial skin, had shrapnel blow into most parts of his face, upper torso and extremities, suffered a traumatic brain injury ("TBI") and concussion, fractured his clavicle ("collarbone") three separate times in securing necessary treatment, underwent operative procedures to correct the clavicle fractures, lost much of his two fibula bones in both of his legs in procedures to graft bone onto his jaw area, and has experienced over 12 surgeries to attempt to fix his jaw area, mouth and teeth.

1602.   As a result of the EFP attack, and the physical and emotional injuries he suffered as a direct result therefrom, Louis Dahlman has experienced severe physical and emotional pain and suffering in the past and will experience same into the indeterminable future; has incurred medical bills for medical and rehabilitation services rendered and will incur same into the indeterminable future; has incurred an overwhelming loss of income and earnings capacity and will experience same into the indeterminable future; has experienced permanent injuries to his person and psyche; and has experienced severe mental anguish, anxiety and depression and will experience same into the indeterminable future.

1603.   Plaintiff, Kay Stockdale, was at the time of Louis Dahlman's attack and still is a citizen of the United States and a resident of the State of Iowa. She is the Mother of Louis Dahlman.

1604.   Plaintiff, Lucas Dahlman, was at the time of Louis Dahlman's attack and still is a citizen of the United States and a resident of the State of Iowa. He is the Brother of Louis Dahlman.

1605.   Plaintiff, Amber Ahrens, was at the time of Louis Dahlman's attack and still is a citizen of the United States and a resident of the State of Iowa. She is the Sister of Louis Dahlman.

1606.   As a result of the EFP attack, and the physical and emotional injuries suffered by Louis Dahlman as a direct result therefrom, Plaintiffs, Kay Stockdale, Lucas Dahlman and Amber Ahrens have suffered and experienced intentional infliction of severe emotional distress and loss of consortium-related damages.

**SS.    The Schumann Family**

1607.   Sergeant Jason Schumann was a citizen and national of the United States and a member of the United States Army when he was killed in Iraq on May 18, 2007.

1608.   On that date, Sergeant Schumann was riding in a lead M1114 HUMVEE armored vehicle providing armed escort for a convoy heading north from Tallil Air Force Base to Camp Scania in Southern Iraq.

1609.   As the lead HUMVEE approached an overpass, an EFP detonated, creating an overwhelming explosion and causing fire and a huge copper slug to rip through it, thus destroying the vehicle and causing the violent death of two Soldiers, including Schumann, and serious physical and emotional injuries to two other Soldiers.

1610.   The Army later confirmed the presence of EFPs at the accident site when it picked up the destroyed HUMVEE.

1611.    Plaintiff, James Schuman, was at the time of Jason Schumann's attack and still is a citizen of the United States and a resident of the State of Minnesota.  He is the Father of Jason Schumann.

1612.   Plaintiff, Ben Schumann, was at the time of Jason Schumann's attack and still is a citizen of the United States and a resident of the State of Minnesota.  He is the Brother of Jason Schumann.

1613.   Plaintiff, Brent Anderson, was at the time of Jason Schumann's attack and still is a

citizen of the United States and a resident of the State of Minnesota.  He is the Step-Brother of Jason Schumann.

1614.   Plaintiff, Kristie Nelson, was at the time of Jason Schumann's attack and still is a citizen of the United States and a resident of the State of Minnesota.  She is the Step-Sister of Jason Schumann.

1615.   Plaintiff, Kayla Nelson, was at the time of Jason Schumann's attack and still is a citizen of the United States and a resident of the State of Minnesota.  She is the Step-Sister of Jason Schumann.

1616.   Plaintiff, James Schumann, brings an action individually and on behalf of the Estate of Jason Schumann, as its Personal Representative in Clay County, Minnesota, under Court File No.: 14-PR-4627.

1617.   As a direct result of the EFP attack, and the resulting wrongful death of Jason Schumann, the Estate of Jason Schumann is entitled to recover for any pain and suffering experienced by Jason Schumann between the time of the EFP attack and his death, and for the substantial economic and earnings capacity loss.

1618.   As a direct result of the EFP attack, and the resulting wrongful death of Jason Schumann, Plaintiffs, James Schumann, Ben Schumann, Brent Anderson, Kristie Nelson and Kayla Nelson have experienced various solatium-related damages, including intentional infliction of severe emotional distress, severe mental anguish, extreme emotional pain and suffering, loss of society, companionship, comfort, advice and counsel, and substantial economic loss.

## ATTACK 35: MAY 29, 2007 – SADR CITY, IRAQ

### TT.    The Hancock Family

1619.   Specialist Jerral Steele Hancock was a citizen and national of the United States and a member of the United States Army when he was wounded in Iraq on May 29, 2007. He is a

316

resident of the State of California.

1620.   On that date, which was also Specialist Hancock's 21st birthday and Memorial Day, he was on a classified mission driving as part of a four-vehicle convoy in Sadr City. Specialist Hancock was driving the lead vehicle, a 70-ton M-1 Abrams Main Battle Tank, through Sadr City, Iraq, when an EFP exploded near his vehicle.

1621.   As a result of the attack, Specialist Hancock has lost his left arm and is paralyzed from the chest down.

1622.   Plaintiff, Rachel Lambright, was at the time of the attack and still is a citizen of the United States and domiciled in Oregon. She was the Wife of Jerral Hancock at the time of his EFP attack.

1623.   Plaintiff, J.H., a Minor, represented by his legal guardian, Stacie Tscherny, was at the time of the attack and still is a citizen of the United States and domiciled in the State of California. He is the Son of Jerral Hancock.

1624.   Plaintiff, A.H., a Minor, represented by her legal guardian, Stacie Tscherny, was at the time of the attack and still is a citizen of the United States and domiciled in the State of California. She is the Daughter of Jerral Hancock.

1625.   Plaintiff, Stacie Tscherny, was at the time of the attack and still is a citizen of the United States and domiciled in California. She is the Mother of Jerral Hancock.

1626.   Plaintiff, Dirrick Benjamin, was at the time of the attack and still is a citizen of the United States and domiciled in California. He is the Step-Father of Jerral Hancock.

1627.   Plaintiff, Savannah Tscherny, was at the time of the attack and still is a citizen of the United States and domiciled in California. She is the Sister of Jerral Hancock.

1628.   Plaintiff, Samantha Hancock, was at the time of the attack and still is a citizen of

the United States and domiciled in California. She is the Sister of Jerral Hancock.

1629.   As a result of the EFP attack, and the physical and emotional injuries he suffered as a direct result therefrom, Jerral Hancock has experienced severe physical and emotional pain and suffering in the past and will experience same into the indeterminable future; has incurred medical bills for medical and rehabilitation services rendered and will incur same into the indeterminable future; has incurred an overwhelming loss of income and earnings capacity and will experience same into the indeterminable future; has experienced permanent injuries to his person and psyche; and has experienced severe mental anguish, anxiety and depression and will experience same into the indeterminable future.

1630.   As a result of the EFP attack, and the physical and emotional injuries suffered by Jerral Hancock as a direct result therefrom, Plaintiffs, Rachel Lambright, J.H., a Minor, A.H., a Minor, Stacie Tscherny, Dirrick Benjamin, Savannah Tscherny, and Samantha Hancock, have suffered and experienced intentional infliction of severe emotional distress and loss of consortium-related damages.

## ATTACK 36: JUNE 6, 2007 – BAGHDAD, IRAQ

### UU.   The Gajdos Family

1631.   Specialist Shawn Gajdos was a citizen and national of the United States and a member of the United States Army when he was killed in Iraq on June 6, 2007.

1632.   On that date, Specialist Gajdos was riding in a M1151 HUMVEE armored vehicle traveling at or near the intersection of Mohammed Al-Qasim Expressway and Omar Bin Al Khatab Street in the Baghdad Al-Jahida area of Baghdad when a multiple array EFP detonated next to the vehicle, thus destroying it and killing Specialist Gajdos.

1633.   Plaintiff, Brenda Richards, is a citizen of the United States and a resident of the State of Michigan.  She is the Mother of Shawn Gajdos.

1634.   Plaintiff, Brenda Richards, brings an action individually and on behalf of the Estate of Shawn Gajdos, as its Personal Representative in Clay County, Minnesota, under Court File No.: 14-PR-4627.

1635.   As a direct result of the EFP attack, and the resulting wrongful death of Shawn Gajdos, the Estate of Shawn Gajdos is entitled to recover for any pain and suffering experienced by Shawn Gajdos between the time of the EFP attack and his death, and for the substantial economic and earnings capacity loss.

1636.   As a direct result of the EFP attack, and the resulting wrongful death of Shawn Gajdos, Plaintiff, Brenda Richards, has experienced various solatium-related damages, including intentional infliction of severe emotional distress, severe mental anguish, extreme emotional pain and suffering, loss of society, companionship, comfort, advice and counsel, and substantial economic loss.

## ATTACK 37: JUNE 11, 2007 – SADR CITY, BAGHDAD, IRAQ

### VV.    The Payne Family

1637.   Private First Class Cameron Payne was a citizen and national of the United States and a member of the United States Army when he was killed in Iraq on June 11, 2007.

1638.   On that date, Private First Class Payne was the "gunner" in the second vehicle of a four-vehicle convoy traveling from Forward Operating Base ("FOB") Rustamiyah to the Ranger Joint Security Station ("JSS") near the Sadr City neighborhood of Baghdad when his M1151 vehicle was struck by an EFP, thus causing Private First Class Payne's death.

1639.   Plaintiff, Julie Payne, is a citizen of the United States and a resident of the State of California.  She is the Widow and Wife of Private First Class Cameron Payne.

1640.   Plaintiff, A.L.P., a Minor, represented by her Mother, Julie Payne, was at the time

of Cameron Payne's attack and still is a citizen of the United States and a resident of the State of California. She is the Daughter of Cameron Payne.

1641. Plaintiff, K.P., a Minor, represented by her Mother, Julie Payne, was at the time of Cameron Payne's attack and still is a citizen of the United States and a resident of the State of California. She is the Daughter of Cameron Payne.

1642. Plaintiff, Julie Payne, brings an action individually and on behalf of the Estate of Cameron Payne, as its Personal Representative in Riverside County, California under Case No.: 1803227.

1643. As a direct result of the EFP attack, and the resulting wrongful death of Cameron Payne, the Estate of Cameron Payne is entitled to recover for any pain and suffering experienced by Cameron Payne between the time of the EFP attack and his death, and for the substantial economic and earnings capacity loss.

1644. As a direct result of the EFP attack, and the resulting wrongful death of Cameron Payne, Plaintiffs, Julie Payne, A.L.P., a Minor, and K.P., a Minor, have experienced various solatium-related damages, including intentional infliction of severe emotional distress, severe mental anguish, extreme emotional pain and suffering, loss of society, companionship, comfort, advice and counsel, and substantial economic loss.

## ATTACK 38: JUNE 19, 2007 – MUHAMMAD SALIH, IRAQ

### WW. The Modgling Family

1645. Private First Class Joshua Modgling was a citizen and national of the United States and a member of the United States Army when he was killed in Iraq on June 19, 2007.

1646. On that date, Private First Class Modgling was acting as a Combat Engineer on a mounted patrol driving a Bradley Fighting Vehicle near Muhammad Salih, Iraq, when an IED detonated close by, thus causing a massive explosion which, in turn, caused blast injuries to

Modgling's head, torso, and extremities, thus causing his death along with the death of a Soldier riding with him.

1647.   Plaintiff, Julie Montano, was at the time of the attack and still is a citizen of the United States and a resident of the State of Nevada. She is the Mother of Joshua Modgling.

1648.   Plaintiff, Keith Modgling, was at the time of the attack and still is a citizen of the United States and a resident of the State of Nevada. He is the Father of Joshua Modgling.

1649.   Plaintiff, Christopher Modgling, was at the time of the attack and still is a citizen of the United States and resident of the State of Nevada. He is the Brother of Joshua Modgling.

1650.   Plaintiff, Kellilynn Stuart, was at the time of the attack and still is a citizen of the United States and a resident of the State of Colorado. She is the Step-Sister of Joshua Modgling.

1651.   Plaintiff, Michelle Modgling, was at the time of the attack and still is a citizen of the United States and a resident of the State of Nevada. She is the Sister of Joshua Modgling.

1652.   Plaintiff, Kenneth Schaffer, was at the time of the attack and still is a citizen of the United States and a resident of the State of Nevada. He is the Step-Brother of Joshua Modgling.

1653.   Plaintiff, Julie Montano, brings an action individually and on behalf of the Estate of Joshua Modgling, as its Personal Representative in Nye County, Nevada under Case No.: PR8367.

1654.   As a direct result of the IED attack, and the resulting wrongful death of Joshua Modgling, the Estate of Joshua Modgling is entitled to recover for any pain and suffering experienced by Joshua Modgling between the time of the IED attack and his death, and for the substantial economic and earnings capacity loss.

1655.   As a direct result of the IED attack, and the resulting wrongful death of Joshua Modgling, Plaintiffs, Julie Montano, Keith Modgling, Christopher Modgling, Kellilynn Stuart,

Michelle Modgling, and Kenneth Schaffer have experienced various solatium-related damages, including intentional infliction of severe emotional distress, severe mental anguish, extreme emotional pain and suffering, loss of society, companionship, comfort, advice and counsel, and substantial economic loss.

## XX.   The Zapfe Family

1656.   Sergeant First Class William Zapfe was a citizen and national of the United States and a member of the United States Army when he was killed in Iraq on June 19, 2007.

1657.   On that date, Sergeant First Class Zapfe was on a mounted patrol riding in a Bradley Fighting Vehicle near Muhammad Salih, Iraq, when an IED detonated close by, thus causing a massive explosion which, in turn, caused Sergeant First Class Zapfe's death, along with the death of a Soldier riding with him.

1658.   Plaintiff, Conietha Zapfe, was at the time of the attack and still is a citizen of the United States and resident of the State of Kentucky. She is the Widow and Wife of William Zapfe.

1659.   Plaintiff, C.Z., a Minor, represented by his legal guardian, Conietha Zapfe, was at the time of William Zapfe's death and still is a citizen of the United States and is a resident of the State of Kentucky. He is the Son of William Zapfe.

1660.   Plaintiff, S.Z., a Minor, represented by his legal guardian, Conietha Zapfe, was at the time of William Zapfe's death and still is a citizen of the United States and is a resident of the State of Kentucky. He is the Son of William Zapfe.

1661.   Plaintiff, A.Z., a Minor, represented by her legal guardian, Conietha Zapfe, was at the time of William Zapfe's death and still is a citizen of the United States and is a resident of the State of Kentucky. She is the Daughter of William Zapfe.

1662.   Plaintiff, Joseph Zapfe, is a citizen of the United States and resident of the State of

Idaho. He is the Brother of William Zapfe.

1663.   Plaintiff, Edward Zapfe, is a citizen of the United States and a resident of the State of Idaho. He is the Brother of William Zapfe.

1664.   As a direct result of the IED attack, and the resulting wrongful death of William Zapfe, Plaintiffs, Conietha Zapfe, C.Z., a Minor, S.Z., a Minor, A.Z., a Minor, Joseph Zapfe, and Edward Zapfe have experienced various solatium-related damages, including intentional infliction of severe emotional distress, severe mental anguish, extreme emotional pain and suffering, loss of society, companionship, comfort, advice and counsel, and substantial economic loss.

## ATTACK 39: JUNE 29, 2007 - BAGHDAD, IRAQ

### YY.    The Adair Family

1665.   Specialist James Adair was a citizen and national of the United States and a member of the United States Army when he was killed in Iraq on June 29, 2007.

1666.   On that date, Specialist Adair was on a patrol while riding in an armored M1151 HUMVEE vehicle traveling just outside of Baghdad International Airport when an array of four EFPs detonated on the driver's side of the vehicle, causing a massive, fiery explosion and four large slugs to penetrate the driver's door and left passenger door, thus killing Adair and seriously injuring the other three occupants.

1667.   Plaintiff, Chelsea Adair, was at the time of the attack and still is a citizen of the United States and a resident of the State of Texas. She is the Widow and Wife of James Adair.

1668.   Plaintiff, Chelsea Adair, brings an action individually and on behalf of the Estate of James Adair, as its Personal Representative in Panola County, Texas under No.: 10711.

1669.   As a direct result of the EFP attack, and the resulting wrongful death of James Adair, the Estate of James Adair is entitled to recover for any pain and suffering experienced by James Adair between the time of the EFP attack and his death, and for the substantial economic

loss caused by his death.

1670.   As a direct result of the EFP attack, and the resulting wrongful death of James Adair, Plaintiff, Chelsea Adair, has experienced various solatium-related damages, including intentional infliction of severe emotional distress, severe mental anguish, extreme emotional pain and suffering, loss of society, companionship, comfort, advice and counsel, consortium, and substantial economic loss.

### ZZ.   The Takai Family

1671.   Corporal John Takai was a citizen and national of the United States and a member of the United States Army when he was seriously injured in Iraq on June 29, 2007.  Takai is a resident of the State of Texas.

1672.   On that date, Corporal Takai was on a patrol while riding in an armored M1151 HUMVEE vehicle just outside of Baghdad International Airport when an array of four EFPs detonated on the driver's side of the vehicle, causing a massive, fiery explosion and four large slugs to penetrate the driver's door and left passenger door, thus seriously injuring three occupants, including Takai, and killing the fourth.

1673.   As a result of the EFP attack, John Takai sustained very serious left arm and shoulder injuries, along with a left arm degloving injury, all of which required several major surgeries, a very serious traumatic brain injury ("TBI"), a major concussion, regular headaches, a fractured left humerus bone, hypertrophic ossification, third degree burns with resulting necessary grafting procedures, a left shoulder dislocation, had shrapnel blown into his left thigh which caused a gaping wound hole to exist and cause major femoral artery damage, tore many left leg muscles up and down the length of the left leg, fractured the outer bone in his left foot, and was diagnosed with post-traumatic stress disorder ("PTSD"), depression, fatigue, and flashbacks and nightmares

reliving the incident.

1674.   As a result of the EFP attack, and the physical and emotional injuries he suffered as a direct result therefrom, John Takai has experienced severe physical and emotional pain and suffering in the past and will experience same into the indeterminable future; has incurred medical bills for medical and rehabilitation services rendered and will incur same into the indeterminable future; has incurred an overwhelming loss of income and earnings capacity and will experience same into the indeterminable future; has experienced permanent injuries to his person and psyche; and has experienced severe mental anguish, anxiety and depression and will experience same into the indeterminable future.

1675.   Plaintiff, Mae Takai, was at the time of the attack and still is a citizen of the United States and a resident of the State of Texas. She is the Wife of John Takai.

1676.   Plaintiff, Jonamae Takai, was at the time of the attack and still is a citizen of the United States and a resident of the State of Texas. She is the Daughter of John Takai.

1677.   Plaintiff, Niana Takai, was at the time of the attack and still is a citizen of the United States and a resident of the State of Texas. She is the Daughter of John Takai.

1678.   Plaintiff, I.T., a Minor, represented by her legal guardian, Mae Takai, was at the time of the attack and still is a citizen of the United States and domiciled in the State of Texas. She is the Daughter of John Takai.

1679.   Plaintiff, K.T., a Minor, represented by her legal guardian, Mae Takai, was at the time of the attack and still is a citizen of the United States and a resident of the State of Texas. She is the Daughter of John Takai.

1680.   Plaintiff, Patricia Cruz, was at the time of the attack and still is a citizen of the United States and domiciled in the State of Texas. She is the Mother of John Takai.

1681.   Plaintiff, Juan Takai, was at the time of the attack and still is a citizen of the United States and domiciled in the State of Texas. He is the Father of John Takai.

1682.   Plaintiff, Jolene Takai, was at the time of the attack and still is a citizen of the United States and a resident of the State of Texas. She is the Sister of John Takai.

1683.   Plaintiff, Jermaine Takai, was at the time of the attack and still is a citizen of the United States and a resident of the State of Texas.  He is the Brother of John Takai.

1684.   As a result of the EFP attack, and the physical and emotional injuries suffered by John Takai, Plaintiffs, Mae Takai, Jonamae Takai, Niana Takai, Imiko Takai, Ku'uipolLani Takai, Patricia Cruz, Juan Takai, Jolene Takai, and Jermaine Takai have suffered and experienced intentional infliction of emotional distress and loss of consortium-related damages.

## ATTACK 40: JULY 5, 2007 - BAGHDAD, IRAQ

### AAA.  The Ahearn Family

1685.   Major James Ahearn was a citizen and national of the United States and a member of the United States Army when he was killed in Iraq on July 5, 2007.

1686.   On that date, Major Ahearn was riding with his Civil Affairs Battalion in an armored M1151 HUMVEE lead vehicle of a convoy on Route Jackson just south of the intersection of Baghdad Road and its intersection with the Dora Expressway in southern Baghdad when an array of EFPs struck the driver's side of the vehicle, causing a massive explosion, thus killing Ahearn and another occupant, and also causing very serious personal injuries to three additional occupants.

1687.   The Special Group Kata'ib Hezbollah claimed responsibility for the attack which killed Major Ahearn.

1688.   Plaintiff, Constance Ahearn, was at the time of the attack and still is a citizen of the United States and a resident of the State of California. She is the Mother of James Ahearn.

1689.   Plaintiff, James Ahearn, Sr. was at the time of the attack and still is a citizen of the United States and a resident of the State of Arizona. He is the Father of James Ahearn.

1690.   Plaintiff, Kevin Ahearn, was at the time of the attack and still is a citizen of the United States and a resident of the State of Arizona. He is the Brother of James Ahearn.

1691.   As a direct result of the EFP attack, and the resulting wrongful death of James Ahearn, Plaintiffs, Constance Ahearn, James Ahearn, Sr., and Kevin Ahearn experienced various solatium-related damages, including intentional infliction of severe emotional distress, severe mental anguish, extreme emotional pain and suffering, loss of society, companionship, comfort, advice and counsel, consortium, and substantial economic loss.

**BBB.   The Kline Family**

1692.   Sergeant Keith Kline was a citizen and national of the United States and a member of the United States Army when he was killed in Iraq on July 5, 2007.

1693.   On that date, Sergeant Kline was riding with his Civil Affairs Battalion in an armored M1151 HUMVEE lead vehicle of a convoy on Route Jackson just south of the intersection of Baghdad Road and its intersection with the Dora Expressway in southern Baghdad when an array of EFPs struck the driver's side of the vehicle, causing a massive explosion, killing Sergeant Kline and another occupant and causing very serious personal injuries to three additional occupants.

1694.   The Special Group Kata'ib Hezbollah claimed responsibility for the attack which killed Sergeant Kline.

1695.   Plaintiff, Betty Jean Kline, was at the time of the attack and still is a citizen of the United States and a resident of the State of Ohio. She is the Mother of Keith Kline.

1696.   Plaintiff, John Kline, Jr. was at the time of the attack and still is a citizen of the

United States and a resident of the State of Ohio. He is the Brother of Keith Kline.

1697.   Plaintiff, Pamela McKean, brings an action on behalf of the Estate of Keith Kline, as its Personal Representative in Ottawa County, Ohio under case # 20071178.

1698.   As a direct result of the EFP attack, and the resulting wrongful death of Keith Kline, the Estate of Keith Kline is entitled to recover for any pain and suffering experienced by Keith Kline between the time of the EFP attack and his death, and for the substantial economic and earnings capacity loss.

1699.   As a direct result of the EFP attack, and the resulting wrongful death of Keith Kline, Plaintiffs, Betty Jean Kline, John Kline, Jr. experienced various solatium-related damages, including intentional infliction of severe emotional distress, severe mental anguish, extreme emotional pain and suffering, loss of society, companionship, comfort, advice and counsel, consortium, and substantial economic loss.

## ATTACK 41: JULY 6, 2007 - BAGHDAD, IRAQ

### CCC.  The Lill Family

1700.   Specialist Eric Lill was a citizen and national of the United States and a member of the United States Army when he was killed in Iraq on July 6, 2007.

1701.   On that date, Specialist Lill was riding in an armored M1114 HUMVEE vehicle on a patrol traveling on Muasker Al Rashid Street just south of its intersection with the Dora Expressway when an EFP detonated, thus causing a massive explosion which killed Specialist Lill and seriously injured three other occupants.

1702.   Plaintiff, Skye Otero, was at the time of Eric Lill's attack and still is a citizen of the United States and a resident of the State of Illinois. She is the Widow of Eric Lill.

1703.   Plaintiff, M.L., a Minor, represented by her legal guardian, her Mother, Skye Otero, was at the time of Eric Lill's attack and still is a citizen of the United States and resident of the

State of Illinois.  She is the Daughter of Eric Lill.

1704.   Plaintiff, C.L., a Minor, represented by his legal guardian, his Mother, Skye Otero, was at the time of Eric Lill's attack and still is a citizen of the United States and a resident of the State of Illinois.  He is the Son of Eric Lill.

1705.   Plaintiff, Anthony Lill, was at the time of Eric Lill's attack and still is a citizen of the United States and a resident of the State of Tennessee. He is the Father of Eric Lill.

1706.   Plaintiff, Charmaine Lill, was at the time of Eric Lill's attack and still is a citizen of the United States and resident of the State of Tennessee. She is the Mother of Eric Lill.

1707.   Plaintiff, Kortne Lill Jones, was at the time of Eric Lill's attack and still is a citizen of the United States and resident of the State of Tennessee. She is the Sister of Eric Lill.

1708.   Plaintiff, Anthony Lill, brings an action individually and on behalf of the Estate of Eric Lill, as its Personal Representative in Cook County, Illinois under Case Number 2007P006563.

1709.   As a direct result of the EFP attack, and the resulting wrongful death of Eric Lill, the Estate of Eric Lill is entitled to recover for any pain and suffering experienced by Eric Lill between the time of the EFP attack and his death, and for the substantial economic and earnings capacity loss.

1710.   As a direct result of the EFP attack, and the resulting wrongful death of Eric Lill, Plaintiffs, Skye Otero, M.L., a Minor, C.L., a Minor, Anthony Lill, Charmaine Lill, and Kortne Lill Jones, experienced various solatium-related damages, including intentional infliction of severe emotional distress, severe mental anguish, extreme emotional pain and suffering, loss of society, companionship, comfort, advice and counsel, consortium, and substantial economic loss.

## ATTACK 42: JULY 6, 2007 – BAGHDAD, IRAQ

**DDD.  The Wilson Family**

1711.   Private First Class LeRon A. Wilson was a citizen and national of the United States and a member of the United States Army when he was killed in Iraq on July 6, 2007.

1712.   On that date, Private First Class Wilson was riding in an armored M1151 HUMVEE vehicle on a routine patrol just east of the Mohammed Al-Qasim Expressway near the Sadr City neighborhood of Baghdad when an IED detonated right adjacent to or underneath the vehicle, causing a massive explosion which killed Private First Class Wilson.

1713.   Plaintiff, Simona Francis, was at the time of the attack and still is a citizen of the United States and a resident of the State of New York. She is the Mother of Le Ron A. Wilson.

1714.   Plaintiff, Simona Francis, brings an action individually and on behalf of the Estate of Le Ron A. Wilson, as its Personal Representative in Cook County, Illinois under Case Number 2007P006563.

1715.   As a direct result of the IED attack, and the resulting wrongful death of LeRon Wilson, the Estate of LeRon Wilson is entitled to recover for any pain and suffering experienced by LeRon Wilson between the time of the IED attack and his death, and for the substantial economic and earnings capacity loss.

1716.   As a direct result of the IED attack, and the resulting wrongful death of LeRon Wilson, Plaintiff, Simona Francis experienced various solatium-related damages, including intentional infliction of severe emotional distress, severe mental anguish, extreme emotional pain and suffering, loss of society, companionship, comfort, advice and counsel, consortium, and substantial economic loss.

## ATTACK 43: JULY 14, 2007 - BAGHDAD, IRAQ

### EEE.   The Kube Family

1717.   Private Christopher Kube was a citizen and national of the United States and a member of the United States Army when he was killed in Iraq on July 14, 2007.

1718.   On that date, Private Kube was riding in an armored M1151 HUMVEE in a convoy of vehicles traveling on Airport Road just north of its intersection with the Dora Expressway when an EFP detonated near his vehicle, causing a massive explosion which caused Private Kube's death.

1719.   Plaintiff, Debbie Otte, was at the time of the attack and still is a citizen of the United States and resident of the State of Michigan. She is the Mother of Christopher Kube.

1720.   Plaintiff, David Kube, was at the time of the attack and still is a citizen of the United States and a resident of the State of Michigan. He is the Father of David Kube.

1721.   Plaintiff, Jonathan Kube, was at the time of the attack and still is a citizen of the United States and resident of the State of Michigan. He is the Brother of Christopher Kube.

1722.   Plaintiff, Jessica Kube, was at the time of the attack and still is a citizen of the United States and resident of the State of Michigan.  She is the Sister of Christopher Kube.

1723.   Plaintiff, Jason Kube, was at the time of the attack and still is a citizen of the United States and resident of the State of Michigan. He is the Brother of Christopher Kube.

1724.   Plaintiff, Jennifer Kube, was at the time of the attack and still is a citizen of the United States and a resident of the State of Michigan.  She is the Sister of Christopher Kube.

1725.   Plaintiff, Debbie Otte, brings an action individually and on behalf of the Estate of Christopher Kube, as its Personal Representative in Macomb County, Michigan, under File No.: 2018-227149-DE.

1726.   As a direct result of the EFP attack, and the resulting wrongful death of Christopher Kube, the Estate of Christopher Kube is entitled to recover for any pain and suffering experienced by Christopher Kube between the time of the EFP attack and his death, and for the substantial economic and earnings capacity loss.

1727.   As a direct result of the EFP attack, and the resulting wrongful death of Christopher Kube, Plaintiffs, David Kube, Debbie Otte, Jonathan Kube, Jessica Kube, Jason Kube, and Jennifer Kube have experienced various solatium-related damages, including intentional infliction of severe emotional distress, severe mental anguish, extreme emotional pain and suffering, loss of society, companionship, comfort, advice and counsel, consortium, and substantial economic loss.

## ATTACK 44: JULY 31, 2007 - SADR CITY, BAGHDAD, IRAQ

### FFF.   The Egli Family

1728.   Sergeant Adam Egli was a citizen and national of the United States and a member of the United States Army when he was wounded in Iraq on July 31, 2007.

1729.   On that date, Sergeant Egli was riding in a Stryker vehicle as the lead vehicle of four Stryker vehicles returning from a Sadr City counter-mortar patrol when an array of three EFPs detonated near the Stryker vehicle, causing a massive explosion which struck directly in the main troop compartment of the vehicle, seriously injuring Egli and six other Soldiers, and killing another Soldier.

1730.   As a result of the EFP attack, and the physical and emotional injuries he suffered as a direct result therefrom, Sergeant Egli has experienced severe physical and emotional pain and suffering in the past and will experience same into the indeterminable future; has incurred medical bills for medical and rehabilitation services rendered and will incur same into the indeterminable future; has incurred an overwhelming loss of income and earnings capacity and will experience same into the indeterminable future; has experienced permanent injuries to his person and psyche; and has experienced severe mental anguish, anxiety and depression and will experience same into the indeterminable future.

1731.   Plaintiff, Danielle Egli, was at the time of the attack and still is a citizen of the United States and a resident of the State of Georgia.  She is the Wife of Adam Egli.

1732.  Plaintiff, K.E., a Minor, was at the time of the attack and still is a citizen of the United States and a resident of the State of Georgia.  She is the Daughter of Adam Egli.

1733.  Plaintiff, B.E., a Minor, was at the time of the attack and still is a citizen of the United States and a resident of the State of Georgia.  She is the Daughter of Adam Egli.

1734.  As a result of the EFP attack, and the physical and emotional injuries suffered by Adam Egli as a direct result therefrom, Plaintiffs, Danielle Egli, K.E., a Minor, B.E., a Minor, have experienced intentional infliction of severe emotional distress and loss of consortium-related damages.

**GGG.  The Gonzalez Family**

1735.  Specialist Zachariah Gonzalez was a citizen and national of the United States and a member of the United States Army when he was killed in Iraq on July 31, 2007.

1736.  On that date, Specialist Gonzalez was riding in a Stryker vehicle as the lead vehicle of four Stryker vehicles returning from a Sadr City counter-mortar patrol when an array of three EFPs detonated near the Stryker vehicle, causing a massive explosion which struck directly in the main troop compartment of the vehicle, killing Gonzalez and seriously injuring six other Soldiers.

1737.  Plaintiff, Laura Gonzalez, was at the time of the attack and still is a citizen of the United States and a resident of the State of Indiana.  She is the Mother of Zachariah Gonzalez.

1738.  Plaintiff, Benedict Gonzalez, is a citizen of the United States and a resident of the State of Indiana.  He is the Father of Zachariah Gonzalez.

1739.  Plaintiff, Laura Gonzalez, brings an action individually and on behalf of the Estate of Zachariah Gonzalez, as its Personal Representative in Marion County, Indiana, under Case No.: 49D08-1812-EU-048352.

1740.  As a direct result of the EFP attack, and the resulting wrongful death of Zachariah

Gonzalez, the Estate of Zachariah Gonzalez is entitled to recover for any pain and suffering experienced by Zachariah Gonzalez between the time of the EFP attack and his death, and for the substantial economic and earnings capacity loss.

1741.   As a direct result of the EFP attack, and the resulting wrongful death of Zachariah Gonzalez, Plaintiffs, Laura Gonzalez and Benedict Gonzalez have experienced various solatium-related damages, including intentional infliction of severe emotional distress, severe mental anguish, extreme emotional pain and suffering, loss of society, companionship, comfort, advice and counsel, consortium, and substantial economic loss.

## ATTACK 45: AUGUST 4, 2007   HAWR RAJAB, IRAQ

### HHH.  The Wakeman Family

1742.   Sergeant Dustin Wakeman was a citizen and national of the United States and was a member of the United States Army when he was killed in Iraq on August 4, 2007.

1743.   On that date, Sergeant Wakeman was riding in an M1151 HUMVEE vehicle traveling in Hawr Rajab, Baghdad, Iraq, when an IED detonated near the vehicle in which he was then riding, causing a massive explosion, thus causing his death.

1744.   Plaintiff, Margaret Wakeman, was at the time of the attack and still is a citizen of the United States and a resident of the State of Texas. She is the Mother of Dustin Wakeman.

1745.   Plaintiff, David Wakeman, was at the time of the attack and still is a citizen of the United States and a resident of the State of Texas. He is the Father of Dustin Wakeman.

1746.   Plaintiff, William "Zack" Wakeman, was at the time of the attack and still is a citizen of the United States and a resident the State of Texas. He is the Brother of Dustin Wakeman.

1747.   Plaintiff, Margaret Wakeman, brings an action individually and on behalf of the Estate of Dustin Wakeman, as its Personal Representative in Tarrant County, Texas, under Case No.: 2018-PR00686-2.

1748.   As a direct result of the IED attack, and the resulting wrongful death of Dustin Wakeman, the Estate of Dustin Wakeman is entitled to recover for any pain and suffering experienced by Dustin Wakeman between the time of the IED attack and his death, and for the substantial economic and earnings capacity loss.

1749.   As a direct result of the IED attack, and the resulting wrongful death of Dustin Wakeman, Plaintiffs, Margaret Wakeman, David Wakeman, and William "Zack" Wakeman have experienced various solatium-related damages, including intentional infliction of severe emotional distress, severe mental anguish, extreme emotional pain and suffering, loss of society, companionship, comfort, advice and counsel, consortium, and substantial economic loss.

## ATTACK 46: AUGUST 13, 2007—QAYYARAH, NINEVEH PROVINCE, IRAQ

### III.    The Cottrell Family

1750.   Staff Sergeant Eric Cottrell was a citizen and national of the United States and a member of the United States Army when he was killed in Iraq on August 13, 2007

1751.   On that date, Staff Sergeant Cottrell was riding in an M1114 HUMVEE vehicle northbound on Alternate Supply Route ("ASR") Atlanta near Qayyarah, Nineveh Province, Iraq, when an IED detonated, thus causing a massive explosion which killed Staff Sergeant Cottrell.

1752.   Plaintiff, Sherri Cottrell, was at the time of Eric Cottrell's attack and still is a citizen of the United States and a resident of the State of Maryland. She is the Widow and Wife of Eric Cottrell.

1753.   Plaintiff, E.C., a Minor, being represented by his legal guardian, Sherri Cottrell, was at the time of Eric Cottrell's attack and still is a citizen of the United States and a resident of the State of Maryland. He is the Son of Eric Cottrell.

1754.   Plaintiff, James Cottrell, was at the time of Eric Cottrell's attack and still is a citizen of the United States and a resident of the State of Maryland. He is the Son of Eric Cottrell.

1755.   Plaintiff, Brandy Cottrell, was at the time of Eric Cottrell's attack and still is a citizen of the United States and a resident of the State of Maryland. She is the Daughter of Eric Cottrell.

1756.   Plaintiff, Megan Cottrell, was at the time of Eric Cottrell's attack and still is a citizen of the United States and a resident of the State of Maryland. She is the Daughter of Eric Cottrell.

1757.   Plaintiff, Doeshie Waters, was at the time of Eric Cottrell's attack and still is a citizen of the United States and a resident of the State of California. She is the Mother of Eric Cottrell.

1758.   Plaintiff, Norris Waters, Sr., was at the time of Eric Cottrell's attack and still is a citizen of the United States and a resident of the State of California. He is the Step-Father of Eric Cottrell.

1759.   As a direct result of the IED attack, and the resulting death of Eric Cottrell, Plaintiffs, Sherri Cottrell, E.C., a Minor, James Cottrell, Brandy Cottrell, Megan Cottrell, Doeshie Waters, and Norris Waters, Sr., have experienced various solatium-related damages, including intentional infliction of severe emotional distress, severe mental anguish, extreme emotional pain and suffering, a loss of society, companionship, comfort, advice and counsel, and substantial economic loss.

### ATTACK 47: AUGUST  17, 2007 - BAGHDAD AL JADEEDA, IRAQ

#### JJJ.    The Edds Family

1760.   First Lieutenant Jonathan Edds was a citizen and national of the United States and a member of the United States Army when he was killed in Iraq on August 17, 2007.

1761.   On that date, First Lieutenant Edds was riding in an M1151 HUMVEE vehicle as part of a six-vehicle convoy in the Baghdad Al Jadeeda district of Baghdad, Iraq, when an IED

detonated, thus causing a massive explosion which killed First Lieutenant Edds.

1762.   Plaintiff, Laura Russell Kennedy, was at the time of Jonathan Edds' death and still is a citizen of the United States and a resident of the State of Maryland. She is the Widow of Jonathan Edds.

1763.   Plaintiff, Barry Edds, was at the time of Jonathan Edds' death and still is a citizen of the United States and a resident of the State of Michigan. He is the Father of Jonathan Edds.

1764.   Plaintiff, Julia Edds, was at the time of Jonathan Edds' death and still is a citizen of the United States and a resident of the State of Michigan. She is the Mother of Jonathan Edds.

1765.   Plaintiff, Joel Edds, was at the time of Jonathan Edds' death and still is a citizen of the United States and a resident of the State of Michigan. He is the Brother of Jonathan Edds.

1766.   Plaintiff, Laura Russell Kennedy, brings an action individually and on behalf of the Estate of Jonathan Edds, as its Personal Representative in St. Joseph County, Michigan under File No.: 18-374-DE.

1767.   As a direct result of the IED attack, and the resulting wrongful death of Jonathan Edds, the Estate of Jonathan Edds is entitled to recover for the substantial economic and earnings capacity loss.

1768.   As a direct result of the IED attack, and the resulting death of Jonathan Edds, Plaintiffs, Laura Russell Kennedy, Barry Edds, Julia Edds, and Joel Edds have experienced various solatium-related damages, including intentional infliction of severe emotional distress, severe mental anguish, extreme emotional pain and suffering, a loss of society, companionship, comfort, advice and counsel, and substantial economic loss.

### ATTACK 48: AUGUST 18, 2007—RAHMANIYA, BAGHDAD, IRAQ

**KKK.  Andrew Tong**

1769.   Captain Andrew Tong was a citizen and national of the United States and a member

of the United States Army when he was wounded in Iraq on August 18, 2007.

1770.   On that date, Captain Tong was riding as the right front passenger in an M1083 Medium Tactical Vehicle ("MTV") standard cargo truck, the third vehicle in a convoy of eight vehicles in the Rahmaniya district of Baghdad, Iraq, when an EFP detonated, thus causing a massive explosion which seriously injured Captain Tong.

1771.   As a result of the EFP attack, Captain Tong sustained a traumatic amputation of his right leg below the knee; experienced multiple and various complications associated with the "stump" on the end of his right lower leg, including infections, wounds and neuromas; had shrapnel blow into his left ankle area which has caused the need for over 100 injections; sustained a traumatic brain injury ("TBI") and concussion from the EFP detonation; developed migraine headaches; experienced Post-Traumatic Stress Disorder ("PTSD"); developed permanent double vision; experienced a permanent hearing loss and tinnitus condition; and had to have surgery on his right arm where shrapnel had blown into it.

1772.   As a result of the EFP attack, and the physical and emotional injuries he suffered as a direct result therefrom, Captain Tong has experienced severe physical and emotional pain and suffering in the past and will experience same into the indeterminable future; has incurred medical bills for medical and rehabilitation services rendered and will incur same into the indeterminable future; has incurred an overwhelming loss of income and earnings capacity and will experience same into the indeterminable future; has experienced permanent injuries to his person and psyche; and has experienced severe mental anguish, anxiety and depression and will experience same into the indeterminable future.

## ATTACK 49: SEPTEMBER 4, 2007 - BAGHDAD AL JADEEDA, IRAQ

### LLL.   The Crookston Family

1773.   Specialist Duncan Crookston was a citizen and national of the United States and a

member of the United States Army when he was attacked in Iraq on September 4, 2006. Crookston died some months after this attack.

1774.   On that date, Specialist Crookston was riding in an M1151 HUMVEE vehicle as part of a five vehicle patrol on Route Predator in the Baghdad Al Jadeeda district of Baghdad, Iraq, when an EFP detonated, thus causing a massive explosion which caused serious personal injuries to Specialist Class Crookston, injuries which later caused his death on February 25, 2008.

1775.   Plaintiff, Leesha Crookston, was at the time of Specialist Duncan Crookston's death and still is a citizen of the United States and a resident of the State of Colorado. She is the Widow of Specialist Duncan Crookston.

1776.   Plaintiff, Leesha Crookston, brings an action individually and on behalf of the Estate of Specialist Duncan Crookston, as its Personal Representative in Shawnee County, Kansas under Case No.: 2018-PR-568.

1777.   As a direct result of the EFP attack, and the resulting wrongful death of Specialist Duncan Crookston, the Estate of Specialist Duncan Crookston is entitled to recover for the substantial economic and earnings capacity loss.

1778.   As a direct result of the EFP attack, and the resulting death of Specialist Duncan Crookston, Plaintiff, Leesha Crookston has experienced various solatium-related damages, including intentional infliction of severe emotional distress, severe mental anguish, extreme emotional pain and suffering, a loss of society, companionship, comfort, advice and counsel, and substantial economic loss.

### ATTACK 50: SEPTEMBER 20, 2007—MUQDADIYAH, IRAQ

#### MMM.   The Marciante Family

1779.   Specialist Luigi Marciante was a citizen and national of the United States and a member of the United States Army when he was killed in Iraq on September 20, 2007.

1780.   On that date, Specialist Marciante was riding in an Stryker Fighting Vehicle as part of a Combat Logistics Patrol ("CLP") near Muqdadiyah, Iraq, when an IED detonated, thus causing a massive explosion which killed Specialist Marciante.

1781.   Plaintiff, Stephanie Marciante, was at the time of Luigi Marciante, Jr.'s death and still is a citizen of the United States and a resident of the State of New Jersey. She is the Widow of Corporal Luigi Marciante, Jr.

1782.   Plaintiff, L.M., a Minor, being represented by his legal guardian, Stephanie Marciante, was at the time of Luigi Marciante, Jr.'s death and still is a citizen of the United States and a resident of the State of New Jersey.  He is the Son of Corporal Luigi Marciante, Jr.

1783.   Plaintiff, Maria Marciante, was at the time of Luigi Marciante, Jr.'s death and still is a citizen of the United States and a resident of the State of New Jersey. She is the Mother of Corporal Luigi Marciante, Jr.

1784.   Plaintiff, Luigi Marciante, was at the time of Luigi Marciante, Jr.'s death and still is a citizen of the United States and a resident of the State of New Jersey. He is the Father of Corporal Luigi Marciante, Jr.

1785.   Plaintiff, Enza Marciante Balestrieri, was at the time of Luigi Marciante, Jr.'s death and still is a citizen of the United States and a resident of the State of New Jersey. She is the Sister of Corporal Luigi Marciante, Jr.

1786.   Plaintiff, Stephanie Marciante, brings an action individually and on behalf of the Estate of Corporal Luigi Marciante, Jr., as its Personal Representative in Ocean County, New Jersey under Case No.: 227045.

1787.   As a direct result of the EFP attack, and the resulting wrongful death of Luigi Marciante, Jr., the Estate of Luigi Marciante, Jr. is entitled to recover for the substantial economic

and earnings capacity loss.

1788.   As a direct result of the EFP attack, and the resulting death of Luigi Marciante, Jr., Plaintiffs, Stephanie Marciante, L.M., a Minor, Maria Marciante, Luigi Marciante, and Enza Marciante Balestrieri, has experienced various solatium-related damages, including intentional infliction of severe emotional distress, severe mental anguish, extreme emotional pain and suffering, a loss of society, companionship, comfort, advice and counsel, and substantial economic loss.

## ATTACK 51: NOVEMBER 2, 2007 – HURRIYA, BAGHDAD, IRAQ

### NNN.  The Wells Family

1789.   Specialist Joshua Wells was a citizen and national of the United States and a member of the United States Army when he was seriously injured in Iraq on November 2, 2007. Wells is a resident of the State of Mississippi.

1790.   On that date, Specialist Wells was driving a Stryker vehicle on a routine refueling mission through an Iraqi checkpoint along Mosul Road in the vicinity of Hurriya, northern Baghdad, when an array of four EFPs detonated next to the Stryker vehicle, causing a massive explosion which caused serious physical and emotional injuries to Wells and two other occupants.

1791.   As a result of the EFP attack, Joshua Wells sustained bilateral below-the-knee amputations, a very serious left shoulder injury with permanent nerve damage resulting in loss of lifting and grip strength in his left arm and hand, serious lumbar disc issues and problems which result in constant low back pain due to long term use of bilateral prosthetic devices to ambulate, ringing in his ears, hearing loss, shrapnel fragments blown into various portions of his body, post-traumatic stress disorder ("PTSD"), depression, anxiety disorder, and panic attacks.

1792.   As a result of the EFP attack, and the physical and emotional injuries he suffered as a direct result therefrom, Joshua Wells has experienced severe physical and emotional pain and

suffering in the past and will experience same into the indeterminable future; has incurred medical bills for medical and rehabilitation services rendered and will incur same into the indeterminable future; has incurred an overwhelming loss of income and earnings capacity and will experience same into the indeterminable future; has experienced permanent injuries to his person and psyche; and has experienced severe mental anguish, anxiety and depression and will experience same into the indeterminable future.

1793.   Plaintiff, Lydia Lantrip, was at the time of the attack and still is a citizen of the United States and a resident of the State of Mississippi. She is the Mother of Joshua Wells.

1794.   Plaintiff, Billie Wells, Jr., was at the time of the attack and still is a citizen of the United States and a resident of the State of Mississippi. He is the Father of Joshua Wells.

1795.   Plaintiff, David "Blake" Lantrip, was at the time of the attack and still is a citizen of the United States and a resident of the State of Mississippi. He is the Brother of Joshua Wells.

1796.   Plaintiff, J.W., a Minor represented by his legal guardian, Billie Wells, Jr., was at the time of the attack and still is a citizen of the United States and a resident of the State of Mississippi. He is the Brother of Joshua Wells.

1797.   As a result of the EFP attack, and the physical and emotional injuries suffered by Joshua Wells as a direct result therefrom, Plaintiffs, Lydia Lantrip, Billie Wells, Jr., David "Blake" Lantrip, and J.W., a Minor, have suffered and experienced intentional infliction of severe emotional distress and loss of consortium-related damages.

## ATTACK 52: DECEMBER 17, 2007 – BAGHDAD AL JADEEDA, IRAQ

### OOO.  The Wagner Family

1798.   Specialist Bryan Wagner was a citizen and national of the United States and a member of the United States Army when he was wounded in Iraq on December 17, 2007. Wagner is a resident of the State of Florida.

1799.   On that date, Specialist Wagner was on a Military Police "Protective Service Detail" ("PSD") in an up-armored M1114 HUMVEE vehicle in the Al Jadeeda district of Baghdad, Iraq, when a series of EFPs detonated, thus causing his right leg to be blown off and other very serious physical and emotional injuries.

1800.   Investigation of the blown-up HUMVEE vehicle revealed that its armor had been penetrated by copper slugs, a signature finding of EFP devices.

1801.   As a result of the EFP attack, Specialist Wagner lost his right leg above the knee, along with multiple other and additional physical and emotional injuries, including multiple debridement procedures, treatments for multiple infections, a mangled left thigh and right forearm from shrapnel, permanent radial nerve damage in the right forearm resulting in lost grip strength, traumatic brain injury ("TBI"), post-concussive syndrome, cognitive disorder, and sleep apnea.

1802.   As a result of the EFP attack, and the physical and emotional injuries he suffered as a direct result therefrom, Specialist Wagner has experienced severe physical and emotional pain and suffering in the past and will experience same into the indeterminable future; has incurred medical bills for medical and rehabilitation services rendered and will incur same into the indeterminable future; has incurred an overwhelming loss of income and earnings capacity and will experience same into the indeterminable future; has experienced permanent injuries to his person and psyche; and has experienced severe mental anguish, anxiety and depression and will experience same into the indeterminable future.

### ATTACK 53: MARCH 14, 2008 – EAST OF MUSAYIB, IRAQ

**PPP.   The Knapp Family**

1803.   Specialist David A. Knapp was a citizen and national of the United States and a member of the United States Army when he was wounded in Iraq on March 14, 2008.

1804.   On that date, Specialist Knapp was on a patrol riding in an M1151 HUMVEE just

east of Musayib, Iraq, when an array of four to six EFPs detonated, thus causing a massive explosion which caused Specialist Knapp to sustain very serious personal injuries.

1805.   As a result of the EFP attack, Specialist Knapp suffered two traumatic above-the-knee amputations of his legs and other serious physical and emotional injuries.

1806.   On October 2, 2010, Specialist Knapp died.

1807.   As a result of the EFP attack, and the physical and emotional injuries he suffered as a direct result therefrom, Specialist Knapp experienced severe physical and emotional pain through the date of his death; incurred medical bills for medical and rehabilitation services rendered through the date of his death; incurred an overwhelming loss of income and earnings capacity through the date of his death; experienced injuries to his person and psyche through the date of his death; and experienced severe mental anguish, anxiety and depression through the date of his death.

1808.   Plaintiff, Jeanette Knapp, was at the time of David A. Knapp's attack and still is a citizen of the United States and is a resident of the State of Florida. She is the Mother of David A. Knapp.

1809.   Plaintiff, Jeanette Knapp, was named as the Personal Representative of the Estate of David A. Knapp in Dodge County, Arizona, under File No.: 2018PR000224.  The Estate of David A. Knapp is pursuing claims for the personal injuries sustained by David A. Knapp between the date of the EFP attack and his death.

1810.   As a result of the EFP attack, and the physical and emotional injuries suffered by David Alex Knapp as a direct result therefrom, Plaintiff, Jeanette Knapp, has experienced various solatium-related damages, including intentional infliction of severe emotional distress, severe mental anguish, extreme emotional pain and suffering, and substantial economic loss.

## ATTACK 54: MARCH 17, 2008 - SADR CITY, BAGHDAD, IRAQ

### QQQ.  Norman Forbes, IV

1811.   Sergeant Norman Forbes, IV was a citizen and national of the United States and a member of the United States Army when he was seriously wounded in Iraq on March 17, 2008.

1812.   On that date, Sergeant Forbes was driving an M1114 HUMVEE vehicle in a five-vehicle convoy on Route Predator in Sadr City, Baghdad, Iraq, when at least two EFPs in an array of four EFPS detonated, thus causing a tremendous explosion which seriously injured Sergeant Forbes.

1813.   As a result of the EFP attack, Sergeant Forbes sustained an open and comminuted fracture of his left femur (thigh) bone which has necessitated multiple surgeries and has left him with permanent deformities to the leg and musculature around it; a mangled and disfigured left hand which included multiple fractures and a missing left pinky finger; a fractured left forearm bone with permanent nerve damage; a major missing portion of his left quadriceps muscle area; significant shrapnel injuries to his right forearm which resulted in a loss of sensation and feeling in his right (dominant) hand; and severe lacerations and shrapnel wounds to all of his extremities.

1814.   As a result of the EFP attack, and the physical and emotional injuries he suffered as a direct result therefrom, Sergeant Forbes has experienced severe physical and emotional pain and suffering in the past and will experience same into the indeterminable future; has incurred medical bills for medical and rehabilitation services rendered and will incur same into the indeterminable future; has incurred an overwhelming loss of income and earnings capacity and will experience same into the indeterminable future; has experienced permanent injuries to his person and psyche; and has experienced severe mental anguish, anxiety and depression and will experience same into the indeterminable future.

## ATTACK 55: MARCH 23, 2008 - MALEF, BAGHDAD, IRAQ

**RRR.   The Rubio-Hernandez Family**

1815.   Corporal Jose Rubio-Hernandez was a national of the United States and a member of the United States Army when he was killed in Iraq on March 24, 2008.

1816.   On that date, Corporal Rubio-Hernandez was on a patrol riding in a Bradley A2M2 Fighting Vehicle in the Malef neighborhood of Baghdad area when an EFP detonated near his vehicle, causing a massive explosion, thus causing the death of Hernandez and three other vehicle occupants.

1817.   Plaintiff, Jennifer Rubio, was at the time of the attack and still is a citizen of the United States and a resident of the State of Texas. She is the Widow of Jose Rubio-Hernandez.

1818.   Plaintiff, N.H., a Minor, represented by his legal guardian, Jennifer Rubio, was at the time of the attack and still is a citizen of the United States and a resident of the State of Texas. He is the Son of Jose Rubio-Hernandez.

1819.   As a direct result of the EFP attack, and the resulting wrongful death of Jose Rubio Hernandez, Plaintiffs, Jennifer Rubio and N.H., a Minor, have experienced various solatium-related damages, including intentional infliction of severe emotional distress, severe mental anguish, extreme emotional pain and suffering, loss of society, companionship, comfort, advice and counsel, consortium, and substantial economic loss.

## ATTACK 56: MARCH 29, 2008 - SADR CITY, BAGHDAD, IRAQ

**SSS.   The Bennett Family**

1820.   Specialist Durrell Bennett was a citizen and national of the United States and a member of the United States Army when he was killed in Iraq on March 29, 2008.

1821.   On that date, Specialist Bennett was on a patrol riding in an armored M1151 HUMVEE vehicle in Sadr City, Baghdad, Iraq, when an EFP detonated near his vehicle, causing a massive explosion that killed Bennett and one other occupant, and seriously injured three other

occupants of the vehicle.

1822.   Plaintiff, Doris Bennett, was at the time of the attack and still is a citizen of the United States and a resident of the State of Washington. She is the Mother of Durrell Bennett.

1823.   Plaintiff, Dempsey Bennett, was at the time of the attack and still is a citizen of the United States and resident of the State of Washington. He is the Father of Durrell Bennett.

1824.   Plaintiff, Darnell Bennett, was at the time of the attack and still is a citizen of the United States and resident of the State of Washington. He is the Brother of Durrell Bennett.

1825.   Plaintiff, Dempsey Bennett, brings an action individually and on behalf of the Estate of Durrell Bennett, as its Personal Representative in Pierce County, Washington under File No.: 18-4-01725-7.

1826.   As a direct result of the EFP attack, and the resulting wrongful death of Durrell Bennett, the Estate of Durrell Bennett is entitled to recover for any pain and suffering experienced by Durrell Bennett between the time of the EFP attack and his death, and for the substantial economic and earnings capacity loss.

1827.   As a direct result of the EFP attack, and the resulting wrongful death of Durrell Bennett, Plaintiffs, Dempsey Bennett, Doris Bennett, and Darnell Bennett have experienced various solatium-related damages, including intentional infliction of severe emotional distress, severe mental anguish, extreme emotional pain and suffering, loss of society, companionship, comfort, advice and counsel, consortium, and substantial economic loss.

## **ATTACK 57: APRIL 8, 2008 – BAGHDAD, IRAQ**

### **TTT.   The Rosenberg Family**

1828.   Major Mark Rosenberg was a citizen and national of the United States and a member of the United States Army when he was killed in Iraq on April 8, 2008.

1829.   On that date, Major Rosenberg was riding on a patrol in an M1114 HUMVEE

vehicle along Route Pluto just adjacent to Sadr City, Baghdad, Iraq, when a two array EFP detonation consisting of multiple copper slugs, detonated, thus killing Major Rosenberg.

1830.   The Army concluded that Special Groups in the Sadr City area of Baghdad were responsible for the EFP attack which killed Major Rosenberg and that the Special Groups would continue to target Coalition Forces with similar EFP attacks in the same area.

1831.   Plaintiff, Julie Rosenberg, was at the time of Major Rosenberg's death and still is a citizen of the United States and a resident of the State of New Mexico. She is the Widow of Major Rosenberg.

1832.   Plaintiff, J.R., a Minor, being represented by his legal guardian, Julie Rosenberg, was at the time of Major Mark Rosenberg's death and still is a citizen of the United States and a resident of the State of New Mexico.  He is the Son of Major Mark Rosenberg.

1833.   Plaintiff, M.R., a Minor, being represented by his legal guardian, Julie Rosenberg, was at the time of Major Mark Rosenberg's death and still is a citizen of the United States and a resident of the State of New Mexico.  He is the Son of Major Mark Rosenberg.

1834.  Plaintiff, Julie Rosenberg, is the Personal Representative of Major Mark Rosenberg, in El Paso County, Colorado under Case Number: 2008PR665.

1835.   As a direct result of the EFP attack, and the resulting wrongful death of Major Mark Rosenberg, the Estate of Major Mark Rosenberg is entitled to recover for the substantial economic and earnings capacity loss.

1836.   As a direct result of the EFP attack, and the resulting death of Major Mark Rosenberg, Plaintiffs, Julie Rosenberg, J.R., a Minor, M.R., a Minor, have experienced various solatium-related damages, including intentional infliction of severe emotional distress, severe mental anguish, extreme emotional pain and suffering, a loss of society, companionship, comfort,

advice and counsel, and substantial economic loss.

## ATTACK 58: APRIL 14, 2008 – BAGHDAD, IRAQ

### UUU.  The Joseph Richard, III Family

1837.   Sergeant Joseph Richard, III was a citizen and national of the United States and a member of the United States Army when he was killed in Iraq on April 14, 2008.

1838.   On that date, Sergeant Richard was riding in a vehicle on a patrol in the Akad District of Baghdad just adjacent to Sadr City when an EFP detonation occurred, thus killing Sergeant Richard.

1839.   Plaintiff, Monique Shantel Green Richard, was at the time of Sergeant Joseph Richard, III's death and still is a citizen of the United States and a resident of the State of Louisiana. She is the Widow and Wife of Sergeant Joseph Richard, III.

1840.   Plaintiff, Elaine (Lois) Richard, was at the time of Sergeant Joseph Richard, III's death and still is a citizen of the United States and a resident of the State of Louisiana. She is the Mother of Sergeant Joseph Richard, III.

1841.   Plaintiff, Joseph Richard, Jr., was at the time of Sergeant Joseph Richard, III's death and still is a citizen of the United States and a resident of the State of Louisiana. He is the Father of Sergeant Joseph Richard, III.

1842.   Plaintiff, Carmen Richard Billedeaux, was at the time of Sergeant Joseph Richard, III's death and still is a citizen of the United States and a resident of the State of Louisiana. She is the Sister of Sergeant Joseph Richard, III.

1843.   Plaintiff, Monique Shantel Green Richard, is the Personal Representative of Sergeant Joseph Richard, III, in Parish of Beauregard, Louisiana under Number: P-20058-0131A.

1844.   As a direct result of the EFP attack, and the resulting wrongful death of Sergeant Joseph Richard, III, the Estate of Sergeant Joseph Richard, III is entitled to recover for the

substantial economic and earnings capacity loss.

1845.   As a direct result of the EFP attack, and the resulting death of Sergeant Joseph Richard, III, Plaintiffs, Monique Shantel Green Richard, Elaine (Lois) Richard, Joseph Richard, Jr., and Carmen Richard Billedeaux, have experienced various solatium-related damages, including intentional infliction of severe emotional distress, severe mental anguish, extreme emotional pain and suffering, a loss of society, companionship, comfort, advice and counsel, and substantial economic loss.

## ATTACK 59: APRIL 30, 2008 – BAGHDAD, IRAQ

### VVV.   The Pearson Family

1846.   Captain Andrew R. Pearson was a citizen and national of the United States and a member of the United States Army when he was killed in Iraq on April 30, 2008.

1847.   On that date, Captain Pearson was riding in a vehicle on a patrol in the Baiyaa, Al Rashid District of Baghdad just adjacent to Sadr City when an EFP detonation occurred, thus killing Captain Pearson.

1848.   Plaintiff, Jon Marie Pearson, was at the time of Captain Pearson's death and still is a citizen of the United States and a resident of the State of New York. She is the Widow of Captain Andrew R. Pearson.

1849.   Plaintiff, Jon Marie Pearson, is the Personal Representative of Captain Andrew R. Pearson in Parish of Beauregard, Louisiana under Number: P-20058-0131A.

1850.   As a direct result of the EFP attack, and the resulting wrongful death of Captain Andrew R. Pearson, the Estate of Captain Andrew R. Pearson is entitled to recover for the substantial economic and earnings capacity loss.

1851.   As a direct result of the EFP attack, and the resulting death of Captain Andrew R. Pearson, Plaintiff, Jon Marie Pearson has experienced various solatium-related damages, including

intentional infliction of severe emotional distress, severe mental anguish, extreme emotional pain and suffering, a loss of society, companionship, comfort, advice and counsel, and substantial economic loss.

## ATTACK 60: JUNE 1, 2008 – BAGHDAD, IRAQ

### WWW.   The Mixon Family

1852.   Specialist Justin Mixon was a citizen and national of the United States and a member of the United States Army when he was killed in Iraq on June 1, 2008.

1853.   On that date, Specialist Mixon was on a patrol riding in a Stryker Armored Combat Vehicle in a convoy of two Stryker vehicles and six low-boy trailers near the Al Jazair Police Station in Baghdad when an array of between six to eight EFPs detonated near his vehicle, causing a massive explosion, thus causing the death of Mixon and very serious injuries to the other occupant of the vehicle.

1854.   Plaintiff, Tia Mixon, was at the time of Specialist Mixon's death and still is a citizen of the United States and a resident of the State of Mississippi. She is the Widow of Specialist Mixon.

1855.   Plaintiff, T.R.M., a Minor represented by his legal guardian, Tia Mixon, is a citizen of the United States and a resident of the State of Mississippi. He is the son of Specialist Mixon.

1856.   Plaintiff, Melinda Mixon, was at the time of Specialist Mixon's death and still is a citizen of the United States and a resident of the State of Mississippi.  She is the Mother of Justin Mixon.

1857.   Plaintiff, Walter Mixon, was at the time of Specialist Mixon's death and still is a citizen of the United States and a resident of the State of Mississippi. He is the Father of Justin Mixon.

1858.   Plaintiff, Kenneth Mixon, was at the time of Specialist Mixon's death and still is a

citizen of the United States and a resident of the State of Louisiana. He is the Brother of Justin Mixon.

1859.   Plaintiff, Kimberly Spillyards, was at the time of Specialist Mixon's death and still is a citizen of the United States and a resident of the State of Louisiana. She is the Sister of Justin Mixon.

1860.   Plaintiff, Walter Mixon, brings an action individually and on behalf of the Estate of Justin Mixon, as its Personal Representative in Parish of Washington, Louisiana, under Probate Number: 16230-A.

1861.   As a direct result of the EFP attack, and the resulting wrongful death of Justin Mixon, the proper parties Plaintiff in the Wrongful Death action can and should recover for any pain and suffering experienced by Justin Mixon between the time of the EFP attack and his death, and for the substantial economic loss caused by his death.

1862.   As a direct result of the EFP attack, and the resulting wrongful death of Justin Mixon, Plaintiffs, Tia Mixon, T.R.M., a Minor, Walter Mixon, Melinda Mixon, Kenneth Mixon, and Kimberly Spillyards, have experienced various solatium-related damages, including intentional infliction of severe emotional distress, severe mental anguish, extreme emotional pain and suffering, loss of society, companionship, comfort, advice and counsel, consortium, and substantial economic loss.

## ATTACK 61: JUNE 25, 2008 - BAGHDAD, IRAQ

### XXX.  The Plocica Family

1863.   Specialist Joshua Plocica was a citizen and national of the United States and a member of the United States Army when he was killed in Iraq on June 25, 2008.

1864.   At that time, Specialist Plocica was in an armored M1151 HUMVEE in a convoy of vehicles consisting of two Mine Resistant Ambush Protected vehicles ("MRAPs"), four armored

M1151 HUMVEE vehicles, and five "Rhino Runner" armored buses, when a dual array of six EFPs each detonated near his vehicle, causing a massive explosion that killed Plocica and seriously injured the three other occupants of the vehicle.

1865.   Upon information and belief, the specific Special Group perpetrating this attack was Jaysh al-Mahdi.

1866.   Plaintiff, Lisa Thompson, is a citizen of the United States and resident of the State of Tennessee. She is the Mother of Joshua Plocica.

1867.   Plaintiff, Lowell "Keith" Thompson, is a citizen of the United States and resident of the State of Tennessee. He is the step-Father of Joshua Plocica.

1868.   Plaintiff, Brenna Corbin, is a citizen of the United States and resident of the State of Tennessee. She is the Sister of Joshua Plocica.

1869.   Plaintiff, Lisa Thompson, brings an action individually and on behalf of the Estate of Joshua Plocica, as its Personal Representative in Montgomery County, Tennessee at Clarksville Probate Division, under Case No. MC CM CV PB 18-0000079.

1870.   As a direct result of the EFP attack, and the resulting wrongful death of Joshua Plocica, the proper parties Plaintiff in the Wrongful Death action can and should recover for any pain and suffering experienced by Joshua Plocica between the time of the EFP attack and his death, and for the substantial economic loss caused by his death.

1871.   As a direct result of the EFP attack, and the resulting wrongful death of Joshua Plocica, Plaintiffs, Lisa Thompson, Lowell "Keith" Thompson, and Brenna Corbin have experienced various solatium-related damages, including intentional infliction of severe emotional distress, severe mental anguish, extreme emotional pain and suffering, loss of society, companionship, comfort, advice and counsel, consortium, and substantial economic loss.

## ATTACK 62: AUGUST 4, 2008 - BAGHDAD, IRAQ

### YYY.  The Blickenstaff Family

1872.   Specialist John Blickenstaff was a citizen and national of the United States and a member of the United States Army when he was seriously injured in Iraq on August 4, 2008. Blickenstaff is resident of the State of Indiana.

1873.   On August 4, 2008, Specialist Blickenstaff was operating as a Gunner and a Military Policeman and was riding in an M1151 HUMVEE vehicle as the lead vehicle of a four HUMVEE convoy when a dual array of eight EFPs each detonated next to his HUMVEE, causing a massive explosion and very serious physical and emotional injuries to Blickenstaff and the death of two other occupants of the vehicle.

1874.   Upon information and belief, the specific Special Group perpetrating this attack was Jaysh al-Mahdi.

1875.   As a result of the EFP attack, John Blickenstaff sustained massive injuries to both of his legs, including fractures of his tibia and fibula bones in his right leg, a transection of his peroneal artery in his right leg, extensive soft tissue injuries to his right leg, extensive wounds in and to the right leg, a fractured left tibia bone, a major injury to his right calf area which required significant surgery, shrapnel blown into and embedded inside various portions of his body, a major injury to his testicles which required an orchiotomy procedure, which is in essence a removal of the testicles, an amputated right second toe, developed traumatically-caused "hammer toes," a migraine headache syndrome, a brachial-plexus nerve injury, post-traumatic stress disorder ("PTSD"), panic attacks, anxiety disorder, cognitive difficulties, sleeping disorder, and depression.

1876.   As a result of the EFP attack, and the physical and emotional injuries he suffered as a direct result therefrom, John Blickenstaff has experienced severe physical and emotional pain and suffering in the past and will experience same into the indeterminable future; has incurred

medical bills for medical and rehabilitation services rendered and will incur same into the indeterminable future; has incurred an overwhelming loss of income and earnings capacity and will experience same into the indeterminable future; has experienced permanent injuries to his person and psyche; and has experienced severe mental anguish, anxiety and depression and will experience same into the indeterminable future.

1877.   Plaintiff, Misty Blickenstaff, was at the time of John Blickenstaff's attack and still is a citizen of the United States and a resident of the State of Indiana. She is the Wife of John Blickenstaff.

1878.   Plaintiff, M.B., a Minor, represented by her legal guardian, Misty Blickenstaff, was at the time of John Blickenstaff's attack and still is a citizen of the United States and a resident of the State of Indiana. She is the Daughter of John Blickenstaff.

1879.   Plaintiff, C.B., a Minor, represented by her legal guardian, Misty Blickenstaff, was at the time of John Blickenstaff's attack and still is a citizen of the United States and a resident of the State of Indiana. She is the Daughter of John Blickenstaff.

1880.   Plaintiff, Pam Jones, was at the time of John Blickenstaff's attack and still is a citizen of the United States and a resident of the State of Indiana. She is the Mother of John Blickenstaff.

1881.   Plaintiff, Jared Blickenstaff, was at the time of John Blickenstaff's attack and still is a citizen of the United States and a resident of the State of Indiana. He is the Brother of John Blickenstaff.

1882.   Plaintiff, Adrianne Blickenstaff, was at the time of John Blickenstaff's attack and still is a citizen of the United States and a resident of the State of Indiana. She is the Sister of John Blickenstaff.

1883.   Plaintiff, Trista Carter, was at the time of John Blickenstaff's attack and still is a citizen of the United States and a resident of the State of Indiana. She is the Sister of John Blickenstaff.

1884.   As a result of the EFP attack, and the physical and emotional injuries suffered by John Blickenstaff as a direct result therefrom, Plaintiffs, Misty Blickenstaff, M.B., a Minor, C.B., a Minor, Pam Jones, Jared Carter, Adrianne Blickenstaff and Trista Carter have suffered and experienced intentional infliction of severe emotional distress and loss of consortium-related damages.

**ZZZ.   The Henry Family**

1885.   Sergeant Gary Henry was a citizen and national of the United States and a member of the United States Army when he was killed in Iraq on August 4, 2008.

1886.   On that date, Sergeant Henry was acting as a Military Policeman and was riding in an M1151 HUMVEE vehicle as the lead vehicle of a four HUMVEE convoy when a dual array of eight EFPs each detonated next to his HUMVEE, thus causing a massive explosion that killed Henry and another vehicle occupant, seriously injured another occupant.

1887.   Upon information and belief, the specific Special Group perpetrating this attack was Jaysh al-Mahdi.

1888.   Plaintiff, Gary L. Henry, was at the time of Gary Henry's death and still is a citizen of the United States and a resident of the State of Indiana. He is the Father of Gary Henry.

1889.   As a direct result of the EFP attack, and the resulting wrongful death of Gary Henry, Plaintiff, Gary L. Henry, has experienced various solatium-related damages, including intentional infliction of severe emotional distress, severe mental anguish, extreme emotional pain and suffering, loss of society, companionship, comfort, advice and counsel, consortium, and substantial

economic loss.

## ATTACK 63: AUGUST 9, 2008 – SADR CITY, IRAQ

### AAAA.    The Ulloa Family

1890.    Sergeant Jose E. Ulloa was a citizen and national of the United States and a member of the United States Army when he was killed in Iraq on August 9, 2008.

1891.    On that date, Sergeant Ulloa was on a patrol riding in a Stryker Armored Combat Vehicle in a convoy of two Stryker vehicles and six low-boy trailers near the Al Jazair Police Station in Baghdad when an array of between six to eight EFPs detonated near his vehicle, causing a massive explosion, that killed Sergeant Ulloa and seriously injured the other occupant of the vehicle.

1892.    Plaintiff, Melanie Atzmann, was at the time of Sergeant Ulloa's death and still is a citizen of the United States and a resident of the State of New York. She is the Widow of Sergeant Jose E. Ulloa.

1893.    Plaintiff, S.U., a Minor represented by his legal guardian, Melanie Atzmann, is a citizen of the United States and a resident of the State of New York. He is the son of Sergeant Jose E. Ulloa.

1894.    Plaintiff, Francisca Marmol, was at the time of Sergeant Ulloa's death and still is a citizen of the United States and a resident of the State of New York.  She is the Sister who was also the legal guardian of Sergeant Jose E. Ulloa.

1895.    Plaintiff, Jose Ulloa, was at the time of Sergeant Ulloa's death and still is a citizen of the United States and a resident of the State of New York. He is the Father of Sergeant Jose E. Ulloa.

1896.    Plaintiff, Ruberterna Ulloa, was at the time of Sergeant Ulloa's death and still is a citizen of the United States and a resident of the State of New York. She is the Sister of Sergeant

Jose E. Ulloa.

1897.   Plaintiff, Stephanie Marmol, was at the time of Sergeant Ulloa's death and still is a citizen of the United States and a resident of the State of New York. She is the Sister of Sergeant Jose E. Ulloa.

1898.   Plaintiff, Stephanie Marmol, brings an action individually and on behalf of the Estate of Sergeant Jose E. Ulloa, as its Personal Representative in Parish of Washington, Louisiana, under Probate Number: 16230-A.

1899.   As a direct result of the EFP attack, and the resulting wrongful death of Jose E. Ulloa, the Estate of Jose Ulloa is entitled to recover for any pain and suffering experienced by Jose Ulloa between the time of the EFP attack and his death, and for the substantial economic loss caused by his death.

1900.   As a direct result of the EFP attack, and the resulting wrongful death of Sergeant Jose E. Ulloa, Plaintiffs, Melanie Atzmann, S.U., a Minor, Francisca Marmol, Jose Ulloa, Ruberterna Ulloa, and Stephanie Marmol, have experienced various solatium-related damages, including intentional infliction of severe emotional distress, severe mental anguish, extreme emotional pain and suffering, loss of society, companionship, comfort, advice and counsel, consortium, and substantial economic loss.

## ATTACK 64: FEBRUARY 15, 2009 - AS SALAM, IRAQ

### BBBB. The Diamond Family

1901.   Staff Sergeant Sean Diamond was a citizen and national of the United States and a member of the United States Army when he was killed in Iraq on February 15, 2009.

1902.   On that date, Staff Sergeant Diamond was on a patrol riding in a RG-31 Nyala Mine Protected Vehicle with another such vehicle near As Salam, Iraq, when an array of three EFPs detonated nearby his vehicle, causing a massive explosion, thereby causing his death and very

serious personal injuries to two other occupants.

1903.   Plaintiff, Loramay "Lora" Diamond, was at the time of Staff Sergeant Diamond's death and still is a citizen of the United States and a resident of the State of Washington. She is the Widow of Sean Diamond.

1904.   Plaintiff, Taylor M. Diamond, was at the time of Staff Sergeant Diamond's death and still is a citizen of the United States and a resident of the State of Washington. She is the Daughter of Sean Diamond.

1905.   Plaintiff, Madison J. Diamond, was at the time of Staff Sergeant Diamond's death and still is a citizen of the United States and a resident of the State of Washington. She is the Daughter of Sean Diamond.

1906.   Plaintiff, S.R.D., a Minor, represented by his legal guardian, Loramay "Lora" Diamond, was at the time of Staff Sergeant Diamond's death and still is a citizen of the United States and a resident of the State of Washington. He is the son of Sean Diamond.

1907.   Plaintiff, A.N.D., a Minor, represented by her legal guardian, Loramay "Lora" Diamond, was at the time of Staff Sergeant Diamond's death and still is a citizen of the United States and a resident of the State of Washington. She is the Daughter of Sean Diamond.

1908.   Plaintiff, Sally Diamond Wiley, was at the time of Staff Sergeant Diamond's death and still is a citizen of the United States and a resident of the State of Nevada. She is the Mother of Sean Diamond.

1909.   Plaintiff, James "Michael" Wiley, was at the time of Staff Sergeant Diamond's death and still is a citizen of the United States and a resident of the State of Nevada. He is the Step-Father of Sean Diamond.

1910.  Plaintiff, Jason Diamond, was at the time of Staff Sergeant Diamond's death and still is a citizen of the United States and a resident of the State of California. He is the Brother of Sean Diamond.

1911.  Plaintiff, Michael Diamond, was at the time of Staff Sergeant Diamond's death and still is a citizen of the United States and a resident of the State of California. He is the Brother of Sean Diamond.

1912.  Plaintiff, Loramay "Lora" Diamond, brings an action individually and on behalf of the Estate of Sean Diamond, as its Personal Representative in Pierce County, Washington, under Case Number: 18-4-01345-6.

1913.  As a direct result of the EFP attack, and the resulting wrongful death of Sean Diamond, the Estate of Sean Diamond is entitled to recover for any pain and suffering experienced by Sean Diamond between the time of the EFP attack and his death, and for the substantial economic loss caused by his death.

1914.  As a direct result of the EFP attack, and the resulting wrongful death of Sean Diamond, Plaintiff, Loramay "Lora" Diamond, Taylor M. Diamond, Madison J. Diamond, S.R.D., a Minor, A.N.D., a Minor, Sally Diamond Wiley, James "Michael" Wiley, Jason Diamond, and Michael Diamond experienced various solatium-related damages, including intentional infliction of severe emotional distress, severe mental anguish, extreme emotional pain and suffering, loss of society, companionship, comfort, advice and counsel, consortium, and substantial economic loss.

### ATTACK 65: APRIL 12, 2009 - BAYLA, IRAQ

**CCCC.  The Anaya Family**

1915.  Corporal Michael Anaya was a citizen and national of the United States and a member of the United States Army when he was killed in Iraq on April 12, 2009.

1916.  On that date, Corporal Anaya was riding in a Mine Resistant Ambush Protected

("MRAP") vehicle as the fourth vehicle in a four vehicle convoy near Forward Operating Base ("FOB") Summerall in Sharqat, Iraq, when an EFP detonation occurred, thus causing a massive explosion, thus causing Corporal Anaya's death.

1917.   The Combined Explosive Exploitation Cell ("CEXC") discovered copper remnants at the detonation scene and noted "copper-shaped charged, steel-lined IED 12 APR09."   The CEXC concluded that "this IED was an EFP…"

1918.   Plaintiff, Cheryl Anaya, was at the time of Corporal Anaya's death and still is a citizen of the United States and a resident of the State of Florida. She is the Mother of Michael Anaya.

1919.   Plaintiff, Trista Moffett, was at the time of Corporal Anaya's death and still is a citizen of the United States and a resident of the State of Florida. She is the Sister of Michael Anaya.

1920.   Plaintiff, Carmelo Anaya, Jr. was at the time of Corporal Anaya's death and still is a citizen of the United States and a resident of the State of Florida. He is the Brother of Michael Anaya.

1921.   Plaintiff, Cheryl Anaya, brings an action individually and on behalf of the Estate of Michael Anaya, as its Personal Representative in Okaloosa County, Florida, under Probate Case No.: 2018 CP 000460.

1922.   As a direct result of the EFP attack, and the resulting wrongful death of Michael Anaya, the Estate of Michael Anaya is entitled to recover for any pain and suffering experienced by Michael Anaya between the time of the EFP attack and his death, and for the substantial economic loss caused by his death.

1923.   As a direct result of the EFP attack, and the resulting wrongful death of Michael

Anaya, Plaintiffs, Cheryl Anaya, Trista Moffett, and Carmelo Anaya, Jr. have experienced various solatium-related damages, including intentional infliction of severe emotional distress, severe mental anguish, extreme emotional pain and suffering, loss of society, companionship, comfort, advice and counsel, consortium, and substantial economic loss.

### ATTACK 66: JULY 16, 2009 – BASRA, IRAQ

**DDDD.   The Wilcox Family**

1924.   Specialist Carlos Wilcox was a citizen and national of the United States and a member of the United States Army when he was killed in Iraq on July 16, 2009.

1925.   On that date, Specialist Wilcox was operating on a military base near Basrah, Iraq, when the vehicle in which he was then riding came under rocket fire that caused a massive explosion, which killed him.

1926.   Plaintiff, Charlene Wilcox, was at the time of Specialist Wilcox's death and still is a citizen of the United States and a resident of the State of Minnesota. She is the Mother of Carlos Wilcox.

1927.   Plaintiff, Bianca Wilcox, was at the time of Specialist Wilcox's death and still is a citizen of the United States and a resident of the State of Minnesota. She is the Sister of Carlos Wilcox.

1928.   Plaintiff, Ona Wilcox, was at the time of Specialist Wilcox's death and still is a citizen of the United States and a resident of the State of Minnesota. She is the Sister of Carlos Wilcox.

1929.   Plaintiff, Charles Wilcox III, was at the time of Specialist Wilcox's death and still is a citizen of the United States and a resident of the State of Minnesota. He is the Brother of Carlos Wilcox.

1930.   Plaintiff, Charlene Wilcox, brings an action individually and on behalf of the Estate

of Carlos Wilcox, as its Personal Representative in Washington County, Minnesota, under Court File No: 82-PR-18-999.

1931.   As a direct result of the rocket attack, and the resulting wrongful death of Carlos Wilcox, the proper parties Plaintiff in the Wrongful Death action can recover for any pain and suffering experienced by Carlos Wilcox between the time of the EFP attack and his death, and for the substantial economic loss caused by his death.

1932.   As a direct result of the rocket attack, and the resulting wrongful death of Carlos Wilcox, Plaintiffs, Charlene Wilcox, Bianca Wilcox, Ona Wilcox, and Charles Wilcox III have experienced various solatium-related damages, including intentional infliction of severe emotional distress, severe mental anguish, extreme emotional pain and suffering, loss of society, companionship, comfort, advice and counsel, consortium, and substantial economic loss.

## VIII.   CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### CIVIL LIABILITY UNDER 18 U.S.C. § 2333(a) AGAINST ALL DEFENDANTS FOR VIOLATIONS OF 18 U.S.C. § 2339A CONSTITUTING ACTS OF INTERNATIONAL TERRORISM

1933.   Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

1934.   By knowingly agreeing to provide, and providing, material support to Iran in an illegal manner, and knowing, or with deliberate indifference to the fact, that the objects and aims of the Conspiracy were to be used in preparation for or carrying out multiple acts set forth in 18 U.S.C. § 2339A, each Defendant violated § 2339A's express prohibition against conspiring to provide material support within the meaning of § 2339A, and committed and completed overt acts in furtherance of the Conspiracy.

1935.   Each Defendant's conduct in agreeing to provide Iran with hundreds of millions (or

more) of USD in an illegal manner, violated 18 U.S.C. § 2339A's express prohibition against concealing or disguising the nature, location, source, or ownership of material support or resources, knowing that the material support or resources are to be used in preparation for, or in carrying out, a violation of any of 18 U.S.C. §§ 32, 37, 81, 175, 229, 351, 831, 842(m)-(n), 844(f) or (i), 930 (c), 956, 1091, 1114, 1116, 1203, 1361, 1362, 1363, 1366, 1751, 1992, 2155, 2156, 2280, 2281, 2332, 2332a, 2332b, 2332f, 2340A, or 2442, 42 U.S.C. § 2284, 49 U.S.C. §§ 46502 or 60123 (b), or any offense listed in 18 U.S.C. § 2332b (g)(5)(B) (except for §§ 2339A and 2339B).

1936.  Both the Conspiracy itself and the acts of international terrorism that injured the Plaintiffs constitute acts of international terrorism under 18 U.S.C. § 2331, and constitute "engaging in terrorist activity" under 8 U.S.C. § 1182(a)(3)(B)(iii)-(iv), and/or "engaging in terrorism" under 22 U.S.C. § 2656f.

1937.  The Conspiracy between Iran and its agents and the Defendants (including Defendants John Does 1-50), and other non-defendant Co-conspirators resulted in the transfer of: (a) more than two hundred billion dollars through the United States in a manner designed to purposefully circumvent monitoring by U.S. regulators and law enforcement agencies; and (b) hundreds of millions of dollars to Hezbollah, the IRGC and other terrorist organizations (including the Special Groups) actively engaged in murdering and maiming U.S. nationals in Iraq.

1938.  The Defendants (including Defendants John Does 1-50) together with other nondefendant Co-conspirators (including Iran) agreed to, and did in fact, purposefully transfer billions of USD through the United States knowing that such funds would be delivered to Iran and Iranian agents, and that the payment order messages facilitating such funds transfers had been deliberately and intentionally structured, designed, and processed in a manner expressly designed

to ensure that such funds would not be detected or monitored by U.S. regulators and law enforcement agencies.

1939.   At the time each Defendant knowingly agreed to provide Iran material support in an illegal manner, each Defendant knew that the United States had formally designated Iran as a State Sponsor of Terrorism and knew, or was deliberately indifferent to the fact that, *inter alia*, Iran used the IRGC and Hezbollah as primary mechanisms to cultivate and support terrorism.

1940.   Among other things, and as documented in the U.S. State Department's 2013 Country Reports on Terrorism, between 2004 and 2011 the IRGC, in concert with Hezbollah, provided training outside of Iraq, as well as sending advisors to Iraq, to assist, train, supply and guide Special Groups in the construction and use of EFPs and other advanced weaponry, devices that constitute "weapons of mass destruction" as defined in 18 U.S.C. § 2332a, incorporating the definition of "destructive devices" set forth in 18 U.S.C. § 924(4)(A)-(C).

1941.   Each Defendant knew or was deliberately indifferent to the fact that Iran, the IRGC, Hezbollah, and the Special Groups engaged or engages in terrorist activity (8 U.S.C. § 1182(a)((3)(B)(iii)-(iv)), terrorism (22 U.S.C § 2656f), and acts of international terrorism (18 U.S.C. § 2331), including facilitating, funding, preparing for, and supporting terrorist activity by the Special Groups.

1942.   Through this clandestine stream of U.S. dollars, each Defendant knew, or was deliberately indifferent to the fact that as a result of knowingly agreeing to join the Conspiracy to provide Iran with illegal material support, such conduct foreseeably (and in fact did) facilitate the transfer of hundreds of millions of dollars in payments to the IRGC and Hezbollah through the international financial system, including payments initiated, processed, altered, modified, falsified, or released by or through the Defendants.

1943.   Each Defendant knowingly and purposefully agreed to provide material support and services to Iran in an illegal manner, knowing or deliberately indifferent to the fact that such illegal support and services facilitated Iran's clandestine support for the IRGC and Hezbollah, and that such agreements and resultant overt acts and conduct would foreseeably facilitate acts of international terrorism, terrorist activities, and terrorism, including homicides, attempted homicides, or conspiracies to commit homicide against U.S. nationals by the IRGC, Hezbollah and/or the Special Groups (including KH, JAM and AAH), as well as attacks conducted by weapons of mass destruction, such as EFPs, and bombings, attempted bombings, or conspiracies to bomb places of public use, state or government facilities, public transportation systems, or infrastructure facilities by the IRGC, Hezbollah, and/or the Special Groups.

1944.   The material support that Defendants knowingly agreed to illegally provide to Iran and Hezbollah's agents, provided foreseeable, substantial assistance to the IRGC, Hezbollah and the Special Groups, thereby preparing and facilitating acts of terrorism in violation of 18 U.S.C. §§ 1114, 1203, 1362, 2332(a), 2332(b), 2332(c), 2332a, and/or 2332f that caused Plaintiffs' injuries.

1945.   The material support that Defendants knowingly agreed to illegally provide to Iran included facilitating tens of millions of dollars in illicit transactions on behalf of MODAFL, the IRGC, Mahan Air and other instrumentalities of Iranian state-sponsored terror to enable numerous violations of the U.S. trade embargo against Iran, concealing Iran's efforts to evade U.S. sanctions and enabling Iran's acquisition from the United States of goods and technologies prohibited by U.S. law to be sold or transferred to Iran, including components of IEDs deployed against Coalition Forces in Iraq.

1946.   Each Defendant also: knew of the existence of other conspirators including some

or all of the Defendants; was aware that the other conspirators (including Defendants and Iranian Bank Co-conspirators) engaged in the same or similar conduct, and that the other conspirators shared the objective of providing material support to Iran in an illegal manner for the explicit purpose of enabling Iran to avoid U.S. sanctions and regulations enacted specifically to prevent Iran's ability to finance, support, prepare for, plan, or carry out acts of international terrorism, including the types of acts that injured the Plaintiffs.

1947.   Each Defendant also knew or was deliberately indifferent to the fact that one of the specific aims and objectives of the Conspiracy was keeping U.S. depository institutions, law enforcement and counter-terrorism agencies blind to Iran's movement of U.S. dollars through the international financial system, and thus also knew or was deliberately indifferent to the fact that the overt acts they performed in furtherance of the Conspiracy facilitated that specific objective.

1948.   Having entered into an agreement to provide Iran material support in an illegal manner, in direct contravention of U.S. laws and regulations enacted expressly to mitigate Iran's sponsorship of terrorism and terrorist organizations (including Weapons of Mass Destruction proliferation activities in furtherance of such sponsorship) each Defendant also knew or was deliberately indifferent to the fact, that the Conspiracy's aims would foreseeably result in Iran transferring millions of dollars in order to engage in terrorist activities (8 U.S.C. § 1182(a)(3)(B)(iii)-(iv)), terrorism (22 U.S.C. § 2656f), and acts of international terrorism (18 U.S.C. § 2331).

1949.   The Defendants' overt acts and agreement to purposefully transfer billions of dollars through the United States to Iran in a manner expressly designed to ensure that the funds could be transferred by and to Iran without being monitored by U.S. regulators and law

enforcement agencies, involved acts that were dangerous to human life, by their nature, and as further evidenced by their consequences.

1950.   The Defendants' acts either occurred primarily outside the territorial jurisdiction of the United States or transcended national boundaries in terms of the means by which they were accomplished.

1951.   Each Defendant's agreement to enter into the Conspiracy and purposeful transfer of billions of dollars through the United States in a manner designed to purposefully circumvent monitoring by U.S. regulators and law enforcement agencies foreseeably resulted in material support being delivered in order to carry out or prepare for violations of, *inter alia*, 18 U.S.C. §§ 2332(a)-(c), 2332a, and § 2332f by the IRGC, Hezbollah and/or the Special Groups, and were thus themselves acts of international terrorism because they either were, or objectively appear to have been intended to: (a) intimidate or coerce the civilian population of the United States and other nations, (b) influence the policy of the governments of the United States and other nations by intimidation or coercion, and/or (c) affect the conduct of the governments of the United States and other nations by facilitating the IRGC, Hezbollah and/or the Special Groups' abilities to prepare for, support, fund, train, initiate, and/or carry out mass destruction and murder.

1952.   Each Defendant's conduct was a substantial cause in fact and a significant factor in the chain of events leading to the Plaintiffs' injuries, and foreseeably, substantially enhanced the IRGC, Hezbollah and the Special Groups' ability to engage in terrorist activity (8 U.S.C. § 1182(a)(3)(B)(iii)-(iv)), terrorism (22 U.S.C. § 2656f), and/or commit acts of international terrorism (18 U.S.C. § 2331) (including violations of 18 U.S.C. §§ 1114, 1203, 1362, 2332(a), 2332(b), 2332(c), 2332a, and/or 2332f and 2339A). Each Defendant's conduct was thus also a substantial, foreseeable factor in bringing about the Plaintiffs' injuries.

1953.   Furthermore, each Plaintiff's injuries constitutes a harm falling within the foreseeable risk contemplated by each Defendant's violations, including each Defendant's knowing agreement to enter into the Conspiracy, each Defendant's performance of overt acts in furtherance of the Conspiracy, and each Defendant's knowledge or deliberate indifference to the full scope, objectives, and results of the Conspiracy. Injuries resulting from terrorist attacks (including attacks launched by Hezbollah and the Special Groups) that were planned, supported by, funded, or assisted by Iran are precisely the risks contemplated by Executive Orders, statutes and regulations (including, without limitation, designations under Executive Orders specifically concerning the IRGC, Defendant Bank Saderat Plc, and the IRISL) enacted specifically to ensure that Iran had restricted access to USD and financial services under conditions of maximum transparency, that such dollars were used only for legitimate agencies, operations, and programs and not by or for the benefit of SDNs, and not for Iran's efforts to acquire, develop, and distribute Weapons of Mass Destruction (including weapons such as EFPs directed at Coalition Forces), and to ensure that any funds Iran did receive that touched U.S. depository institutions could be monitored by U.S. regulators and law enforcement agencies.

1954.   Through its conduct as described above, by knowingly entering into the Conspiracy and violating 18 U.S.C. § 2339A in the manner and with the state of mind alleged above, each Defendant committed acts of international terrorism and is civilly liable for damages to each Plaintiff for their injuries pursuant to 18 U.S.C. § 2333(a).

**SECOND CLAIM FOR RELIEF**
**CIVIL LIABILITY UNDER 18 U.S.C. § 2333(a) AGAINST ALL DEFENDANTS FOR VIOLATIONS OF 18 U.S.C. § 2339B CONSTITUTING ACTS OF INTERNATIONAL TERRORISM**

1955.   Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

1956.   In knowingly agreeing to provide, and providing, material support to Iran in an illegal manner, and knowing, or deliberately indifferent to the fact, that the objects and aims of the Conspiracy were to provide material support to Foreign Terrorist Organizations (FTOs), including Hezbollah and Kata'ib Hezbollah, each Defendant violated § 2339B's express prohibition against conspiring to provide material support within the meaning of § 2339B, and committed and completed overt acts in furtherance of the Conspiracy

1957.   The Defendants herein (including Defendants John Does 1-50) and Iran agreed to, and did in fact, purposefully transfer hundreds of billions of dollars through the United States in a manner expressly designed to purposefully circumvent monitoring by U.S. regulators and law enforcement agencies and evade U.S. sanctions; minimize the transparency of their financial activities; and knowingly, or with deliberate indifference, facilitated the transfer of tens of millions of dollars in payments to Hezbollah through the international financial system. In doing so, the Defendants were willing to, and did, commit numerous felonies under U.S. law to assist Iran in concealing its financial activities and violated 18 U.S.C. § 2339B by knowingly, or with deliberate indifference, entering the Conspiracy, which provided material support to FTOs that were responsible for Plaintiffs' injuries.

1958.   At the time each Defendant knowingly agreed to provide Iran material support in an illegal manner, each Defendant knew that Iran had, since 1984, been officially designated by the United States as a State Sponsor of Terrorism, subject to various U.S. sanctions, and knew or was deliberately indifferent to the fact that such designation was based in part on Iran's sponsorship and patronage of Hezbollah and other FTOs, and that Iran used Hezbollah as a primary mechanism to enable it to cultivate and support terrorism.

1959.   Each Defendant knew, or was deliberately indifferent to the fact that, Hezbollah

was designated an FTO at all times relevant to this action. Each Defendant also knew that Hezbollah engaged in terrorist activities (8 U.S.C. § 1183(a)(3)(B)(iii)-(iv)), terrorism (22 U.S.C.§ 2656f), and acts of international terrorism (18 U.S.C. § 2331).

1960.   Each Defendant knew or was deliberately indifferent to the fact that its agreement to provide Iran material support in an illegal manner, and the overt acts it completed in connection with the Conspiracy, unlawfully evaded U.S. sanctions and regulations directed at mitigating the risk that Iran would carry out, support, fund, plan for, prepare, conspire with, or facilitate acts of international terrorism by FTOs, including acts planned, attempted, and perpetrated by Iran's proxy, agent, and strategic partner, Hezbollah.

1961.   Both the Conspiracy itself and the acts of international terrorism that injured the Plaintiffs constitute acts of international terrorism under 18 U.S.C. § 2331, and constitute "engaging in terrorist activity" under 8 U.S.C. § 1182(a)(3)(B)(iii)-(iv), and/or "engaging in terrorism" under 22 U.S.C. § 2656f.

1962.   Each Defendant also: knew of the existence of other Co-conspirators including some or all of the Defendants; was aware that the other Co-conspirators (including Defendants and Iranian Bank Co-conspirators) engaged in the same or similar conduct, and that the other Co-conspirators shared the objective of providing material support and services to Iran in an illegal manner for the explicit purpose of enabling Iran to avoid U.S. sanctions and regulations enacted specifically to prevent Iran's ability to finance, support, prepare for, plan, or carry out acts by FTOs including Iran's proxy, agent, and strategic partner, Hezbollah.

1963.   Each Defendant also knew or was deliberately indifferent to the fact that one of the specific aims and objectives of the Conspiracy was to keep U.S. depository institutions, law enforcement and counter-terrorism agencies blind to Iran's movement of U.S. dollars through the

international financial system, and thus also knew or was deliberately indifferent to the fact that the overt acts it performed in furtherance of the Conspiracy facilitated that specific objective.

1964.   Having entered into an agreement to provide Iran material support in an illegal manner, in direct contravention of U.S. laws and regulations enacted expressly to mitigate Iran's sponsorship of terrorism and terrorist organizations (including Weapons of Mass Destruction proliferation activities in furtherance of such sponsorship), each Defendant also knew or was deliberately indifferent to the fact, that the Conspiracy's aims would foreseeably result in Iran transferring millions of dollars to Hezbollah, an FTO.

1965.   The material support that each Defendant, through the Conspiracy, knowingly, or with deliberate indifference, provided to Hezbollah, constituted substantial assistance to Hezbollah, thereby facilitating acts of terrorism in violation of §§ 1114, 1203, 1362, 2332(a), 2332(b), 2332(c), 2332a, and/or 2332f, and that has caused injuries to Plaintiffs.

1966.   The Defendants' overt acts in entering into the Conspiracy and knowingly agreeing to provide Iran – a known and designated State Sponsor of Terrorism – material support and services in an illegal manner, and resultant, purposeful transfer of billions of USD through the United States in a manner expressly designed to ensure that the funds could be transferred without being monitored by U.S. regulators and law enforcement agencies – involved acts that were dangerous to human life, by their nature, and as further evidenced by their consequences.

1967.   The Defendants' acts either occurred primarily outside the territorial jurisdiction of the United States or transcended national boundaries in terms of the means by which they were accomplished.

1968.   Each Defendant's agreement to enter into the Conspiracy and purposeful transfer (collectively) of billions of dollars through the United States in a manner designed to purposefully

circumvent monitoring by U.S. regulators and law enforcement agencies foreseeably resulted in material support being provided to FTOs, and were thus themselves acts of international terrorism because they either were, or objectively appear to have been intended to: (a) intimidate or coerce the civilian population of the United States and other nations, (b) influence the policy of the governments of the United States and other nations by intimidation or coercion (in part to cause them to withdraw Coalition Forces from Iraq), and/or (c) affect the conduct of the governments of the United States and other nations by facilitating Hezbollah's role in killing and injuring hundreds of American nationals in Iraq.

1969.   Each Defendant's conduct was a substantial cause in fact and a significant factor in the chain of events leading to the Plaintiffs' injuries, and foreseeably, substantially accelerated and multiplied Hezbollah's ability to engage in terrorist activity (8 U.S.C. § 1182(a)(3)(B)(iii)-(iv)), terrorism (22 U.S.C. § 2656f), and acts of international terrorism under the definition set forth in 18 U.S.C. § 2331. Each Defendant's conduct was thus also a substantial, foreseeable factor in bringing about the Plaintiffs' injuries.

1970.   Furthermore, each Plaintiff's injuries constitutes a harm falling within the risk contemplated by each Defendant's violations, including each Defendant's knowing agreement to enter into the Conspiracy, the overt acts each Defendant performed in furtherance of the Conspiracy, and each Defendant's knowledge of, or deliberate indifference to, the fact that a specific, foreseeable aim and purpose of the Conspiracy was to provide material support to Hezbollah and other FTOs. Injuries resulting from terrorist attacks planned, designed, assisted, funded, initiated, and/or overseen by Hezbollah are precisely the risks contemplated by statutes, regulations and Executive Orders designed to ensure that Hezbollah's sponsor, principal, and strategic partner – Iran – had restricted access to U.S. dollars and financial services, and that any

funds it did receive that touched U.S. depository institutions were transparent and could be blocked if warranted.

1971.   Through its conduct as described above, by knowingly entering into the Conspiracy and violating 18 U.S.C. § 2339B in the manner and with the state of mind alleged above, each Defendant committed acts of international terrorism and is civilly liable for damages to each Plaintiff for their injuries pursuant to 18 U.S.C. § 2333(a).

### THIRD CLAIM FOR RELIEF
### CIVIL LIABILITY AGAINST HSBC BANK USA, N.A. UNDER 18 U.S.C. § 2333(a) FOR VIOLATIONS OF 18 U.S.C. § 2332d CONSTITUTING ACTS OF INTERNATIONAL TERRORISM

1972.   Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

1973.   Defendant HSBC-US is a juridical person organized under the laws of the United States pursuant to 18 U.S.C. § 2332d(b)(2)(C), and is also a person within the United States pursuant to 18 U.S.C. § 2332d(b)(2)(D).

1974.   As alleged above, at all relevant times HSBC-US knew that Iran was a country designated by the United States under section 6(j) of the Export Administration Act of 1979 (50 App. U.S.C. 2405) as a country supporting international terrorism, yet HSBC-US nevertheless engaged in thousands of financial transactions with Iran in violation of 18 U.S.C. § 2332d.

1975.   Defendant HSBC-US also knew, or was deliberately indifferent to the fact, that Hezbollah had been designated an FTO.

1976.   Defendant HSBC-US also knew, or was deliberately indifferent to the fact, that the IRGC-QF had been designated an SDGT.

1977.   Defendant HSBC-US also knew, or was deliberately indifferent to the fact, that Bank Saderat (including Defendant Bank Saderat Plc) had been designated an SDGT.

1978.   Defendant HSBC-US also knew, or was deliberately indifferent to the fact, that the IRGC had been designated an SDN.

1979.   Defendant HSBC-US also knew or was deliberately indifferent to the fact that Bank Melli (including Melli Bank Plc), Bank Saderat (including Defendant Bank Saderat Plc), Bank Mellat, and Bank Sepah had been designated SDNs before November 2008, and, as such, were excluded from accessing the U-Turn exemption in the Iranian Transaction Regulations.

1980.   Defendant HSBC-US also knew or was deliberately indifferent to the fact that the IRISL and multiple IRISL entities had been designated SDNs.

1981.   As alleged above, HSBC-US knowingly conducted illegal financial transactions on behalf of Iran through Bank Melli and other Iranian counter-parties that did not fall within the safe harbor provisions of the regulations issued by the U.S. Treasury Department – regulations passed for the specific purposes of mitigating the risk that funds transfers to Iran could be used to: engage in terrorist activity under 8 U.S.C. § 1182(a)(3)(B)(iii)-(iv), terrorism under 22 U.S.C. § 2656f, or acts of international terrorism under 18 U.S.C. § 2331.

1982.   In fact, the transactions at issue (including at least the $183 million HSBC-US facilitated on behalf of sanctioned entities in Iran that were identified in HSBC-US's December 11, 2012 Deferred Prosecution Agreement with DOJ) explicitly violated 31 C.F.R 535.701(a)(2) and 31 C.F.R 560.203.

1983.   Defendant HSBC-US knew that Defendants HSBC-Europe and HSBC-Middle East were deliberately altering and omitting information in funds transfer payment order messages being processed through HSBC-US, thereby evading U.S. laws and regulations whose express purpose was (and is) to ensure that only a very limited class of payments could be facilitated to Iran, and that payment order messages for such funds transfers required transparency in order to

ensure that the transfers qualified for the limited exceptions and exemptions, and did not result in U.S. depository institutions processing transactions for the benefit of SDNs.

1984.   As alleged in detail above, throughout the relevant time period, HSBC-US knew that other HSBC Defendants such as HSBC-London and HSBC-Middle East were providing material support to Iran in a manner violating U.S. laws and regulations, and HSBC-US also knew its own systems and networks were being used to facilitate the HSBC Defendants' illegal conduct.

1985.   Defendant HSBC-US also thus knew or was deliberately indifferent to the fact that Iran, the IRGC, IRISL, Hezbollah, and Defendant Bank Saderat Plc all engaged in terrorist activity under 8 U.S.C. § 1182(a)(3)(B)(iii)-(iv), terrorism under 22 U.S.C. § 2656f, and acts of international terrorism under 18 U.S.C. § 2331 (including violations of 18 U.S.C. §§ 1114, 1203, 1362, 2332(a), 2332(b), 2332(c), 2332a, and/or 2332f), and that Iran provided massive support and sponsorship for violations of all these statutes, while also providing support for other acts of international terrorism, such as those planned, attempted, and/or perpetrated by the Special Groups.

1986.   Knowing that Defendants HSBC-London and HSBC-Middle East were moving billions of sanctions-evading Iranian USD through HSBC-US's offices with the specific intent of defeating HSBC-US's OFAC filters and violating HSBC-US reporting requirements, it was reasonably foreseeable that HSBC-US's conduct would aid Iran and Iran's agents, proxies, and strategic partners (including Hezbollah, the IRGC, and Special Groups) to engage in terrorist activity under 8 U.S.C. § 1182(a)(3)(B)(iii)-(iv), terrorism under 22 U.S.C. § 2656f, and acts of international terrorism under 18 U.S.C. § 2331.

1987.   Because Defendant HSBC-US is a financial institution operating in the United States, at all times relevant to the Complaint, it is deemed by law to be aware of all designations

made to the SDN list, including without limitation designations for Iran, Hezbollah, the IRGC, the IRGC-QF, Bank Saderat (including Defendant Bank Saderat Plc), Bank Melli, Bank Mellat, Bank Sepah, IRISL (and multiple IRISL entities).

1988.   Defendant HSBC-US thus also knew or was deliberately indifferent to the fact that Bank Melli (including Melli Bank Plc), Bank Saderat (including Defendant Bank Saderat Plc) Bank Mellat, and Bank Sepah had been designated SDNs before November 2008, and, as such, were excluded from accessing the U-Turn exemption in the Iranian Transaction Regulations.

1989.   Defendant HSBC-US's conduct foreseeably and substantially enhanced Hezbollah's, the IRGC's and the Special Groups' and other Iranian-sponsored terrorists' ability to engage in terrorist activity, including preparing and facilitating acts of terrorism in violation of 18 U.S.C. §§ 1114, 1203, 1362, 2332(a), 2332(b), 2332(c), 2332a, and/or 2332f that caused Plaintiffs' injuries, and thus HSBC-US's conduct was also a substantial, foreseeable factor in bringing about the Plaintiffs' injuries.

1990.   Defendant HSBC-US's knowing or deliberately indifferent provision of illegal financial services to Iran, enabled Iran to move billions of U.S. dollars through the United States without those funds being monitored by U.S. regulators and law enforcement agencies and therefore involved acts that were dangerous to human life, by their nature and as evidenced by their consequences.

1991.   Defendant HSBC-US's acts transcended national boundaries in terms of the means by which they were accomplished.

1992.   Defendant HSBC-US's conduct itself constitutes an act of international terrorism because it either was, or objectively appears to have been intended to: (a) intimidate or coerce the civilian population of the United States and other nations, (b) influence the policy of the

governments of the United States and other nations by intimidation or coercion, and/or (c) affect the conduct of the governments of the United States and other nations by facilitating Iran's ability to prepare for and/or carry out mass destruction and murder.

1993.  Furthermore, each Plaintiff's injuries constitute a harm falling within the risk contemplated by Defendant HSBC-US's violations, including its knowing agreement to provide illegal services to Iran. Injuries resulting from terrorist attacks (including attacks launched by Hezbollah or the Special Groups) that were planned, supported by, funded, or assisted by the IRGC and/or Hezbollah are precisely the risks contemplated by Executive Orders, statutes and regulations designed to ensure that Iran had restricted access to U.S. dollars and financial services, and that any funds it did receive that touched U.S. depository institutions could be monitored by U.S. regulators and law enforcement agencies, and that the transactions were not for the benefit of SDNs.

1994.  Through its conduct as described above, by violating § 2332d in the manner and with the state of mind alleged above, HSBC-US committed acts of international terrorism, and is civilly liable for damages to each Plaintiff for their injuries pursuant to 18 U.S.C. § 2333(a).

### FOURTH CLAIM FOR RELIEF
### CIVIL LIABILITY UNDER 18 U.S.C. § 2333(a) AGAINST STANDARD CHARTERED BANK, ROYAL BANK OF SCOTLAND N.V. AND COMMERZBANK FOR VIOLATIONS OF 18 USC § 2332d CONSTITUTING ACTS OF INTERNATIONAL TERRORISM

1995.  Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

1996.  Defendants SCB, ABN Amro (RBS N.V.), and Commerzbank each utilized their respective New York branches in connection with their agreement to provide Iran material support in an illegal manner in order to effectuate and facilitate the Conspiracy, and each of those

respective New York branches is a "person in the United States" within the scope of 18 U.S.C. § 2332d(b)(2)(D).

1997.  As set forth above, each of the above-referenced Defendants knew or was deliberately indifferent to the fact that Iran was designated under section 6(j) of the Export Administration Act of 1979 (50 App. U.S.C. 2405) as a country supporting international terrorism and nonetheless knowingly engaged in thousands of illegal financial transactions with the government of Iran through their U.S. operations.

1998.  The New York branch of each of the above-referenced Defendants also knew, or was deliberately indifferent to the fact, that Hezbollah had been designated an FTO, that the IRGC-QF and Bank Saderat (including Defendant Bank Saderat Plc) had each been designated an SDGT, and that multiple other Iranian actors and agents (including the IRGC, Bank Melli, Bank Mellat, Bank Sepah, IRISL (and multiple IRISL entities)) had been designated SDNs.

1999.  The New York branches of the above-referenced Defendants also knew or were deliberately indifferent to the fact that Bank Melli (including Melli Bank Plc), Bank Saderat (including Defendant Bank Saderat Plc), Bank Mellat, and Bank Sepah had been designated SDNs before November 2008, and, as such, were excluded from accessing the U-Turn exemption in the Iranian Transaction Regulations.

2000.  As set forth above, the illegal transactions knowingly facilitated through New York by the respective New York branches of the above-referenced Defendants thus did not fall within the safe harbor provisions of the regulations issued by the U.S. Treasury Department for U-Turn exemption transactions, and therefore violated the criminal provisions of 18 U.S.C § 2332d(a).

2001.  In fact, the transactions at issue explicitly violated 31 C.F.R 535.701(a)(2) and 31 C.F.R 560.203.

2002.  Each of the above-referenced Defendants' New York branch's acts transcended national boundaries in terms of the means by which they were accomplished.

2003.  Each of the above-referenced Defendants' New York branch's conduct foreseeably and substantially enhanced Hezbollah's, the IRGC's and Special Groups' and other Iranian sponsored terrorists' ability to engage in terrorist activity, including preparing and facilitating acts of terrorism in violation of 18 U.S.C. §§ 1114, 1203, 1362, 2332(a), 2332(b), 2332(c), 2332a, and/or 2332f that caused Plaintiffs' injuries, and thus each of the above Defendants' New York branch's conduct was also a substantial, foreseeable factor in bringing about the Plaintiffs' injuries.

2004.  Each of the above-referenced Defendant's New York branch knowingly, or with deliberate indifference, provided financial services to Iran in the United States, knowing that its conduct enabled Iran to move millions (or in some cases, billions) of USD through the United States without those funds being monitored by U.S. regulators and law enforcement agencies.  That conduct involved acts that were dangerous to human life, by their nature and as evidenced by their consequences.

2005.  Each of the above-referenced Defendant's conduct itself constitutes an act of international terrorism because it either was, or objectively appears to have been intended to: (a) intimidate or coerce the civilian population of the United States and other nations, (b) influence the policy of the governments of the United States and other nations by intimidation or coercion, and/or (c) affect the conduct of the governments of the United States and other nations by facilitating Iran's ability to prepare for and/or carry out mass destruction and murder.

2006.  Furthermore, each Plaintiff's injuries constitute a harm falling within the risk contemplated by each of the above-referenced Defendants' New York branch's unlawful conduct, including their knowing agreement to provide illegal services to Iran. Injuries resulting from

terrorist attacks (including attacks launched by Hezbollah or the Special Groups) that were planned, supported by, funded, or assisted by the IRGC and/or Hezbollah are precisely the risks contemplated by Executive Orders, statutes and regulations designed to ensure that Iran had restricted access to U.S. dollars and financial services, and that any funds it did receive that touched U.S. depository institutions could be monitored by U.S. regulators and law enforcement agencies.

2007.   Each of the above-referenced Defendants' criminal violations of the provisions of 18 U.S.C. § 2332d(a) was a sufficient cause of Plaintiffs' injuries, and, for the reasons alleged in Plaintiffs' Third Claim for Relief against Defendant HSBC-US, constitutes an act of international terrorism rendering each of the above Defendants civilly liable for damages to each Plaintiff for their injuries pursuant to 18 U.S.C. § 2333(a).

**FIFTH CLAIM FOR RELIEF**
**CIVIL LIABILITY AGAINST COMMERZBANK AG UNDER 18 U.S.C. § 2333(a) FOR VIOLATIONS OF 18 U.S.C. § 2339A CONSTITUTING ACTS OF INTERNATIONAL TERRORISM**

2008.   Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

2009.  Defendant Commerzbank provided material support to the IRGC through Commerzbank's acts on behalf of IRISL, and Commerzbank violated § 2339A in concealing and disguising the nature, location, source, and ownership of material support it provided to IRISL, knowing or deliberately indifferent to the fact, that IRISL and the IRGC would use that support in preparation for, or in carrying out acts of international terrorism, including violations of 18 U.S.C. §§ 1114, 1203, 1362, 2332(a), 2332(b), 2332(c), 2332a, and/or 2332f .

2010.   Defendant Commerzbank knew or was deliberately indifferent that to the fact that the IRISL had been designated an SDN for Weapons of Mass Destruction-related activities that included arms shipments, including shipments destined for Hezbollah and other terrorists.

2011.   Defendant Commerzbank's conduct was a substantial cause in fact and a significant factor in the chain of events leading to the Plaintiffs' injuries, and substantially accelerated and multiplied the IRGC's ability to engage in terrorist activity (8 U.S.C § 1182(a)(3)(B)(iii)-(iv)), terrorism (22 U.S.C. § 2656f), and/or commit acts of international terrorism as that terms is defined in 18 U.S.C. § 2331.

2012.   The material support that Commerzbank knowingly and illegally provided to the IRISL provided foreseeable, substantial assistance to the IRGC, Hezbollah and the Special Groups, thereby preparing and facilitating acts of terrorism in violation of 18 U.S.C. §§ 1114, 1203, 1362, 2332(a), 2332(b), 2332(c), 2332a, and/or 2332f that caused Plaintiffs' injuries, and thus Commerzbank's conduct was also a substantial, foreseeable factor in bringing about the Plaintiffs' injuries.

2013.   Commerzbank's illegal conduct transcended national boundaries in terms of the means by which it was accomplished.

2014.   Commerzbank's knowing or deliberately indifferent provision of illegal financial services to the IRGC and IRISL involved acts that were dangerous to human life, by their nature and as evidenced by their consequences.

2015.   Commerzbank's conduct itself constitutes an act of international terrorism because it either was, or objectively appears to have been intended to: (a) intimidate or coerce the civilian population of the United States and other nations, (b) influence the policy of the governments of the United States and other nations by intimidation or coercion, and/or (c) affect the conduct of the governments of the United States and other nations by facilitating Iran's ability to prepare for and/or carry out mass destruction and murder.

2016.   Furthermore, each Plaintiff's injuries constitute a harm falling within the risk

contemplated by Commerzbank's material support to the IRGC and IRISL. Injuries resulting from terrorist attacks perpetrated, planned, supported by, funded, or assisted by Iran and Hezbollah are precisely the risks contemplated by statutes and regulations designed to ensure that the IRGC, IRISL and Iran had restricted access to USD and financial services, and that any funds they did receive that touched U.S. depository institutions were transparent and could be blocked if warranted, and did not benefit an SDN.

2017.   Through its conduct as described above, by knowingly or with deliberate indifference, providing material support to Iran, the IRGC, and IRISL, and thereby violating 18 U.S.C. § 2339A in the manner and with the state of mind alleged above, Commerzbank is civilly liable for damages to each Plaintiff for their injuries pursuant to 18 U.S.C. § 2333(a).

**SIXTH CLAIM FOR RELIEF**
**CIVIL LIABILITY AGAINST COMMERZBANK AG UNDER 18 U.S.C. § 2333(a) FOR VIOLATIONS OF 18 U.S.C. § 2339B CONSTITUTING ACTS OF INTERNATIONAL TERRORISM**

2018.   Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

2019.   Defendant Commerzbank violated § 2339B by providing material support to Hezbollah through Commerzbank's acts on behalf of its customer Waisenkinderprojekt Libanon e.V. (Orphans Project Lebanon e.V.).

2020.   Commerzbank knew, or was deliberately indifferent to the fact, that Orphans Project Lebanon e.V. was transferring funds through Commerzbank to FTO Hezbollah and that Hezbollah would use that support in preparation for, or in carrying out, acts of international terrorism, including violations of 18 U.S.C. §§ 1114, 1203, 1362, 2332(a), 2332(b), 2332(c), 2332a, and/or 2332f.

2021.   Defendant Commerzbank's conduct was a substantial cause in fact and a significant

factor in the chain of events leading to the Plaintiffs' injuries, and substantially accelerated and multiplied Hezbollah's ability to engage in terrorist activity (8 U.S.C § 1182(a)(3)(B)(iii)-(iv)), terrorism (22 U.S.C. § 2656f), and acts of international terrorism as that terms is defined in 18 U.S.C. § 2331.

2022.   The material support that Commerzbank knowingly and illegally provided to the Orphans Project Lebanon e.V. and hence to Hezbollah, provided foreseeable, substantial assistance to the Hezbollah and the Special Groups, thereby preparing and facilitating acts of terrorism in violation of 18 U.S.C. §§ 1114, 1203, 1362, 2332(a), 2332(b), 2332(c), 2332a, and/or 2332f that caused Plaintiffs' injuries, and thus Commerzbank's conduct was also a substantial, foreseeable factor in bringing about the Plaintiffs' injuries.

2023.   Commerzbank's illegal conduct transcended national boundaries in terms of the means by which it was accomplished.

2024.   Commerzbank's knowing or deliberately indifferent provision of illegal financial services to Hezbollah involved acts that were dangerous to human life, by their nature and as evidenced by their consequences.

2025.   Commerzbank's conduct itself constitutes an act of international terrorism because it either was, or objectively appears to have been intended to: (a) intimidate or coerce the civilian population of the United States and other nations, (b) influence the policy of the governments of the United States and other nations by intimidation or coercion, and/or (c) affect the conduct of the governments of the United States and other nations by facilitating Iran's ability to prepare for and/or carry out mass destruction and murder.

2026.   Furthermore, each Plaintiff's injuries constitute a harm falling within the risk contemplated by Commerzbank's material support to Hezbollah.

2027.   Through its conduct as described above, by knowingly or with deliberate indifference, providing material support to Hezbollah, and thereby violating 18 U.S.C. § 2339B in the manner and with the state of mind alleged above, Commerzbank is civilly liable for damages to each Plaintiff for their injuries pursuant to 18 U.S.C. § 2333(a).

**SEVENTH CLAIM FOR RELIEF**
**CIVIL LIABILITY AGAINST STANDARD CHARTERED BANK UNDER 18 U.S.C. §**
**2333(a) FOR VIOLATIONS OF 18 U.S.C. § 2339A CONSTITUTING ACTS OF**
**INTERNATIONAL TERRORISM**

2028.   Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

2029.   Defendant Standard Chartered Bank provided material support to the IRGC and its Qods Force through its acts on behalf of Mahan Air, MODAFL and other entities identified *supra* in violation of § 2339A by concealing and disguising the nature, location, source, and ownership of material support it provided to Mahan Air, MODAFL and other entities identified *supra*, knowing or deliberately indifferent to the fact that the IRGC and its Qods Force would use that support in preparation for, or in carrying out, acts of international terrorism, including violations of 18 U.S.C. §§ 1114, 1203, 1362, 2332(a), 2332(b), 2332(c), 2332a, and/or 2332f .

2030.   Defendant Standard Chartered Bank knew or was deliberately indifferent to the fact that Mahan Air, MODAFL and other entities identified *supra* were utilizing Letters of Credit facilitated by Standard Chartered Bank to evade U.S. sanctions and acquire materials used, *inter alia*, to effectuate arms shipments, transport weapons, personnel and technology to the IRGC-QF and Hezbollah.

2031.   Mahan Air did, in fact, transport weapons, personnel and technology into Iraq on behalf of the IRGC-QF and Hezbollah and did, in fact, transport modules used to control and activate IEDs and EFPs deployed against Coalition Forces in Iraq.

2032.   Iran could not have successfully evaded U.S. sanctions and obtained raw materials and manufacturing equipment prohibited by the International Traffic in Arms Regulations ("ITARs"), Export Administration Regulations ("EARs"), and Iran Trade Regulations ("ITRs") simply by establishing front companies in foreign jurisdictions like Malaysia, Singapore or Dubai because those front companies could not have negotiated international payments without being able to provide U.S. and other suppliers with conventional letters of credit drawn on Western banks with established correspondent accounts with U.S. clearing banks.

2033.   Nor could the front companies that participated in Iran's clandestine supply chain have succeeded in their efforts had they been forced to rely solely on financing by Iranian banks because those banks could not have provided financing directly since they could not maintain correspondent accounts with U.S. clearing banks and most of them were blacklisted at one point in time or another and frozen out of the US dollar-clearing system.

2034.   For example, no legitimate U.S. manufacturer would have agreed to transport materials subject to the ITARs, EARs or ITRs to an unknown company in Singapore or Dubai based on a letter of credit issued by Bank Saderat or Bank Melli.

2035.   The linchpin of Iran's illegal and clandestine supply chain was the cooperation of Standard Chartered Bank and the other Western Bank Defendants who concealed both the role of Iranian banks in providing the credit necessary to finance the transactions and the identities of the Iranian military and IRGC sub-agencies that were actually purchasing the raw materials and manufacturing equipment (invariably being transported to Iran by IRISL, Mahan Air or Iran Air).

2036.   Defendant Standard Chartered Bank knew, or was deliberately indifferent to the fact, that Mahan Air, MODAFL and other entities identified *supra* were utilizing Letters of Credit facilitated by Standard Chartered Bank to evade U.S. sanctions and acquire materials used, inter

alia, to effectuate arms shipments, transport weapons, personnel and technology to the IRGC-QF and Hezbollah.

2037.  Mahan Air did, in fact, transport weapons, personnel and technology into Iraq on behalf of the IRGC-QF and Hezbollah and did, in fact, transport modules used to control and activate IEDs and EFPs deployed against Coalition Forces in Iraq.

2038.  With the necessary assistance of Standard Chartered Bank and the other Western Bank Defendants, MODAFL did in fact acquire spare parts for various military aircraft.

2039.  With the necessary assistance of Standard Chartered Bank and the other Western Bank Defendants, Iranian front companies did purchase hydraulic press components of the kind used to manufacture EFPs and did purchase steel and copper and other materials necessary for the manufacturing of EFPs and other weapons deployed against Coalition Forces in Iraq.

2040.  This substantial assistance to Iran's terror apparatus (including the IRGC and MODAFL), knowingly provided by Defendant Standard Chartered Bank, made it possible for Iran to procure the radio frequency modules, metals, and hydraulic presses used to manufacture the copper plates and steel cylinders necessary to manufacture the EFPs and other Iranian weapons used in the attacks on the Plaintiffs, as well Iran's transport of weapons, supplies, and IRGC and Hezbollah operatives (who conducted, supervised, and trained the perpetrators of those attacks). Defendant Standard Chartered Bank's conduct was a substantial cause in fact and a significant factor in the chain of events leading to the Plaintiffs' injuries, and substantially accelerated and multiplied the IRGC's ability to engage in terrorist activity (8 U.S.C § 1182(a)(3)(B)(iii)-(iv)), terrorism (22 U.S.C. § 2656f), and commit acts of international terrorism as that terms is defined in 18 U.S.C. § 2331.

2041.  The material support that Standard Chartered Bank knowingly and illegally

provided to Mahan Air, MODAFL and other entities identified *supra* provided foreseeable, substantial assistance to the IRGC, Hezbollah and the Special Groups, thereby preparing and facilitating acts of terrorism in violation of 18 U.S.C. §§ 1114, 1203, 1362, 2332(a), 2332(b), 2332(c), 2332a, and/or 2332f that caused Plaintiffs' injuries, and thus Standard Chartered Bank's conduct was also a substantial, foreseeable factor in bringing about the Plaintiffs' injuries.

2042. Standard Chartered Bank's illegal conduct transcended national boundaries in terms of the means by which it was accomplished.

2043. Standard Chartered Bank's knowing or deliberately indifferent provision of illegal financial services to the IRGC, Mahan Air, MODAFL and other entities identified *supra*, involved acts that were dangerous to human life, by their nature and as evidenced by their consequences.

2044. Standard Chartered Bank's conduct itself constitutes an act of international terrorism because it either was, or objectively appears to have been intended to: (a) intimidate or coerce the civilian population of the United States and other nations, (b) influence the policy of the governments of the United States and other nations by intimidation or coercion, and/or (c) affect the conduct of the governments of the United States and other nations by facilitating Iran's ability to prepare for and/or carry out mass destruction and murder.

2045. Furthermore, each Plaintiff's injuries constitute a harm falling within the risk contemplated by Standard Chartered Bank's material support to the IRGC, Mahan Air, MODAFL and other entities identified *supra*. Injuries resulting from terrorist attacks perpetrated, planned, supported by, funded, or assisted by Iran and Hezbollah are precisely the risks contemplated by statutes and regulations designed to ensure that Iran had restricted access to U.S. dollars and financial services, and that any funds they did receive that touched U.S. depository institutions were transparent and could be blocked if warranted, and did not benefit an SDN.

2046.   Through its conduct as described above, by knowingly or with deliberate indifference, providing material support to Iran, the IRGC, Mahan Air, MODAFL and other entities identified *supra*, and thereby violating 18 U.S.C. § 2339A in the manner and with the state of mind alleged above, Standard Chartered Bank is civilly liable for damages to each Plaintiff for their injuries pursuant to 18 U.S.C. § 2333(a).

**EIGHTH CLAIM FOR RELIEF**
**PRIMARY LIABILITY UNDER 18. U.S.C. §2333(a) AGAINST ALL DEFENDANTS**

2047.   Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

2048.   By knowingly providing material support and resources, to include financial services, currency, monetary instruments, or securities, to designated FTO Hezbollah, Defendants have violated 18 U.S.C. §2339B(a)(1).

2049.   During the Relevant Time Period, Defendants had absolute corporate knowledge that Hezbollah was designated by the United States Secretary of State as a designated Foreign Terrorist Organization ("FTO") on October 8, 1997.  By definition of such designation, the Bank Defendants had absolute corporate knowledge that Hezbollah was at all times relevant to this lawsuit an organization which engages in terrorist activities which threaten the security of the United States and its nationals.

2050.   During the Relevant Time Period, Defendants knew that Hezbollah was an FTO when they engaged in financial transactions with and for the benefit of Hezbollah and agents of Hezbollah, and that by engaging in such financial transactions with agents for Hezbollah those agents would provide material support and resources to Hezbollah, including the Special Groups.

2051.   The admitted criminal conduct of Defendants did not involve anything resembling "routine banking services", but rather a criminal enterprise, as exemplified by the allegations and

criminal admissions referred to above in this Complaint, both prior to and during the Relevant Time Period.  Put another way, criminally avoiding inputting the correct spelling of known Hezbollah agents in the Wire Filter System is anything but routine banking services.

2052.   The actions and omissions of Defendants as described in this Complaint constitute "acts of international terrorism" inasmuch as giving money to an FTO like Hezbollah is analogous to giving a loaded gun to a child.  Both are acts "dangerous to human life."

2053.   By augmenting Hezbollah's coffers, Defendants enabled Hezbollah to wreak more terrorist activity havoc on Americans, including the Plaintiffs herein.

2054.   Given that blowing up American Soldiers is exactly what Hezbollah does–that is why it has been designated as an FTO since 1997–engaging in financial transactions for its ultimate benefit would "appear to be intended to intimidate or coerce a civilian population or to influence the policy of a government by intimidation or coercion."

2055.   By knowingly providing material support and resources to Hezbollah, a designated FTO, and by virtue of the fact that all of the Plaintiffs herein have suffered severe personal injury and/or death by reason of these acts of international terrorism, Defendants are civilly liable to all of the Plaintiffs herein.

## NINTH CLAIM FOR RELIEF
## SECONDARY LIABILITY UNDER 18. U.S.C. §2333(d)(2) FOR AIDING AND ABETTING A FOREIGN TERRORIST ORGANIZATION

2056.   Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

2057.   Defendants violated 18 U.S.C. § 2333(d)(2) by aiding and abetting Hezbollah through Defendants' acts on behalf of various agents for Hezbollah, who were Defendants' customers.

2058.   Defendants knew, or were deliberately indifferent to the fact, that Hezbollah (including its agents) was transferring funds through them and that Hezbollah would use that support in preparation for, or in carrying out, acts of international terrorism.

2059.   Defendants conduct was a substantial cause in fact and a significant factor in the chain of events leading to the Plaintiffs' injuries, and substantially accelerated and multiplied Hezbollah's ability to engage in terrorist activity (8 U.S.C § 1182(a)(3)(B)(iii)-(iv)), terrorism (22 U.S.C. § 2656f), and acts of international terrorism as that terms is defined in 18 U.S.C. § 2331.

2060.   The amount of assistance Defendants provided—millions of dollars illegally transferred to Hezbollah and access to the U.S. financial system while blinding U.S. counter-terror finance authorities—was integral to the acts of terrorism at issue.

2061.   The substantial assistance that Defendants knowingly and illegally provided to Hezbollah and its agents provided foreseeable, material support to Hezbollah and the Special Groups, thereby preparing and facilitating acts of terrorism in violation of 18 U.S.C. §§ 1114, 1203, 1362, 2332(a), 2332(b), 2332(c), 2332a, and/or 2332f that caused Plaintiffs' injuries, and thus Defendants conduct was also a substantial, foreseeable factor in bringing about the Plaintiffs' injuries.

2062.   Defendants' illegal conduct transcended national boundaries in terms of the means by which it was accomplished.

2063.   Furthermore, each Plaintiff's injuries constitute a harm falling within the risk contemplated by Defendants' substantial assistance to Hezbollah.

2064.   Through its conduct as described above, by knowingly or with deliberate indifference, providing substantial assistance to Hezbollah, Defendants are civilly liable for damages to each Plaintiff for their injuries pursuant to 18 U.S.C. §§ 2333(a) and 2333(d)(2).

2065.   Hezbollah, a designated FTO since 1997, committed, planned and/or authorized the hideous EFP attacks that maimed or killed all of the Plaintiffs or their family members.

2066.   During the entire Relevant Time Period Defendants engaged in their financial transactions with and for the benefit of FTO Hezbollah (including its agents).  Defendants were generally aware that they were playing a role, and a significant financial one at that, in Hezbollah's criminal terrorist enterprise.

2067.   Defendants' material support was a substantial factor in the sequence of events causing Plaintiffs' injuries.

2068.   Plaintiffs' injuries were reasonably foreseeable as a natural consequence of Defendants' material support.

2069.   Defendants were found by the United States Government to have turned a blind eye to their brazen violations of federal banking, BSA and AML laws.  Defendants' explicit agreement to bypass these laws converted their actions from routine banking behavior to atypical, illicit and illegal conduct.  Defendants' facilitation of non-routine and illegal financial transactions for the benefit of Hezbollah (and its agents) constitutes material support, because Hezbollah depended on the illegal actions of banks in order to access the Eurodollar market and thereby fund Hezbollah's terrorist activities.  Defendants were generally aware that allowing and sponsoring the flow of hundreds of millions of USD to Hezbollah during the Relevant Time Period substantially assisted its terrorist activities, including the EFP attacks on Plaintiffs or their family members.

2070.  Given the Defendants' scienter, as demonstrated by the allegations in this Complaint prior to and during the entire Relevant Time Period, there is no question that Defendants knew they were playing a substantial role in Hezbollah's criminal terrorist enterprise.  As just one example, Defendants intentionally misspelled the names of Hezbollah's agents in order to avoid

detection by various law enforcement agencies and banking authorities.

2071.   When Congress enacted the subject amendments to JASTA in late 2016, it made very clear, lest there be no ambiguity or confusion in matters like this lawsuit, that the intention of JASTA is to hold those entities which provide substantial assistance to FTOs which commit acts of international terrorism civilly liable to those injured by the acts of international terrorism.

2072.   Defendants are civilly liable to Plaintiffs herein under both the ATA and JASTA.

### TENTH CLAIM FOR RELIEF
### CIVIL LIABILITY FOR CONSPIRACY IN VIOLATION OF 18 U.S.C. § 2333(d)(2) (JASTA)

2073.   Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

2074.   Plaintiffs allege that Defendants conspired with Hezbollah (including its agents), who committed the acts of international terrorism (set forth herein), within the meaning of 18 U.S.C. § 2333(d).

2075.   Each attack alleged herein was an act of international terrorism as defined by 18 U.S.C. § 2331(1).

2076.   The IRGC's and Hezbollah's provision of EFPs and other weapons, training, funding, and direction to the Special Groups to target Coalition Forces constitutes acts of international terrorism as defined by 18 U.S.C. § 2331(1).

2077.   The Plaintiffs' injuries were proximately caused by these acts of international terrorism, which included the provision of EFPs and other weapons, training, funding, and direction to the Special Groups to target Coalition Forces.

2078.   Each attack and act of international terrorism alleged herein was committed, planned or authorized by the designated Foreign Terrorist Organizations ("FTOs") Hezbollah, in concert with the IRGC.

2079.   Each attack and act of international terrorism alleged herein was committed by Hezbollah through its agents, the Special Groups, who perpetrated the attacks in Iraq.

2080.   The IRGC and Hezbollah provided the EFPs and other explosive devices used in the attacks by the Special Groups that injured or killed the Plaintiffs or their family members.

2081.   The IRGC and Hezbollah funded, trained, equipped, guided, directed and controlled the Special Groups who emplaced and activated the EFPs and other explosive devices and/or shot Plaintiffs or their family members, in concert with, and at the direction of, the IRGC and Hezbollah.

2082.   Each Defendant conspired with Hezbollah (including its agents), Iran, the IRGC, the "Iranian commercial co-conspirators" (constituting Bank Melli, Defendant Bank Saderat, the Central Bank of Iran, the National Iranian Oil Company, the Islamic Republic of Iran Shipping Lines, various entities owned by the Ministry of Defense Armed Forces Logistics ("MODAFL"), and their banking co-Defendants to provide material support, directly or indirectly, for terrorism and terrorist crimes. This material support was often channeled, inter alia, through the Iranian commercial co-conspirators, acting as funding conduits on behalf of, and as agents for, the IRGC and Hezbollah.   Defendants also provided material support directly to Hezbollah through its various financing agents.

2083.   Each Defendant joined this conspiracy and agreed and conspired with Hezbollah, Iran, the IRGC, the Iranian "commercial" co-conspirators, and their banking co-Defendants to conceal and disguise the nature, location, source, or ownership of that material support, which

constituted illegal services that Hezbollah and its agents needed in order to perform acts of international terrorism without interference by U.S. authorities.

2084.   Each Defendant agreed and conspired with Hezbollah, Iran, the IRGC, the Iranian "commercial" co-conspirators, and their banking co-Defendants, to deceive U.S. counter-terror finance authorities and evade legal controls, and to illegally perform transactions outside of Iran's regulatory safe harbor for performing legitimate transactions, to give Hezbollah, Iran, the IRGC, and their agents and proxies concealed access to the U.S. financial system for illegitimate activities, enabling them to commit acts of terrorism and to facilitate their support for terrorism.

2085.   Each Defendant agreed and conspired to provide, and conceal and disguise the source of, material support for agents, affiliates, and alter egos of the IRGC and Hezbollah.

2086.   At least some of the Defendants also knowingly facilitated Iran's and the IRGC's illegal acquisition of materials specifically prohibited from export to Iran because of their military or terrorism applications, including items used in the manufacture of EFPs.

2087.   Each Defendant knew that, or exhibited deliberate indifference to whether, Iran's and Hezbollah's terrorism campaigns required vast sums of money.

2088.   Each Defendant knew that most of Iran's financial resources were held in Eurodollars.

2089.   Each Defendant knew that the U.S. sanctions and authorities it circumvented on behalf of its Iranian co-conspirators were designed to prevent Iran from financing terrorism and, in some cases, weapons of mass destruction proliferation.

2090.   Each Defendant knew, from its interactions with co-conspirators, the counter-terror financing and counter-WMD proliferation sanctions laws they were violating, and publicly available information, that providing and concealing and disguising the source of material support

and controlled materials for the foregoing purposes and entities was Iran's core purpose for the conspiracy.

2091.   Each Defendant also knew that, or exhibited deliberate indifference as to whether, its acts in furtherance of the conspiracy raised a substantial probability that some of the funds it concealed and provided would be used by Hezbollah and its agents for terrorist activities and acts of international terrorism.

2092.   Each Defendant understood that the lucrative fees it collected from its co-conspirators and the large pools of Eurodollars it was allowed to invest on behalf its co-conspirators were dependent on each Defendant's ongoing willingness to commit multiple crimes on behalf of its co-conspirators.

2093.   As set forth above, Iran, the IRGC, Hezbollah and their terror agents and proxies depended on this illegal assistance of major banks with the financial and legal capacity to clear billions of dollars through the United States and their willingness to circumvent U.S. counter-terror financing controls.

2094.   Despite this knowledge, each Defendant continued to participate in the conspiracy for several years during the relevant period.

2095.   The Defendants' unlawful acts for the benefit of Hezbollah and the IRGC, in stripping financial transactions, disguising payment sources, directly or indirectly transferring funds to sanctioned entities, manually altering payment information, and related activities intended to evade U.S. sanctions, were pursuant to, and in furtherance of, the conspiracy.

2096.   The use of the funds that the Iranian commercial co-conspirators channeled to coconspirators Hezbollah and IRGC and their agents, proxies and affiliates were within the scope of the Conspiracy.

2097.   The acts of international terrorism at issue were overt acts foreseeably committed as a consequence of, in furtherance of, and pursuant to the conspiracy.

## ELEVENTH CLAIM FOR RELIEF
## COLLECTING AND PROVIDING FUNDS FOR THE FINANCING OF TERRORISM
## IN VIOLATION OF 18 U.S.C. §2339C AND 18 U.S.C. §2333(a)

2098.   Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

2099.   The Banking Defendants have all unlawfully and willfully provided and/or collected funds for the benefit of FTO Hezbollah and/or Agents for Hezbollah with full knowledge that such funds were to be used and were used, in full or part, in order to carry out acts of international terrorism.

2100.   Given that blowing up American Soldiers is exactly what Hezbollah does–that is why it has been designated as an FTO since 1997–providing and collecting funds for its ultimate benefit would have to be done with knowledge that such funds were going to be used to intimidate or coerce a civilian population or to influence the policy of a government by intimidation or coercion", or in acts of international terrorism, the Banking Defendants' actions themselves were acts of international terrorism.

2101.   By unlawfully and willfully providing and collecting funds for or on behalf of Hezbollah, a designated FTO, for acts of international terrorism, and by virtue of the fact that all of the Plaintiffs herein have suffered severe personal injury and/or death by reason of these acts of international terrorism, the Defendants are civilly liable to all of the Plaintiffs herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, and each of them, pray that this Court:

(a)  Enter Judgment in their favor and against each Banking Defendant for compensatory damages in amounts to be determined at trial;

(b)   Enter Judgment in their favor and against each Banking Defendant for treble damages pursuant to 18 U.S.C. §2333(a);

(c)  Enter Judgment in their favor and against each Banking Defendant for any and all litigation-related costs incurred in connection with the pursuit of this lawsuit, including any and all attorneys' fees; and

(d)  Grant such other and further relief as justice requires

**<u>PLAINTIFFS DEMAND A JURY TRIAL ON ALL ISSUES</u>**

Dated: <u>December 28, 2018</u>        By: _____

                          Laura J. Baughman, EDNY SBN 4173399
Thomas Sims (*Pro Hac Vice* to be filed)
Russell Budd (*Pro Hac Vice* to be filed)
**BARON & BUDD, P.C.**
3102 Oak Lawn Avenue, Suite 1100
Dallas, Texas 75219
Tel: (214) 521-3605
Fax: (214) 520-1181
Email: lbaughman@baronbudd.com
Email: tsims@baronbudd.com
Email: rbudd@baronbudd.com

**THE DRISCOLL FIRM, P.C.**
John J. Driscoll (*Pro Hac Vice* to be filed)
Christopher Quinn (*Pro Hac Vice* to be filed)
Paul Johnson (*Pro Hac Vice* to be filed)
One Metropolitan Square
211 N. Broadway, 40th Floor
St. Louis, Mo.  63102
314-932-3232
314-932-3233 facsimile

*Attorneys for Plaintiffs*